UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION


IN RE: PROFESSIONAL FEE MATTERS.
  CONCERNING JACKSON WALKER LAW.   MCALLEN, TEXAS
  FIRM                  .   WEDNESDAY, AUGUST 7, 2024
                       .   08:30 A.M. TO 03:03 P.M.
                       .

. . . . . . . . . . . . . . .


SEALED PORTION ONLY

STATUS CONFERENCE/MOTION HEARING

(SOME PARTIES APPEARING VIA ZOOM)

BEFORE THE HONORABLE EDUARDO V. RODRIGUEZ
UNITED STATES CHIEF BANKRUPTCY JUDGE


APPEARANCES:               SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER: AARON JACKSON

OFFICIAL INTERPRETER:      NONE PRESENT

CASE MANAGER:           NOT IDENTIFIED


TRANSCRIPTION SERVICE BY:

**Trinity Transcription Services**
1081 Main Street
Surgoinsville, TN 37873
281-782-0802
battshott@aol.com


**Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

IN RE: PROFESSIONAL FEE MATTERS.
  CONCERNING JACKSON WALKER LAW.  MCALLEN, TEXAS
  FIRM                  .  WEDNESDAY, AUGUST 7, 2024
                      .  08:30 A.M. TO 03:03 P.M.
                      .

. . . . . . . . . . . . . .

SEALED PORTION ONLY

STATUS CONFERENCE/MOTION HEARING

(SOME PARTIES APPEARING VIA ZOOM)

BEFORE THE HONORABLE EDUARDO V. RODRIGUEZ
UNITED STATES CHIEF BANKRUPTCY JUDGE

Appearances:

For JACKSON WALKER:          JAYSON L. BOLAND, ESQ.
                            WILLIAM R. GREENDYKE, ESQ.
                            PAUL TRAHAN, ESQ.
                            Norton Rose Fulbright US LLP
                            1550 Lamar, Suite 2000
                            Houston, TX 77010

For JACKSON WALKER:          RUSSELL HARDIN, JR., ESQ.
                            EMILY M. SMITH, ESQ.
                            LEAH M. GRAHAM, ESQ.
                            Russell Hardin & Associates LLP
                            1401 Louisiana, Suite 2250
                            Houston, TX 77002

For DAVID JONES:             JOANNA D. CAYTOS, ESQ.
                            BENJAMIN I. FINESTONE, ESQ.
                            Quinn Emanuel Urquhart & Sullivan
                              LLP
                            700 Louisiana Street, Suite 3900
                            Houston, TX 77002

For RANDY W. WILLIAMS,     CRAIG A. HIGGINBOTHAM, ESQ.
  CHAPTER 7 TRUSTEE:        Byman & Associates, PLLC
                            7924 Broadway, Suite 104
                            Pearland, TX 77581

Appearances (cont.)

**For J.C. PENNEY PLAN**
  **ADMINISTRATORS:**

STEPHEN W. LEMMON, ESQ.
Streusand Landon Ozburn
  Lemmon LLP
1801 S. Mopac Expressway
Suite 320
Austin, TX 78746


**For UNITED STATES TRUSTEE:**
**UNITED STATES TRUSTEE:**

LAURA STEEL, ESQ.
VIANEY GARZA, ESQ.
ALICIA L. BARCOMB, ESQ.
MILLIE A. SALL, ESQ.
Office of the United States
  Trustee
515 Rusk Street, Suite 3516
Houston, TX 77002


**For VARIOUS PLAINTIFFS:**

SHELBY A. JORDAN, ESQ.
Jordan & Ortiz PC
500 N. Shoreline Boulevard
Suite 804
Corpus Christi, TX 78401


**For PLAN ADMINISTRATOR:**

DANIEL GEOGHAN, ESQ.
Cole Schotz P.C.
1325 Avenue of the Americas
19th Floor
New York, NY 10019


(Please see electronic appearances.)


Transcriber:

Cheryl Battaglia
Trinity Transcription Services
1081 Main Street
Surgoinsville, TN 37873
281-782-0802

1

1    Houston, Texas; Wednesday, August 7, 2024; 08:30 a.m.

2    (Some parties appearing via Zoom)

3                    (SEALED PORTION ONLY)

4    (Begin sealed portion 08:38:43 a.m.)

5    (Pause in the proceeding.)

6    (Voices whispering.)

7         THE COURT:  All right.  Mr. Finestone, I just want to

8    conduct an audio check.  Can you please state your appearance

9    again for the record.

10   (No audio response.)

11        THE COURT:  Okay.  Mr. Finestone, you need to connect

12   on Zoom audio, not the phone.

13   (Pause in the proceeding.)

14   (No audio response.)

15        THE COURT:  I cannot hear you, sir.  You need to

16   unmute your line over there on that side by Zoom.

17   (Pause in the proceeding.)

18        THE COURT:  Let's try that again.

19        MR. FINESTONE:  Mic check.  One, two.

20        THE COURT:  There we go.  Very well.

21        MR. FINESTONE:  Okay.

22        THE COURT:  Can you all hear him okay?

23   (No response.)

24        THE COURT:  All right.  Everybody can hear him okay?

25        UNKNOWN MALE:  Yes, your Honor.

2

1        **THE COURT:**  All right.  Let's get started.

2        Go ahead, Mr. Finestone.

3        **MR. FINESTONE:**  Okay.  Thank you, your Honor.

4        So on July 18th, your Honor, it is true that former

5   Judge Jones and I met with lawyers from the Rusty Hardin Law

6   Firm, from the Nordstrom Rose Law Firm, and Jackson Walker Law

7   Firm at Rusty Hardin's offices for approximately 2½ hours, your

8   Honor.

9        Let me first just start by representing to the Court

10  that of the seven plus lawyers that attended that meeting

11  across four other law firms.  None of those lawyers, nor did

12  former Judge Jones, believe, your Honor, for one moment that

13  the individuals at that meeting were violating the Judiciary

14  Policy.  And more importantly, your Honor, in the hierarchy of

15  the law in this country, none of those individuals thought for

16  a second that they were acting in contravention or in violation

17  of your Honor's orders.

18       It would not have been something that any of

19  those -- any of those lawyers would have, for a moment, wanted

20  to do.  And it just wasn't the -- it wasn't what the meeting

21  was designed for.

22       Your Honor, since the first week --

23       **THE COURT:**  Let me --

24       **MR. FINESTONE:**  -- of June --

25       **THE COURT:**  Let me just -- let me just --

1          **MR. FINESTONE:**  Yes.

2          **THE COURT:**  -- stop you right there, Mr. Finestone.

3          I -- how can you make that argument in good faith,

4   knowing that Mr. Jones requested guidance from this Court as a

5   determining officer, the kinds and types of questions that can

6   be asked, held -- I set a hearing, we held a hearing.  And

7   despite that hearing, knowing that I still had not made a

8   determination, this entire group here at this hearing went

9   ahead and proceeded with this interview.

10          **MR. FINESTONE:**  Your -- your Honor, I think your

11   Honor would agree that the efforts that I exerted at both of

12   the hearings, because you -- the Court allowed me to

13   participate remotely for Mr. Alonzo's hearing as well.

14          But I think the Court would agree that the effort

15   that I exerted at both of those hearings was in furtherance of

16   limiting and, indeed, potentially eliminating any testimony

17   from former Judge Jones in these proceedings.

18          I argued as best as I could, your Honor, in

19   furtherance of that being the deliberate process, the mediation

20   privilege.  And I went further, when your Honor allowed me to

21   go further, I argued relevance, your Honor.

22          And I argued relevance based on what my view was

23   needed for the contested matter.  And also because I wanted to

24   protect what I viewed as testimony, if it were allowed, that

25   could be embarrassing for my client, former Judge Jones.

4

1          I did all of that, your Honor, of course.

2    Our -- from -- from the beginning when I got on the phone at

3    the first meeting to confer with the Jackson Walker lawyers,

4    because it was their subpoena that came in first, I had been

5    basically arguing the same exact thing that I argued in Court,

6    your Honor, to the Jackson Law Firm lawyers.

7          I -- it's basically the same thing.  I didn't -- I

8    didn't refine that argument in any respect.  I told them

9    there's no relevance.  I told them this would be embarrassing.

10         I told them where -- there's no way you're going to

11   get into deliberative processes or mediation privileges.  We

12   sent them R's and O's.  And, your Honor, so far maybe my

13   argument hasn't come together.

14         But from the beginning when we proposed to sit down

15   with them a talk, from our perspective, at least, your Honor,

16   it was to -- it was to obtain that outcome.  It was to

17   eliminate the need for testimony and to show them why we were

18   right.

19         Now, your Honor, one of the -- I -- I reviewed the

20   Jackson Walker pleading that they filed yesterday.  And what I

21   think we agreed with all of it.  But one element -- one piece

22   of fact that I don't think made it to the -- made it in

23   that -- in that pleading, your Honor, was that -- but it made

24   it in the U.S. Trustee's notice to your Honor that kicked this

25   whole thing off, is that one of the terms that Judge Jones and

1  I imposed on the meeting was that whatever we discussed today,

2  it is not usable in any respect, your Honor.

3          Not just that it can't be used at trial

4  as -- as -- as testimony, as affirmative testimony.  It can't

5  be used to impeach.  It can't be used for any -- any use

6  whatsoever.  And that's -- that was the U.S. Trustee's

7  reference, your Honor, to off the record.  And when they put it

8  in quotes like that, I think it carried with it some negative

9  implication.

10          But from our perspective, it was a element of the

11  agreement that insured that whatever the definition of

12  testimony may be in the Judiciary Policy, that this was a

13  discussion.  This was a -- a -- a discussion for us to show you

14  that we don't have anything that can help the -- the matters

15  and that was designed in furtherance of the policies of the

16  Judiciary Policy, complete with potential testimony of a former

17  U.S. Judge.

18          And also, your Honor, my role at the meeting, because

19  I'm a mere lawyer, and I didn't have much to add to the

20  discussion.  But my role at the meeting was to monitor the, at

21  least as I viewed it, your Honor, was to monitor and protect,

22  and to -- and to insure that the discussion did not go into

23  deliberate processes or mediation privilege.

24          **THE COURT:**  Well that's -- that's your --

25          **MR. FINESTONE:**  And again --

6

1          **THE COURT:**  That's your first mistake.  That's my

2   job, not yours.

3          How is that your job, Mr. Finestone?

4          **MR. FINESTONE:**  It -- it -- I am not the determining

5   officer --

6          **THE COURT:**  And how do I know --

7          **MR. FINESTONE:**  --

8      **(Parties speaking concurrently - indiscernible)**

9          **THE COURT:**  How do I know you did that?  I mean,

10  you're not wearing the black robe here.  Nobody in this

11  courtroom wearing the black robe other than me, right?

12         **MR. FINESTONE:**  I agree with you.

13         **THE COURT:**  And nobody else in this courtroom is a

14  determining officer but me.  You have no authority, absolutely

15  zero authority to make that call.

16         **MR. FINESTONE:**  I have no authority.  But I think

17  your Honor would agree I have a responsibility to --

18         **THE COURT:**  You have a responsibility to follow my

19  orders, right?

20         **MR. FINESTONE:**  I -- if I can (indiscernible).  Your

21  Honor, I (indiscernible).

22         **THE COURT:**  And so how can you sit here and tell me

23  you followed my orders?

24         I took this matter under advisement.  Your client

25  asked me for direction under this policy.  How have you not

7

1    violated my order?

2         **MR. FINESTONE:**  Well your Honor's orders were no

3    deposition should occur.  And I think that --

4         **THE COURT:**  Deposition includes testimony.  Testimony

5    includes an interview under the Guidance Policy; does it not?

6         **MR. FINESTONE:**  Your Honor --

7         **THE COURT:**  Does it not, Mr. Finestone?

8         **MR. FINESTONE:**  The definition of testimony includes

9    interview.  But it's a long -- it's a long --

10        **THE COURT:**  Well, interview is what can -- what

11   happened; wasn't it?

12        **MR. FINESTONE:**  From -- from Judge Jones and my

13   perspective this was a discussion.  Your Honor, (indiscernible)

14        **THE COURT:**  The difference -- what's the difference

15   between a discussion and an interview?

16        **MR. FINESTONE:**  Well, from --

17        **THE COURT:**  We are in the middle of a legal

18   proceeding here, Mr. Finestone.  This is not a discussion over

19   a cup of coffee, right?  These are directly related to what I

20   was going to determine under the Guidance.

21        **MR. FINESTONE:**  Yes.

22        **THE COURT:**  Questions asked at this interview

23   directly connected to the noticed deposition Jackson -- Jackson

24   Walker has in this case.

25        **MR. FINESTONE:**  We -- we thought this -- this

8

1    discussion, your Honor, was -- was a -- and -- and I

2    believe -- we didn't take any notes.  But based on our memory,

3    my client and the lawyers and my memory, this was about the

4    relationship, your Honor.  And this was for us to show them

5    there was no need for testimony in this case.

6            And whatever was said at that meeting, was -- was

7    under no compulsion.  And was never going to be used in any

8    legal proceeding, whatsoever, which I think, your Honor, at

9    least was my understanding of the function of testimony.

10           And so for us to -- to -- and -- and -- and look now

11   understand your Honor's view of it, your Honor.  If I had

12   that -- if had to -- if I understood your Honor's view, we

13   would have proposed the same thing to the United States

14   Trustee.

15           Well my job here from the beginning was

16   (indiscernible).

17           **THE COURT:**  How could you not understand my view,

18   four and a half hour hearing on this matter.  And I took it

19   under advisement.

20           I had not issued a ruling yet.  What authority --

21           **MR. FINESTONE:**  (indiscernible).

22           **THE COURT:**  -- did you have my order, my ruling, and

23   this Guidance to conduct this interview?

24           **MR. FINESTONE:**  We -- if we had sat down for a

25   deposition, your Honor, that would be in contravention of your

1   Honor's order.

2          **THE COURT:**   I've already said that this was an

3   interview under the Guidance Policy.   It falls directly under

4   the policy.   It implicates questions under the policy.

5          A lot of these topics that were discussed were

6   directly related to the notice questions in the Jackson Walker

7   and the United States Trustee's notice depositions.

8          **MR. FINESTONE:**   Your Honor --

9          **THE COURT:**   Those were under advisement,

10  Mr. Finestone.

11      **(Pause in the proceeding.)**

12          **MR. FINESTONE:**   They -- they -- of course they were

13  under advisement.   We never would have sat for a deposition.

14  And (indiscernible).

15          **THE COURT:**   It wasn't a deposition.   It was an

16  interview under the Guidance Policy.   Let's not -- let's not

17  mince words here, Mr. Finestone.

18          **MR. FINESTONE:**   Your -- your Honor, you remember,

19  your Honor, at the last hearing, I think it was Mr. Alonzo's

20  hearing and not the -- Mr. Jones's hearing.   I had been

21  discussing some of the case law on the deliberate process

22  privilege.   And I had -- and my words probably didn't come out

23  correctly.

24          And you said, Mr. Finestone, I disagree with you.

25  There's on case law interpreting this policy.

1          **THE COURT:**  Uh-huh.

2          **MR. FINESTONE:**  And I said, your Honor, I agree with

3     that.  I was only -- I -- I meant to refer to the case law that

4     inspired pieces and elements of the policy.

5          Um, your Honor -- your Honor was right.  There is no

6     case law interpreting this policy.  We looked at the definition

7     of testimony, your Honor.  It's -- it's broad.  I'm not going

8     to argue it's not broad.

9          But it's wide-ranging -- my view of it was it's for

10    discovery.  It is -- it is -- it is for use in a legal

11    proceeding.  And is -- what we did at this meeting in an

12    attempt to make these proceedings more efficient in the hope

13    testimony go away, was we got the agreement of Jackson Walker

14    that whatever the parties talk about is not going to be

15    testimony.  It's not going to be used, even if -- even in a

16    subsequent deposition it's not going to be used.

17         **THE COURT:**  All right.  So here -- here's what -- I'm

18    going to read you the definition.  Testimony on the statute,

19    810.30.

20              "Any written or oral statement in any for

21              by a witness arising out the performance of

22              the witness' official duties, including

23              personal appearance, and statements in

24              court, or at a hearing or trial,

25              depositions, answer to interrogatories,

1         affidavits, declarations, interviews,

2         telephonic, televised, or video tape, et

3         cetera, et cetera."

4         That falls right under the Guidance Policy,

5 implicates the Guidance Policy.  These matters and these

6 topics, whether you thought they were not falling under the

7 policy is not your call.  Until I issued a ruling and I said

8 okay, these topics are okay.  They don't implicate the policy.

9 These topics are not okay.  You cannot discuss these topics.

10         But yet, you went ahead and made that call yourself

11 and decided this was okay.

