# In The Matter Of:

*In Re:  Professional Fee Matters Concerning*
*The Jackson Walker Law Firm*

*David R. Jones*
*September 19, 2024*

*Behmke Reporting and Video Services, Inc.*
*550 California Street, Suite 820*
*San Francisco, California  94104*
*(415) 597-5600*

Original File 43348JonesUSTP_nl.txt
Min-U-Script® with Word Index

Page 29

 1  what you just said?
 2     He's asking to preserve the objections
 3  rather than asserting the objections under the Rules.
 4     MS. STEELE: Your Honor, I think our
 5  preference would be for Mr. Jones to assert the
 6  privilege to each question.  Is that the question?
 7     JUDGE RODRIGUEZ: No.
 8     MR. FINESTONE: That's going to happen,
 9  Counselor.  In a normal deposition we don't have the
10  benefit of His Honor sitting here prepared to make
11  evidentiary rulings.  I would object to form and
12  preserve and reserve all other objections for a future
13  date and time.  And I'm asking whether we have your
14  agreement that it's going to proceed the same way.
15     MS. STEELE: That's fine, Your Honor.
16  We can agree to that.  Thank you.
17     MR. FINESTONE: One final procedural
18  point, Your Honor.
19     Perhaps in lawyerly fashion, I
20  described the rights that I anticipate my client will
21  assert today.  I'd like for my client to be able --
22  almost like a defined term in a corporate document,
23  I'd like for my client to simply be able to say, "I'm
24  declining to answer that" and for Your Honor and for
25  the record to be clear, when my client says he's

Page 30

 1  declining to answer the question, the rights that he's
 2  asserting are the Fifth Amendment rights under the
 3  Constitution and the analogous rights under the Texas
 4  Constitution.
 5     MS. STEELE: Your Honor, I'm okay with
 6  the shorthand version of that, but I think there needs
 7  to be a clear record that the witness is indeed
 8  asserting the Fifth Amendment and any Texas
 9  Constitution --
10     JUDGE RODRIGUEZ: We'll get that on the
11  record.  That's fine.
12     Let's get started.  Call your first
13  witness.
14     MS. STEELE: Thank you, Your Honor.  I
15  would call Mr. David R. Jones to the stand, please.
16     DAVID R. JONES,
17  having been first duly sworn, testified as follows:
18     JUDGE RODRIGUEZ: Ms. Steele, your
19  witness.
20  EXAMINATION BY MS. STEELE
21  Q.   Good morning, Mr. Jones.  My name is Laura
22    Steele.  I'm a trial attorney with the United States
23    Department of Justice, U.S. Trustee Program.  Thank
24    you for being here this morning, Mr. Jones.
25       Could you please state your full name

Page 31

 1    for the record?
 2  A.   David Ronald Jones.
 3  Q.   What is your current residence?
 4  A.   I don't know how to answer that.
 5  Q.   Where do you live?
 6  A.   I have two homes.
 7  Q.   What are the addresses of your two homes?
 8  A.   6530 Rolla.  210 Ridge Lane.
 9  Q.   And where do you spend the majority of your
10    time living?
11  A.   I couldn't do that.  That would be a guess.
12  Q.   Where do you claim your homestead exemption?
13  A.   210 Ridge Lane.
14  Q.   Does anyone reside with you at 210 Ridge
15    Lane?
16     THE WITNESS: Judge, how do you want to
17  do the shorthand?
18     JUDGE RODRIGUEZ: I haven't heard any
19  objections.
20     THE WITNESS: I'm declining to answer
21  the question based upon the rights and privileges
22  granted to me under the United States Constitution as
23  well as the Texas Constitution.  Do you want me to
24  repeat that each and every time or --
25     JUDGE RODRIGUEZ: We can make that a

Page 32

 1  defined, just "decline to answer" asserting your
 2  rights under the Fifth amendment.
 3     THE WITNESS: All right.
 4     BY MS. STEELE:
 5  Q.   Mr. Jones, does anyone reside with you at
 6    the Rolla Street property?
 7  A.   I decline to answer.
 8  Q.   Are you the only owner of 210 Ridge Lane?
 9  A.   I decline to answer.
10  Q.   Are you the only owner of the Rolla Street
11    property?
12  A.   I decline to answer.
13  Q.   How long have you lived at the 210 Ridge
14    Lane property?
15  A.   I decline to answer.
16  Q.   How long have you lived at the Rolla
17    property?
18  A.   I decline to answer.
19  Q.   Do you own any other properties other than
20    the two properties that we've discussed this morning
21    so far?
22  A.   I decline to answer.
23  Q.   Mr. Jones, what is your highest level of
24    education?
25  A.   I decline to answer.

