IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | |
| | § | Case No. 23-00645  (EVR) |
| Professional Fee Matters Concerning | § | |
| The Jackson Walker Law Firm | § | |

**BRIEF OF JC PENNEY PLAN ADMINISTRATORS REGARDING
SCOPE OF ISSUES FOR CONSIDERATION BY THIS COURT**

The Old Copper Company, Inc. f/k/a J. C. Penney Company, Inc. and Copper Sub Corporation, Inc. f/k/a J. C. Penney Corporation, Inc. as Wind Down Debtor in J. C. Penney Direct Marketing Services, LLC ("JCP"), as a party-in-interest, respectfully submits this brief in an effort to facilitate the Court's attempt to narrow the issues to be considered by dispositive motions and/or at trial.

### I.   OVERVIEW

At the October 15, 2024, status conference (the "10/15 Hearing"), this Court informed the parties, for the first time, that the "only question to be addressed in this proceeding is whether or not final fee orders should be vacated" [ECF 471]. The Court instructed the U.S. Trustee's Office ("UST") and Jackson Walker LLP ("JW") to submit briefing "as to the Court's question regarding the filing of a dispositive motion on the question of whether any of the final Jackson Walker fee orders should be vacated" [ECF 471].

At the 10/15 Hearing, the Court seemed to express its view that there are no relevant disputed facts because JW has admitted it knew the about relationship (the "Relationship") between former judge David Jones ("Jones") and Elizabeth Freeman ("Freeman") as of March 2022. However, March 2022 is not the determinative date for this Court's deliberations. The facts, as pled by JW and set out in Judge Isgur's September 20, 2024, referral of JW to the District Court pursuant to Rule 6 of the Disciplinary Rules of this District (the "Disciplinary Referral"), establish

(at a minimum) that JW knew of a past Relationship as of March 7, 2021, and knew of an ongoing Relationship as of March 30, 2022.  See Exhibit A. ("[On March 7, 2021], Ms. Freeman acknowledged that she had been in a prior intimate relation[ship] with Judge Jones during her tenure at Jackson Walker.  She denied a present relationship….Ms. Freeman ... continued to deny the existence of an ongoing intimate relationship until March 30, 2022…"  Judge Isgur concludes in the Disciplinary Referral that "**[O]nce Jackson Walker learned from Ms. Freeman that there had been a prior relationship [March 7, 2021], its ability to defend its non-disclosure ended**." Exhibit A (emphasis added).

Factual evidence developed in this proceeding brings JW's claims as to what it knew and when into question.  The investigation regarding these key facts is ongoing but has been hindered by JW's stonewalling of discovery efforts.  To truncate the factual investigation undertaken in this proceeding based on the date JW claims it knew the Relationship was ongoing (rather than in the past), is unjust and does not appear to be in line with Judge Isgur's analysis set forth in the Disciplinary Referral.  In many cases, including the JCP Case (defined below), the JW retention applications and final fee applications were filed (and approved) prior to March 2022.  Thus, what and when JW knew about the Relationship is a vital factual issue that cannot be summarily adjudicated.

In JCP's view, the questions for this Court and/or the original court are: Did the Relationship constitute a "connection" under Rule 2014 that required JW's disclosure at the time it filed its retention applications?  If disclosure was not required at the time of the retention applications, did JW have a duty to supplement its disclosures at any time during the case and/or as part of its final fee application? Did JW's failure to disclose the Relationship to its clients render it ineligible to serve as debtor's counsel § 327 and/or to be compensated under § 328 because it

2

was no longer "disinterested"? Should the retention orders and final fee orders be vacated/revoked?

For the purpose of this brief, JCP suggests that an analysis of the meaning of "connections" under Rule 2014 *at the time of retention* is not, in and of itself, dispositive for the reasons discussed herein. As explained by Judge Isgur in the Disciplinary Referral, JW breached its duties to its clients when knew about the Relationship and failed to inform them.– regardless of whether or not it was ongoing or in the past. *See* Exhibit A. Once JW breached its duties to its clients, it was no longer disinterested and held an interest adverse to the estate. At that moment, it had a duty to disclose these facts to the Court and parties in interest. It did not do so in violation of the retention orders and the Bankruptcy Code and Rules.

## II.     FACTUAL HISTORY REGARDING JW KNOWLEDGE AND DISCLOSURE

On March 6, 2021, Matthew Cavenaugh ("Cavenaugh"), a JW partner, received an email from Michael Van Deelen, a creditor in the *McDermott* case, in which he alleged the Relationship had resulted in prejudice to him and other parties in interest (the "Van Deelen Allegations"). Van Deelen followed up this email with an anonymous letter he received alleging an affair between Jones and Freeman. Van Deelen had earlier (July 31, 2020) filed a motion to recuse Jones, which was heard by Judge Isgur on March 10, 2021, (the "Recusal Hearing"). Judge Isgur denied the motion to recuse.