12         **MR. FINESTONE:**  Well, your -- your Honor, I -- I

13 certainly did not purport to whether a legal conclusion

14 interpreting the Policy.  But as a lawyer, all I can do to

15 guide --

16         **THE COURT:**  Well what -- what else would you call it,

17 Mr. Finestone?

18         **MR. FINESTONE:**  Well, it's -- I don't have -- I don't

19 have any standing to, you know, purport to give a legal

20 conclusion to impose on others.  That's your Honor's province,

21 of course.

22         But we need to read the Policy as best we can and

23 guide our actions by it.  And we did do that.  We affirm with,

24 your Honor, affirmatively in two respects.  One, the agreement

25 that this never is discussed, whatever answer they gave us,

12

1  whatever answers we gave them cannot be used.  And two, your

2  Honor, I objected and made sure that the -- the mental

3  process -- the deliberative processes things was not intruded

4  upon.

5         And so, your Honor, discussions about his

6  relationship was revealed to be irrelevant, it's -- it -- it

7  is -- it's -- your -- your Honor is right that the hearings

8  went further than what went into that stuff.  And, your Honor,

9  entertained relevance objections from me.

10        Which I think your Honor was doing for efficiency

11  purposes in these contested matters.  But even the United

12  States Trustee, your Honor, argued to you repeatedly, every

13  time, counsel stood up, that all the personal issues that the

14  Judiciary Policy did not extend to that.

15        And, your Honor, just in terms of defending their

16  lawyers that were at this meeting, in terms of their ability to

17  read the Judiciary Policy as clearly as your Honor has.  The

18  United States Trustee itself interviewed Miss Freeman for six

19  hours, recorded the conversation, your Honor, well authority to

20  (indiscernible) about this at all.

21        And the questions went into the deliberative process,

22  specifically when Miss Freeman was a Clerk with Judge Jones

23  about their discussions and determinations under 28 U.S.C. 455.

24        Had I been -- had I been at that interview, I would

25  have guided that away.  I wasn't.  But this is the United

1    States Trustee who kicked this whole thing off.

2          I say all that, your Honor, not to drag down a

3    quasi -- an office of our Government.  But I say it all for

4    purpose of defense, your Honor, that this policy, and it is

5    mere policy, you know --

6          **THE COURT:**  Well as the saying goes, two wrongs do

7    not make a right, Mr. Finestone.  And I'm going to get to the

8    U.S. Trustee when I get to it.

9          **MR. FINESTONE:**  Okay.  Your -- your -- I only say it

10   for the point of, it's -- it's not a beacon of clarity, your

11   Honor.

12         And it's -- it's not.  I'm not asking -- I'm not

13   asking your Honor to reach a contrary ruling.  I'm not asking

14   for your Honor to reconsider interpretation of testimony.  But

15   I am saying that for the seven lawyers that were at the meeting

16   for Judge Jones, this Judiciary Policy and its purposes are not

17   crystal clear.

18         There's certainly -- I believe, there's certainly

19   reasonable grounds to interpret differently.  And, especially

20   given the -- the practical use and definition of the word

21   testimony, which is to be used in some legal proceeding which

22   we (indiscernible).

23         **THE COURT:**  How can you misinterpret interview as not

24   providing testimony?  It's right in the -- in the Guidance.

25         **MR. FINESTONE:**  Sure, your Honor.  But an interview,

1  as I know it, and as the Supreme Court has interpreted it, is

2  questions and answers given to questions for use in a legal

3  proceeding.  And we -- we blew that up.

4        We -- we assured that that wouldn't take place.

5        **THE COURT:**  Well, what do you think this is?  This is

6  not a legal proceeding?

7        **MR. FINESTONE:**  Well, here today before your Honor

8  (indiscernible).

9        **THE COURT:**  That Jackson Walker has gained knowledge

10 of some of the internal workings of this Court by this

11 interview.

12       **MR. FINESTONE:**  Well, (indiscernible), your Honor,

13 that was my error in execution.  But I know you're --

14       **THE COURT:**  That's exactly why this should not have

15 happened, Mr. Finestone.

16       You're not the determining officer.  You cannot make

17 a judgment call on which questions fall under this policy or

18 not.  Right?

19       **MR. FINESTONE:**  Certainly not with the force of law.

20 Certainly not with the force of law.

21       But I -- I don't think private parties consult with

22 their lawyers in the absence of a judicial determination to

23 guide their behavior.  And the important point that I want to

24 convey was that Judge Jones and I, most importantly, never

25 sought to contravene your order of no deposition.  Everything

1    we did was in an attempt to kill a deposition.

2           And -- and in Judiciary Policy interpretation,

3    it -- we -- we're read it differently than your Honor.  It's

4    clear to me today.  But we read it in good faith, your Honor.

5    And we attempted to protect the Judiciary Policy.

6           **THE COURT:**  So why didn't you tell me this was going

7    to happen at the July 16th hearing or 15th, whenever we had that

8    hearing.

9           **MR. FINESTONE:**  I didn't --

10          **THE COURT:**  Why didn't you tell me about it?

11          **MR. FINESTONE:**  I -- I always viewed it, your Honor,

12   as two different tracks.

13

14

15

16

17

18

19

20          It is irrelevant to this matter.  And there's -- and

21   I'm not comfortable talking about it today.

22          **THE COURT:**  All right.  And so instead of proceeding

23   to an interview, why didn't you just file a motion to quash?

24          **MR. FINESTONE:**  I think -- I think that's -- I

25   was -- your Honor accepting my objections at those two

16

1    hearings.  (indiscernible).

2            **THE COURT:**  That's -- that's not my question.  That's

3    not my question, Mr. Finestone.

4        **(Pause in the proceeding.)**

5            **MR. FINESTONE:**  I think the issue was before your

6    Honor was (indiscernible).

7            **THE COURT:**  But you wanted to -- you wanted to have a

8    five-hour hearing listening to your objections and your

9    client's complaints about not having to sit for this

10   deposition, when your originally agreed to sit for it.

11           And then you decided this is not a good idea.  You

12   objected virtually to everything.  And then you, yet, went

13   ahead after the hearing, sat down for an interview anyway.

14   That --

15           **MR. FINESTONE:**  To -- to --

16           **THE COURT:**  That does not make any sense to me.

17       **(Pause in the proceeding.)**

18           **MR. FINESTONE:**  Well, it -- it -- if, your Honor, if

19   it doesn't make sense, I can't defend that.  I can only tell

20   you that it was with the same end goal in mind, which was that

21   no testimony.  And (indiscernible).

22           **THE COURT:**  Testimony, we've already established

23   that, Mr. Finestone.  It falls under the Guidance.

24           **MR. FINESTONE:**  If it can't be used in any legal

25   proceeding, your Honor, I don't think Jackson Walker can use

1   it.

2   **THE COURT:**  How can -- how can Jackson Walker unlearn

3   that they have learned at this interview?  And why was the U.S.

4   Trustee excluded and all the other parties that are entitled to

5   be there if this is going to be an interview?

6   **MR. FINESTONE:**  Your -- your -- your Honor is now

7   touching upon something else, valid concern, which is fairness

8   of adversarial process before your Honor.  And -- for which we

9   are viewed as a third-party witness.

10   We have no -- we have no desire, your Honor, to -- to

11   tip those scales in any respect.  We don't care if Jackson

12   Walker has to disgorge all of these fees.  I can represent that

13   to you.

14   We offer to sit down with the United States Trustee.

15   We would love to convince them as well, your Honor, that no

16   deposition and no testimony is necessary.  And, your Honor,

17   maybe this is -- the great irony of all of this.  But I think

18   at least in terms of how your Honor is approaching this.

19   But when I looked at the purposes of the Judiciary

20   Policy, your Honor, two and five are what we were rowing

21   toward.  Minimize the participation of the federal judiciary in

22   proceedings that the whole picture is general initiative, its

23   general cause.  And try to protect the deliberative of

24   processes.

25   I've been a broken record on that.  And this meeting

1   was designed to have -- cause Jackson Walker to agree to pull

2   the deposition notice altogether so that there would be no

3   testimony in this case, your Honor.

4           And it's the same -- I would love, your Honor, I'm

5   obviously, not going to do it in view of your Honor's comments

6   today, and the determination today.  But we offered, and we

7   would like to make the same calls to the United States Trustee

8   that was made to your Honor at these two hearings.

9           Which is, Judge Jones does not need to be a part of

10   this proceeding in any -- in any respect, testimony -- well,

11   I'll leave it at testimony, cause that's the role of a third-

12   party witness, your Honor.

13           But I -- I -- I guess the last thing, I just want to

14   highlight it.  And then we can continue to answer any

15   questions.

16           For both -- for us, your Honor's order's sacrosanct.

17   We (indiscernible).

18           **THE COURT:**  Apparently not, Mr. Finestone.

19           **MR. FINESTONE:**  But, your Honor, it would --

20           **THE COURT:**  Apparently not.

21           **MR. FINESTONE:**  Your Honor --

22           **THE COURT:**  Apparently not from what I'm seeing here

23   today.

24           **MR. FINESTONE:**  Well, and I -- I'm -- I'm

25   disappointed that your Honor feels that way.  Your Honor said

1  no deposition.  I don't think that the U.S. Trustee or anybody

2  can argue this was a deposition.

3       Your Honor, we took the Judiciary Policy just as

4  seriously.  And we have a different -- we have a disagreements

5  in terms of how to interpret the Judiciary Policy, given your

6  Honor's determination our interpretation was wrong.

7       But it's what guided our actions.  And we did protect

8  deliberative processes and mediation privilege.  I don't know

9  that I needed to be there to protect it.  But I remember at

10 least one time saying stop.

11      And, your Honor, we also insured that this wasn't

12 going to lead to testimony.  For you -- it wasn't discovery,

13 not controlled by a Rule 26 in any of your Honor's proceedings.

14      And in terms of us just being good practitioners of

15 law, the balance of the adversarial process, we made the same

16 offer to the United States Trustee.

17      And that's -- that's when this quote "off the record"

18 was delivered to them.  And they interpreted it as, I think

19 something clandestine, if I'm saying that word correctly.

20      And really what I meant off the records was, this is

21 not testimony.  This is designed to eliminate testimony.

22      THE COURT:  Well wasn't -- isn't that exactly why

23 we're here?  Because of what has happened.

24      MR. FINESTONE:  Yes.

25      THE COURT:  All these clandestine meetings that have

1  been alleged, right?  Isn't that what got us here in the first

2  place?  And yet you proceed anyway?

3         MR. FINESTONE:  I -- I -- I don't -- factually I'm

4  not sure.  I -- I -- this was not as -- Judge Jones and I, in

5  fact, how did the U.S. Trustee find out?  Judge Jones walked

6  out of that meeting not with -- without any belief that what we

7  did was secret, your Honor.

8         The -- the discussion was off the record, but we were

9  not -- the fact, for example, your Honor, one thing that came

10  up at that meeting was --

11         THE COURT:  If it wasn't secret, why weren't other

12  parties invited to this little get together?

13         MR. FINESTONE:  It was --

14         THE COURT:  Why was -- why wasn't I on notice that

15  this was going to happen when I had this matter under

16  advisement?

17         MR. FINESTONE:  I -- I -- I didn't -- I did not

18  think, your Honor, that this was impinging on the your --

19         THE COURT:  Again -- again, you're putting on a black

20  robe, which you do not have and making that call,

21  Mr. Finestone.

22         I am so disappointed that I've had to hit -- set this

23  show cause hearing and bring in a former sitting judge, federal

24  judge into a show cause hearing to deal with this particular

25  issue that could have been avoided had you all waited for my

21

1   ruling.

2       **(Pause in the proceeding.)**

3       **MR. FINESTONE:**  As a -- as a -- as a strategic or

4   practical matter, your Honor, we -- we -- we

5   issued -- when -- when we got the -- when we got the request

6   from Jackson Walker, we complied the next day with the

7   Judiciary Policy sending the email to your Honor.

8       That had to be done.  Your Honor's going to make a

9   determination whether they'll be any testimony in this -- in

10  this case.

11      If Jackson Walker withdraws their subpoena, your

12  Honor's legal determination becomes practically --

13      **THE COURT:**  They're not going to withdraw it.  I'm

14  not going to allow them to withdraw it at this point.  That's

15  not going to happen.

16      **MR. FINESTONE:**  Okay.

17      **THE COURT:**  No.  That is not going to happen.  No,

18  sir.  Not at all.

19      **MR. FINESTONE:**  Obviously, with -- I had -- I had

20  no -- this is really in our contest to that, your Honor.

21      But the point of my comments today are why we -- why

22  we were doing what we were doing.  And, your Honor, in terms of

23  good faith, there wasn't and I wanted to tell you.

24      At the meeting, Jackson Walker showed us an email in

25  which -- that the United States Trustee had produced in

1   discovery.  And this email was copies of a picture of someone

2   water skiing.  It was Miss Freeman waterskiing with somebody

3   else.

4           And the United States Trustee believed that that was

5   Mr. Jones.  An email was sent to other Jackson Walker lawyers.

6   And so we can understand why the United States Trustee believed

7   that to be relevant, because it would put other Jackson Walker

8   lawyers on notice.  I think that is very relevant to the

9   dispute -- to the dispute before your Honor.

10          It was shown -- I'll get to the point, your Honor.

11  It was shown to us.  The first thing former Judge Jones says

12  is, I don't even know how to water ski.  And -- and yet in good

13  faith, he continued to stare at the picture to -- because the

14  individual strangely looked a little bit like former Judge

15  Jones in blurred fashion.

16          But he doesn't know how to water ski, never -- it

17  doesn't ring any bell.  So he said, this is not me.

18          But after the meeting, we call Miss Freeman, your

19  Honor.  And we said, there's this picture of someone water

20  skiing who -- who -- who is that?  And it was Miss Freeman's

21  brother, your Honor.

22          The reason I tell you all of this story, not -- not,

23  your Honor, for relevance or the fact that is was Miss

24  Freeman's brother that the United States Trustee thought that

25  it was Judge Jones.  We were not acting as if this meeting was

1    secret.

2            We called Miss Freeman.  I think Judge Jones may have

3    also told Mr. Alonzo about the fact of this meeting.  We didn't

4    think we were doing anything that would cause the reaction that

5    is -- that we're seeing, your Honor, today.

6            And I'm not saying your Honor's reaction is

7    unreasonable.  I'm just telling you, your Honor, we did not

8    anticipate or foresee it, this reaction.  And we were acting in

9    good faith and really not intentionally trying to violate your

10   Honor's orders, or the Judiciary Policy.

11           Which even though it doesn't have the force of law,

12   we treat it as such.  We -- we -- we did, your Honor.  All the

13   lawyers from different kinds of law firms.  And -- and

14   that's -- that's what we can say about that.  That was

15   our -- that was our goal to -- to lessen -- to lessen the need

16   for testimony here.

17           And, yes, maybe -- maybe moot the dispute that was

18   before your Honor.  But -- but maybe by analogy, your Honor,

19   notwithstanding the -- the economy that your Honor's put into

20   this dispute, for which I was appreciative of those two

21   hearings.

22           Maybe by analogy we were trying to settle the dispute

23   before it ruled.  That's not the way we thought about it.  But

24   that's an analogy that I'm thinking of now.

25           We were trying to cause the deposition to go away.

1      **(Pause in the proceeding.)**

2              **MR. FINESTONE:** And --

3      **(Pause in the proceeding.)**

4              **MR. FINESTONE:** And -- and then, obviously, your

5      Honor, with 20/20 hindsight, it -- it -- the meeting did not

6      need to occur.  We think we -- we think we had had sufficiency

7      with something your Honor touched upon at one of the hearings.

8              Your Honor, certainly, was not directing us to sit

9      down for a discussion.  But we thought we were advancing

10     that -- I thought it was advancing the policies of the -- two

11     and five in the Judiciary Policy.

12             And most importantly, I -- I just don't need or think

13     that Judge Jones needs to testify in this case.  Because the

14     fact of the relationship has been made -- made public is

15     undisputed.  Both parties know about it and it's not denied,

16     your Honor.

17             **THE COURT:** All right.  What -- the proper procedure

18     would be to file a motion to quash and let me make that

19     determination, Mr. Finestone.  You were sadly mistaken in

20     proceeding in the way that you did here.  Otherwise, I wouldn't

21     have set this hearing.

22             And as I said before we started this hearing, I'm

23     sadly disappointed with so much legal talent in this courtroom

24     that this approach was taken.  Knowing that it was going to

25     happen during the hearing I was having.  And not let me even

1    know about it.

2         **(Pause in the proceeding.)**

3              **THE COURT:**  Mr. Boland.

4         **(Pause in the proceeding.)**

5              **THE COURT:**  Mr. Hardin, you were the one asking the

6    questions, were you not?