Page 293

1  Q.  And when did you learn?
2  A.  I think I read about them. And I don't know
3    from where. But I've read somewhere that Jackson
4    Walker adjusted or comped so that nothing was
5    attributable to any case that I had. I know at some
6    point she was told she couldn't work on cases that I
7    presided over.
8      But I don't know when I learned that.
9    It was certainly after they had done it.
10 Q.  Did Ms. Freeman generally confide in you
11   about, you know, things that troubled her at work, you
12   know, just frustrations with coworkers or supervisors
13   or anything like that?
14 A.  No.
15 Q.  Did you ever talk about her work at Jackson
16   Walker at home?
17 A.  "Never" is a strong word, but as a matter of
18   practice, no.
19 Q.  So you were completely unaware of what was
20   going on at Jackson Walker, I believe, March 6th to
21   the 8th, 2021?
22 A.  What was going on on March 6th? I don't
23   know what you're referring to.
24 Q.  Sure.
25     So Ms. Freeman had been called up by

Page 294

1    the firm and asked questions, and you were unaware
2    about that happening?
3  A.  She was called up. You mean like somebody
4    called her on the telephone?
5  Q.  Correct.
6  A.  I have no memory of that.
7  Q.  Mr. Jones, if you could go to Exhibit 62. I
8    do appreciate your patience with this many exhibits.
9    I know it's cumbersome.
10 A.  All right.
11 Q.  So in September of 2021, Mr. Cowlishaw
12   received a letter from Harvey and Jarvis, which are
13   counsel for Holland & Knight, regarding the
14   allegations that had been made in the Van Deelen
15   letter.
16     Have you ever seen this letter before
17   today?
18 A.  No.
19 Q.  Did Jackson Walker at any point contact you
20   to confirm facts regarding your relationship with
21   Ms. Freeman before 2023?
22 A.  I don't think so.
23 Q.  Would it have been true if Ms. Freeman
24   represented that she had not seen you since the onset
25   of COVID through March 2021?

Page 295

1  A.  That she had not seen me?
2  Q.  Correct.
3  A.  From when to when?
4  Q.  So March 2020 through March 2021.
5  A.  I mean, I'm sure she saw me on video for
6    hearings and stuff.
7  Q.  Did she see you at home?
8  A.  Ask the question again.
9  Q.  Sure.
10     Did she see you at home in the period
11   of March 2020 through March 2021?
12 A.  What are you referring to as home?
13 Q.  Rolla Street.
14 A.  I don't believe so.
15 Q.  And where was she?
16 A.  I don't know.
17 Q.  Did you see her at other places?
18 A.  I mean, one, you're asking me something that
19   happened a long time ago, and I don't want to give you
20   an incorrect answer. I just -- I don't know.
21 Q.  Had she moved out of the Rolla house in
22   2021?
23 A.  I'm going to decline to answer that
24   question.
25 Q.  So Jackson Walker contacted Harvey and

Page 296

1    Jarvis and Holland & Knight for the purpose of seeking
2    what I believe to be some guidance as to -- to handle
3    the revelations that Ms. Freeman had made to them
4    about there having been a prior relationship.
5  A.  Are you telling me to assume that as a fact?
6  Q.  Yes.
7  A.  Okay.
8  Q.  Because you've never seen the letter, you
9    don't know anything about Harvey and Jarvis?
10 A.  Well, I know who Holland & Knight is. It's
11   not Holland and Jarvis, but I know who Holland &
12   Knight is.
13 Q.  I appreciate the correction. Thank you.
14   Harvey and Jarvis.
15 A.  Holland & Knight.
16 Q.  And Holland & Knight.
17     So Harvey and Jarvis are the two
18   attorneys who work for Holland & Knight?
19 A.  I don't know that. I'll accept that.
20 Q.  Okay. Thank you.
21     In 2021 in March, did you have any
22   further conversations with Ms. Freeman with regard to
23   your ethical duties to disclose the relationship?
24 A.  Not that I know of. Or not that I remember.
25   She wouldn't have asked my advice anyway.