The Van Deelen Allegations unleased a series of events that resulted in nationwide scrutiny upon this District and the bankruptcy system in general. To preserve the integrity of the bankruptcy system, it is imperative that a full examination of the facts and this Court's deliberations are conducted with the upmost transparency.

A.      **The JW Retention Application and Final Fee Application in JCP Case**

JW, as co-counsel to the debtors, filed several affiliated cases for JCP (collectively, the "JCP Case") on March 15, 2020, in the Southern District of Texas, Corpus Christi Division, and the first day hearings occurred the following day (a Saturday). The affiliated JCP cases were jointly administered under Case No. 20-20182.

JW filed an Application to Retain JW as Co-Counsel and Conflicts Counsel (the "Retention Application") on June 11, 2020 [JCP Case, ECF 685], supported by the Declaration of Cavenaugh. The Retention Application and Cavenaugh Declaration did not disclose the Relationship. JW never supplemented the Retention Application, despite the order approving the Retention Application (the "Retention Order") [JCP Case, ECF 963] requiring such supplement:

> ORDERED that Jackson Walker LLP will review its files periodically during the pendency of these chapter 11 cases to ensure that no conflicts or other disqualifying circumstances exist or arise. If any new relevant facts or relationships are discovered or arise, Jackson Walker LLP will use reasonable efforts to identify such further developments and will promptly file a supplemental declaration, as required by Fed. R. Bankr. P. 2014(a); it is further

JW filed its final fee application (the "Fee Application") on March 10, 2021, 12 hours *after* the Recusal Hearing in the *McDermott* case and *after* JW, and specifically, Cavenaugh, knew about the Relationship. JW did not supplement the disclosure at any time. This was a violation of the Retention Order.

Recently produced text messages reveal that Cavenaugh was so concerned about his declarations in prior cases that on March 8, 2021 (two nights prior to the Recusal Hearing), he worked all night reading them:

> Matthew Cavenaugh <8324962338>                                   3/9/2021, 11:07 PM
> I only got 1 hour of sleep last night. 4 hours of just energy calls, and 3 hours of re reading all of my declarations in prior cases

4

JW_00025819.

B.     **JW's Knowledge of the Relationship**

The romantic relationship between Freeman and Jones appears to have been "on again and off again" for approximately a decade. Jones testified that he never attempted to hide the relationship, and his case manager Albert Alonzo characterized Freeman and Jones as "hiding in plain sight." Nevertheless, parties and counsel in cases in which JW represented debtors did not know the history, nature, or extent of the Relationship. JW never disclosed the Relationship.

There is contradictory evidence regarding the date when Freeman confirmed a past Relationship to JW. In JW's Response to the UST's Motion for Relief from Judgment, JW states: "Upon receiving the **March 6, 2021** email, JW discussed the allegations with Ms. Freeman **that same day.** At that time, Ms. Feeman acknowledged the existence of a prior romantic relationship with former Judge Jones…." However, Cavenaugh testified in his deposition that he discussed the veracity of the Van Deelen Allegations with Freeman on **March 10, 2021**, "following the recusal hearing." Cavenaugh and other JW attorneys testified in depositions that they did not know about the Relationship until Freeman, after being confronted about the Van Deelen Allegations, admitted a *past* Relationship, but denied it was ongoing.

Recently produced text messages collected from JW partner Veronica Polnick ("Polnick") show that Cavenaugh and Polnick, as well as several senior JW partners, including its general counsel, knew about the Relationship at least as early March 7, 2021:

> Veronica Polnick <6313750279>   3/7/2021, 9:20 PM
> How's Bruce?
>
> Matthew Cavenaugh <8324962338>   3/7/2021, 9:22 PM
> He's good. It's been a day. Just so you know, the circle includes Bruce, chip, and Cowlishaw.
>
> Receipts • Veronica Polnick <6313750279> [R:3/7/2021, 9:23 PM]
>
> Matthew Cavenaugh <8324962338>   3/7/2021, 9:23 PM
> They are all good
>
> Receipts • Veronica Polnick <6313750279> [R:3/7/2021, 9:23 PM]
>
> Matthew Cavenaugh <8324962338>   3/7/2021, 9:23 PM
> They are also signed off on the plan

5



JW_00025798-00025799.

In addition, it appears Polnick knew about the Relationship "before":

> Veronica Polnick <6313750279>                                       3/9/2021, 10:32 PM
> [redacted]
>
> Veronica Polnick <6313750279>                                       3/9/2021, 10:32 PM
> Does Bruce know that I know now?
>
> Matthew Cavenaugh <8324962338>                                      3/9/2021, 10:32 PM
> I told him I had to loop you in for the filings
>
> Veronica Polnick <6313750279>                                       3/9/2021, 10:33 PM
> That's fine. Doesn't bother me if he knew that I knew before anyway. But I won't volunteer that
>
> Matthew Cavenaugh <8324962338>                                      3/9/2021, 10:33 PM
> He does not know that

JW_00025818

### C. Discovery Issues

The text messages cited above, among countless others, which were not available at the time the majority of the JW depositions were taken, contradict the deposition testimony. The inconsistency in the facts pled by JW and the testimony of JW lawyers is an example of why there are too many fact issues to decide this matter on a summary basis.