7              **MR. HARDIN:**  Asking questions is a hard -- hard way

8    to describe.  But I was certainly -- I did sometimes ask

9    questions.

10             This is primarily a meeting.  And -- and as did

11   others.  But this was primarily a meeting.

12             **THE COURT:**  Why did you think this was proper?

13             **MR. HARDIN:**  Cause, if I can, I -- I want to

14   try -- would it help if I sort of give the Court a little bit

15   of idea how this happened?

16             **THE COURT:**  Sure.

17             **MR. HARDIN:**  Okay.

18        **(Pause in the proceeding.)**

19             **MR. HARDIN:**  Back, I believe -- first of all, I agree

20   with everything counsel has just said.  I don't -- I don't

21   disagree with any of the factual recitations or the thoughts.

22             One of the reasons, I want, if I can, if you --

23             **THE COURT:**  So you thought this was okay, too.

24             **MR. HARDIN:**  Of course.  We -- first of all,

25   the -- our interpretation, and -- and not -- obviously, you're

1  the final arbiter here as to what the rules and regulations

2  mean.

3          But our interpretation of the rules is, it works off

4  of the request.  And it -- it --

5          **THE COURT:**  Which has been made and I took under

6  advisement.

7          **MR. HARDIN:**  Yes.  But if at the end, if we go back

8  to the end of the hearing, your Honor.  We walked out believing

9  what you were taking was an advisement as to whether or not

10  certain questions under oath could be compounded.

11          If this was all about a subpoena.

12          **THE COURT:**  The Guidance includes interviews.

13          **MR. HARDIN:**  Well, it says it.

14          **THE COURT:**  You know, that's -- hat's exactly right.

15          And that's the -- that's defined as testimony.

16          **MR. HARDIN:**  It -- it -- but there are no cases

17  saying that interviews are not the way we took it.  Interviews

18  we have taken --

19          **THE COURT:**  There are no case law in the country

20  regarding this policy.

21          **MR. HARDIN:**  I understand.

22          And -- and the -- and the Rules make sure that it is

23  simply the internal Judiciary Policy.  And doesn't have the --

24          **THE COURT:**  You understand that this has wider

25  implications does -- than just former Judge Jones here.

1          It implicates the entire judiciary --

2          **MR. HARDIN:**  It does.

3          **THE COURT:**  -- Mr. Harden.

4          **MR. HARDIN:**  It does, your Honor.

5          **THE COURT:**  And if I allow this stand, how -- what

6   would prevent anybody from interviewing federal employees on

7   their own will --

8          **MR. HARDIN:**  If --

9          **THE COURT:**  -- without a Court making a determination

10  as to what kind of questions can be asked?

11         **MR. HARDIN:**  It's our position, your Honor, and I'm

12  not -- I'm not arguing with the Court's interpretation.  But

13  ours is very different.

14         Our interpretation and belief is, is these rules

15  apply to proceedings by subpoena.  If we go back, whether it is

16  a subpoena for an interview, whether it is a subpoena to sit

17  down and answer some questions informally.  But it is

18  a -- these are designed to make it to where the federal

19  judicial officer or personnel are not required to answer

20  questions if they oppose and don't want to.

21         They do not --

22         **THE COURT:**  Well -- well, like in this case, you

23  know, he answered questions he should not have answered.

24         **MR. HARDIN:**  Well --

25         **THE COURT:**  It's not that he didn't want to.  He did

1  answer questions.  Or he made statements to you and whoever

2  else was in that room, this list of names that I have, that

3  implicate directly that noticed topics in the deposition that

4  your office sent to him, and fall directly under the Guidance

5  and directly my order taking this order under advisement,

6  Mr. Hardin.

7           **MR. HARDIN:**  If we --

8           **THE COURT:**  So how can you tell me here that you

9  didn't cross those lines by having this interview with

10 Mr. Jones?

11          **MR. HARDIN:**  What I want to ask -- answer first is,

12 we did this in good faith.  So we did not intentionally, or

13 knowingly, cross the line.

14          If the Court decides we crossed the line, then we all

15 deeply regret it.

16          **THE COURT:**  How could you say you proceeded in good

17 faith.  Didn't tell me about it during the five hours we spent

18 in this courtroom.  Me dealing with all the questions that I

19 was asking, all the objections that were raised.  Everything.

20          And nobody's mentioned a word of it to me while I was

21 sitting here on the bench listening to arguments at Mr. Jones'

22 request.

23          **MR. HARDIN:**  Because from our perspective and our

24 belief, and this was a uniform belief.  This wasn't like one

25 lawyer here or two lawyers where they across the board, the

1   lawyers believed what was before you was a pending formal

2   subpoena process.  And what it --

3            THE COURT:  Have you read the Guidance Policy?

4            MR. HARDIN:  I have.  I've read it since --

5            THE COURT:  Tell me how an interview does not fall

6   under this policy?

7            MR. HARDIN:  Cause it doesn't define interview.  And

8   I would respectfully --

9            THE COURT:  Well what do you -- what -- what else

10   would you call it?

11            MR. HARDIN:  Well, if you look at -- let me see if I

12   can put this diplomatically.

13            When one goes over the rules, it talks about legal

14   proceedings.  If one looks at the deposition about legal

15   proceeding, an informal interview in which is not compulsory

16   process.  The person is just simply voluntarily at his own

17   instance.

18            We did not request the meeting.  We did not -- we did

19   not enter any process.

20            THE COURT:  You agreed to it.

21            MR. HARDIN:  We certainly did.

22            THE COURT:  They didn't make you sit there and listen

23   to what he had to say.

24            MR. HARDIN:  Because we have an obligation to

25   represent our client.  And we -- we have -- we had a -- this is

1  a work product interview.  Just --

2  　　　　　THE COURT:  How could you have any expectation,

3  Mr. Hardin, of privilege or work product in this interview

4  knowing that I had this matter under advisement?  How can you

5  have any expectation of that?

6  　　　　　MR. HARDIN:  Because he was not there at our request.

7  He was not there --

8  　　　　　THE COURT:  You went forward with the interview

9  anyway.  They didn't make you sit there.  They didn't bar the

10  door and say you have to sit there and listen to me.

11  　　　　　MR. HARDIN:  I'm sorry.  I apologize, Judge.  I don't

12  quite understand the point.

13  　　　　　My point -- my point was --

14  　　　　　THE COURT:  You said it was their idea and not yours,

15  right?  That's what you're telling me.

16  　　　　　MR. HARDIN:  Well, and that's what he --

17  　　　　　THE COURT:  Mr. Finestone's idea.

18  　　　　　MR. HARDIN:  That's what Mr. Finestone suggested.

19  　　　　　THE COURT:  So did they make you there -- sit there

20  and listen?

21  　　　　　MR. HARDIN:  No.  Because there's nothing wrong with

22  us --

23  　　　　　THE COURT:  You could have said no.  This -- the

24  Judge Rodriguez has this under advisement.  It falls under the

25  Guidance.  I don't want to cross the line here.

1          But yet, you still did.  You sat there and you

2   listened to all of this.  And you participated.  And you asked

3   a lot of questions that are directly connected to your noticed

4   depositions of Mr. Jones.

5          **MR. HARDIN:**  your Honor, what we did -- we did not

6   answer --

7          **THE COURT:**  Without me first making a determination,

8   Mr. Hardin, of whether those questions are proper or not.

9          **MR. HARDIN:**  And --

10         **THE COURT:**  How can you have any expectation of work

11  product or privilege here knowing that?

12         **MR. HARDIN:**  Your Honor, there was no formal process.

13  And that's what the rules are about.

14         **THE COURT:**  Well you called this whole proceeding.

15         **MR. HARDIN:**  If -- if we look at 820, yeah.

16  "Federal judicial personnel may not provide testimony or

17  produce records in legal" --

18         **THE COURT:**  Testimony under 810.30 includes

19  interviews, Mr. Hardin.

20         **MR. HARDIN:**  I -- that's --

21         **THE COURT:**  I've driven this home with Mr. Finestone.

22  Do I need to repeat myself again?

23         **MR. HARDIN:**  No, you don't.  Because you're going to

24  make the decision.  And as you --

25         **THE COURT:**  That's right.  And until I do, but nobody

32

1  can move on this case.

2         **MR. HARDIN:**  But it -- but this is not about whether

3  we did something wrong.  This is about whether --

4         **THE COURT:**  This is absolutely about what you did

5  wrong.

6         **MR. HARDIN:**  Your Honor, I already --

7         **THE COURT:**  Why do you think we're here, Mr. Hardin?

8         **MR. HARDIN:**  It's for you to decide whether to

9  sanction for us to -- for doing something we did not think was

10  wrong.

11         **THE COURT:**  No.  For doing something that was wrong.

12  Not what you thought.  What I think is wrong is what counts in

13  this courtroom.

14         **MR. HARDIN:**  And --

15         **THE COURT:**  And I -- I was very specific about

16  nothing going forward on this deposition, including any

17  testimony, until I made a determination.

18         How --

19         **MR. HARDIN:**  No, your Honor.

20         **THE COURT:**  -- much clearer can I be then?

21         **MR. HARDIN:**  Your Honor --

22         **THE COURT:**  But it's a request, it's a hearing.  We

23  had a hearing.  We went through the entire process.  And I -- I

24  specifically said in my orders that this -- these

25  determinations fall directly under the Guidance.

1    As a determining officer, I have to make that

2 determination.  Until I do, nobody can do anything.

3    MR. HARDIN:  And what was before you was a subpoena.

4 And what questions we would allow a federal judge, ex-federal

5 judge, to be asked.

6    What was, if you look back, in all due respect, to

7 the end of the hearing, you said nothing to us about no -- have

8 no contact with each other.  You said nothing about --

9    THE COURT:  I didn't say about no contact.

10    MR. HARDIN:  You just simply --

11    THE COURT:  Strictly.  You're correct about that.

12 But what I did say is this matter's under advisement.

13    MR. HARDIN:  Yes, sir.

14    THE COURT:  What do you think is not under advisement

15 that was proper here, Mr. Hardin?

16    MR. HARDIN:  What was under advisement, your Honor,

17 was whether or not -- what questions he would be --

18    THE COURT:  The topics in the noticed deposition,

19 right?  Whether you call it -- you call it a deposition, call

20 it what you want.  It was testimony provided by Mr. Jones in an

21 informal setting covering topics that were in your noticed

22 deposition to Mr. Jones.

23    MR. HARDIN:  What would --

24    THE COURT:  Was it not?

25    MR. HARDIN:  Yes, sir.  But what was --

1          **THE COURT:**  Okay.  So what's the problem here?  What

2     don't you understand?

3          **MR. HARDIN:**  What I don't understand is applying

4     this -- these rules to what is supposed to be in our view --

5          **THE COURT:**  How do you think it's proper --

6          **MR. HARDIN:**  I didn't think.

7          **THE COURT:**  -- that former Judge Jones provided

8     testimony about his thought processes, about how he decided

9     things --

10          **MR. HARDIN:**  Judge --

11          **THE COURT:**  -- does not fall under this policy under

12     this particular Guidance?

13          **MR. HARDIN:**  Your Honor, what -- I'm trying to

14     explain what we thought.  And the fact that you think we were

15     wrong, I deeply regret.  We did it in good faith.

16     Mr. Finestone did it in good faith.  I think the U.S. Trustees

17     in December did it when they did it in good faith when they

18     have a six-hour interview with a former federal clerk

19     and -- and specifically asked questions about deliberative

20     process for six hours.

21          **THE COURT:**  And I will get to them.  I --

22          **MR. HARDIN:**  I understand.  But he -- I want to point

23     out as to why Mr. Finestone and I both are referencing that.

24          We're not saying is this, they did it, too, you know,

25     so we -- it's okay if we do.  We are not saying that.

1          What we're saying is, it's evidence of the thought

2   processes of all of the lawyers in this case on both sides that

3   what they were doing was perfectly okay because it was not a

4   compelled process interview.

5          THE COURT:  As in -- where does it say it has to be

6   compelled?

7          MR. HARDIN:  Well, if you look at -- it says it has

8   to be requested, all right?  And if we look at legal

9   proceedings.

10         And this is -- your Honor, if we look at 10 -- 810.30

11  on the definitions.  If we actually start them back.  If you

12  look at legal proceedings, if you have -- don't have it --

13         THE COURT:  What do you think this is?

14         MR. HARDIN:  No.  Then --

15         THE COURT:  Some kind of a party.

16         MR. HARDIN:  This is --

17         THE COURT:  This is a legal proceeding.

18         MR. HARDIN:  But it's not --

19         THE COURT:  Everything connected with it, and any

20  witnesses.

21         MR. HARDIN:  That -- that is your position.  And that

22  we would have to abide about.  But it's certainly not what we

23  believed at the time.

24         If you look at legal proceedings, not once does it

25  suggest that a federal judge is not free to voluntarily have

36

1   informal conversations with lawyers.

2           **THE COURT:**  He gave up that --

3           **MR. HARDIN:**  That's the first --

4           **THE COURT:**  -- right when he resigned from office,

5   Mr. Hardin.

6           That call is my sole province to make in this Court.

7           **MR. HARDIN:**  I don't know where that is.

8           **THE COURT:**  It's in the statute.  It's in the

9   Guidance.

10          **MR. HARDIN:**  I don't -- I --

11          **THE COURT:**  Want me to read it to you, I can read it

12   to you.

13          **MR. HARDIN:**  Sure.

14       **(Pause in the proceeding.)**

15          **THE COURT:**  Eight forty(b)(1).

16          "The case of a sitting Judge, sitting Judge

17          can make that determination him or herself.

18          The case of a former direct -- former

19          judge, the determining officer will be the

20          Chief Judge of the Court in which the

21          former judge previously served.  840(a) and

22          (b)."

23          **MR. HARDIN:**  Those -- but those are --

24          **THE COURT:**  How is there any question about that?

25          **MR. HARDIN:**  Because that's about our -- that has to

1   be a question because you and I disagree about it.

2          So there must be a question in a sense.  I read that

3   to mean --

4          **THE COURT:**  So that he's a former Judge?

5          **MR. HARDIN:**  No.  The fact that it's not formal

6   process.

7          Former federal judge and a federal judge don't give

8   up their First Amendment rights, your Honor.

9          **THE COURT:**  Absolutely not.

10         **MR. HARDIN:**  And he -- he gave an interview, for

11  instance, this thing kids off with comments that --

12         **THE COURT:**  That -- yeah.

13         **MR. HARDIN:**  -- he made to the Wall Street Journal.

14         **THE COURT:**  Yeah.  That was not a legal proceeding.

15         **MR. HARDIN:**  Neither is what we did.  That's my

16  point.

17         Where we disagree, Judge --

18         **THE COURT:**  Do you think giving testimony off the

19  record directly connected to your noticed deposition topics,

20  which are currently under review by this Court, is not a legal

21  proceeding, Mr. Hardin?

22         **MR. HARDIN:**  It is not --

23         **THE COURT:**  How long have you been practicing law,

24  Mr. Hardin?

25         **(Pause in the proceeding.)**

38

1          MR. HARDIN:  Am I under oath?

2          THE COURT:  No.  You're an officer --

3          MR. HARDIN:  I prefer --

4          THE COURT:  You're an officer of this Court.

5          MR. HARDIN:  Well, I'm trying to be --

6          THE COURT:  And you have to answer my questions.

7          MR. HARDIN:  I'm just kidding, your Honor.  I was

8    trying to give a lightness.  And I know the Court is upset.

9          THE COURT:  Understand.  But I'm not.

10         MR. HARDIN:  I know you're not.  And that's very

11   obvious.  And I appreciate your ire.

12         But the fact is, if you look at the definition of

13   legal proceeding, what we did is not included.  That's my whole

14   point.  If you look at -- if -- if I can be so bold as just to

15   read it out loud.

16         THE COURT:  Where -- where are you looking?

17         MR. HARDIN:  I'm looking at 810.30 definitions, the

18   third definition.

19         THE COURT:  Eight thirty?

20         MR. HARDIN:  And this one isn't --

21         THE COURT:  Eight ten point thirty.

22         MR. HARDIN:  Yes, sir.

23         THE COURT:  All right.

24         MR. HARDIN:  "All pretrial, trial, and post

25         trial stages of all existed, anticipated

1           judicial or administrative actions,

2           hearings, investigations, cases" --

3           **THE COURT:**  Why wouldn't it fall under an

4    investigation?  Is that what you're -- wasn't that what you

5    were doing?  Investigating what happened?  Asking timelines of

6    this event, you know, when they were together, when they were

7    not.

8           What did he think about this?  What do you think

9    about that, Judge.  What -- how he made determinations.  What

10   his legal theories are of what occurred, what should not have

11   occurred.  Isn't that an under investigation of what you did?