.JW has not explained why the Polnick text messages were produced on October 1, 2024, despite Polnick's testimony that she had turned over her devices to JW in May. Likewise, there is no explanation for why these messages were not collected from Cavenaugh's devices and produced.

These are just a few of the documents bringing into question JW's testimony that it did not learn of even a prior Relationship until after the Recusal Hearing. Undoubtedly, others exist. As the text messages have only recently been produced, at this time it is still unclear who knew what and when. But what seems clear is that Cavenaugh and Polnick had sufficient knowledge of the

Relationship to cause Cavenaugh to go back and review all of his declarations (JW_00025819) and to cause Polnick to be concerned that it could cost Jones the bench (JW_00025798). Despite this knowledge, at 9:45 p.m. on March 10, 2021, the evening of the Recusal Hearing and after Freeman confirmed a past Relationship, JW filed its Fee Application without making the necessary disclosures or amending the Cavanaugh Declaration.

### III.     LEGAL CONCLUSIONS BASED ON JW'S NON-DISCLOSURE

**A.     JW Was Not Disinterested, as a Matter of Law, Because It Breached Its Duties to JCP**

Bankruptcy Code § 101(14) defines "Disinterested Person" as on who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." 11 U.S.C. §101(14)(C). Thus, by definition, "disinterested person" excludes anyone who possesses an interest adverse to the estate.

As Judge Isgur concluded in the Disciplinary Referral, JW breached its ethical duties to its clients by not disclosing the Relationship to them. *See* Exhibit A. This is buttressed by the opinion of Peter Jarvis, a consulting expert retained by JW "immediately" after the Van Deelen Allegations arose. JW_00020335-00020338.

If JW breached its ethical duties, then it was necessarily not "disinterested." If JW had a duty to disclose the Relationship at the time it was retained or before it filed its Retention Application and failed to do so, then the estate held a claim against JW, rendering it a creditor of the estate, and, by definition, no longer "disinterested." *See* 11 U.S.C. § 101(14)(A) (stating that a disinterested person "is not a creditor"); *See also In re Pillowtex, Inc.*, 304 F.3d 246, fn 3 (3d Cir. 2002) ("The Bankruptcy Code prohibits retention of a professional who is a prepetition creditor of the debtor.");

7

Thus, if JW, through Cavenaugh or any other JW attorney, knew it had an obligation to disclose the Relationship to JCP and did not do so, it was not "disinterested." Nonetheless, it went forward and filed the Fee Application and sworn Cavenaugh Declaration without mentioning the Relationship.

### B. JW Violated the Terms of the Retention Order

Further, the Retention Order expressly required a supplemental declaration "if any new facts or relationships are discovered or arise." As JW, at least through Cavenaugh and Polnick, knew of the Relationship before filing the Final Fee Application and failed to apprise their client, the terms of the Retention Order were clearly violated.

Cavenaugh's and Polnick's knowledge (in addition to Freeman's knowledge) are imputed to JW as a matter of law. As the Fifth Circuit has recently confirmed, the knowledge of an agent (here the partner) is attributed to the principal for the purpose of liability. S*ee In re Black Elk Energy Offshore Operations, LLC,* 114 F.4th 343, 354 (5th Cir. 2024).

### IV.   CONCLUSION

Despite recognizing the potential disclosure issue as early as March 7, 2021, JW never apprised its clients or other parties of the Relationship and never supplemented its disclosures. The failure to disclose in and of itself negated the "disinterested" requirement as a matter of law. Instead of issuing a supplemental disclosure, JW proceeded to file final fee applications (in the JCP Case) after the Recusal Hearing. At a minimum it had a duty to inform its clients of the allegations and the potential risk.

The inquiry into JW's disclosure obligations and its failure to make any required disclosures requires a determination of disputed (and contradictory) facts that should be presented in a full evidentiary hearing and not summarily decided.

Dated: October 24, 2024

Respectfully submitted,

STREUSAND, LANDON, OZBURN
& LEMMON LLP

By: */s/ Rhonda Mates*
    Stephen W. Lemmon
    State Bar No. 12194500
    lemmon@slollp.com
    Rhonda Mates
    State Bar No. 24040491
    mates@slollp.com
    1801 S. MoPac Expressway, Suite 320
    Austin, Texas 78746
    (512) 236-9900; (512) 236-9904 (Fax)

**ATTORNEY FOR OLD COPPER COMPANY, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing instrument has been served on this 24th day of October 2024 upon all parties registered to receive such electronic notices in this case via this Court's ECF Notification system.

    */s/ Rhonda Mates*
    Rhonda Mates