12          **MR. HARDIN:**  I don't read it that way.

13          **THE COURT:**  Well what you call it.

14          **MR. HARDIN:**  If you -- I can't.

15          I read all of this to be formal proceedings by --

16          **THE COURT:**  "Cases, controversies, or similar

17   proceedings."  How is this not a similar proceeding?  How is

18   this not a case or a controversy that we are in?

19          **MR. HARDIN:**  I just -- I just disagree that it is.

20   What this was --

21          **THE COURT:**  What would you call it?

22          **MR. HARDIN:**  -- was an informal meeting in which we

23   were taking advantage of his willingness to try to give us

24   information in order to avoid having to sit for a -- a

25   deposition.

1          The motivation in this meeting was, the same as --

2          **THE COURT:**  Why not just go for the deposition?  Why

3  not just ask him on the record?

4          **MR. HARDIN:**  Because, Judge, you asked me how long

5  I've been practicing.  All of -- for the record, 49 years.

6  Okay?

7          And in those 49 years, I have never had a client, 15½

8  of those years was as a prosecutor.  So take those out for a

9  second.  And then go to the fact that since 1991 I've been

10  involved in a civil and a white collar criminals practice.

11          I practice about 85 percent civil since February of

12  '91.  I have never had a client on my -- that I represented or

13  on the other side that wanted his client to sit for a

14  deposition.

15          **THE COURT:**  You noticed it.

16          **MR. HARDIN:**  Counsel, excuse me.

17          **THE COURT:**  You were the one that asked for it.

18          **MR. HARDIN:**  No.  Of course, we did.

19          But I'm saying that the other side in this case that,

20  former Judge Jones, neither he or his lawyer want to be on the

21  record.  Think about what's happened, we -- right before this

22  happened --

23          **THE COURT:**  I know that he doesn't want to be on the

24  record.

25          **MR. HARDIN:**  But --

1      **THE COURT:**  But that's my call.

2      **MR. HARDIN:**  Well --

3      **THE COURT:**  What kind of questions could be asked?

4  That's the whole purpose of that proceeding that I had on July

5  15th.

6      **MR. HARDIN:**  Yes.  And that whole proceeding was

7  about a formal activity, a formal meeting, and by process.

8      It was about a -- a -- a subpoena to a former federal

9  judge, and whether or not, and what questions he could be

10  asked.  And that's what you were deciding.

11      In all due respect, you were not asked to decide

12  whether the parties could conduct informal interviews in order

13  to represent their clients, because the significance here,

14  Judge is, the Government announced a federal investigation.

15  Well they didn't -- they announced it by sending a -- a -- a

16  letter to the federal judiciary here to preserve documents.

17      Now the lawyer representing ex Jones.  So now I know

18  there's a federal investigation.  And I've got people that want

19  my -- my deposition on the record.

20      And even if there wasn't -- so what am I and

21  Mr. Finestone going to do about that?  That is the limit that

22  lawyers face all the time.  Never do they want their client to

23  sit for a deposition if they can avoid it.  Because the

24  deposition allows, in today's social media world, and it's

25  going to ultimately would be public, it allows people to go out

1    and grab a little phrase here, a little phrase there.  Put it

2    in the media.

3              People who don't have the interest of the -- of

4    the --

5              **THE COURT:**  All right.  So then why not withdraw your

6    noticed deposition and ask me for guidance as to the type of

7    questions you want to ask Mr. Jones and he's willing to answer.

8              **MR. HARDIN:**  I believe that we did.  But I don't have

9    anything in writing because --

10             **THE COURT:**  There is an active noticed deposition

11   which involves testimony by a former sitting federal judge.

12   Questions asked at this interview and answers provided directly

13   are connected to your noticed deposition and directly are

14   impacted by this Guidance.

15             **MR. HARDIN:**  The -- this meeting was designed to let

16   Judge Jones tell us what he wanted us to know and what he was

17   willing to share --

18             **THE COURT:**  And what were you going to do with this

19   information?

20             **MR. HARDIN:**  Excuse me.  Pardon me?

21             **THE COURT:**  What were you going to do with this

22   information?

23             **MR. HARDIN:**  Prepare to defend our client, who right

24   now somebody wants 14, 18, $20 million.

25             **THE COURT:**  And how were you do that when you're not

43

1  going to be able to use this information?

2           **MR. HARDIN:**  Yeah.  Well it -- that's -- that's part

3  of the dilemma here; isn't it?

4           But right now, this was not information we could use.

5  That's the other thing.  It would help our knowledge.  It would

6  help us know what the timeline of their relationship was, which

7  is -- which really at the heart of this.

8           **THE COURT:**  Granted.  That -- that may -- and that

9  may be a portion that I may grant, right?

10          **MR. HARDIN:**  Yes.

11          **THE COURT:**  I -- I --

12          **MR. HARDIN:**  But you --

13          **THE COURT:**  But I haven't made that call yet,

14  Mr. Hardin.

15          **MR. HARDIN:**  I know it.  And what you would decide is

16  what --

17          **THE COURT:**  So why should Jackson Walker know the

18  inter-workings of a federal court?  Why?

19          **MR. HARDIN:**  We were not interested in the inter-

20  workings.

21          **THE COURT:**  Well you got that information; didn't

22  you?

23          **MR. HARDIN:**  Yeah.  I -- you know, I'd have to go

24  back and think.  Because there were not --

25          **THE COURT:**  I -- I know exactly what was said.

44

1          **MR. HARDIN:**  There was not questions designed to go

2     into the deliberative process of a federal judge.  That was not

3     what was there.

4          What was there was, how did -- what happened?  What

5     was the timeline?  When did this go on?  Because that's at the

6     heart of what Jackson Walker did or did not know when --

7          **THE COURT:**  He talked about mediations.  He talked

8     about his thought processes, or how his court operated, and

9     what he thought about some of the other judges.

10         **MR. HARDIN:**  And all due --

11         **THE COURT:**  All of that has to do with federal

12    courts --

13         **MR. HARDIN:**  And all due --

14         **THE COURT:**  -- directly.

15         **MR. HARDIN:**  All due respect, he had every right to

16    do that in our opinion.

17         If the Court --

18         **THE COURT:**  Not until I say so.

19         **MR. HARDIN:**  But --

20         **THE COURT:**  Not until I say so, Mr. Hardin.  Isn't

21    that what the whole hearing was about?

22         **MR. HARDIN:**  The hearing was whether that would be

23    the case on a deposition of formal process.

24         **THE COURT:**  And he's not --

25         **MR. HARDIN:**  It was not about --

1         **THE COURT:**  That is -- that is wholly incorrect.

2       **(Pause in the proceeding.)**

3         **MR. HARDIN:**  That is what we believed.

4         That -- when we come right back to it, your Honor --

5         **THE COURT:**  If you thought it was okay, why didn't

6 you tell me about it at the hearing?

7         **MR. HARDIN:**  Why would -- why would we tell anybody

8 about having -- we never tell a judge about who -- what

9 witnesses we're going to interview.  We never do that.  And

10 neither did the bankruptcy Trustee.

11         I mean, my point being is, I'm not saying because

12 they did it, it's okay we did, if you think it's wrong.  I tell

13 you that because it shows that both sides of this case thought

14 it was okay in an informal setting to talk to a former federal

15 judge who was willing to do it.  And he did it for six hours

16 with the federal bankruptcy Trustees.

17         The relevance of all of that is, the same thing was

18 true with Miss Freeman's lawyer, Mr. Kuykendahl (phonetic).  He

19 wanted to avoid a deposition on the record that could be then

20 public and broadcast to the world.

21         He wanted to try to talk the federal government into

22 one arm, the bankruptcy people, into they didn't do anything

23 wrong.  Here are the facts.

24         Now -- and it -- it did him so much good that

25 in -- that in the -- I think it's on the July 15th, 2 days

1  before your hearing, the -- it becomes public knowledge that

2  the Government is criminally investigating the judge and Miss

3  Freeman, Department of Justice.

4          And the irony of all this, Judge, is we try to

5  protect as private citizens our client and defend him is one

6  arm of the federal government says we're going to investigate

7  you for a criminal thing.

8          Now by the way, over here, another arm of this

9  department, Department of Justice, the bankruptcy Trustee

10  is -- has got a lawsuit.  And they want to ask you questions.

11  And they want to put you on the record and have you swear to

12  things, while another group of the same organization is looking

13  whether to file criminal charges on you.

14          In all due respect, in my 49 years of practice,

15  it -- that puts the private lawyer, such as Mr. Finestone, in

16  an incredible dilemma.

17          So rather than have to do and go through that process

18  and formally intervene, whether he refuses to answer questions,

19  or whether he answers questions subjecting it, the department

20  people investigating continues, one way or the other -- he

21  recently reaches out to both sides and says, I would like to

22  give you an informal interview.  And, therefore, obviate no

23  need for a deposition.

24          That's what it was about.  And all the lawyers on

25  both sides, I'll guarantee what every -- I've not talked to the

1   bankruptcy Trustees about that, because they're the one that

2   came to complaint to you.  So I have no idea what they're going

3   to say.

4        But it does take a pretty high degree of -- of

5   whatever word you'd want to use, chutzpah or anything else, for

6   them to do the same thing we did, plus one.  And I'll get to it

7   in a second, with Miss Freeman.

8        But the relevance here is that they then also

9   believed it was okay, because the rules, as the Court knows

10  much better than I, equally apply to a former federal clerk

11  when he'd get to anything about the deliberative process and so

12  on during the time she was a federal clerk.

13       And yet they did six hours.  And then in addition to

14  that, the Court may be aware, or may not, they've taken Miss

15  Freeman's deposition now while this was pending.

16  **(Pause in the proceeding.)**

17       **THE COURT:**  When did this happen?

18       **MR. HARDIN:**  I think the deposition that they took

19  was like, I want to say the 29th or 30th.

20       **MS. GARCA:**  July 30th.

21       **MR. HARDIN:**  Thirtieth, yeah.  July 30th.

22       So the point being is, I'm not trying to get them in

23  trouble.  They can handle their own boat.  But I will tell you

24  that that's one more indication of the lawyers on both side of

25  these thing, acted in good faith.  That as long as this was not

1   part of a formal -- was not the result of a formal, subpoenaed

2   process that they were allowed to do what they do at every

3   trial, informally visit with witnesses, try to get as much

4   information they can.

5          THE COURT:  I would agree with you on that if it was

6   any other witness.  But we're dealing with former federal

7   employees here, Mr. Hardin.

8          MR. HARDIN:  Well --

9          THE COURT:  That is -- that's what makes which whole

10  case different.

11         MR. HARDIN:  You are -- you are absolutely right.  It

12  is different.  And the regulations that --

13         THE COURT:  My job to protect the record.  My job to

14  make sure that nobody crosses the line and implicates this

15  policy.  And it's my job to make sure the judiciary remains

16  intact, and remains intact its independence.

17         MR. HARDIN:  And I would like to --

18         THE COURT:  And if I allow questions to go forward

19  like this out into the public, where does it end?

20         MR. HARDIN:  Any time anybody states to any type of

21  formal process to get a former or current federal official to

22  testify.

23         THE COURT:  So you don't think this whole

24  proceeding's not a formal process.  That's --

25         MR. HARDIN:  I think that --

1      **THE COURT:**  That's your answer to my show cause

2  hearing today.

3      Why your office and everybody else in this meeting

4  should not be sanctioned by this Court for violation of my

5  order.  That's your -- that's your -- that's your response.

6      **MR. HARDIN:**  I -- no.  It's not my response in all

7  due respect.

8      My response is that in this exchange you and I are

9  engaging in, two different men are acting in good faith, and so

10  was Mr. Finestone.

11      So as you make your decision as to whether to

12  sanction us, I respectfully suggest the issues is, should the

13  lawyers uniformly who believed that what they did was okay --

14      **THE COURT:**  So when --

15      **MR. HARDIN:**  -- and have --

16      **THE COURT:**  When Mr. Jones answered questions or

17  offered answers that directly implicated this policy, did you

18  stop him?

19      **MR. HARDIN:**  No, sir.

20      **THE COURT:**  Why not?

21      **MR. HARDIN:**  Because I didn't think there was

22  anything wrong with him talk -- none of that could be used in

23  any formal proceeding.  And that's what the --

24      **THE COURT:**  Yeah.  But you've learned of it, right?

25      **MR. HARDIN:**  There's nothing wrong --

1          **THE COURT:**  And so has your client.

2          **MR. HARDIN:**  There's nothing wrong with me learning

3    it.  What's wrong --

4          **THE COURT:**  And so what's -- what would prevent you

5    from publishing that to the world?

6          Mr. Jones, told me at this interview that he thought,

7    you know, this particular decision he made was wrong because of

8    this particular statute or rule.

9          **MR. HARDIN:**  Nobody in that room --

10         **THE COURT:**  How -- how is that okay?

11         **MR. HARDIN:**  It would not be okay.

12         **THE COURT:**  So you --

13         **MR. HARDIN:**  It would not --

14         **THE COURT:**  So you understand the importance of this

15   proceeding and why I'm the sole determining officer here.  And

16   whether or not these types of questions can be asked, answered

17   in a deposition, in an interview.  Call it what you want to

18   call it, dealing with former federal employees is just not

19   right.  It's not allowed.

20         How have I not made that clear to everybody here?

21         **MR. HARDIN:**  Well you have today.  There's no

22   question about that.

23         **THE COURT:**  I thought I had done that before with my

24   orders.  I cited the

25   policy.  Do I have to read it to everybody --

1            MR. HARDIN:  No, we --

2            THE COURT:  And you're -- everybody here

3   is -- they're good lawyers all of you.  And I'm so

4   disappointed, Mr. Hardin.

5            MR. HARDIN:  Well, it's very obvious.  And I

6   appreciate it.  And I -- I'm -- and I deeply regret it.  I

7   understand it.

8            But, Judge, that --

9            THE COURT:  Why would you not come to me first?

10           MR. HARDIN:  Cause we don't agree with you that it

11  was required.

12           THE COURT:  Well, fine.  File a motion.  Tell me that

13  I'm wrong.

14           MR. HARDIN:  I don't know of a single -- all due

15  respect, I don't know of a single reported case in this country

16  in which lawyers --

17           THE COURT:  I said that on the record.

18           MR. HARDIN:  And we --

19           THE COURT:  Judge, file a motion.  Judge, I disagree

20  that, you know, these questions or this interview that we're

21  going to have with former Judge Jones fall in the Guidance

22  Policy.  Let's have a hearing.  You make a ruling whether I can

23  proceed on this informal interview.  It has nothing to do with

24  the deposition.

25           MR. HARDIN:  And I --

52

1          THE COURT:  Let's have a hearing on it.

2          MR. HARDIN:  But in our view --

3          THE COURT:  Let's have a public hearing on it.

4          MR. HARDIN:  In our view --

5          THE COURT:  But to go behind my back, Mr. Hardin,

6   after a hearing, knowing that I was -- had these questions

7   under advisement, you still went ahead and sat there and

8   listened to all of this conversation and all these answers that

9   Mr. Jones provided to you --

10         MR. HARDIN:  Your Honor --

11         THE COURT:  -- voluntarily that fall under this

12  policy.  Some may or may not.

13         But that is not anybody's call but this Court.

14         MR. HARDIN:  Your Honor, to believe --

15         THE COURT:  Nobody's call.  And if I hear another

16  argument that you disagree with me on that, sir, I'm going to

17  caution your next words on that.

18         MR. HARDIN:  Your Honor, if you --

19         THE COURT:  You're on notice, Mr. Hardin.

20         MR. HARDIN:  Are you saying that I, as a lawyer,

21  representing a client cannot respectfully tell a judge I

22  disagree?

23         THE COURT:  You -- you can tell me you disagree,

24  Mr. Hardin.  But I don't want to argue with you on this point.

25         I -- you're telling me you proceeded in good faith.

53

1          MR. HARDIN:  Yes, sir.

2          THE COURT:  Right?

3          MR. HARDIN:  Yes, sir.

4          THE COURT:  And that's what Mr. Finestone told me.

5          MR. HARDIN:  And that's what every lawyer --

6          THE COURT:  And then that's -- I mean,

7   that's -- that's a -- that's a canned response to a show cause

8   hearing that directly contravenes this Court's orders.

9          MR. HARDIN:  When I was a prosecutor, your Honor, and

10  a -- and a litigant filed a motion claiming prosecutorial

11  misconduct, I asked the Court always, every single time, for a

12  hearing, and the basis for them saying that I committed an

13  unethical act.

14          In telling you that I acted in good faith, and lying

15  as I'm doing it, is not only unethical, it's immoral, and

16  should not be condoned.  So if you believe that I, and everyone

17  of us lawyers are lying --

18          THE COURT:  I didn't say you lied, Mr. Hardin.  I

19  never use that term.  I would never use that term in this type

20  of proceeding or any proceeding, unless I truly believed it.

21  And I have said it before.  I'm not saying that here.

22          MR. HARDIN:  Okay.

23          THE COURT:  I'm questioning the good faith here of

24  this entire team.

25          MR. HARDIN:  I -- I understand.  And then that means

1   that you are questioning the good faiths of the -- all of the

2   people on both sides of this case.

3           THE COURT:   That's right.

4           MR. HARDIN:   And I would ask you to take that into

5   consideration when you're deciding whether to sanction.   That's

6   all, in my view, the issue before you is not only the outrage

7   that you feel justified and -- and have every right to express.

8           But it also about then, okay, what do I do if I have

9   a panoply of lawyers on both side of the case who, in good

10  faith believed that they could enter a voluntary interview with

11  a former federal official as long, and in our case, as long as

12  we didn't even request it.   And that the rules applied to

13  formal process, or compulsory process, such as subpoenas.   And

14  believed that we were before you on a subpoena matter as to

15  whether he could be forced to answer these questions, or if

16  whether the areas were not impermissible.

17          It never occurred to any of us that we were going

18  around the Court.   We didn't consider that.   We got a request.

19  We got a -- the question is, would you like to meet with him

20  informally?   We didn't make that request.   And we met with him.

21          And we -- the ground rules at the beginning of that

22  interview.   This interview, which is why I've said, no,

23  publishing it to the world would have been wrong and unethical

24  in my view.

25          This interview is off the record, not to be used in

1   any proceeding.  Judge Jones, I understand that you have things

2   you would like for people to know.  Because it's important to

3   remember to this day, this moment, he does not believe he was

4   wrong.  He has -- he has a different view of -- of the

5   law -- of the statute and everything, that we do.

6           He wanted the world to know his side.  He did not

7   want to do it in a formal deposition because both he and his

8   counsel felt that what happens with those deposition is

9   they -- they become public.

10          People that don't have their interest at heart, or

11  people who's upset, accepts here and there and misuse the whole

12  process.

13          So a man who believes he didn't do anything wrong,

14  wanted to express that to us and to the bankruptcy Trustee.

15  That's the way he looked at it.  We looked at it as an informal

16  work product interview to get ready for trial.  Okay.

17          Nothing he says we could use.  But that's the

18  agreement.  We can't use it in any proceeding.  We can't use it

19  in court.  We can't do anything with it.  But at least it

20  informs our knowledge of what the sequence was, which a lot of

21  which we still didn't know.

22          And that's what the purpose of the interview was.

23  Mr. Finestone and we never --

24          **THE COURT:**  So how are you going to get that on the

25  record then?

1          **MR. HARDIN:**  Pardon me?

2          **THE COURT:**  What you learned at this -- at this

3    interview, how are you going to get that on the record to

4    defend your client?

5          **MR. HARDIN:**  It'll be witnesses that we call at

6    trial.  And we would call the witnesses at trial.  We're not

7    going to be -- we -- we have a knowledge of what we believe and

8    what he thinks happened.

9          But that doesn't mean that the trier of fact is going

10   to be bound to accept either one of our sides.  But at least we

11   are more informed.

12         I -- I -- many years ago, I represented a man and the

13   issue was whether or not he was going to allow us to go to

14   Russia to interview some witnesses.  And I was nervous when I

15   called him and asked if three of us could go.

16         Because he was wealthy, even the wealthy don't like

17   to spend money on three lawyers when they could do it maybe

18   with one.  So I expected a lot of push back.  He told me,

19   Rusty, the sooner the better.

20         I learned a long time ago, he who knows the most the

21   soonest usually wins.  We looked at that meeting when they

22   offered it.  We didn't request it.  When they offered it, we

23   looked it as a way to try to learn as much as we could.

24         We knew, and it was expressed specifically in the

25   meeting, and Mr. Finestone made it clear also.  We could not

1    use that in any kind of proceeding.  Does the knowledge help

2    inform you as to questions or places to go to seek more

3    information that could be admissible?  Yes.

4            But nothing in that meeting is visible.  To use

5    anything that we got from the judge to whatever get -- that we

6    would be able to get from the judge, we would have to subpoena

7    him as we did.  He'd have to submit himself for deposition

8    under the rules and regulations that you yourself, as the

9    arbiter, would decide we could do.

10           And that's, in our mind, what was before you, not an

11   informal hearing.  I deeply, deeply regret that you feel so

12   strongly and have the view that what we did was wrong.

13           And I'm -- all I'm telling you is, neither I nor any

14   of the other lawyers, and I would even argue the case for the

15   bankruptcy Trustee, believed what they were doing was wrong.

16           The fact that you're as exorcised about it as

17   you -- as I have nothing but the foremost respect for the

18   federal judiciary and any judiciary.

19           I've spent a career telling lawyers, you don't go

20   outside of the courtroom and argue what a judge did.  If you're

21   going to disagree with a judge, disagree with him in the

22   courtroom when he can talk back.  Don't go outside the

23   courtroom and complain about what they did.  For 49 years

24   that's been my position.  It still is.

25           **THE COURT:**  Except for this particular case,

1  Mr. Hardin.  Tell me how you brought this to my attention

2  before you did this?

3       **MR. HARDIN:**  But now I brought it to your attention

4  because we didn't think it was something that we need to.

5  That's at the heart of this.  We did not believe this was a

6  formal proceeding that the rules applied to.

7       We believed that this was an informal interview.  It

8  was so expressed in the meeting.  And it was to help us get

9  information to represent our clients.  We got -- we got one

10  group here's keeping us from getting information because

11  they're threatening the people we want to talk to legally

12  threatening them, not improperly.

13       My point being is, in the private practice of law,

14  the system is not geared to make sure the litigant the

15  allegations are made against, gets all the information.  And we

16  wanted to get as much as we could without, for one second,

17  thinking it was contrary to you.

18       We looked always as what before you was the formal

19  proceeding and what could he be asked in a -- in a deposition.

20  And that that's what you were ruling on.

21       It was not whether or not he could information

22  informally with whomever he wanted.  And when I go back and

23  look at the order at the end, and I could tell from your

24  comments you're done the same thing, look at the record.

25       All you said to us as we left is, I'm going to -- I'm

1   going to reserve judgment, make my decision.  I'm paraphrasing.

2   Please do not do the -- I'm not sure whether you said please,

3   but that was your tone.  Do not do the deposition until I've

4   ruled.  And we did not do a deposition in our view.

5           And even today, obviously, you disagree strongly.  We

6   have a disagreement with you as to whether we did was covered

7   by the judicial rules.

8           And we're wrong, and the Court certainly believes

9   we're wrong, it was all of us.  And so I just respectfully ask

10  you to consider that fact when you're deciding whether to

11  sanction.

12          **THE COURT:**  Let go back to my original question,

13  Mr. Hardin.

14          **MR. HARDIN:**  Sure.

15          **THE COURT:**  And I want to take a step back and

16  apologize to all the attorneys if my tone seems to be too harsh

17  today.  I've -- I'm not usually this reactive to a show cause

18  hearing.

19          I am upset, clearly.  But I don't want that

20  misinterpreted to mean that I'm personally attacking anybody

21  appearing before me.  That's not what I'm doing here today.

22          I, as I said at the very beginning, you're all good

23  lawyers.  And I'm severely disappointed to say the least.  And

24  that's what got me worked up about this hearing.

25          Because this whole hearing is supposed to be open and

1   transparent.  And it's been lacking because of things like

2   this.  And that -- that's what really concerns me.

3          And the implication that a former federal employee

4   can sit for an interview and parties can gain knowledge about

5   the internal workings of a Court and publicize that to anybody

6   who wants it is wholly improper, Mr. Hardin.  And that's what's

7   got me worked up about this.

8          Because, as I said, it has broader implications than

9   just one judge.  It implicates the entire federal judiciary all

10  the way up and all the way down.  And I think now everybody

11  understands the seriousness of this particular proceeding and

12  why I'm all worked up about this because of the questions that

13  were asked and the answers that were given.

14          So I'm going to go back now and ask you how did you

15  think any of the information provided, you've already said it

16  can't be used at any proceeding, but how can any of that

17  information that Mr. Jones provided to you, or anybody in this

18  proceeding at that hearing, is protected by the work product or

19  privilege?

20          MR. HARDIN:  Because --

21          THE COURT:  How did you have any expectation that

22  that would be covered?

23          MR. HARDIN:  I thought at that meeting that what we

24  did is what we do in every lawsuit.  When we have informal

25  meetings like that, and this one which it was actually

1  requested by the other side, rather than us.

2          But regardless of that.  That in those types of

3  information gathering, an informal setting, not under oath,

4  with the understanding by both sides it could not be used in

5  any proceeding.  It -- what we have done was gather information

6  that would help us represent our client.

7          And that, though we could not use it in any formal

8  way, at least it would inform us as to some facts --

9          **THE COURT:**  I -- I get your understanding.

10         But I continue a direct question.  How did

11 you -- what expectation did you have that the information you

12 gathered would be covered under the work product privilege,

13 knowing that these matters were being considered by me and

14 taken under advisement.

15         The questions that were asked, some of the topics

16 that were discussed, directly related to your noticed

17 deposition and under this Policy?

18         **MR. HARDIN:**  Cause we never believed --

19         **THE COURT:**  Whether or not the questions are

20 permissible or not, I haven't made that determination, right?

21         **MR. HARDIN:**  Right.

22         **THE COURT:**  Had I made a determination, I think you'd

23 be fine.

24         **MR. HARDIN:**  And we believed that that was -- that

25 that applied to formal legal proceedings the way we interpreted

1  legal proceedings.  And this was not.  This was an informal

2  interview to -- to sort of inform us.

3          And that is what we do in preparing for trial all the

4  time.  Is we go out and interview witnesses.  And if it is done

5  after litigation has begun, or in anticipation of litigation,

6  it historically is protected by the work product privilege.

7          That is a different -- that's why we believed that

8  that's -- I'm trying to answer your question.

9          **THE COURT:**  So if -- so all right.  So let me see if

10  I can understand you.

11          This was not a legal proceeding in your mind.

12          **MR. HARDIN:**  Exactly.

13          **THE COURT:**  So it shouldn't be covered under the

14  work -- work product privilege.  But if it is a legal

15  proceeding than it is?

16          **MR. HARDIN:**  No.  No.

17          **THE COURT:**  So which one is it?

18          **MR. HARDIN:**  No.  No.  It's not a legal proceeding of

19  the definition in the Rules, the Federal Rules.

20          However, the work product privilege applies whether

21  it's a legal proceeding or not.  If you are -- if you are

22  anticipating a litigation, or if litigation --

23          **THE COURT:**  Well, we are in a litigation

24  proceeding --

25          **MR. HARDIN:**  Right.

1          THE COURT:  -- Mr. Hardin --

2          MR. HARDIN:  And there --

3          THE COURT:  It's nothing that we anticipated here.

4          MR. HARDIN:  We are in litigation so the work product

5     privilege applies.

6          That is a different issue as to whether this was a

7     legal proceeding in terms of whether we could even have the

8     interview under the Rules.

9          We believed it was not a legal proceeding.  I still

10    respectfully believe that.

11         THE COURT:  What would you call it?

12         MR. HARDIN:  I would call it just an informal

13    meeting.

14         THE COURT:  Have nothing to do with what's happening

15    in this Court.

16         MR. HARDIN:  It has every --

17         THE COURT:  Absolutely nothing to do with it --

18         MR. HARDIN:  Actually --

19         MR. HARDIN:  -- what's happening here.

20         MR. HARDIN:  It -- it did not have anything to do

21    with anything in this courtroom because it's -- in our view,

22    because this -- this Court was deciding whether or not these

23    questions could be propounded under legal process.

24         That's what you -- that's what is before you.  Is

25    what question can either side ask of a former federal official.

1   And -- and unprocessed.

2           What was not before you, as long as you ask my

3   opinion, and I quickly want to point out to you, I'm not

4   arguing with you, so help me God.

5           **THE COURT:**  I understand.

6           **MR. HARDIN:**  I am not suicidal.  I may be dumb, but

7   I'm not suicidal.

8           **THE COURT:**  I understand, Mr. Hardin.

9           **MR. HARDIN:**  But anyway, I think the Court -- we

10  believe this was information gathering that we do to prepare

11  for any case.

12          The other side, without speaking for them officially,

13  believed they were volunteering information that they hoped

14  would make it not necessary for them to have to give a

15  deposition.

16          Neither of those two sides believed that what we were

17  doing was covered by the Rules.  The Court feels very

18  differently and that -- and made it very clear.  And going to

19  rule accordingly.

20          I only ask you to take all the consideration and the

21  mindset of people and their intent into consideration deciding

22  whether to sanction.

23      **(Pause in the proceeding.)**

24          **MR. HARDIN:**  No one is quarreling with your -- your

25  authority.

65

1       **(Pause in the proceeding.)**

2               **THE COURT:**  So you still think, despite everything

3       that's occurred here this morning, that this interview should

4       not be made public to the other parties in interest in this

5       case.

6               **MR. HARDIN:**  Yes.

7               **THE COURT:**  To be protected.

8               **MR. HARDIN:**  Yes.

9               **THE COURT:**  Because it wasn't a legal proceeding.

10              **MR. HARDIN:**  No.  Because it was -- it wasn't a legal

11      proceeding under the definitions of the Rules.  But it also is

12      covered by the work product privilege.

13              Because we were -- it was an interview.  I'd love to

14      say it was a discussion.  Because in many ways it was the judge

15      expressing his views of what happened and so on in his

16      relationship with his former clerk.

17              And -- and obviously, there were questions asked.

18      We've given you the notes that were done.  But it was always

19      agreed from the very beginning that neither side would use what

20      came out of this hearing in any type of proceeding in any kind

21      of evidentiary way.

22              And so in our mindset was always, this was a work

23      product interview.

24              **THE COURT:**  Traditionally, I would agree with you on

25      that.

66

1          **MR. HARDIN:**  Well --

2          **THE COURT:**  If this Court hadn't already taken -- had

3    oral arguments and taken under advisement the questions that

4    were asked and the answers that were given, I would -- I would

5    agree with you.

6          But to my point, Mr. Hardin, is that these questions

7    were pending before me.  And I -- at the hearing we had a lot

8    of push back from everybody saying well, your Honor, these

9    particular questions don't fall under the Guidance Policy

10   because they don't directly implicate the judicial process or

11   thought process, and on, and on, and on.

12         And I heard those arguments.  And my -- I heard them

13   throughout the proceeding.  But understanding that until I make

14   a determination, they are.  Every single one of them are until

15   I say they're not.  That's the way this Guidance works.

16         **MR. HARDIN:**  I -- I think --

17         **THE COURT:**  Does it not, Mr. Hardin?

18         **MR. HARDIN:**  It is the way the process works.

19         **THE COURT:**  Okay.

20         **MR. HARDIN:**  And I'm trying to think.

21         If you look at the full body of the interview, I

22   think, and I haven't gone and done line-by-line.  But I have

23   read over the notes a couple of times.

24         If you look at it, anything that might involve the

25   deliberative process is a very small part of the interview.

1        **THE COURT:**  But yet it is part of the interview.

2        **MR. HARDIN:**  Well --

3        **THE COURT:**  And prohibited --

4        **MR. HARDIN:**  Not --

5        **THE COURT:**  -- until I've made a ruling.

6        **MR. HARDIN:**  And not --

7        **THE COURT:**  Everyone of -- this whole interview is

8   prohibited under the Guidance until I said it was okay.

9        **MR. HARDIN:**  I understand that's the Court position.

10        **THE COURT:**  Right.

11        **MR. HARDIN:**  We respectfully disagree.

12        And the way this system works is, we'd lose.  You're

13   right.  We're wrong.  I don't disagree with the fact that you

14   have the right to tell us not in my court can you do that.

15        And so, we're certainly going to comply with any

16   order of the Court.  We did not believe at the time we were

17   doing anything to the contrary.  And as evidence, the U.S.

18   Trustee must not, too.  Because they went and conducted a

19   deposition while you had it pending.

20        **THE COURT:**  Right.

21        **MR. HARDIN:**  So my point being is, the relevancy

22   there is I think every lawyer across the board has to say that

23   they do not believe that an informal interview that they did

24   not request, that had a perfectly appropriate motive and reason

25   for -- for the other side to ask for me.  We did not request.

68

1          I -- I just want for the record.  We also believed

2     that these Rules apply to us when we request a meeting, not

3     when the other side does.

4               THE COURT:  Right.  But as we discussed before, you

5     didn't refuse to have the meeting.

6               MR. HARDIN:  No, of course not.

7               THE COURT:  All right.

8               MR. HARDIN:  Of course not.

9               THE COURT:  And you were the one --

10              MR. HARDIN:  But we didn't --

11              THE COURT:  -- asking most of the questions at this

12    hearing.

13              MR. HARDIN:  No.  That's right.

14         But we didn't believe that the Rules applied to that

15    meeting.  I -- I don't want to beat a dead horse.  I just want

16    to try to persuade --

17              THE COURT:  Well, we're talking about the privilege,

18    Mr. Hardin.  How you think that's --

19              MR. HARDIN:  The work product privilege?

20              THE COURT:  That's right.

21              MR. HARDIN:  Well it always applies to us asking most

22    of the questions.  That's, I mean, every interview we have

23    is --

24              THE COURT:  Agreed.  But when a Court says no until I

25    say it's okay, how would you have any expectation that this is

1  still covered --

2         **MR. HARDIN:**  I --

3         **THE COURT:**  -- under the privilege.

4         **MR. HARDIN:**  So let me venture --

5         **THE COURT:**  That's my direct question to you.

6         **MR. HARDIN:**  Let me venture one more time --

7         **THE COURT:**  Go right ahead.

8         **MR. HARDIN:**  -- off into -- off into particularly

9  challengeable territory.

10         You didn't tell us not to do that.  So we

11  never -- never even registered.  And that's why I went back --

12         **THE COURT:**  Deposition we've already established

13  involves testimony.  Testimony involves and implicates

14  interview, which happened here.

15         **MR. HARDIN:**  We --

16         **THE COURT:**  Right.

17         **MR. HARDIN:**  We were totally unaware that -- that

18  the -- that that would be the interpretation.  And in all due

19  respect, when I go back and look, you simply asked us to

20  postpone the deposition.

21         **THE COURT:**  And what is a -- what is a deposition?

22         **MR. HARDIN:**  It is a -- a, excuse me.  It is simply a

23  by process by subpoena, a formal process in which a witness is

24  to give testimony --

25         **THE COURT:**  Right.

1      **MR. HARDIN:** -- at the behest of the --

2      **THE COURT:** That's exactly right.

3      **MR. HARDIN:** But --

4      **THE COURT:** Testimony includes interviews.

5      **MR. HARDIN:** And it compels them to do so.  I

6  respectfully suggest the Rules to address a request, a request

7  in a formal process.

8      **(Pause in the proceeding.)**

9      **MR. HARDIN:** And if -- if, you know, if it was -- if

10 a higher court was right ruling on this, and there was some

11 type of appeal --

12      **THE COURT:** A request under the Guidance, under

13 810.30, includes requests for voluntary production of testimony

14 in the absence of any legal process.

15      **MR. HARDIN:** And we did not do that.

16      **THE COURT:** And you said this is not a legal process,

17 right?

18      So that definition contradicts exactly what you've

19 been telling me during this whole hearing, Mr. Hardin.

20      **MR. HARDIN:** No, sir.  In all due respect.

21      **THE COURT:** You said it wasn't a legal process,

22 right?

23      **MR. HARDIN:** I said it was not a legal proceeding

24 under the Rules.  And I still believe that.  And I understand

25 the Court disagrees.

1       But the -- the Rules, I would respectfully suggest,

2  are designed to how to deal with the process invoked where a

3  private party requests through subpoena, or some other type of

4  formal process, to interview a current or former federal

5  official.

6       That is the way I read the Rules.  I understand you

7  disagree.  But that's -- that was our good faith belief.  And

8  it's evidenced by all the lawyers.

9       **THE COURT:**  But when it indirectly implicates

10 testimony for a federal employee, current or former, this

11 Guidance Policy is in effect and it applies.

12      **MR. HARDIN:**  If we are using some type of process to

13 have the interview.

14      If the person is not -- that requested it.  This was

15 a federal official, former federal official, requested a

16 meeting so he could express his side of the case.  That's all

17 it was.

18      That was helpful to us and we did not (indiscernible)

19 because that would help us know what he said the actual facts

20 and timeline were.

21      At no time did anyone on either side believe that

22 that was -- that was in conflict with what we were doing.  When

23 we left here, I thought, and I think everybody else did, we

24 were awaiting your decision as to what questions could we ask

25 in a deposition on the record of an ex judge.

72

1          **THE COURT:**  Did you bother to look at the Guidance

2   Policy to see what is included in a deposition?

3          **MR. HARDIN:**  I have now.  I was not --

4          **THE COURT:**  But not then.

5          **MR. HARDIN:**  Yeah.  No, if you remember, Judge, none

6   of our lawyers, including those -- cause these Rules, as the

7   Court knows ten times better than I do, these Rules apply to

8   all federal judges and federal personnel.

9          **THE COURT:**  Right.

10         **MR. HARDIN:**  And it's not just a bankruptcy issue.  I

11  agree.

12         **THE COURT:**  That's right.

13         **MR. HARDIN:**  So it's one of the things you've been

14  talking about understandably and I agree with, is this a, you

15  know, how you rule on things has implications across the board

16  for more than just a bankruptcy decision.

17         And I totally agree with that.  That's why the rules

18  exist.  But I went back and looked.  Because if you -- if you

19  notice, the Trustees had to inform us after we filed our

20  original papers that, subpoena, that we had to comply with the

21  *Tooey* (phonetic) decision.

22         I, and I think most of us, were not aware of those

23  regulations.  So then we had to file an amended one.  That's

24  why you have an -- an amended pleading from us.

25         **THE COURT:**  Right.

1        **MR. HARDIN:**  And then we've studied them assiduously,

2   but when we had that meeting, I wasn't even aware of the Tooey

3   Regulations.  Not before the meeting.  I was aware of it by

4   then.  I wasn't aware of it at the time we filed our first

5   petition, or our first pleading.

6        So at the end of the day, once we found how exorcised

7   and upset you were about this, we've looked at them

8   assiduously.  And I strong believe that what we did was not

9   covered by the Rules.

10       I understand the Court disagrees.  And I'm not

11  prepared to argue with the Court at all.  I'm just simply

12  trying to tell you what our mindset was.

13       **(Pause in the proceeding.)**

14       **THE COURT:**  All right.

15       **(Pause in the proceeding.)**

16       **THE COURT:**  Thank you, Mr. Hardin.

17       **MR. HARDIN:**  Thank you, Judge.

18       **THE COURT:**  Mr. Boland.

19       **(Pause in the proceeding.)**

20       **MR. BOLAND:**  Your Honor, if I may.  Jason Boland for

21  Norton Rose.

22       I wasn't initially -- I was -- Mr. Hardin was going

23  to handle this hearing.  But I'm probably the one that

24  practices most in front of this District and this Court, Judge.

25  And, you know --

74

1          **THE COURT:**  You're primary counsel for Jackson

2  Walker; are you not?

3          **MR. BOLAND:**  Um, Mr. Hardin's team is trial counsel

4  and handling the witnesses.  We're handling the bankruptcy

5  piece.  But I don't want to get into nomenclature, Judge.

6          **THE COURT:**  Sure.

7          **MR. BOLAND:**  We're certainly responsible for whatever

8  your Honor's ruling is.

9          But I -- I think I owe it to your Honor to at least

10  give you where my head was at and where my mind was at, right

11  or wrong, Judge.  I think I owe that to you as an officer of

12  the Court.

13          So, if you could bear with me, Judge.  I did attend

14  the meeting with former Judge Jones.  I don't recall asking

15  questions.  To the opposite, I actually, Mr. Jones asked me a

16  couple of questions.  But the notes that were hand-written that

17  were submitted under seal, Judge, those were my notes from the

18  meeting.

19          And to talk about your question about attorney work

20  product or privilege, all I would suggest, your Honor, is, you

21  know, the highlighting in there.  I had my own thoughts about

22  what I did.  Some of the topics that was -- there wasn't

23  delineated topics as best I recall.  It was my trying to break

24  them up into how I was envisioning our case, and how that

25  proceeded.

1           And so, just to answer your question directly about

2   mental processes, attorney work product, et cetera, that's all

3   I can tell you, Judge.

4           **THE COURT:**  How did you have any reasonable

5   expectation, Mr. Boland, as experienced as you are of work

6   product or privilege, knowing that these topics were under

7   review by this Court?

8           **MR. BOLAND:**  Sure.  If I -- if I could address that,

9   Judge.

10          You know, when I sit before you many hours, we told

11  you when we issued the first subpoena, we did that incorrectly.

12  And -- and the U.S. Trustee told us about the regulations under

13  the Judicial Policy to follow.

14          We went back and reissued that subpoena, Judge.  And

15  I want to talk about the request that Mr. --

16          **THE COURT:**  Well aware of the regulations.

17          **MR. BOLAND:**  We are, Judge, of course.

18          My point in saying that, though, Judge, and we

19  submitted this Exhibit 5, 6, 7.  And I'm just telling you

20  my -- my thought processes as far as our good faith here, or

21  intended good faith, I should say.

22          When you look at the Committee -- Committee notes in

23  what promulgated the Judicial Regulations that we're talking

24  about.  And that's Exhibit 5, your Honor, page 9.  It says,

25       "On recommendation of the Committee on court

1        administration and case management, the Judicial

2        Conference adopted regulations to govern the

3        judiciary's responses to subpoenas issued to

4        federal judges."

5  And it goes on and on.

6        Tab 6, Judge, because I've read these Judicial

7  Policies probably more than a dozen times at this point, and

8  even before your last hearing.

9        When you go to the Judicial Policies website,

10  uscourts.gov, the very -- the third to the bottom one, it's a

11  link, subpoena regulations.  You click the link, Judge, and

12  Exhibit 7, it's titled

13        "Subpoena Regulations.  These regulations

14        govern responses to subpoenas issued to

15        federal judges."

16        I say all that because in our mind, we issued a

17  subpoena to former Judge Jones to compel his testimony under

18  oath, which is why we believed we fit within the Judicial

19  Policies when we were before your Honor.

20    **(Pause in the proceeding.)**

21    **MR. BOLAND:**  We did not -- so when your Honor asked

22  us at the end of that hearing to not take a deposition, didn't

23  even -- I'll just speak for myself, Judge.  I wasn't the only

24  one.

25        But it did not even cross my mind when you said don't

1  take a deposition that we were talking about anything other

2  than the subpoenaed deposition to compel his testimony under

3  oath, Judge.

4         **THE COURT:**  Did not go back and look at the Rules, at

5  the Guidance, before you --

6         **MR. BOLAND:**  Yes.

7         **THE COURT:**  -- sat there for this meeting?

8         **MR. BOLAND:**  We absolutely did, Judge.  And --

9         **THE COURT:**  So how do you think interview didn't fall

10 under testimony?

11        **MR. BOLAND:**  Sure.  I'll -- I'll direct the answer to

12 your question.

13        Under the Regulations, and it's -- I don't know if

14 it's 830.

15     **(Pause in the proceeding.)**

16        **MR. BOLAND:**  Eight fifty, Judge.  It's a procedure

17 when a request is made.

18        And that sounds like a technical argument.  But from

19 all -- my -- I don't want to speak.  I don't want to say our.

20 From my perspective, Judge, there could be multiple paths.  And

21 one path was we did make a request for a subpoena to compel

22 testimony.

23        We did not make a request for an interview.  We did

24 make a request for a meeting.  This was -- and there are

25 contemporaneous notes that were taken internally by the Rusty

1    Hardin team on June 5th.  Mr. Fine --

2            **THE COURT:**  Now we're mincing words.  It's -- was a

3    meeting.  It wasn't an interview?

4            **MR. BOLAND:**  Oh, I -- I was mincing words, meeting,

5    interview.  I -- I -- that not my point of --

6            **THE COURT:**  Okay.

7            **MR. BOLAND:**  -- where I'm going.

8            My -- my point is the request, Judge.  And

9    I -- that -- and I say that because I think that's important

10   here.

11           On June 5th, Judge, and we have contemporaneous notes

12   about this, Mr. Finestone called the Rusty Hardin team.  And

13   Mr. Finestone said, I'm requesting that you take deposition by

14   written interrogatories or I'll offer you an informal

15   interview.  That's what our contemporaneous notes say.

16           Move fast forward, you know, we issued a subpoena.

17   We do it wrong.  We reissue the subpoena.  Mr. Finestone's

18   continuing to press to avoid testimony at all costs.  That's my

19   words, not his.  Because he's trying to avoid testimony under

20   oath, sworn testimony --

21           **THE COURT:**  Sure.

22           **MR. BOLAND:**  -- pursuant to a subpoena.

23           So from my good, honest belief, Judge, it was a

24   separate request for this interview, meeting, whatever you want

25   to call it.  I'm -- that I don't parse words on that.

79

1    Interview's fine.

2          It was a separate request in my view, Judge, which is

3    why we believed it didn't fall under there Guidelines.   Right

4    or wrong, we may --

5          THE COURT:  But then why were the -- the topics that

6    were discussed, they were directly connected to your noticed

7    deposition.

8          If you intended it to be something else, why was

9    it --

10         MR. BOLAND:  Sure.

11         THE COURT:  -- exactly what was in the noticed

12   deposition?

13         MR. BOLAND:  I -- I did not ask --

14         THE COURT:  Which was under advisement by this Court.

15         MR. BOLAND:  I -- I didn't ask questions in

16   the -- the topics, your Honor.

17         THE COURT:  Right.  But --

18         MR. BOLAND:  There was no --

19         THE COURT:  But you were sitting there.

20         MR. BOLAND:  There was no listing of topics that

21   we're going through.

22         THE COURT:  Right.  But you were sitting there

23   listening to all of this.

24         MR. BOLAND:  I was listening.

25         THE COURT:  And you didn't stand up and say well,

1    wait a minute.

2              **MR. BOLAND:**  I --

3              **THE COURT:**  This is under advisement.

4              **MR. BOLAND:**  I did listen, Judge.

5              **THE COURT:**  We shouldn't be talking about it.

6              **MR. BOLAND:**  I did listen.

7              **THE COURT:**  We shouldn't be talking about this.  It's

8    under advisement.  Why didn't you do that?

9              **MR. BOLAND:**  your Honor, I viewed it as a request

10   that didn't follow -- fall under the Guidelines, because it was

11   a request by Mr. Finestone to offer this interview to us.

12   That's the honest answer, Judge.

13             That's all I can tell you.  I viewed it as a separate

14   parallel path.  It wasn't a compelled sworn testimony for a

15   subpoena that we viewed --

16             **THE COURT:**  And you still believe that today after

17   listening everything that's happened in this courtroom?

18             **MR. BOLAND:**  Your Honor, I know you disagree with

19   that.  My -- my -- my belief is that, based on how I'm reading

20   the regulations, based on how I'm reading the Committee notes,

21   looking through how we got to the subpoena, going back to my

22   contemporaneous notes about the June 5th offer from

23   Mr. Finestone, he reissued that offer on June 15th after like,

24   what Mr. Hardin said with respect to the criminal

25   investigation.

1          THE COURT:  So you knew all about that meeting while

2     we were sitting in this courtroom for five hours deliberating

3     these particular questions.

4          MR. BOLAND:  We --

5          THE COURT:  Why not just say wait, Judge.  We don't

6     need to have this hearing.  We're going to have a meeting with

7     Judge Jones.  And --

8          MR. BOLAND:  We wanted --

9          THE COURT:  And so we want to avoid this whole

10    hearing.  We think we're going to conserve judicial resources

11    in doing that.  But nobody did that.

12         MR. BOLAND:  We wanted to have --

13         THE COURT:  We spent five hours in this courtroom --

14         MR. BOLAND:  We wanted --

15         THE COURT:  -- Mr. Boland.

16         MR. BOLAND:  -- to have the hearing, Judge, because

17    we wanted to get guidance from you in the event that we

18    determined --

19         THE COURT:  And you all -- you disregarded --

20         MR. BOLAND:  -- that there are --

21         THE COURT:  You disregarded what happened in this

22    courtroom.

23         MR. BOLAND:  I --

24         THE COURT:  And I said no depositions, right?  And

25    that implicates testimony.  And testimony implicates interview.

1          **MR. BOLAND:**  Testimony in -- in -- in -- this wasn't

2    just a Jason Boland view.

3          Testimony, as I have ever thought about it, Judge, is

4    something that is under oath, that's sworn, that you can

5    perjure yourself in, that I can use to impeach you with.  We

6    have none of that, Judge.  We have none of that.

7          So testimony in our mind was --

8          **THE COURT:**  Well but that, just that.  The Guidance

9    says interview falls under the definition of testimony.

10         **MR. BOLAND:**  If we request an interview, Judge.  And

11   I respectfully suggest we did not.

12         **THE COURT:**  Doesn't say if you request it.

13         **MR. BOLAND:**  It -- It -- I respectfully disagree.  I

14   think --

15         **THE COURT:**  Where does it say if you request it?

16         **MR. BOLAND:**  I think the whole process is implemented

17   upon a request.

18      **(Pause in the proceeding.)**

19         **MR. BOLAND:**  Which goes back to in your think

20   about --

21         **THE COURT:**  "Any written rule, statement,

22              any form by a witness arising out of

23              performance of witness official duties,

24              including personal appearances, statements

25              in court, or at a hearing, or a trial,

1          depositions, answers to interrogatories,

2          affidavits, declarations, interviews."

3          MR. BOLAND:  Section 850 is the procedure when a

4  request is made.  "In response to a request for testimony" --

5          THE COURT:  Mr. Jones made a request upon this Court

6  that I make the determination.  That's how this whole process

7  started.  Wasn't it not?

8          MR. BOLAND:  I -- I -- I interpret this as our

9  request.

10          THE COURT:  Well, he didn't make a request of this

11 Court?

12          MR. BOLAND:  He --

13          THE COURT:  He made a request.

14          MR. BOLAND:  No, I --

15          THE COURT:  I ordered, right?  I'm going to have a

16 hearing.  And we had a hearing.

17          MR. BOLAND:  I respect --

18          THE COURT:  And all of these questions fell under

19 this Guidance Policy.

20          MR. BOLAND:  I -- I viewed that in a -- what you just

21 said, Judge, I viewed that what you just said as, we made a

22 request under a subpoena to -- for testimony that would be

23 sworn for Judge --

24          THE COURT:  No.  That's not the way this works.

25 Right?

1          A federal employee, either current or former, makes a

2   request.  I granted that request.  We held a hearing.  And we

3   talked about all this.  We deliberated and discussed this, and

4   had a heated, very helpful discussion about topics, and the

5   Policy, and what I was going to do about that, right?

6          **MR. BOLAND:**  We did --

7          **THE COURT:**  That's what happened here.

8          **MR. BOLAND:**  We -- the -- we did have a thoughtful

9   discussion, Judge.

10          I -- as I stand here today, as I read these

11   regulations, it's in response to a request that I make

12   for -- to compel testimony.

13          **THE COURT:**  Where does it say that a response to a

14   request you made.

15          **MR. BOLAND:**   In response to our request for

16   testimony.  My response to --

17          **THE COURT:**  And you made that under a noticed

18   deposition, did you not?

19          **MR. BOLAND:**  Under a subpoena, yes, Judge.

20          **THE COURT:**  Right.

21      **(Pause in the proceeding.)**

22          **MR. BOLAND:**  But I did not make a response.

23          **THE COURT:**  Mr. Jones responded by asking this Court

24   to make a determination.  That's what triggered this whole

25   event.

1          **MR. BOLAND:**  That is what triggered it for --

2          **THE COURT:**  Right.

3          **MR. BOLAND:**  And so --

4          **THE COURT:**  And so how do these questions fall

5    outside of that?  Did you discuss, you know, anything other

6    than what was in the noticed deposition?  I don't think so.

7    I've read -- I've read the notes.

8          **MR. BOLAND:**  I -- I'm giving you the benefit of -- of

9    my thought processes, Judge, as far as where -- where --

10         **THE COURT:**  And I -- I'm going to push back pretty

11   hard today, Mr. Boland, as you can see.

12         **MR. BOLAND:**  I understand.  I understand.

13         **THE COURT:**  And --

14         **MR. BOLAND:**  That's fair.

15         **THE COURT:**  And -- because I'm just not understanding

16   how --

17         **MR. BOLAND:**  From --

18         **THE COURT:**  -- all of you could misunderstand what

19   was happening here.

20         **MR. BOLAND:**  And we talked about this at the hearing,

21   Judge.  I mean, I --

22         **THE COURT:**  I mean, do I have to spell it out and

23   read the entire Guidance Policy to these highly educated

24   lawyers as to what's going to happen here?

25         **MR. BOLAND:**  We -- we viewed it no different than

1    when former Judge Jones talked to the Wall Street Journal.  We

2    viewed it as his right to talk --

3             **THE COURT:**  That wasn't a legal proceeding.

4             He has a -- everybody has a First Amendment right to

5    talk to whoever they want to, you know?  But when it's involved

6    in a proceeding that's before this Court, it's different.

7    Things change.  Rules apply.  Guidance applies.  My orders

8    apply.

9             **MR. BOLAND:**  We -- we view that as --

10            **THE COURT:**  Right?  So how do you -- so how do you

11   view his interview different than, or the same, as a interview

12   with the Wall Street Journal or any reporter?

13            **MR. BOLAND:**  We viewed him as having a First

14   Amendment right to speak to folks he wanted to see on his own

15   volition.

16            He can, and from my perspective, Judge, if he wants

17   to go to dinner with a colleague or a friend in Houston and

18   have -- have a -- over dinner and give you his thought

19   processes, whatever he wants to talk about.

20            **THE COURT:**  Sure.  I agree with you on that,

21   Mr. Boland.

22            **MR. BOLAND:**  That's -- that's how we viewed this,

23   Judge, as his offer to sit down with us over dinner, if you

24   will.

25            Bad analogy.  But I'm -- I'm trying to tell you

1  where -- where our head was at, at least, from a thought

2  process standpoint.

3       We certainly, I hope, just looking around in the

4  courtroom and the folks behind us, and never in our -- never in

5  my wildest imagination, Judge, would I ever have the audacity

6  to sit before you on July 16th and you tell me not to take a

7  deposition and 2 days later I take a deposition.

8       Never would anyone in the courtroom have the audacity

9  to do that, Judge.  If -- if -- if -- and we sense your

10  frustration, Judge.  And certainly, there's no -- we apologize

11  if -- if we've obviously gone astray from where your Honor

12  believes we should have.

13      No intention of doing that.  We would never do that,

14  Judge.  As -- as officers of the Court we would never do that.

15  And so, I'm sorry if we disappointed your Honor and the Court.

16  The -- it was well intentioned.  And I'm happy to answer

17  questions, Judge.

18      **THE COURT:**  I need to understand from your

19  perspective, Mr. Boland, how you thought this interview would

20  be protected under the work product privilege.

21      **MR. BOLAND:**  Sure.

22      **THE COURT:**  If knowing what was going on this court

23  and the questions to be considered by this Court that had not

24  yet ruled on, how did you have any expectation that this was

25  going to be protected?

1        **MR. BOLAND:**  From my perspective, any time we do a

2   witness as part of any case, Judge, my notes are privileged.

3   My notes are my work product.  My notes are my recollection, my

4   take away, my thought processes in connection with what -- what

5   any witness is telling me.  I'm -- I'm highlighting.  I'm

6   organizing it the way I want.  I'm putting comments on the

7   side.

8        Just because you see some comments, it might have

9   come from Mr. Finestone.  It might have come from some other

10  folks in the room.  It wasn't necessarily from former Judge

11  Jones.  I'm interpreting it.  I'm, you know, I'm -- I'm

12  emphasizing things.  There's mental processes that go in

13  connection with those notes.

14       And all I would, you know, if -- if that's the

15  question, Judge, I would urge you to -- to at least go back and

16  look at my notes, which were the hand-written notes.  And

17  hopefully you can help see some of the processes that were at

18  least going through in my mind as far as --

19       **THE COURT:**  I saw all of that.  I sure did.

20       **MR. BOLAND:**  That -- that's all I have.

21       **THE COURT:**  And that's why I asked this question.

22

23

24

25

1

2          **MR. BOLAND:**  The -- that -- that -- the interview,

3  yes.

4          **THE COURT:**  Why else say that?

5          **MR. BOLAND:**  No, the interview absolutely, yes.

6  But --

7          **THE COURT:**  So how, again, how was there any

8  expectation that this would be covered.

9          **MR. BOLAND:**  I mean, look, your Honor, the U.S.

10  Trustee's asserted work product privilege in connection with

11  their notes in their Freeman interview.  We don't have those.

12  We asked for them.

13          **THE COURT:**  That's not -- that's not what I'm hearing

14  right now.

15          **MR. BOLAND:**  Well, but it's -- I think they have the

16  same viewpoint as we do, which is when you take notes from a

17  meeting, from an interview, from --

18          **THE COURT:**  Sure.  Under normal rules of discovery, I

19  would agree with you.  This is not a normal discovery hearing,

20  right?

21          This -- these are matters that I'm the sole

22  determining officer on and have to make that call.  And I'm not

23  trying to protect anybody here in particular.

24          **MR. BOLAND:**  I know you're not, Judge.  I know you're

25  not.

1          **THE COURT:**  I'm not taking sides on anything.

2    I'm -- I'm being protective of the judicial process as a whole,

3    and this whole process.

4          And there should be open communications between the

5    parties, I agree with you.  But this proceeding should be open

6    and transparent, not clandestine.  And certainly not after I've

7    said you can't do that until I make a determination so I can

8    say, all right these group of questions are fine, these are

9    not.

10          So, I mean, I -- I just don't understand your

11   argument of how you could expect that any of this would be

12   privileged, knowing what you know now.  And should have known

13   before you conducted an interview.

14          We went through five hours of hearing, knowing that

15   the next couple of days you were going to have an interview

16   with Mr. Jones.

17          **MR. BOLAND:**  I'm -- I'm never going to convince you

18   that the request falls outside of the guidance, Judge.  You've

19   heard my argument.  I just wanted you to have the benefit of

20   what I believe, but --

21          **THE COURT:**  No, I -- and -- and your argument has

22   validity.  So does Mr. Finestone and so does Mr. Hardin.

23          **MR. BOLAND:**  Yes, sir.

24          **THE COURT:**  And you're -- you all may be partially

25   right.  But those -- some of the questions, maybe not all of

1  them, fall outside the guidance.  You may be correct about

2  that.

3       **MR. BOLAND:**  Okay.

4       **THE COURT:**  But I have yet to make that

5  determination.  And that's the line that I'm drawing in the

6  sand here, Mr. Boland.

7       Until I make a determination, and I call the balls

8  and strikes on the questions, nobody, not you, not Mr. Hardin,

9  and not Mr. Finestone, gets to make that call.

10       But how can you honestly believe that you had the

11  right to sit there and contravention of this Guidance, and our

12  hearing, and my orders, and still go forward on this proceeding

13  and make that call?

14       **MR. BOLAND:**  We didn't -- none of us in this room

15  thought that this was in any way contravention of your orders

16  or the Policy, Judge.  Like I said, and I don't want to be

17  repetitive, I'm sorry.  But I want to answer your question.

18       We viewed this as a request from -- and -- and I

19  think Mr. Finestone will affirm that.  He asked for this

20  interview.  We viewed that as a separate path from the

21  judiciary regulations which govern requests, which we had

22  pending a subpoena to compel testimony, Judge.

23       That's all I can tell you.  So, the answer to your

24  question, we viewed it as a separate parallel process.  He

25  offered it.  We took it.  And in that context, Judge, we

1  thought that if -- if Judge Jones wanted to talk about

2  something, obviously, Mr. Finestone was there to raise issues.

3       There -- there -- this was not a, as best I can

4  recall, a kind of a question answer session.  In any event,

5  what would you like to tell us, I think, might be the first

6  question if -- best I can recall.

7       And then Judge Jones talked, Judge.  That's the best

8  I can recall from what happened.  So I hope I answered your

9  question.  It may not be satisfactory to your Honor.  But --

10      **(Pause in the proceeding.)**

11          **MR. BOLAND:**  -- that's my response.

12      **(Pause in the proceeding.)**

13          **THE COURT:**  All right.

14          **MR. BOLAND:**  Thank you, Judge.

15          **THE COURT:**  Thank you, Mr. Boland.

16      **(Pause in the proceeding.)**

17          **MR. BOLAND:**  Your Honor, I have --

18          **THE COURT:**  Yes, sir.

19          **MR. BOLAND:**  -- one more thing, just because I feel

20  like now's my time.

21      I know there's been a lot of talk about the Freeman

22  interview, and I know that's for a different day.

23      But I do want you to know that, you know, as part of

24  our thought process is in the good faith element of this, or

25  what we -- our good intentions, if you will.

1      That's why it didn't cross our mind either, Judge.

2  They did this interview in December of 2023.  I saw it.  You

3  know we -- we filed some excerpts.  I saw those excerpts come

4  off from the docket.

5      And our point in showing you was they, you know, they

6  were asking direct question on 455, and recusal, and judicial

7  deliberations.  The deposition that happened two weeks after

8  your hearings with Jones on the Jones and Mr. Alonzo, is when

9  the deposition occurred.

10      We -- we were going to file the rough draft excerpts

11  from the deposition.  But we didn't want to offend your Honor

12  in doing that.  But I can tell you it's the same sort of

13  questions that were asked in connection with that deposition.

14      So I would just respectfully submit they actually

15  took it a step further, seeking what we all believed to be

16  sworn testimony.  We stopped -- we thought we intended to stop

17  short in -- in the interview process.

18      So, I know you might have a different view, Judge.  I

19  respect your view.  But I didn't -- I just wanted to say that

20  before I sat down.

21      **THE COURT:**  Has -- has -- have you -- has your firm

22  or Mr. Hardin's firm interviewed Miss Freeman or taken her

23  deposition?

24      **MR. BOLAND:**  No, sir.

25      We -- we -- I believe Mr. Hardin was at the

94

1   deposition of Miss Freement.  But I don't believe we asked

2   questions.

3           THE COURT:  And this deposition occurred when?

4           UNKNOWN FEMALE:  July 30th.

5           MR. BOLAND:  July 30, Judge.

6           THE COURT:  Any other federal employees been

7   interviewed or otherwise deposed?

8           MR. BOLAND:  Not that we're aware of.

9       (Pause in the proceeding.)

10          MR. JONES:  Judge, would the Court entertain a couple

11  of minutes from me, or would you just want to keep it between

12  the lawyers.

13          THE COURT:  It's up to Mr. Finestone.

14          MR. FINESTONE:  Permission granted, your Honor.  No

15  objection.

16          THE COURT:  All right.  Come forward, sir.

17          MR. JONES:  Judge, I think that you are seeing this

18  morning part of the problem that exists.  And I'm not going

19  to -- I've listened very carefully to what you have said today.

20          You may not know this, but I think before you got

21  this proceeding, that I was the only one who'd ever dealt with

22  the policy.  I have my own views about what it says and what it

23  does.  I agree there's not a lot of guidance.

24          I think the whole concept of the interview has been

25  misconstrued.  And I'm happy to tell you what I think interview

1  means in the context of the policy and in the context of civil

2  litigation.  Happy not to.

3          I also have read your orders.  I was on your

4  audio/video while you had that five-hour hearing.  I listened

5  very carefully.  I read your orders.  I'm not criticizing the

6  order at all.  We all do the best we can.

7          I did the best I could when I sat in your -- in your

8  chair.  I know that you do the absolute best every day that you

9  sit in that chair.

10          Having a more instructive order would be helpful to

11  all the parties  I would love an order that says no one can

12  talk to Jones about anything until I say so.  That would be

13  terrific.  I encourage that.

14          What it said was, well the words say what they say.

15  And everyone else is left to kind of deal with that.

16  And -- and I'm not trying to --

17          **THE COURT:**  Usually when lawyers have a question

18  about an order, they ask for a hearing.  They need

19  clarification.  And that -- and my order directly cites the

20  Guidance.  And to not read the Guidance -- to misinterpret the

21  Guidance as -- as an interview, not being part of this process,

22  is just very misguided.

23          **MR. JONES:**  So can we -- well can we go to that,

24  Judge?

25          Because you're -- you're essentially asking me what I

1  think the word interview means.  And I do --

2          **THE COURT:**  I don't need an explanation of what an

3  interview, Mr. Jones.  That's --

4          **MR. JONES:**  I think you do under the Policy.

5          **THE COURT:**  That's -- that's my call here.

6          **MR. JONES:**  It is.

7          But I would -- I would hope that you would want to

8  entertain the views of the parties affected by it as to might

9  help explain why they did what they did.

10         **THE COURT:**  Go right ahead.

11         **MR. JONES:**  If you don't want it, I --

12         **THE COURT:**  Go -- go right ahead if you insist.

13         **MR. JONES:**  The concept of an interview under the

14  Policy is one where I say, you know, John Smith I want an

15  interview.  And I take notes of that interview and it becomes

16  your statement.

17         If you get on the stand and say something different,

18  I can use that interview to impeach you.  It is testimony.  The

19  whole purpose, and I -- I will take full responsibility for

20  this.  Because it was all based upon my interview and the list

21  of things that could and could not be subject to the Policy, is

22  this interview never happened.

23         It could -- Mr. Hardin said it can't be used in any

24  proceeding.  The agreement was it can't be used for any

25  purpose.  Doesn't exist.  I could say whatever I wanted to now,

1   and with all due respect to Mr. Hardin, you know I'd never do

2   this.

3         But he couldn't use the fact that I'd said something

4   different in that interview for any purpose.  That's the

5   distinction.  And that's, I think, the important distinction.

6         The object of this was, Judge, is my relationship has

7   been the subject of misinformation everywhere.  It has caused,

8   and I'm not asking for sympathy, it has caused an immense

9   amount of embarrassment.  It's affected my relationship.  It's

10   done a lot of very negative things.  And most of it's simply

11   wrong.

12         So the purpose in doing this was really to give an

13   opportunity to say hey, let me tell you what the relationship

14   really was and really wasn't.

15         That example that came up about the picture.  I can't

16   imagine how much money's been spent on the fact that hey, Jones

17   is water skiing the day after Christmas and this was sent to

18   Jackson Walker.

19         Well you told us to be efficient.  That was -- those

20   were your parting words.  Look, I can't water ski.  And it

21   wasn't me.

22         **(Pause in the proceeding.)**

23         **MR. JONES:**  That was just -- it was just that type of

24   exchange of information.  And part of the agreement was, is we

25   sat down.  I got to ask questions.  And I did ask questions.

1  Because there've been some things that have been in pleadings

2  that I don't understand.

3          And so it really was a transfer of information.  Now

4  you've made reference a couple of times that I -- that I

5  crossed the line with respect to the deliberative process and

6  how the Court functioned.

7          And again, I've never seen the notes.  I don't recall

8  doing that.  If I did that, that was wrong.  This -- that was

9  something I would never, ever do.

10

11

12

13

14

15

16      **(Pause in the proceeding.)**

17          **MR. JONES:**  I don't think that that crosses the line.

18          **THE COURT:**  You said a little bit more than that.

19          **MR. JONES:**  I don't recall saying that.  And

20  I'm -- I'm happy -- I'm happy for you to tell me what the notes

21  say.  And I'll -- I'll -- if I said it, I said it.

22          But, again, when people takes notes, that's their

23  opinion of what they heard.

24          **THE COURT:**  Well that's the whole problem with this

25  process, isn't it?

1          **MR. JONES:**  Judge, because the process -- the

2    process, and I want to define this.

3          The process is having that get together.  And, again,

4    I don't think it was an interview, because it doesn't exist.

5    You don't like the concept of a conversation, all fine.  We'll

6    call it whatever we want.

7          It just, you know, when you write down notes, you

8    hear what you hear.  And then you go off and you try to, I

9    mean, nothing I told Rusty Hardin he's going to rely on.  I

10   mean --

11         **THE COURT:**  But he has knowledge now that nobody

12   else --

13         **MR. JONES:**  Of course he does.

14         **THE COURT:**  -- nobody else has, right?

15         **MR. JONES:**  Well, no.  I mean, U.S. Trustee knows

16   that --

17         **THE COURT:**  They weren't privy to this interview.

18         **MR. JONES:**  No.  But they know that, for instance,

19   that the picture wasn't me.

20         **THE COURT:**  Well that's just a small part of it.

21         **MR. JONES:**  I -- I -- I was not --

22         **THE COURT:**  That's one part of it.

23         **MR. JONES:**  I was trying to be efficient in

24   addressing your issues, Judge.  I -- I wasn't trying to go

25   through piece by piece.

1        I'm happy to do that if that's what you like.  I

2   don't know what they say.  We made the same offer to the U.S.

3   Trustee.  And, of course, the U.S. Trustee's what they think is

4   important than what Jackson Walker thinks is important.

5        I don't want to testify because as we come to find

6   out, the day that folks were here arguing with you for five

7   hours, the U.S. Attorney lawyer who stood up and argued to you

8   that they wanted all of the stuff, which we think is

9   irrelevant, we didn't understand, knew that a criminal

10  investigation had been offered.

11       We didn't yet know.  We found out a day or two later.

12  She knew.  She's acknowledged she knew.  She's acknowledged to

13  Mr. Finestone.  I mean, that puts me in a horrible position.

14       Because my guess is there'll never be any testimony.

15

16

17

18

19

20

21       **(Pause in the proceeding.)**

22       **MR. JONES:**  And, Judge, again, I was there.  I was

23  the one who was talking.  I'm happy to answer --

24       **THE COURT:**  But why -- but --

25       **MR. JONES:**  -- anything that you want.

1          **THE COURT:**  So why -- why ask for guidance under this

2    policy?  And go --

3          **MR. JONES:**  Cause it --

4          **THE COURT:**  -- through this whole proceeding --

5          **MR. JONES:**  Happy to --

6          **THE COURT:**  Yeah.  I know you have to.  And --

7          **MR. JONES:**  I'm happy to address that.

8          Because one, and I -- there's -- Mr. Boland and the

9    Court I don't think were communicating very well.  So he sends

10   a depo notice.  When I got the first one, I knew it wasn't

11   right.  I understand the process.

12         They send the second.  I get Mr. Finestone and said

13   see if you can figure out an alternative.  And he tried and

14   failed.  I get the second one.  At that point, I send the

15   email.  And again, I want to officially say, my understanding

16   of that process.  It's always a court administrative process.

17   You don't file pleadings.  You don't file notices.

18         I did not mean to offend you by sending that email.

19   I did what I thought I was supposed to do.  I did what -- I

20   did, you know, the process as I understood it and how I had

21   dealt with it.

22         I make that request.  That's going to be whatever it

23   is you determine that I have to answer, again, subject to any

24   other privileges and objections --

25         **THE COURT:**  Right.

1          **MR. JONES:** -- that I may have.

2          Whatever it is that you say I have to answer becomes

3   the official statement of the United States Judge, retired,

4   resign, whatever -- whatever it is you want to put on the end

5   of it.   It's still the statement of a United States Judge.

6          That's the purpose of going through that process.

7   When I tell Mr. Hardin that I had an affair when I was married,

8   but that conversation doesn't exist, that's not the statement

9   of anybody.   He knows it, but he already knew that.   Or he

10   believed he knew it, cause they took my ex-wife's depo.   That's

11   how far this is going.

12          But as I told him, I'm going to answer honestly about

13   my relationship.   Am I perfect?   I am not.   But I've never lied

14   about it.   That's the difference.

15          The statements don't exist.   No one can print Judge

16   Jones said.   This --

17          **THE COURT:**   So who's going to stop them?   I mean --

18          **MR. JONES:** Who's going to --

19          **THE COURT:**   -- the -- the cat's already out of -- out

20   of the bag so to speak, right?

21          You've already --

22          **MR. JONES:**   Well --

23          **THE COURT:**   -- provided -- you've provided these

24   lawyers here --

25          **MR. JONES:**   Yes.

1      THE COURT:  -- information that only you know, right?

2  And --

3      MR. JONES:  I don't think so.

4      THE COURT:  And you --

5      MR. JONES:  But you --

6      THE COURT:  -- talked about different topics.

7      MR. JONES:  Well, could you give me an example of

8  something that only I know?  Cause I don't -- I didn't think

9  that there was anything.

10      THE COURT:  Well, okay, well, that's been made public

11  perhaps.

12      MR. JONES:  Uh-huh.

13      THE COURT:  And nothing's on the record.

14      But they -- you were talking about different topics.

15  Or questions were being asked.  I can't figure out how this

16  went about.

17      But by reading the notes, they --

18      MR. JONES:  Judge, I hope you understand --

19      THE COURT:  Don't interrupt me, please.

20      MR. JONES:  Okay.

21      THE COURT:  Different topics were discussed.  And you

22  provided information regarding topics that directly related to

23  the noticed deposition.

24      Now had you had a discussion about some trip you had,

25  had nothing to do with what's going on in this Court.  I would

1 agree with you, that's fine.

2          MR. JONES:  I think I --

3          THE COURT:  And I -- I agree with everybody here.

4          MR. JONES:  And I think that gives us --

5          THE COURT:  But those topics -- those topics were

6 directly related to the noticed deposition by both Jackson

7 Walker and the United States Trustee.

8          MR. JONES:  Sure.

9          Is the goal, Judge, is we had two depo notices,

10 right?

11          THE COURT:  Right.

12          MR. JONES:  We had Jackson Walker's and the cross

13 notes.

14          THE COURT:  Right.

15          MR. JONES:  There was no agreement.  But it was my

16 hope that at the conclusion of that meeting that I could

17 convince this group of lawyers that I was simply irrelevant.

18 And I think I did.

19      **(Pause in the proceeding.)**

20          THE COURT:  And so why didn't you do that before you

21 sent this notice or we were going through whole proceeding?

22          MR. JONES:  I couldn't.  I -- I'm required -- upon

23 receiving the request, I'm required to notify you the way I

24 read it.

25          THE COURT:  And so why didn't anybody say anything at

1   the hearing?  Why spend five hours here --

2          MR. JONES:  So --

3          THE COURT:  -- when you already knew you were going

4   to sit down for an interview?

5          MR. JONES:  It had been previously scheduled, but I

6   had not yet agreed that I was absolutely coming.  I wanted to

7   see what you were going to do.

8          And if you had entered an order that said, there will

9   be no communications until I rule.

10          THE COURT:  Didn't I do that?

11          MR. JONES:  I don't believe you did, not in a clear,

12   unequivocal way.  You said, and I heard what you were going to

13   do.  But what the language says, postpone the depo.

14          THE COURT:  Right.

15          MR. JONES:  I --

16          THE COURT:  And the depo includes testimony --

17          MR. JONES:  I understand.

18          THE COURT:  -- testimony includes interviews.

19          MR. JONES:  I know what you were going to do.

20          THE COURT:  Right.

21          MR. JONES:  But again, we get back to what it was.

22   An interview is a formal statement.

23          I haven't said anything as we stand here today.  I've

24   said nothing.

25          THE COURT:  Doesn't say formal interview.  Just says

1  interview.

2           **MR. JONES:**  No, but it's -- I -- you remember when --

3           **THE COURT:**  That's your definition.  And we'll

4  disagree on that, Mr. Jones.  I'm happy --

5           **MR. JONES:**  But I --

6           **THE COURT:**  -- to disagree with you on that.

7           **MR. JONES:**  And I -- all due respect, I just think

8  I'm right about that, cause I've had that experience.

9           But I'm not trying to quibble with the Court.  You

10  are -- you are absolutely the judge of this Court.

11       **(Pause in the proceeding.)**

12           **MR. JONES:**  But we get -- we get to the issue about

13  what was going to happen two days after the hearing, or the day

14  after the hearing, whatever that was.

15           I hadn't agreed I was going to show up.  And if your

16  order had said, there will be no communication with Jones until

17  I rule.  Okay.  There would have been no sit down.

18           The way that I read the order on its face, and I can

19  be wrong.  I am certainly not perfect.  Process has proved

20  that.

21           When we look at it in terms of complying with a Court

22  order and, again, taking your show cause to the contempt issue,

23  a clear, unequivocal statement within the four corners of the

24  order.  And it says no depo.  Didn't run across that.

25           Now I get that you think, as we march backward with

1  the implications, that what I did with Jackson Walker violated

2  that statement of no depo.

3         Again, I'm just going to respectfully disagree.  I

4  took no oath.  I wasn't under any compulsion.  I didn't have to

5  answer anything I didn't want.  And I got to ask questions.

6         I learned about as much as I gave.  I learned about

7  how far off some of these things are.  Now what am I going to

8  do with that?  I mean, probably nothing, cause I don't have a

9  vehicle to do that.

10        And I'm now in the position of, you know, that may be

11 the last statement I ever make, cause I may be forced into that

12 position.  You know, you know, you said why didn't you file a

13 motion to quash?  There are two motions to quash.

14        There was one that we were going to file with respect

15 to the Jackson Walker.  And we didn't because of what you did,

16 you know, the purpose of the Jackson -- purpose of the motion

17 to quash is to stop the depo.  And said no depo.  And, again,

18 I'm not trying to limit anything.  I'm just trying to tell you

19 the thought process.

20        There's another motion to quash that's coming with

21 respect to the U.S. Trustee, because we think it's just

22 untenable that you let leak.  And we now know it's a leak.  You

23 let leak that I'm under criminal investigation.  And then the

24 other arm of the Justice Department wants to depose me about a

25 whole series of topics that have nothing to do with what

1   Jackson Walker knew and what they did or didn't do in response

2   to that knowledge.

3           I mean, it's -- and I -- and again, I am not trying

4   to shy away from any responsibility.  I'm not trying to say

5   that I'm not at fault.  I'm trying to tell you that there's an

6   awful lot out here that I'm trying to process.  And I heard

7   your -- I heard your command at the end.

8           Let's be efficient about the process.  And I simply

9   thought that with respect to the relationship, and I'm -- cause

10  that was the majority of it, at least that's my memory.

11          If I can help get these folks on to what did or

12  didn't happen, then they can go off and verify.  They can go

13  off and talk to people.  They can do whatever it is they want

14  to do.

15          **THE COURT:**  Yeah.  And I agree with you on that.

16  But --

17          **MR. JONES:**  Well --

18          **THE COURT:**  -- until I made that call, it wasn't

19  anybody's right to make that call.

20          **MR. JONES:**  With the way, Judge, if I -- all due

21  respect.

22          If you believe that you have control over what I can

23  say off the record, in other words, it's not the statement of a

24  feral judicial official, then I agree.

25          I just simply didn't think that your authority went

1  that far.  I thought it stopped at an official statement of a

2  former employee.

3          Because now with what's out there, yes.  Had a

4  conversation.  But it's even better than if I had a

5  conversation with your law clerk.  And I don't -- I'm not

6  picking on him.  I was just looking at him.

7          I -- if I had a conversation with your CSO.  CSO can

8  go tell whoever it wants to about that and do with whatever it

9  wants to.

10          But the agreement that I got, and it was the only way

11  I would do it, is that you can't use this for any purpose.  You

12  can't leak it to the press.  You can't --

13          **THE COURT:**  The difference is, the CSO is not a party

14  to this litigation.  That's the difference here.

15          **MR. JONES:**  I didn't see that as a distinction.  And

16  if that's wrong, then that's my fault.

17          **(Pause in the proceeding.)**

18          **MR. JONES:**  I was really trying to, I mean, I can't

19  imagine the amount of money that's been spent on this already,

20  and the amount of money that's going to be spent.

21          But it would not surprise me to hear Mr. Hardin stand

22  up here and say that, you know, we've spent $75,000 trying to

23  figure out who this guy was on water skis when I could simply

24  say it isn't me.

25          And if you want to go get third-party verification,

1   you know, here's who it was.  Wasn't me.  That was the goal.

2         I was trying to be helpful.  I was actually help a

3   process that, quite frankly, I can't imagine what you're

4   sitting through and having to deal with.

5         But the goal was to try and help.  I was trying to

6   get rid of some of the noise, cause that's what a lot of it is

7   is just noise.  And if that was wrong, then that was wrong.

8         **THE COURT:**  All right.

9         **MR. JONES:**  Anything else, Judge?

10        **THE COURT:**  Thank you.

11        **MR. JONES:**  Thank you.

12   **(Pause in the proceeding.)**

13        **THE COURT:**  All right.  We're going to take a brief

14   recess.  We'll resume at 10:50, 10 point 5, 0.  We're going to

15   be back on the record in the main proceeding.  And then I'll

16   determine which particular matter we'll take up next.  Okay.

17        We're -- we're -- yes, sir.

18        **MR. JONES:**  Just -- and again, I apologize for -- I'm

19   not a lawyer here.

20        **THE COURT:**  Speak into the microphone or -- so we can

21   hear you.

22        **MR. JONES:**  What should we tell the folks out in the

23   hallway.

24        **THE COURT:**  Everybody can come in.  If they want to

25   come in now, they can come in now.

1          **MR. JONES:**  Okay.  Can the -- can the CSO --

2          **THE COURT:**  CSO, could you please let everybody back

3    in.

4          **MR. JONES:**  All right.  Thank you, Judge.

5          **THE COURT:**  I'm going to -- Mr. Finestone, I'm going

6    to knock you out of Zoom.  I'm going to go back to GoToMeeting.

7          **MR. FINESTONE:**  Understood.  Thank you.

8          **THE COURT:**  Okay.  We're going to unseal the

9    remainder of this proceeding.

10         We are now -- it is now 10:34 a.m.  We are -- I'm

11   going to unseal the remainder of this proceeding.

12         **(End of sealed portion at 10:34:17 a.m.)**

13         **(This portion of the proceeding was adjourned at 10:34**

14   **a.m.)**

15

16                           CERTIFICATION

17

18         I certify that the foregoing is a correct transcript

19   from the electronic sound recording of the proceedings in the

20   above-entitled matter.

21

22   _/s/Cheryl L. Battaglia_          _August 8, 2024_

23         Transcriber                      Date

24   4:23-0645

25   08/07/24 - 08/08/24