**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
EXHIBIT
1
```

*In re:*

Professional Fee Matters Concerning the Jackson Walker Law Firm

Case No. 23-645

**EXPERT REPORT OF PROFESSOR JONATHAN C. LIPSON REGARDING CERTAIN**
**DISCLOSURE AND ETHICS MATTERS**

September 30, 2024

## TABLE OF CONTENTS

I. Summary........................................................................................................................................4

II. Qualifications and Conditions ....................................................................................................7

    A. Qualifications .........................................................................................................................7

    B. Conditions .............................................................................................................................9

III. Factual Background ..................................................................................................................9

    A. The Parties ..........................................................................................................................10

        1. EF and DJ .......................................................................................................................10

        2. EF Goes to JW ................................................................................................................11

    B. The Relationship is Discovered ...........................................................................................11

        1. "It Was All in the Past" ..................................................................................................12

        2. JW Responds to the Van Deelen Email .........................................................................12

        3. Seeking Peter Jarvis's Advice ("Jarvis1") ....................................................................13

    C. Actually, It's Not All in the Past. .........................................................................................14

        1. JW Learns that EF and DJ are Still Together—February, 2022. ....................................14

        2. Jarvis2: Disclose or Withdraw ......................................................................................14

    D. Say Nothing ........................................................................................................................16

        1.The Confidential Withdrawal Agreement.......................................................................16

        2.What Is the Relationship? EF and DJ Buy a Home and Live There—June 2017 ..........18

IV. The Role of Disclosure and Transparency in Chapter 11 Reorganization ............................20

    A. Lawyer Disclosure Obligations ...........................................................................................20

    B. Judicial Obligations .............................................................................................................22

    C. The Historic Need for Disclosure ........................................................................................23

V. Analysis of JW's Acts and Omissions Regarding Disclosure .................................................24

    A. Imputation of EF's Conflict to JW ......................................................................................24

        1. Texas Partnership Act ....................................................................................................24

        2. Texas's Imputation of Personal Interest Conflicts.........................................................25

        3. If It Looks Like A Marriage, It Probably Is a Marriage for Professional Conduct Purposes ............

        ......................................................................................................................................27

    B. What Should JW Have Done?  28

    C. The Mediation Cases ..........................................................................................................29

Conclusion .....................................................................................................................................31

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

*In re:*

Professional Fee Matters Concerning the
Jackson Walker Law Firm

Case No. 23-645

## EXPERT REPORT OF PROFESSOR JONATHAN C. LIPSON REGARDING CERTAIN DISCLOSURE AND ETHICS MATTERS

*"The conduct of bankruptcy proceedings not only should be right but must seem right."*[1]

*"[W]hat he gave me was a line of bull.  And I don't appreciate it.  You're asking me to put a lot of faith in people I don't know. And I expect transparency, I expect forthrightness, and I got neither . . . ."*[2]

*"Any litigant or member of the public might reasonably question whether the fees Jones awarded to Jackson Walker may have been paying the judge's mortgage and utility bills."*[3]

I have been retained by the United States Trustee for Region 7 ("UST") to offer my expert opinion on certain disclosure and ethical obligations of the law firm of Jackson Walker LLP ("JW") as they pertain to the intimate relationship (which had romantic, financial, and/or cohabitation features) (the "Relationship") of former JW partner Elizabeth Freeman ("EF" or "Ms. Freeman") to former United States Bankruptcy Judge R. David Jones ("DJ" or "Judge Jones").

Although the factual record of the Relationship is still developing as of this writing (and I thus reserve my right to supplement this Report and my opinions, as further provided below), my task is to assess what obligations, if any, JW had to disclose the existence and nature of the Relationship under section 327 of the United States Bankruptcy Code, Federal Rule of Bankruptcy Procedure 2014, and other applicable authorities incorporated therein, including rules and standards of professional responsibility as they may pertain to JW in the bankruptcy context.  More specifically, I have been asked to focus on such questions in connection with various motions and related efforts (the "Motions") by the UST to vacate the approval of orders retaining JW in certain cases (the "Cases") and awarding it fees.[4] The list of Cases is attached as Appendix A.

---

[1] *In re Ira Haupt & Co.,* 361 F.2d 164, 168 (2d Cir. 1966) (Friendly, J).

[2] Judge David R. Jones, quoted in May 29, 2020 Hr'g Tr., *In re Neiman Marcus Group Ltd LLC, et al.,* case no. 20-32519, doc. 827, p. 171:9-21.

[3] *Van Deelen v. Jones,* No. 4:23-CV-03729-AM, 2024 WL 3852349, at *16 (S.D. Tex. Aug. 16, 2024).

[4] *See, e.g.,* United States Trustee's Amended and Supplemental Motion for (1) Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6) and Federal Rule of Bankruptcy Procedures 9024 Approving the Retention and Compensation Applications of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief, *In re 43 Brands*

I am being compensated at the rate of $900/hour.

This Report has five parts. Part I summarizes my opinion. Part II provides my qualifications and the conditions and reservations under which I provide this opinion. Part III summarizes my understanding of the facts and my basis for such understanding.

Part IV describes the role that disclosure of actual and potential conflicts of interest plays in maintaining the integrity of the chapter 11 system, and why Congress sought to create a system of robust disclosure to act as a check on self-dealing and the appearance of impropriety in chapter 11 practice.

Part V.A explains why EF's conflict created by the Relationship was also JW's conflict: Texas imputes an attorney's personal interest conflict, such as a romantic relationship, to her law firm.  Part V.B shows how and why JW should have disclosed the Relationship no later than February, 2022, when the firm undeniably learned of the existence of the Relationship and that EF had repeatedly lied to JW about it. Part V.C explains why the Relationship also had to be disclosed in the Cases in which DJ acted not as a United States Bankruptcy Judge but instead as a mediator (the "<u>Mediation Cases</u>").

I. Summary

JW does not seriously dispute that EF's participation in the Relationship reflected a significant ethical lapse: they asked her to withdraw as a JW partner because, they concede, "an ongoing intimate relationship with Judge Jones . . . would be incompatible with [Jackson Walker's] continued participation in cases before Judge Jones."[5]  Rather, they assert that the obligation to disclose this "connection" fell to DJ,[6] who simply made an unfortunate error in judgment by failing to recognize that the Relationship was the sort of connection that had to be disclosed (in order to obtain informed consent) or that he had to be disqualified from presiding over the Cases pursuant to 28 U.S.C. § 455.[7] In any case, they would argue, Federal Rule of Bankruptcy Procedure 2014 does not require disclosure of attorney connections to judges by JW or EF.

JW is wrong on both the letter and the spirit of the law.

Although Rule 2014 does not explicitly say that connections to judges must be disclosed, that Rule exists to implement through forced disclosure the conflict rules of the Bankruptcy Code, including section 327(a), which governed the retention of JW.  Section 327(a) requires that EF and JW be "disinterested,"[8] a term which precludes a lawyer from representing a chapter 11 debtor if

---

*Northamerica LLC*, No. 22-50009 (Bankr. S.D. Tex. Feb. 29, 2240), ECF No. 645; United States Trustee's Objection to First and Final Fee Application of the Law Office of Liz Freeman for Allowance and Payment of Fees and Expenses as Co-Counsel and Conflicts Counsel to the Debtors for the Period from January 31, 2023 Through June 16, 2023, *In re IEH Auto Parts Holding LLC,* No. 23-09954 (Bankr. S.D. Tex. Jan. 29, 2024), ECF No. 1049.

[5]  *See* Opp. ¶ 38. Citation shorthand to Case documents on which I rely is set forth in Part II.

[6]  *See* Opp. ¶ 55 (Judge Jones insisted that "any disclosure obligation belonged to him, and him alone").

[7]  This provides that "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a).

[8]  11 U.S.C. § 327(a). This section provides in pertinent part that "the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." *Id.*

she has "an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders. . . . *or for any other reason*."[9]  If being in an undisclosed relationship that appears to be the functional equivalent of a marriage to a presiding judge is not an "other reason" an attorney would potentially be adverse to a bankruptcy estate, then nothing is.

Although Rule 2014 does not specifically mention judges as a disclosable "connection," the Judicial Code provides that Federal Rules of Bankruptcy Procedure "shall not abridge, enlarge, or modify any substantive right."[10]  JW would turn Rule 2014 on its head, and use it to abridge disclosure obligations that are fundamental to confidence in the chapter 11 system, including by eliminating the duty to disclose "other reasons" that an attorney may not be disinterested.

As a fallback, JW would argue that if any attorney had a duty to disclose the Relationship, it should be limited to EF, who allegedly concealed and lied about the Relationship to her colleagues at JW.[11]  Here, too, JW ignores the letter of the law.  Under Rule 1.06(f) of the Texas Disciplinary Rules of Professional Conduct (TDRPC) any conflict of EF—even a personal interest—would be imputed to JW, whether or not other attorneys at JW knew of it.[12]

Wholly apart from black letter rules—and JW would remind us that "'text is always the alpha'"[13]—Congress surely did not intend the result JW urges: that a law firm has no obligation to disclose an intimate relationship between one of its partners and a bankruptcy judge before whom the law firm regularly appears.

On JW's theory, a law firm has no such disclosure obligation *even when they have actual knowledge of the conflict*—a theory JW put into practice in February, 2022, by which time they indisputably learned that EF and DJ were in the Relationship yet failed to amend any of their Rule 2014 statements in the Cases.  Indeed, they have not to this day amended those disclosures, even though they concede the impropriety of the Relationship.

The Fifth Circuit Court of Appeals—like every appellate court to consider the question— views the disclosure obligations of estate professionals expansively.  The disclosure requirements of Rule 2014(a) "are broader than the rules governing disqualification, and an applicant must disclose *all* connections regardless of whether they are sufficient to rise to the level of a disqualifying interest under Section 327(a)."[14]  This is a continuing obligation,[15] and "counsel who

---

[9] 11 U.S.C. § 101(14)(C).

[10] 11 U.S.C. § 2075.

[11] Opp. ¶ 183 ("JW . . . had been repeatedly lied to" by EF "about her secret intimate relationship with a sitting federal bankruptcy judge who insisted that any disclosure obligations were his, and his alone").

[12] *See* Texas Disciplinary Rules of Professional Conduct 1.06(f), available at https://www.texasbar.com/AM/Template.cfm?Section=Home&ContentID=27271&Template=/CM/ContentDisplay.cfm (accessed Sept, 30, 2024) ("If a lawyer would be prohibited by [Rule 1.06] from engaging in particular conduct, no other lawyer while a member or associated with that lawyer's firm may engage in that conduct.").

[13] Opp. ¶ 103 (quoting *Whitlock v. Lowe (In re DeBerry)*, 945 F3d 943, 947 (5th Cir. 2019).

[14] *Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.)*, 676 F.3d 455, 465 (5th Cir. 2012) (emphasis added) (citing *In re Cornerstone Prods., Inc.*, 416 B.R. 591, 608 (Bankr. E.D. Tex. 2008) (stating that "all" connections must be disclosed); *In re Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (same).  *See also In re Wright*, 578 B.R. 570, 581 (Bankr. S.D. Tex. 2017) (requiring ongoing disclosure under Rule 2014 in a chapter 13 case) (Rodriguez, J.).

[15] *I.G. Petroleum, L.L.C. v. Fenasci (In re West Delta Oil Co. Inc.)*, 432 F.3d 347 (5th Cir. 2005).

fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation."[16]  While the duty to update prior filings is not eternal, it survives plan confirmation.[17]

There is an obvious reason for the expansive application of bankruptcy's disclosure rules. "The integrity of the bankruptcy system, indeed the entire legal system is dependent in large part on the ethical conduct of lawyers, their adherence to the law, and their compliance with the rules of the courts before which they appear."[18]  This is especially true in practice under chapter 11 because, as a presumptively collaborative process, it usually lacks dynamics of adversity that would otherwise tend to force into the open disabling conflicts of interest.  Thus, "the general rule in bankruptcy is 'disclose, disclose, disclose.'"[19]

Bankruptcy has a long and unfortunate history of significant ethical lapses by legal professionals.  Most notoriously, the "bankruptcy ring" of the 20th Century was a "festering sore" and a scourge that Congress sought to eliminate in enacting the Bankruptcy Code of 1978.[20]  It sought to do so through transparency and disclosure by professionals of actual, potential or conceivable conflicts of interest.

In my opinion, from and after the time JW first learned definitively that EF and DJ were in, and had been in, the Relationship throughout EW's partnership with JW (no later than February, 2022), JW had a duty to amend its 2014 disclosures in the Cases which erroneously indicated or implied no such connection to DJ.  DJ's erroneous interpretation of his ethical obligations is no excuse, because JW had an independent obligation to investigate the truth of allegations regarding the Relationship and, if the results warranted it, thereafter to disclose this conflict or to withdraw from the Cases—as it was advised to do by its own ethics expert in June of 2022.[21]  Unfortunately, at every important moment in this matter, JW chose not to disclose but instead to conceal what it knew or had good reason to know about the Relationship.

JW's conduct in this matter has been astounding.  It would appear that others share this reaction:

- On September 20, 2024 United States Bankruptcy Judge Marvin Isgur—formerly DJ's colleague on the "complex cases" panel for the Bankruptcy Court for the Southern District of Texas—issued an extraordinary letter referring JW and its conduct in connection with the Relationship for disciplinary action under Rule 6 of the Rules of Discipline of the Local

---

[16] *Waldron,* 676 F.3d at 465-6.

[17] As discussed below, this is a reasonable inference to draw from the *Bucyrus-Erie* bankruptcy and its fallout, as detailed in *United States v. Gellene*, 182 F.3d 578, 584 (7th Cir. 1999).

[18] *In re NNN 400 Cap. Ctr*. 16, LLC, 619 B.R. 802, 804 (Bankr. D. Del. 2020), *aff'd sub nom. In re NNN 400* Capitol Ctr. 16 LLC, 632 B.R. 243 (D. Del. 2021), *aff'd sub nom. In re NNN 400 Capitol Ctr. 16 LLC*., No. 21-3013, 2022 WL 17831445 (3d Cir. Dec. 21, 2022).

[19] Nancy B. Rapoport, *Am I My Colleague's Keeper When It Comes to Disclosing Connections?*, 40 EMORY BANKR. DEV. J. 333, 382 (2024).

[20] DAVID A. SKEEL, DEBT'S DOMINION, 76 (2001)(pre-Code bankruptcy's "festering sore was the perception that bankruptcy practice was grimy and, far worse, operated as a low-level racket.").

[21] *See* discussion of "Jarvis2" letter, *infra*.

Rules for the United States District Court for the Southern District of Texas (the "Isgur Letter").[22]

- On August 16, 2024, Chief District Judge Alia Moses, of the Southern District of Texas, stated that "the damage has been done" thanks to JW's "egregious" conduct.[23] "Public confidence in our courts is difficult to rebuild," she observed.[24] "No one litigant—no matter how zealous or well-represented—can lift the specter of impropriety these allegations have cast over the courthouse in which, until recently, half of all large bankruptcy cases were decided. This could have, and should have, been avoided."[25]

- On October 13, 2023, Chief Judge Priscilla Richman, of the Fifth Circuit Court of Appeals, found that "the alleged conduct" involving the Relationship "appears to constitute impropriety or at least the appearance of impropriety," and opened a disciplinary complaint against DJ.[26] Judge Jones resigned soon thereafter rather than defend it.[27]

- JW's co-counsel in 22 of the Cases, Kirkland & Ellis, lamented JW's disclosure failures regarding the Relationship. Kirkland partner Joshua Sussberg testified at deposition that JW's errors here "obviously tarnished . . . everything that was happening down in Houston."[28] He "would absolutely say that . . . it tarnishes all these cases. And that's a great concern from our perspective."[29]

- Indeed, even JW's own counsel has conceded in a separate pending civil proceeding that the Relationship "at a minimum" "creates the appearance of impropriety."[30]

## II.    Qualifications and Conditions

### A.    Qualifications

I am a tenured professor of law at Temple University-Beasley School of Law ("Temple Law"), where I hold the endowed Harold E. Kohn Chair, a position I have held since 2012. From 2010-2012, I held the Foley & Lardner Chair (with tenure) at the University of Wisconsin Law School. From 2004 to 2010, I was a tenured associate, and then full, professor at Temple Law. From 1999 to 2004, I was an assistant, and then tenured associate, professor of law at the University of Baltimore Law School. From 1990 to 1999, I was in private practice, as an associate

---

[22] See Letter dated Sept. 20, 2024 from Marvin Isgur, United States Bankruptcy Jude to Chief United Stated District Judge Randy Crane, re: Referral of Jackson Walker LLP, Case 4:24-mc-01523 Doc. 1 (S.D. Tex. Sept. 20, 2024).

[23] *Van Deelen v. Jones*, No. 4:23-CV-03729-AM, 2024 WL 3852349, at *15, *19 (S.D. Tex. Aug. 16, 2024).

[24] *Id.* at *19.

[25] *Id.* at *19.

[26] Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvements Act of 2002, Complaint No. 05-24-90002 (5th Cir. Oct. 13, 2023) available at https://www.courthousenews.com/wp-content/uploads/2023/10/fifth-circuit-complaint-against-bankruptcy-judge-david-jones.pdf (accessed Sept. 30, 2024).

[27] Cameron Langford, *Houston bankruptcy judge resigns amid ethics investigation,* Courthouse News, Oct 16, 2023, https://www.courthousenews.com/houston-bankruptcy-judge-resigns-amid-ethics-investigation/.

[28] Sussberg Dep. 79:13-15.

[29] *Id.* at 80:12-14.

[30] *Van Deelen v. Jones*, No. 4:23-CV-3729, Hr'g Tr. at 80:4–10 (S.D. Tex. June 6, 2024).

at the law firms of Milbank Tweed (1990-1992); Kirkland & Ellis (1992-1994); and Hill & Barlow (1995-1999).[31]  I am admitted to practice in New York and Massachusetts (inactive).  My resume is attached as Appendix B.

My research forms three clusters: (i) Contracts; (ii) Corporate Governance; and (iii) Corporate Reorganization under chapter 11 of the Bankruptcy Code.  I have had a particular interest in the role that transparency and disclosure play in the operation of the chapter 11 system.  In 2010 and 2016 I was the principal investigator in a major empirical study of the use of "examiners" in the chapter 11 system (the latter of which won the *American Bankruptcy Law Journal* Editors' Prize for best article of 2016).  In 2009, I published *The Shadow Bankruptcy System*, in which I argued that "[w]hen it enacted Chapter 11 of the Bankruptcy Code in 1978, Congress created a system that it believed would maximize transparency."[32]

I have worked closely with a number of United States Bankruptcy Judges over the years.  Of note, I am the Faculty Advisor to the *American Bankruptcy Law Journal*, the peer-reviewed legal journal published by the National Conference of Bankruptcy Judges, hosted by Temple Law.[33]  In that capacity, I work regularly and closely with United States Bankruptcy Judges around the nation.[34]  These interactions have given me insight into the deep respect the bankruptcy judiciary has for the bankruptcy system and their commitment to its integrity in fact and in appearance.

I also have certain disclosable connections to the UST.  I have twice submitted amicus briefs to appellate courts in support of positions advocated by the United States Trustee, in *In re FTX* and *Harrington v. Purdue Pharma*, as more fully indicated on my resume.  The former (*FTX*) supported the UST's (successful) efforts to achieve greater transparency in chapter 11 through the appointment of an examiner.  I undertook both efforts as counsel of record to amici curiae bankruptcy law professors, and did so on a pro bono basis.  I have made presentations to the UST program and been on panels with employees thereof.[35]  Other than those interactions, and this engagement, I have no material connection to the UST.

---

[31] I note that, although I was a bankruptcy associate at Kirkland & Ellis, I have had no significant contact with anyone from that firm in many years.

[32] Jonathan C. Lipson, *The Shadow Bankruptcy System*, 89 B.U. L. REV. 1609, 1620 (2009).

[33] AMERICAN BANKRUPTCY LAW JOURNAL, https://ablj.org/.

[34] In particular, I have in this capacity worked closely with the Hon. Terrence Michael, of the Northern District of Oklahoma and the current editor in chief, the Hon. Michelle Harner (District of Maryland), the incoming editor in chiuef, the Hon. Jeffrey Deller (Western District of Pennsylvania), a former editor in chief, and the Hon. Michael Kaplan (District of New Jersey), former business manager of ABLJ.  As explained by ABLJ, the Temple Law-ABLJ partnership was the product of a competitive bidding process.  Temple Law hosts ABLJ without charge.

Separately, the Hon. Craig T. Goldblatt (District of Delaware) and I coach Temple Law's Duberstein Moot Court team.  I also regularly present my scholarship on panels with and for Bankruptcy Judges.

For the record, I have never met or spoken with Judges Jones, Isgur, Rodriguez or Perez, of the Southern District of Texas.  I briefly met Judge Christopher Lopez at an academic conference in March, 2024—we sat at the same table at dinner—but it is improbable he would remember me.

[35] I also know William Harrington, UST for Regions 2 and 3, socially (and of course supported his efforts in *Purdue Pharma* through the amicus brief noted above).

I have been an expert witness in several matters listed on my resume. I have been deposed once, in a matter not involving bankruptcy. I have never testified in court. Of note, I was retained as a consulting expert by the Creditors Committee of Enron Corp. following confirmation of its plan of reorganization, to assess the work performed by the law firms of Vinson & Elkins and Andrews Kurth as prebankruptcy counsel to Enron and its affiliated debtors. Those matters settled, resulting in a payment to the creditors' trust of about $30 million.[36]

### B. Conditions

It is customary for expert reports and the opinions rendered by expert witnesses to be subject to various conditions and qualifications, the most important of which is the right to supplement the report and/or the opinion in the light of subsequent facts or developments in the matter under consideration. I reserve the right to do so.

This condition, while customary, is especially important in this matter. The schedule set has required the exchange of Expert Reports September 30, 2024—before the completion of fact discovery. Certain depositions have been sealed, and I have not seen those. The transcripts of many of the depositions and other materials evaluated were made available within weeks or days of the due date of this Report. The compressed schedule for the production of this Report, and the incomplete nature of the factual record, require me to be especially clear that I reserve the right to amend this Report and the opinions expressed herein as the record further develops in this and related matters.

A list of the materials made available by the UST is attached as Appendix C.[37]

## III.   Factual Background

Ten days ago, on September 20, 2024 United States Bankruptcy Judge Marvin Isgur—formerly DJ's colleague on the "complex cases" panel for the Bankruptcy Court for the Southern District of Texas—issued an extraordinary letter referring JW and its conduct in connection with the Relationship for disciplinary action under Rule 6 of the Rules of Discipline of the Local Rules for the United States District Court for the Southern District of Texas (the "Isgur Letter").[38]

My understanding of the facts of the Relationship and the Cases derives in part from discovery to this point and the Isgur Letter, as well as the following:

(i) The Preliminary Response of Jackson Walker LLP to Recent Filings by the Office of the United States Trustee, *In re Neiman-Marcus Group Ltd, LLC, et al.*, case 20-32519 (MI) Doc 3184 (Bankr. S.D. Tex. November 13, 2023) ("Preliminary Response" or "Prelim. Resp.");

(ii) Jackson Walker LLP's Response in Opposition to the United States Trustee's Amended and Supplemental Motion for (1) Relief from Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(6) and Federal Rule of Bankruptcy Procedure 9024 Approving the Retention and

---

[36] *See Houston's Vinson & Elkins Settled with Fallen Energy Giant, In re*: Comm. of Unsecured Creditors of Enron Corp., 2006 WL 1889497 (June 2, 2006).

[37] In this regard, I note that I have not had the opportunity to review every item on Exhibit C, every pleading in the Cases, every item involving or responding to the Motions, or even every page of discovery that has been produced. I have made a good faith effort to review that which appears to be most plausibly relevant to the scope of this opinion.

[38] See Letter dated Sept. 20, 2024 from Marvin Isgur, United States Bankruptcy Jude to Chief United Stated District Judge Randy Crane, re: Referral of Jackson Walker LLP, Case 4:24-mc-01523 Doc. 1 (S.D. Tex. Sept. 20, 2024).

Compensation Applications of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief, *In re Neiman-Marcus Group Ltd, LLC*, et al., case 20-32519 (MI) Doc 3234 (Bankr. S.D. Tex May 22, 2024) ("Opposition" or "Opp."); and

(iii) The United States Trustee's Reply To Jackson Walker LLP's Response In Opposition To Motion For (1) Relief From Judgment Pursuant To Federal Rule Of Civil Procedure 60(B)(6) And Federal Rule Of Bankruptcy Procedure 9024 Approving The Compensation Applications Of Jackson Walker LLP, (2) Sanctions, and (3) Related Relief discovery produced in the Cases, *In re: Auto Plus Auto Sales, LLC et al.,* Case No. 23-90055 (formerly jointly administered under Lead Case IEH Auto Parts Holding LLC. Case No. 23-90054 Doc. 150 (Bankr. S.D. Tex. July 1, 2024)("UST Reply").

I understand that the Preliminary Response, the Opposition, and the UST Reply, as well as the Motions, are substantially similar across the Cases.

### A. The Parties

#### 1. *EF and DJ*

Elizabeth Freeman graduated from Baylor University School of Law in 1997.[39] She was admitted to the Texas Bar in 1998.[40] Upon graduating from law school, Ms. Freeman clerked for the Honorable (Ret.) Bankruptcy Judge Wesley Steen in the Southern District of Texas.[41] Following her clerkship, Ms. Freeman began her career as a bankruptcy associate at the law firm of Locke Lord Bissell & Liddell LLP n/k/a Locke Lord LLPMs.[42] In 2009, EF joined Houston-based Porter Hedges LLP as a partner in the bankruptcy group and remained until 2011 when she left to become former Judge Jones's permanent law clerk. Former Judge Jones was also a partner at Porter Hedges at that time.[43]

Ms. Freeman "was a nationally recognized and widely respected bankruptcy attorney."[44] She is one of 96 "specialists" in bankruptcy certified by the Texas Board of Legal Specialization.[45]

After earning his law degree, former Judge Jones joined the bankruptcy boutique firm of Kirkendall & Isgur.[46] When Judge Marvin Isgur was appointed to the bench on February 1, 2004, former Judge Jones left the firm to join Porter Hedges as a partner in the bankruptcy group.[47] Former Judge Jones "developed a successful bankruptcy litigation practice."[48]

---

[39] Opposition, ¶ 14.

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] Opp. ¶ 15.

[45] *Id.*

[46] Opp., ¶ 17.

[47] *Id.*

[48] *Id.*

DJ left Porter Hedges to become a United States Bankruptcy Judge for the Southern District of Texas, and was sworn in as such September 30, 2011.[49]  EF left Porter Hedges to serve as DJ's law clerk, a position she held for approximately six (6) years.[50]

### 2.  EF Goes to JW

In early 2018, EF sought a partnership position at JW.[51]  She represented that she had no conflicts of interest in JW's Lateral Partner Questionnaire, but was "unable to work on an[y][sic] matter currently pending before Judge Jones."[52]  JW interpreted this as a requirement that DJ made of former clerks, and was in EF's case to last six (6) years.[53]

According to JW, "[a]t no time during the interview or onboarding process with JW did Ms. Freeman disclose that she had in the past—or was currently having—an intimate relationship with former Judge Jones. Nor did she disclose that she lived with former Judge Jones or that they co-owned residential property."[54]

JW claims that it "had no reason to believe otherwise.  And even to this date, JW *still* does not know the true state or history of the [R]elationship between former Judge Jones and Ms. Freeman."[55]

### B.  The Relationship is Discovered

JW asserts that on Saturday, March 6, 2021, "the very first *allegations* of a possible intimate relationship between former Judge Jones and Ms. Freeman surfaced."[56]  "*Pro se* litigant Michael Van Deelen raised these allegations in an email to [JW bankruptcy partner Matthew] Cavenaugh in connection with his effort to recuse former Judge Jones from the *McDermott* bankruptcy proceedings" (the "Van Deelen Email").[57]  Mr. Van Deelen asserted that "he had received an anonymous letter (the "Van Deelen Letter") claiming former Judge Jones and Ms. Freeman were in an intimate relationship."[58]

---

[49] Opp. ¶ 18.

[50] *Id.*

[51] Opp. ¶ 26.

[52] *Id.*

[53] Opp. ¶ 27.

[54] Opp. ¶ 28.

[55] *Id.*

[56] Opp. ¶ 33 (emphasis in original).

[57] *Id.* Mr. Van Deelen had been a shareholder of McDermott International, whose chapter 11 bankruptcy was one of the Cases over which Judge Jones presided.  Mr. Van Deelen moved to recuse Judge Jones almost a year before he presented the Van Deelen Letter to Mr. Cavenaugh, on July 23, 2020. *Van Deelen v. Dickson (In re McDermott Int'l Inc.)*, Adv. No. 20-3309 (Bankr. S.D.Tex.), ECF No. 4 (July 23, 2020) (the "Van Deelen Adversary Proceeding"). Mr. Van Deelen filed an amended recusal motion and attached an anonymous letter that he said he had received just days before accusing Judge Jones of "corruption." *Van Deelen v. Dickson (In re McDermott Int'l Inc.)*, No. 21-3369 (Bankr. S.D. Tex.), ECF No. 33 at 37–38 (Jan. 9, 2023) (Order on Appeal Affirming Dismissal of the Adversary Proceeding and Denial of Motion to Recuse).

[58] Opp. ¶ 33 (footnotes omitted).

### 1. *"It Was All in the Past"*

JW discussed the allegations with Ms. Freeman sooner thereafter.[59] At that time, "Ms. Freeman acknowledged the existence of a prior romantic relationship with former Judge Jones before the COVID-19 pandemic (*i.e.*, sometime prior to March 2020)."[60]  "[B]ut," she stated that "such romantic relationship was well in the past and was not ongoing. Indeed, Ms. Freeman told a representative of the firm that she had not even seen former Judge Jones since before the onset of the pandemic, a year earlier."[61]

As explained below, this would prove to be false, as EF has since testified that she has been in an intimate relationship with DJ, living with him continuously since 2015.[62] Although the admission of a prior relationship "contradicted the disclosures [EF] made to JW when she joined the firm," it appears that JW undertook no independent factual investigation of the allegations.

### 2. *JW Responds to the Van Deelen Email*

Instead, JW sought to conceal these allegations.  JW delivered the Van Deelen Letter to Judge Jones the morning of March 8, 2021 and asked the clerk of the Bankruptcy Court to seal it.[63]  The next day, March 9, 2021, Judge Jones contacted Judge Isgur and asked Judge Isgur to reassign Mr. Van Deelen's  recusal motion from Judge Jones to another judge; Judge Isgur entered an order that he would hear the motion to recuse; Judge Jones later signed the order sealing the Van Deelen Letter.[64]  It appears that at no time did DJ or JW inform Judge Isgur that EF had by then admitted that she and DJ had in fact been in the Relationship until March of 2020 (she would later confess that it never ceased).

On March 10, 2021, unaware of EF's admission, Judge Isgur ruled that because the Van Deelen Letter was anonymous, it was not admissible.[65]  JW did not make an appearance on the record at the virtual March 10 hearing, and apparently made no effort to inform Judge Isgur of its knowledge of the Relationship at and to that point.  Nor did it inform its principal co-counsel in the Cases, Kirkland & Ellis, what it actually knew about the Relationship.[66] Nor did it undertake any independent factual investigation of the truth of the allegations in the Van Deelen Letter, although JW has an internal investigations practice.[67]

---

[59] It is not entirely clear when Freeman confessed that she had a prior relationship with DJ. It appears to have been March 7 or 8th, 2021. Freeman Dep. 205:15-16.

[60] Opp. ¶ 34.

[61] *Id.*

[62] Freeman Dep. 134:21-23; 138: 16-18.  It appears that EF and DJ lived together prior to 2017 in a residence known as 524 Three Corners. *Id.*

[63] Prelim Resp. Ex. 1 at p.3; Motion, ¶ 22.

[64] Motion, ¶¶ 24 & 25. *See also* Van Deelen Adversary Proceeding, *supra*.

[65] Opp. ¶ 41.

[66] Joshua Sussberg, a Kirkland & Ellis partner stated in deposition that "They never told us that there was a confirmed romantic, financial, or cohabitation arrangement."  Sussberg Dep. 54:25-55:1. JW partner Matthew Cavenaugh testified in deposition that he forwarded the Van Deelen Letter and email. Cavenaugh Dep. 187:15-19.

[67] Cavenaugh Dep. 189:2-21.

### 3. *Seeking Peter Jarvis's Advice ("Jarvis1")*

Instead, it appears that JW sought an opinion of ethics expert Peter Jarvis, of Holland & Knight.[68] JW has not produced the request it made of Mr. Jarvis, so it is not clear how the facts or questions were framed for him. Nevertheless, its Preliminary Response attached an August 2021 draft of a letter from Patrick Cowlishaw, JW's general counsel, to Mr. Jarvis ("Draft Jarvis Request").[69] Here, JW stated that "there has been no romantic relationship between Ms. Freeman and Judge Jones since at least March 2020, and Ms. Freeman, and Judge Jones have not and do not live together."[70] It also stated that it had "disclosed these matters to our Kirkland co-counsel, who disclosed them to the client."[71] The latter statement appears to have been false when made by JW; the others would turn out to be false (it is not clear how much JW really knew then about the Relationship).

Based on these representations Mr. Jarvis began his response by stating that he "underst[ood] your core question to be whether the steps outlined in your letter" regarding EF "and the practice that your firm and she have before U.S. Bankruptcy Court Judge David R. Jones are sufficient *to meet public disclosure obligations that Ms. Freeman and your firm may have and to allow Judge Jones not to have to make further disclosures or to disqualify your firm or himself from cases on which Ms. Freeman and your firm may work on a going-forward basis.*"[72]

> I understand your core question to be whether the steps outlined in your letter regarding your partner, Elizabeth Freeman, and the practice that your firm and she have before U.S. Bankruptcy Court Judge David R. Jones are sufficient to meet public disclosure obligations that Ms. Freeman and your firm may have and to allow Judge Jones not to have to make further disclosures or disqualify your firm or himself from cases on which Ms. Freeman and your firm may work on a going-forward basis.[2] Although there is a lack of what I would consider "all fours" authority and

Source: Freeman Dep. Ex. 43

Mr. Jarvis's letter is devoted largely to the question whether Judge Jones would have to be disqualified: It does not directly address any of "public disclosure" obligations that EF or JW may have had.[73] Mr. Jarvis concluded that "it is my opinion that a reasonable observer aware of the surrounding facts and circumstances would conclude that there presently is and will continue to be an insufficient basis to question Judge Jones' impartiality."[74]

JW had apparently set forth for Mr. Jarvis steps it proposed to take to address the Relationship. All were internal to the firm, and largely involved partially screening EF from

---

[68] Although JW asserts that JW "immediately consulted" with Mr. Jarvis, Opp. at ¶ 37, they did not actually ask for his opinion until September 1, 2021—nearly six months later. See Letter dated Sept. 22, 2021 from Peter R. Jarvis to Patrick R. Cowlishaw, which appears as Exhibit 43 in the Freeman Dep. ("Jarvis1 Letter").

[69] Prelim Resp. at Ex 1.

[70] Prelim Resp. at Ex 1, pp. 3-4.

[71] Jarvis1 Letter, *supra* at 1.

[72] *Id.* at 5 (italics added).

[73] Although Mr. Jarvis does not appear to be a bankruptcy expert, per se, he has rendered expert opinions on the public disclosure obligations of bankruptcy attorneys. In *In re Jore*, he testified extensively that the law of Perkins Coie had breached disclosure duties under the same rules in question in the Cases and the Motions: *In re Jore Corp.*, 298 B.R. 703, 720–21 (Bankr. D. Mont. 2003).

[74] Jarvis1, *supra* at 4-5.

working on chapter 11 cases before DJ.[75]  It does not appear that JW made any effort to amend Rule 2014 statements filed in the Cases made during the period when it now knew that EF had been in a romantic relationship with DJ (i.e., from 2018 to 2020).

### C.  Actually, It's Not All in the Past

#### 1.  *JW Learns that EF and DJ are Still Together—February, 2022.*

Despite EF's assurance that the Relationship had ended, on February 1, 2022, a JW non-bankruptcy partner was told by a "credible third party" that the Relationship was in fact continuing.[76]

Although JW's management planned to "again confront" EF, EF did not "finally admit[] that she and Judge Jones had rekindled their relationship" for nearly two months, on March 30, 2022.[77]  She continued "to deny that she and former Judge Jones were living together and she never mentioned the co-ownership of residential property."[78]

According to JW, "Ms. Freeman's initial lies and eventual revelation thrust JW into an unprecedented situation. The law firm knew the status quo was not appropriate, yet, the situation involved a highly personal matter involving a sitting Federal Bankruptcy Judge who, as late as October 2023, was convinced that his interpretation of the applicable rules did not require disclosure of the relationship with Ms. Freeman. These unprecedented circumstances required a thoughtful approach."[79]

That may be true, but it is not clear what JW was thinking. Rather than undertake an independent investigation to determine the truth about this "unprecedented situation," JW again chose concealment over disclosure.

#### 2.  *Jarvis2: Disclose or Withdraw*

JW again sought the advice of Mr. Jarvis.[80]  As with the first letter from Mr. Jarvis, it is unclear what JW told or asked him.  Nevertheless, in a memorandum dated June 2, 2022 from Peter R. Jarvis and Jacqueline N. Harvey to Jackson Walker LLP ("Jarvis2") it appears that Mr. Jarvis told JW in no uncertain terms that it should disclose what it knew of the Relationship to its clients and thereafter make disclosure or seek recusal.[81] If the client failed to authorize such disclosure, Jarvis2 advised that JW must withdraw from its representations in the Cases.

---

[75] Prelim Resp. at Ex 1, pp. 5.

[76] Prelim. Resp. ¶ 16; Opp. ¶ 46.

[77] Opp. ¶¶ 47 & 48.

[78] Opp. ¶ 48.

[79] Opp. ¶ 50.

[80] Opp. ¶ 52.

[81] Jarvis2 appears as Cavenaugh Dep. Ex. 112.

> Although we cannot say that the matter is entirely free from doubt, it is our opinion that the lawyer has a duty to disclose the judicial conflict to the lawyer's client and seek to obtain the client's agreement to make disclosure. If the client directs the lawyer to make disclosure, the lawyer must either see to it that the judicial conflict is disclosed or withdraw. If the client directs the lawyer not to make any disclosure, the lawyer must withdraw.

Source: Cavenaugh Dep. Ex. 112.

Jarvis2 started from the supposition that, in the JW's rendering of the situation, JW represented parties with a "conflict of interest that the judge was and is required to disclose under 28 U.S.C. § 455 but has not disclosed."[82] This provides that a judge must "disqualify himself in any proceeding in which his impartiality might [] reasonably be questioned."[83] Because this provision "'focuses on the appearance of impartiality, as opposed to the existence in fact of any bias or prejudice, a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street.'"[84]

Jarvis2 reasoned that applicable ethics rules required JW to disclose DJ's conflict with its clients.[85] This was required "even if the lawyer was not personally certain that the judge had failed to make a necessary disclosure but just believed that there was a material risk of the case taking a turn unfavorable to the lawyer's client" as a result of future adverse rulings or the need to relitigate the underlying matters (e.g., due to a Rule 60(b)(6) vacatur).

Even if an informed client directed counsel not to make further disclosure, the lawyer would be at risk of violating Rule of Professional Conduct 8.04(a)(6), Jarvis2 observed, which forbids a lawyer from "knowingly assist[ing] a judge or judicial official in conduct that is a violation of applicable judicial conduct."[86] Although a lawyer in this position could feign ignorance under the "knowingly" standard, Jarvis2 opined that "the likelihood of the lawyer prevailing on such a defense is low" because it was "difficult to identify a plausible and non-frivolous argument as to why disclosure is not necessary."[87] Nor could JW claim that simply saying or doing nothing would suffice. That would be the equivalent of "impermissible assistance" to a judge.

> In the present circumstances, however, it would appear difficult to conclude that the lawyer's participation in a case before a judge who is required either to disclose a conflict or implement recusal is equivalent to mere silence which does not constitute impermissible assistance. In other words, it is our opinion that conducting a case before and seeking favorable rulings from a judge who is required to make disclosure or implement recusal would therefore constitute impermissible assistance to a judge under RPC 8.04(a)(6).

Source: Cavenaugh Dep. Ex. 112.

---

[82] Jarvis2 at 1.

[83] Id.

[84] Id. (quoting Potashnick v. Port City Const. Co., 609 F.2d 1101, 1111 (5th Cir. 1980)).

[85] Id. at 2 (citing Rule of Professional Conduct 1.03).

[86] Id. at 3 (quoting RPC 8.04(a)(6)).

[87] Id.

In the face of this unequivocal guidance—"the lawyer must either do or say something about the conflict or withdraw" (*id.* 4)—JW again did neither.  It did not inform its cocounsel, Kirkland & Ellis,[88] and did not otherwise seek client consent.  Nor did it amend any of its public disclosures in the cases.

### D.  Say Nothing

Instead, JW decided that "Ms. Freeman's departure from the law firm was the only path forward."[89]  Incredibly, JW also rejected advice from both EF's personal counsel and from DJ himself, both of whom by June of 2022 urged that JW make some form of disclosure.  To be sure, the disclosures each recommended were problematic because they would merely have stated that EF and DJ had a "close personal relationship," indistinguishable from relationships DJ had with others.[90]  For these reasons, JW recognized that such proposed disclosures were "inadequate" and "misleading."[91]

JW's solution?  Say nothing at all.

#### 1.  *The Confidential Withdrawal Agreement*

Rather than disclose or withdraw, as Mr. Jarvis advised, JW decided to further bury evidence of the Relationship, through a "Confidential Withdrawal Agreement" between JW and EF dated November 30, 2022 ("CWA").[92]  Under the CWA, EF agreed to withdraw as an equity partner of JW, and the two parties agreed on an allocation of her owed income, benefits and similar matters.[93]  The CWA also contemplated that EF and JW would continue to "work together as co-counsel in future matters, excluding matters before Judge Jones . . . . JW and [EF] each commit to use reasonable best efforts to realize future opportunities to work together to our mutual benefit, but each also agrees that neither has made any commitment to the other regarding any volume of work or any compensation."[94]

> 7.    The parties acknowledge that they have discussed the opportunity, subsequent to your withdrawal, to work together as co-counsel in future matters, excluding matters before Judge Jones.  The parties also acknowledge that any work together following your withdrawal, and the terms of such work, will require client consent on a matter by matter basis, and, in the case of some bankruptcy matters, may require court approval.  JW and you each commit to use reasonable best efforts to realize future opportunities to work together to our mutual benefit, but each also agrees that neither has made any commitment to the other regarding any volume of work or any compensation.

Cavenaugh Dep. Ex. 77.

For purposes of this opinion, the most important provision in the CWA is its confidentiality term.  The CWA provides that "JW and [EF] agree that this Agreement, all of its terms and

---

[88] Sussberg Dep. 70:23-25-71:1-25.

[89] Opp. at ¶ 53.

[90] Opp. at ¶¶ 52 & 56.

[91] Opp. at ¶ 57.

[92] The CWA appears as Cavenaugh Dep. Ex. 77.

[93] CWA ¶¶ 3-5.

[94] CWA ¶ 7.

conditions and all preceding discussions between you and JW, regarding your relationship with Judge Jones ("Covered Matters") are confidential and shall not be disclosed or revealed to any third party." It contains several exceptions, including "as otherwise may be required by law."

> 6. <u>Confidentiality.</u> JW and you agree that this Agreement, all of its terms and conditions, and all preceding discussions between you and JW, regarding your relationship with Judge Jones ("Covered Matters") are confidential and shall not be disclosed or revealed to any third party, except as specified below. JW and you agree that the existence, terms and conditions of the Agreement, and the content of the preceding discussions, may be disclosed only (a) by either party to their tax advisor, the IRS, accountants, insurers, or attorneys as each party deems necessary; (b) in the course of defending a legal or regulatory proceeding commenced by someone other than the disclosing party; (c) in a proceeding to enforce this Agreement, or (d) as otherwise may be required by law. The parties acknowledge that, within JW, Covered Matters have been discussed within the Management and Compensation Committees and with JW internal and outside counsel, and the parties agree that the resolution of these matters in the reaching of this agreement may be disclosed within those Committees. You agree that JW also may disclose the terms of this Agreement to the members of its Compensation Committee and, as needed in order to carry out its terms, its accounting and administrative personnel.

Cavenaugh Dep. Ex. 77.

I draw three inferences from the confidentiality provision of the CWA:

First, it appears that the CWA was intended to minimize the likelihood that the Relationship (or the CWA itself) would be disclosed publicly. It would also contractually preclude JW and EF from disclosing the Relationship to clients of either (or both) of them.

Second, it appears that JW and EF have in fact treated the Relationship and the CWA as confidential. I am aware of no case in which the Relationship or the CWA have been disclosed in any Rule 2014 statement.

Third, it appears that JW believed that this confidentiality provision would enable it to avoid disclosing to clients or the court any continued representation as cocounsel with EF before Judge Jones—despite JW's repeated assurance that that would not be the case.[95] In *In re Sorrento Therapeutics*, for example, in March of 2023—long after JW knew EF had repeatedly lied about the Relationship—JW "strongly recommend[ed]" that it hire EF as conflicts and special counsel but did not disclose the Relationship or its history to either the DIP or the court.[96] The *Sorrento* case was initially assigned to Judge Jones.

> ***CONFLICTS COUNSEL AND SPECIAL COUNSEL***. The Firm from time to time engages outside conflicts counsel to serve as special conflicts counsel "Conflicts Counsel," now and as the need may arise. Due to the number of banking relationships, and utility providers, the need for Conflicts Counsel is imperative, and should be retained concurrently with the Firm. At this time, the Firm strongly recommends the engagement of the Law Office of Liz Freeman as Conflicts Counsel. Ms. Freeman's hourly rate is $750/hour. Ms. Freeman will send a short form of engagement letter by separate cover.

---

[95] After executing the Confidential Withdrawal Agreement, Cavenaugh testified that EF and JW continued to work together, albeit not on cases in front of DJ. Cavenaugh Dep. 280: 13-19. JW would "strongly" recommend that EF be hired as conflicts counsel.

[96] Application to Retain Jackson Walker LLP as Co-Counsel and Conflicts Counsel for the Debtors and Debtors-in-Possession, Case 23-90085 Doc 231(Bankr. S.D. Tex. March 15, 2023), Ex. A at 3 (engagement letter).

Source: Application to Retain Jackson Walker LLP as Co-Counsel and Conflicts Counsel for the Debtors and Debtors-in-Possession, Case 23-90085 Doc 231 (Bankr. S.D. Tex. March 15, 2023), Ex. A at 3 (engagement letter).

It appears that, even after EF separated from JW, she continued to participate in "informal mini-retreats" involving JW bankruptcy attorneys.[97]

### 2. What *Is* the Relationship? EF and DJ Buy a Home and Live There—June 2017

JW often claims that "even to this date, JW still does not know the true state or history of the relationship between former Judge Jones and Ms. Freeman."[98]  While it may be the case that JW had little or no actual knowledge of the Relationship prior to March 6, 2021, it would appear that even a basic search of public records as of that date—when the Van Deelen Letter first alleged the existence of the Relationship—would have revealed their co-ownership since 2017 of a property at 6530 Rolla St, Houston, Texas ("Rolla Property").

On or about June 26, 2017, it appears that EF and DJ recorded a general warranty deed on a home at 6530 Rolla, Houston, Texas 77018-8103 ("Rolla Deed").  I understand from the UST that this is a true and correct image of a certified, and publicly available copy, of the Rolla Deed.



Source: UST_0773

On the same day, they also recorded a survivorship agreement indicating their joint ownership of the Rolla property.



Source: UST_0777

It appears that EF paid $250 May 8, 2017 to acquire an option to purchase the Rolla Property.

---

[97] JW partner Matt Cavenaugh testified that EF attended "an informal mini-retreat for the debtor team partners or partners to be or associates that were soon to be up for partner." Cavenaugh Dep. 287:13-15.  The goal "to just talk about ways that we can improve our practice and provide better client service and raise the profile of the firm." *Id.* 16-19.  These do not sound like activities of an attorney who has separated from a law firm.

[98] Opp. at ¶ 28.



Source: UST_7993

EF paid ad valorem taxes on that property.



Source: UST_7992

It appears that EF and DJ lived together at the Rolla Property, with EF's children, continuously from 2017 to the present.[99]

```
2      Q    Now, after you moved in to 6530 Rolla, did

3  both of your children have rooms in that house?

4      A    Yes.

5      Q    And did that remain the case from when you

6  moved in the Summer of 2017 through the rest of that

7  year?
```

```
19     Q    Now, did -- isn't it true that former Judge

20 Jones also resided at 6530 beginning in the Summer of

21 2017?

22     A    Yes.
```

```
10     Q    And you both continue to live there?

11     A    In -- you mean today?

12     Q    Yeah, currently?

13     A    Yes, we are both there.
```

Source: Freeman Dep. 145:1-25-146:1-13.

It is undoubtedly true that, in some respects, all relationships are ineffable to the outside observer. But that is not what JW mean when they argue that they do not know the truth about the Relationship. JW would have us believe that they neither knew nor had reason to know that EF

---

[99] Freeman Dep. 145:1-25-146:1-13.

and JW were in a continuous, cohabitational relationship which in many respects appears to have resembled a marriage.

But the Rolla Deed and survivorship agreement were public documents that could readily have been discovered through a modestly diligent search. While JW may have had little reason to conduct that search prior to March 6, 2021, once EF admitted to a prior relationship with DJ, it is difficult to understand how and why they failed to attempt to make this discovery. After February, 2022—when JW learned that the Relationship was continuing—the only plausible explanation is willful ignorance.

## IV.    The Role of Disclosure and Transparency in Chapter 11 Reorganization

Chapter 11 is no place for willful ignorance of actual or potential conflicts of interest. The integrity of the chapter 11 bankruptcy system depends on the integrity of the lawyers who manage its day-to-day operations. Because bankruptcy judges cannot be expected to police large and complex cases, the Bankruptcy Code and Federal Rules of Bankruptcy Procedure impose on attorneys employed by the estate significant disclosure obligations both to assure that all stakeholders can identify possible conflicts and to deter those with disabling conflicts from seeking such employment in the first place.

### A.  Lawyer Disclosure Obligations

The Bankruptcy Code requires that a professional retained by the debtor in possession not "hold or represent an interest adverse to the estate," and that the professional be "disinterested."[100] The term "disinterested" is defined in 11 U.S.C. § 101(14) as a person (1) who "is not a creditor, an equity security holder, or an insider," (2) who "is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor," and (3) who "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, *by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason*."[101]    It would seem that an intimate, ongoing romantic and financial relationship with a judge before whom an attorney appears would prevent that attorney from being "disinterested."

In the Fifth Circuit, "[t]he standards for finding a conflict are "'strict'" and "attorneys engaged in the conduct of a bankruptcy case '*should be free of the slightest personal interest which might be reflected in their decisions concerning matters of the debtor's estate or which might impair the high degree of impartiality and detached judgment expected of them during the course of administration.*'"[102] The Bankruptcy Code's ethical standards are enforced in the first instance by the disclosure requirements of Rule 2014. "Federal Rule of Bankruptcy Procedure 2014(a) requires any professional applying for employment to set forth 'to the best of the applicant's knowledge' all known connections of the applicant with the 'debtor, creditors, or any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the

---

[100] 11 U.S.C. § 327(a); *In re W.F. Dev. Corp.*, 905 F.2d 883, 884 (5th Cir. 1990).

[101] 11 U.S.C. § 101(14); *W.F. Dev. Corp.*, 905 F.3d at 884.

[102] *Waldron v. Adams & Reese, L.L.P. (In re Am. Int'l Refinery, Inc.)*, 676 F.3d 455, 462 (5th Cir. 2012) (quoting *West Delta Oil*, 432 F.3d at 355 (quoting *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1256 & n.6 (5th Cir. 1986)).

office of the United States trustee.'"[103]  The disclosure requirements of Rule 2014(a) "are broader than the rules governing disqualification, and an applicant must disclose all connections regardless of whether they are sufficient to rise to the level of a disqualifying interest under Section 327(a)."[104]

Courts may deny all compensation to professionals who fail to make adequate disclosure, and "counsel who fail to disclose timely and completely their connections proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order and deny compensation."[105]  In determining an appropriate sanction, the Fifth Circuit has stated that "'an important consideration is whether the failure was intentional.'"[106]   Even where there is no disqualifying conflict and "no harm or prejudice to the estate or creditors resulted," a court may impose sanctions for disclosure errors.[107]

The duty to disclose connections under Rule 2014 "continues throughout the chapter 11 case."[108] *Collier on Bankruptcy*, the nation's leading bankruptcy treatise, explains that "*[n]ewly discovered information or any change in circumstances must be disclosed*. An attorney has an affirmative duty to disclose such potential conflicts so that the appropriateness of employment will be subject to the independent judgment of the court."[109]

JW may object that some of the Cases were already closed by the time the UST filed the Motions. Surely, they would argue, that is too late to force JW to amend its filings.  But, the passage of time is not necessarily a reason to fail to update filings if they are known to be false. In the notorious *Bucyrus-Erie* bankruptcy, a creditor sought the disgorgement of fees based on allegations of inadequate 2014 disclosures which came to light two years after the debtors' plan of reorganization was confirmed.[110]

---

[103] *West Delta Oil*, 432 F.3d at 355 (quoting Fed. R. Bankr. P. 2014(a)).

[104] *Waldron*, 676 F.3d, at 465 (citing *In re Cornerstone Prods., Inc*., 416 B.R. 591, 608 (Bankr. E.D. Tex. 2008) (stating that "all" connections must be disclosed); *In re Leslie Fay Cos*., 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994) (same).

[105] *West Delta Oil*, 432 F.3d at 355 (quotation marks omitted); *see also Rome v. Braunstein*, 19 F.3d 54, 59-60 (1st Cir. 1994) ("Absent the spontaneous, timely and complete disclosure required by section 327(a) and [Rule] 2014(a), court-appointed counsel proceed *at their own risk*.").

[106] *Waldron*, 676 F.3d at 466 (quoting *Crivello*, 134 F.3d at 839 (stating that "a bankruptcy court should punish a willful failure to disclose the connections . . . as severely as an attempt to put forth a fraud on the court.").

[107] *Waldron*, 676 F.3d at 465 (20% of compensation awarded).

[108] *In re Ridgeway*, No. 16-10643, 2018 Bankr. LEXIS 531, *5 (Bankr. E.D. La. Feb. 27, 2018).

[109] 3 Collier on Bankruptcy ¶ 327.04 (Richard Levin & Henry J. Sommer eds., 16th ed).  *See also In re Harris Agency, LLC*, 451 B.R. 378, 390 (Bankr. E.D. Pa.), *aff'd sub nom. In re The Harris Agency, LLC*, 462 B.R. 514 (E.D. Pa. 2011) ("Most importantly, the duty to disclose does not end once the Rule 2014 Verified Statement has been filed; rather, there is an ongoing duty of counsel to inform the court of its connections and potential conflicts.").

[110] It appears that the Bucyrus-Erie plan of reorganization was confirmed in December 1994. *Bucyrus-Erie According to the Defendant-Appellant*, 33 No. 4 Bankr. Ct. Dec. News 9 (October 13, 1998).  Creditor Jackson-National did not seek disgorgement of fees, based on claims that Milbank partner John Gellene's 2014 disclosures were inaccurate until December 1996. *United States v. Gellene*, 182 F.3d 578, 584 (7th Cir. 1999). Thereafter, Mr. Gellene was charged, tried and convicted of making false filings in the bankruptcy.  *Id.*

While it is not clear how long the duty to update a 2014 disclosure lasts, or how far back it reaches, here it arose in March 2021 for Cases involving EF and DJ prior to March 2020 and for all of the Cases after JW learned the Relationship was continuing, in February, 2022.

### B. Judicial Obligations

JW's position is that FRBP 2014 does not specifically refer to judges, and thus infers that there is and was no obligation to disclose EF's relationship with DJ: "JW had no obligation to disclose any connections with a presiding judge or mediator under Bankruptcy Rule 2014."[111] Instead, it is their contention that obligation to anticipate and rectify any failing arising from the Relationship fell exclusively on Judge Jones.

Federal Rule of Bankruptcy Procedure 5002(b) forbids a bankruptcy judge from approving an employment application of someone closely connected with that judge:

> A bankruptcy judge may not approve the appointment of a person as a trustee or examiner pursuant to §1104 of the Code or approve the employment of a person as an attorney, accountant, appraiser, auctioneer, or other professional person pursuant to §§ 327, 1103, or 1114 of the Code *if that person is or has been so connected with such judge or the United States trustee as to render the appointment or employment improper*.[112]

It is not, however, clear that the judge's duties insulate a lawyer from an independent duty to report a connection to the judge. The Notes of the Advisory Committee on Rules (1985 Amendment) imply that counsel has an independent duty to disclose connections to the judge.

> The policy underlying subdivision (b) is essentially the same as the policy embodied in the Code of Judicial Conduct. Canon 2 of the Code of Judicial Conduct instructs a judge to avoid impropriety and the appearance of impropriety, and Canon 3(b)(4) provides that the judge "should exercise his power of appointment only on the basis of merit, avoiding nepotism and favoritism." *Subdivision (b) ... indicates to* [*the potential appointee or employee*] *that appropriate disclosure must be made to the bankruptcy court before accepting appointment or employment*.[113]

There is little doubt that disclosure of attorney connections to a bankruptcy judge would appear to be the better practice and the one more consistent with the transparency goals of chapter 11. Thus, JW's co-counsel in many, if not all, of the Cases appears to have done so.[114] Professor (and former Dean) Nancy Rapoport—perhaps the nation's leading expert on legal ethics in bankruptcy—indicates that she believes it is a best practice, one which she observes when she is

---

[111] *See, e.g.*, Opposition at ¶ 109. *See id.* at ¶ 108 (Rule 2014's "language is limiting,113 persons not enumerated in the rule's text are *not* within its scope").

[112] Fed. R. Bankr. P. 5002(b).

[113] Fed. R. Bankr. P. 5002(b), advisory committee's note to 1985 amendment (emphasis added).

[114] *See* Tom Hals, *Law Firm Tied to Bankruptcy Judge Resignation Did Not Make Conflict Disclosures--Data Analysis*, Reuters (Oct. 30, 2023, 10:50 AM), https://www.reuters.com/legal/law-firm-tied-bankruptcy-judge-resignation-did-not-make-conflict-disclosures-2023-10-30/ ("Law firms and other professionals employed by debtors are required under a bankruptcy rule to publicly list potential connections so that judges and other parties in the bankruptcy can assess if there might conflicts of interest. The rule does not mention judges specifically; it refers to debtors, creditors and 'parties in interest.' But disclosing connections to judges appears to be a standard practice. In the court filings Reuters reviewed, the larger national law firms that worked for the debtor alongside Jackson Walker always indicated that they had searched for connections to the judges on the bankruptcy court.").

retained as an expert witness or fee examiner in a chapter 11 case.[115]  Thus, as Professor Rapoport notes, "Disclosure about connections to the judge or other court personnel is important to ensure that the appointment of a professional to a case and the approval of any fees awarded to that professional satisfies the Bankruptcy Code and Rules."[116]

JW's principal co-counsel in the Cases, Kirkland & Ellis, views an attorney's connection to a judge before the firm appears as one that must be disclosed. "[I]f we had actual knowledge of a romantic relationship between a judge and a lawyer work[ing ]with us as local or co-counsel," Mr. Sussberg testified, it "absolutely would've been something to ensure that Number 1, the case wasn't tarnished because of that relationship and it was out [in] the public. . . . And, Number 2, . . . we have a reputation and a brand that we're protecting.  And to the extent we knew of a relationship, we absolutely would've done whatever needed to be done to have that disclosed."[117]

### C.  The Historic Need for Disclosure

Courts insist on robust disclosure in bankruptcy because that is what Congress wanted. In studying bankruptcy practice in the 1970s, and ultimately in enacting the Bankruptcy Reform Act of 1978, Congress intended to eliminate the perception that there was a "bankruptcy ring" of professionals controlling bankruptcy practice.[118]  Under pre-Code practice, a "referee," rather than a judge, had both administrative and judicial duties in bankruptcy.   This could lead to inappropriately close relationships with trustees and their professionals. As the legislative history explains:

> When the referee has appointed, or approved the appointment of, a trustee to take charge of the property of the estate, has supervised and perhaps instructed the trustee in the performance of his duties, and has approved the trustee's choice of counsel and the initiation of an action, the referee may not appear to the trustee's adversary as one fitting the model of judicial objectivity. . . . The responsibility resting on a conscientious referee under the present act is thus conducive to the development of what appears to attorneys who are not included among the specialists, to their clients, and to the public generally, *as an unseemly and continuing relationship between the referee and the members of the specialist bar. He is thus vulnerable to being linked by imputation to the so-called 'bankruptcy ring*,' which is the opprobrious label frequently given to the specialized bankruptcy bar in a community.. . . . Even if a paragon of integrity were sitting on the bench and could keep his mind and feelings insulated from influences which arise from his previous official connections with the case before him and with one of the parties to it, *he probably could not dispel the appearance of a relationship which might compromise his judicial objectivity*. The commission accordingly recommends that the bankruptcy judges be removed from the administration of bankrupt estates and be restricted to the

---

[115]. Rapoport, *supra* at 391 ("For the record, my practice is to disclose my connections to a court and to any court personnel in my own retentions as an expert or as a fee examiner. I believe that disclosing connections to the court or the court's personnel should be considered a best practice, and I also believe that Rule 2014 should be amended to move this type of disclosure from "best practice" to a requirement.").

[116] *Id.* at 374.

[117] Sussberg Dep. 35:16-25; 36:1-6.

[118] Hon. Terrence L. Michael et. al., *NCBJ Special Committee on Venue: Report on Proposal for Revision of the Venue Statute in Commercial Bankruptcy Cases*, 93 AM. BANKR. L.J. 741, 760–61 (2019).

performance of essentially judicial functions, that is, primarily to the resolution of disputes or issues involving adversary parties and matters appropriate for judicial determination.[119]

If administration of the day-to-day affairs of a bankruptcy might lead to the appearance of impropriety, what would Congress think of a bankruptcy judge who lived almost as spouses with an attorney who appeared regularly before him?  Would Congress assume, as it appears JW did, that there was simply nothing to disclose because that was the judge's job? Would it imagine that the rules it authorized the Supreme Court to promulgate for practice under chapter 11 would be used to justify disclosure failings, displacing and neutralizing otherwise applicable state professional ethics rules?

I do not think so.

## V.   Analysis of JW's Acts and Omissions Regarding Disclosure

### A.  Imputation of EF's Conflict to JW

JW asserts that it "did not violate the Bankruptcy Code, Bankruptcy Rules, or Texas Disciplinary Rules of Professional Conduct because, among other things. . . . Ms. Freeman's knowledge and alleged lack of disinterestedness are not imputed to JW."[120]  Rather, imputing EF's knowledge of the Relationship to JW "is at odds with foundational corporate and alternative-entity law principles in Texas and throughout the country."[121]

#### 1.  Texas Partnership Act

This is incorrect. The Texas Revised Partnership Act ("Partnership Act") recognizes that agency law also applies to limited liability partnerships, such as JW.[122] Under the Partnership Act JW would be liable for its partner's acts in the ordinary conduct of the business.[123]  Here, while the Relationship was clearly unusual—perhaps "unprecedented," in JW's words[124]—it furthered both the interests of EF and JW.  There was nothing unprecedented about their shared interest in maximizing the visibility and profitability of JW as a leading chapter 11 practice in Texas.  Under the Partnership Act, and for these purposes, JW *was* EF, and vice versa.  Jackson Walker understood this because it acknowledged that its attorneys connections were the firm's connections when it sought retention.[125]

---

[119] H.R. Rep. 95-595, 50-51, 1978 U.S.C.C.A.N. 5963, 6012 (emphasis supplied).

[120] Opp. ¶ 79.

[121] Opp. ¶ 119, n. 134.

[122] *See* Tex. Bus. Orgs. Code § 152.003 ("The principles of law and equity and the other partnership provisions supplement this chapter unless otherwise provided by this chapter or the other partnership provisions.").

[123] *See* Tex. Bus. Orgs. Code § 152.303(a)(1) ("A partnership is liable for loss or injury to a person, including a partner, or for a penalty caused by or incurred as a result of a wrongful act or omission or other actionable conduct of a partner acting . . . in the ordinary course of business of the partnership . . . .").

[124] Opp. ¶¶ 50 & 183.

[125] *See, e.g., In re Basic Energy Services, Inc*., No. 21-90002, ECF No. 809, Jackson Walker Retention Appl. (disclosing that "to the best of the Debtors' knowledge, these attorneys have no interest adverse to the Debtors, or to the Debtors' bankruptcy estates, and are disinterested.") (emphasis added).

Still, JW would ignore this because it asserts that other JW attorneys besides EF had to have actual knowledge of the Relationship—a form of knowledge they disavow to this day.[126] "Texas law that imputes knowledge from one attorney to her entire firm (a) implicates only a certain *kind* of knowledge (*i.e.*, the attorney's knowledge of a client's protected, confidential information), and (b) does so for the limited purpose of enforcing ethics rules governing, *inter alia*, concurrent representations and former-client conflicts."[127]

This appears to be incorrect because Texas embraces an unusual rule on imputation of attorney conflicts. It appears to impute personal interest conflicts to all partners, regardless of knowledge.

### 2.  *Texas's Imputation of Personal Interest Conflicts*

The Texas Disciplinary Rules of Professional Conduct ("TDRPC") apply to those members of JW who were admitted to practice in Texas.[128]   In addition to EF—a Texas-approved "specialist" in bankruptcy[129]—this included bankruptcy partners Matthew Cavenaugh,[130] Genevieve Graham, [131]Veronica Polnick,[132] and Bruce Ruzinsky.[133]

When a law firm partner is related to a judge within the third degree and is counsel in a case, the Fifth Circuit has found that he or she "automatically has an interest that could be substantially affected by the outcome of the proceedings."[134]   Texas Disciplinary Rule of Professional Conduct 1.06(b)(2) provides in pertinent part that "except to the extent permitted by paragraph (c) [informed client consent], a lawyer shall not represent a person if the representation of that person . . . (2) *reasonably appears* to be or become *adversely limited by the lawyer's or law firm's responsibilities* to another client *or to a third person or by the lawyers' or the law firm's own interests.*"[135]

---

[126] Opp. ¶ 28 ("even to this date, JW *still* does not know the true state or history of the relationship between former Judge Jones and Ms. Freeman")(emphasis in original).

[127] Opp. ¶ 126.

[128] The anti-conflict provisions contained in the Bankruptcy Code "find their counterparts in the codes of professional responsibility that govern the practice of law generally." *In re Marine Power & Equip. Co., Inc*., 67 B.R. 643, 654 (Bankr. W.D. Wash. 1986). Thus, some courts—including those in the Fifth Circuit—have suggested that the Model Code regulates the conduct and disqualification of attorneys practicing before the federal courts, and that it is a guideline for the bankruptcy court to follow in applying the disinterested person standard. *See, e.g., In re Macon Prestressed Concrete Co*., 61 B.R. 375, 378 (Bankr. M.D. Ga. 1986) (citing *Brennan's Inc. v. Brennan's Restaurants, Inc*., 590 F.2d 168, 172 n.15 (5th Cir. 1979); *Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir. 1976)).

[129] Opp. ¶ 15.

[130] https://www.jw.com/people/matthew-cavenaugh/.

[131] https://www.jw.com/people/genevieve-graham/.

[132] https://www.jw.com/people/veronica-polnick/.

[133] https://www.jw.com/people/bruce-ruzinsky/

[134] *McCuin v. Tex. Power & Light Co.*, 714 F.2d 1255, 1259 (5th Cir. 1983).

[135] The exception in (c) does not apply because it requires "client consent" to the representation "after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, in any." There is no evidence that any client of JW's in the Cases knew of, much less consented to, the conflict created by virtue of the Relationship.

Here, EF would not be permitted to represent any debtor if representation "reasonably appears to be . . . adversely limited by [EF's] responsibilities to . . . a third person or by [EF's] own interests." Here, EF's "responsibilities" to DJ (a "third person") and her "own interests" — both personal and as to their jointly owned property—would "reasonably appear" to "adversely limit" her ability to represent debtors before Judge Jones. It is presumably for this reason that JW asked EF to withdraw as an equity partner from JW once they finally confirmed the existence and improper nature of the Relationship in March 2022.

JW would assert that the buck should stop with EF, and not be imputed to the rest of JW. If the ABA Model Rules of Professional Conduct (MRPC) 1.7 and 1.10 applied, they might be correct. MRPC 1.7(a)(2) provides that a concurrent conflict exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Such an interest would not generally be imputed to other attorneys at the same firm, however, by virtue of the Model Rules provisions which generally preclude imputation of personal interest conflicts.[136]

But Texas does not follow the Model Rule on imputation in this regard. Rather, the Professional Ethics Committee for the State Bar of Texas ("Texas Ethics Committee") explains that Texas will impute personal interest conflicts without apparent regard to knowledge—actual or constructive—by rule 1.06(f). This rule provides that "[i]f a lawyer would be prohibited by this Rule [1.06(b)(2)] from engaging in particular conduct, *no other lawyers while a member or associated with that lawyer's firm may engage in that conduct.*

Ethics Opinion 666 of the Texas Ethics Committees explains:

A Rule 1.06(b)(2) conflict of interest will usually exist when both spouses are personally involved in representing opposing parties in the same matter, *or when either spouse, for whatever reason, has a material personal interest in the outcome of the matter*. In other circumstances, resolution of the issue requires consideration of all the circumstances, including, without limitation, (1) the nature of the matter and the issues involved; (2) whether either spouse will be directly involved in the representation, and if so the nature and extent of such involvement; (3) *whether and to what extent the outcome of the representation may have a financial effect on either spouse*; (4) the positions of the spouses within their firms; and (5) whether the lawyers handling the representation have a close working relationship with the lawyer-spouse in the same firm. It should be noted that, under the facts considered in this opinion, each spouse knows that his or her firm is representing a client in a matter directly adverse to a client of the other spouse's firm.

Although there is significant merit to the ABA's approach regarding imputation of "personal interest" conflicts, no such exception exists under the Texas Disciplinary Rules of Professional Conduct. Rule 1.06(f) provides:
'If a lawyer would be prohibited by this Rule from engaging in particular conduct, no other lawyer while a member or associated with that lawyer's firm may engage in that conduct.'

---

[136] MRPC 1.10(a)(1) (excepting from imputation a conflict "based on a personal interest of the disqualified lawyer [that] does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm").

Rule 1.06(f) requires imputation of personal interest conflicts under Rule 1.06(b)(2). Consequently, if a lawyer would be prohibited from undertaking representation on a matter because the representation "*reasonably appears to be or become adversely limited" by the lawyer's relationship with the lawyer's spouse, no other lawyer in the firm may undertake the representation without obtaining the client's informed consent under Rule 1.06(c). The Committee appreciates that the firm-wide imputation of spousal conflicts may in some cases lead to harsh results but those results are dictated by the current provisions of Rule 1.06(f).*[137]

### 3. If It Looks Like A Marriage, It Probably Is a Marriage for Professional Conduct Purposes

Whether a "personal interest" conflict exists "will depend on the circumstances," the Professional Ethics Committee explains. "If the circumstances are such that it reasonably appears *a lawyer's spousal relationship will adversely limit the lawyer's representation*, neither the lawyer nor any other lawyer in his or her law firm may undertake or continue the representation without obtaining the client's informed consent under Rule 1.06(c)."

JW would doubtless object, as did Judge Jones,[138] that this rule does not apply because they were not married. This would fail, however, because "[l]awyers who cohabit in an intimate relationship should be treated similarly to married couples for conflicts purposes. The same is true for couples who are engaged to be married or in exclusive intimate relationships."[139] It would appear that the Relationship approximated these qualities.[140]

---

[137] *See* Tex. Pro. Ethics Comm., Formal Op. 666 (2016), available at https://tcle-web.s3.amazonaws.com/public/documents/Opinion-666_UB8ZRRr.pdf.

[138] Alexander Gladstone & Andrew Scurria, *Bankruptcy Judge Jones Named in a Lawsuit over Romantic Relationship with Local Lawyer*, Wall St. J. (Oct. 7, 2023, 7:57 PM), https://www.wsj.com/articles/bankruptcy-judge-jones-named-in-a-lawsuit-over-romantic-relationship-with-local-lawyer-71df2c00. ("Jones said he believes the relationship didn't need to be disclosed because he and Freeman aren't married and there was no economic benefit to him from her legal work.").

[139] ABA Formal Opinion 494, Conflicts Arising Out of a Lawyer's Personal Relationship with Opposing Counsel, 5 (July 29, 2020).

[140] The ABA has recently recognized that intimate personal relationships that are analogous to marriage, such as cohabitation of the sort apparently involved in the Relationship, is functionally equivalent to marriage for purposes of judicial recusal:

> *A judge must disqualify himself or herself when the judge has a romantic relationship with a lawyer or party in the proceeding, or desires or is pursuing such a relationship.* As the New Mexico Supreme Court has observed, "the rationale for requiring recusal in cases involving family members also applies when a close or intimate relationship [between a judge and a lawyer appearing before the judge] exists because, under such circumstances, the judge's impartiality is questionable." A judge should disclose other intimate or close personal relationships with a lawyer or party to the other lawyers and parties in the proceeding even if the judge believes that he or she can be impartial. If, after disclosure, a party objects to the judge's participation in the proceeding, the judge has the discretion to either continue to preside over the proceeding or to disqualify himself or herself. The judge should put the reasons for the judge's decision to remain on the case or to disqualify himself or herself on the record."

ABA Formal Opinion 488, Judges' Social or Close Personal Relationships with Lawyers or Parties as Grounds for Disqualification or Disclosure, Sept 5, 2019, available at https://lawsintexas.com/wp-content/uploads/2023/09/aba_formal_opinion_488.pdf (footnotes omitted; emphasis supplied). Of course, it also true

JW may argue that DJ was pro-debtor and, because EF and JW represented debtors, JW's clients could suffer no real harm. This, however, would ignore the fiduciary nature of the estate—the DIP and its professionals are fiduciaries for all stakeholders. It would also create a devastating precedent. What if, for example, DJ decided he did not like a particular debtor? Would EF be able to aggressively advocate for her DIP client then?

"One risk" of close personal relationships, Hazard, Hodes and Jarvis observe, "is that closely related lawyers, especially if living in the same household, may unwittingly reveal the confidences of their adverse clients."

Another danger is that while intense personal relationships between lawyers can make for marvelous theater, they may interfere, whether the lawyers are aware of it or not, with their detached professionalism and independent judgment. Depending on the circumstances, these strains on the lawyers' loyalty can constitute a "material limitation" on the representation of one or more of the clients . . . .[141]

These risks would appear to be at least as great when the relationship is between judge and counsel.

After assessing the publicly-available information about the Relationship and the Cases, Professor Rapoport put it succinctly: "I'll go ahead and say it: *a romantic partner living with a judge is exactly the kind of connection that should prevent that judge from approving the romantic partner's employment, awarding fees, or otherwise benefitting that romantic partner's livelihood. Would any reasonable person believe that intimate partners are not "connected"?*[142]

### B. What Should JW Have Done?

Still, JW may object: what were they supposed to do? Taking the facts most favorably to them, they had no actual knowledge of the Relationship until March 6, 2021; even then, they were unfortunately gulled by EF whose obfuscation makes it difficult to know whether JW was acting in good faith, as they claim, or seeking to bury evidence of the connection between EF and JW. The fact that the allegations came initially from Mr. Van Deelen—alleged to be a serial litigant and perhaps unstable[143]—would surely call for lenity.

The problem for JW—even if one thinks Texas's imputation rules do not apply—is that once JW learned February 1, 2022 from a "credible third party"[144] that EF and DJ were in fact still in the Relationship, they appear to have done nothing to remedy the problem. Consider some of the steps JW could have taken which might have ameliorated the "egregious" nature of its conduct:[145]

---

that "[a] judge must disqualify himself or herself when the judge has a romantic relationship with a lawyer or party in the proceeding, or desires or is pursuing such a relationship." *Id.*

[141] HAZARD, HODES & JARVIS, § 12.28.

[142] Rapoport, *supra* 40 EMORY BANKR. DEV. J. at 368.

[143] Opp. ¶ 36 (discussing "Mr. Van Deelen's erratic disposition and credibility").

[144] Prelim. Resp. ¶ 16; Opp. ¶ 46.

[145] *Van Deelen v. Jones*, No. 4:23-CV-03729-AM, 2024 WL 3852349, at *15 (S.D. Tex. Aug. 16, 2024).

- Consistent with the advice given in Jarvis2, JW could have timely informed Kirkland & Ellis—and perhaps the UST—of the gravity of the situation. This, in turn, would have enabled JW to obtain the client consent required to make further disclosure or otherwise proceed to address the undeniable misconduct of EF and DJ, for example by withdrawal. They did not.

- If JW still had lingering doubts about the nature and quality of the Relationship—implausible, given that they chose to ask her to leave after she confirmed the fuller version March 30, 2022—they could easily have conducted an independent investigation. Doing so would have revealed the existence of the Rolla Deed and other public documents associated with the Rolla Property.  A lawyer "may not avoid the bright light of a clear fact by averting [his or her] eyes or turning [his or her] back."[146]

- While separation from EF may have been an appropriate step for JW to take, it was in fact taken in a way that would appear to further the concealment rather than provide the transparency the bankruptcy system requires.  The Confidential Withdrawal Agreement suggests JW sought to conceal the fact of the Relationship. The fact that JW then continued to work with and "strongly recommend" EF—even after they had caught her in several serious lies—is mind-boggling.

- At any point from and after March 8, 2021—when JW first had confirmation from EF that there had been a relationship—the firm had a commitment to supplement those 2014 statements that were submitted during the acknowledged period of overlap in the Relationship and EF's employment at JW (i.e., March 2018 to March 2020).  "[T]he duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interest of the estate."[147]

### C.  The Mediation Cases

Woven throughout JW's defense is the assertion that, even if JW had an actual conflict due to the Relationship, disclosure would have been irrelevant because no one was actually hurt by the outcomes.  Nowhere is this argument more forcefully made than with respect to the  cases in which DJ acted not as judge but as mediator where JW and EF were counsel and, as above, the connection between EF and DJ was not disclosed.  "The evidence in the Mediation Cases," JW asserts, "shows that the debtors and the other mediation parties got precisely what they bargained for: a value-maximizing restructuring implemented through a confirmed plan that the debtors and their stakeholders, in many cases, still benefit from today."[148]

But it is hard to imagine that parties "bargained for" a mediator who was the functional equivalent of the spouse counsel to the debtor. How could they if, like all parties in all of the Cases, none of them knew?

---

[146] Charles W. Wolfram, Modern Legal Ethics 696 (1987).

[147] In re eToys, Inc., 331 B.R. 176, 189–90 (Bankr. D. Del. 2005) (citing In re Leslie Fay Cos., 175 B.R. 525, 533 (Bankr.S.D.N.Y.1994)).

[148] Opp. ¶ 173.

Moreover, there is indirect evidence that Judge Jones's participation in the Mediation Cases was not so value-maximizing for creditors. The UST asserts that in *In re Tehum Care Serv., Inc.*, No. 23-90086, Judge Jones was appointed to mediate a global settlement that included, among other matters, the settlement of a fraudulent transfer claim against a party represented by Ms. Freeman. That mediation resulted in a global settlement, reflected in a proposed plan of reorganization, in which the estate's claims would be released in return for a $37 million contribution by Ms. Freeman's client and the other settlement parties.[149]

Following the resignation of Judge Jones, however, the bankruptcy court ordered a new mediation before a different mediator. Although that mediation involved the same claims and same parties as the mediation under Judge Jones, the resulting proposed settlement increased the settlement payment to $54 million.[150]  As such, the participation of Judge Jones in Tehum would arguably have cost the bankruptcy estate of Tehum—its creditors and other stakeholders—$17 million? If so, his participation reduced value for them.

If anything, the taint of the Relationship was worse in the Mediation Cases than the others because DJ and EF were not only misleading parties, but also other judges, who presided over the Mediation Cases.  Professor Melissa Jacoby has studied mediations conducted by sitting judges, and observed that the practice in general "can [] undercut key justice system values like transparency and impartiality."[151]  While the use of judges as mediators is not uncommon or necessarily problematic, using "judges as mediators run[s] the risk of *increasing* pressure to reach a resolution without trial."[152]

This may have been a problem with the Mediation Cases.  But by far the greater problem is the fact that the judges who appointed DJ to mediate in cases in which EF appeared were apparently as uninformed about the Relationship as were the parties to those mediations. Confidence in the integrity of the chapter 11 process is fundamental for all who are affected by it, creditors, equity holders, and other judges, alike.  That includes confidence that significant conflicts of interest of key participants are either disclosed and waived or, if not, that those with such conflicts will not participate.

---

[149] UST Reply ¶ 116, n. 18 (citing No. 23-90086, ECF No. 1072, Second Am. Chapter 11 Plan, at 17 (Bankr. S.D. Tex. Oct. 27, 2023)).

[150] UST Reply ¶ 116 (citing *Tehum Care Serv*., No. 23-90086, ECF No. 1259, Settlement Mot. (Bankr. S.D. Tex. Jan. 16, 2024).

[151] Melissa B. Jacoby, *Other Judges' Cases*, 78 N.Y.U. ANN. SURV. AM. L. 39, 41 (2022).

[152] *Id.* at 53.

**Conclusion**

In my opinion, JW's persistent pattern of ignoring, obfuscating and concealing the Relationship offended both the letter and spirit of bankruptcy's disclosure regime.  From and after the time JW first learned definitively that EF and DJ were in, and had been in, the Relationship throughout EW's partnership with JW (no later than February, 2022), JW had a duty to amend its 2014 disclosures in the Cases which erroneously indicated or implied no such connection to DJ. DJ's erroneous interpretation of his ethical obligations is no excuse, because JW had an independent obligation to investigate the truth of allegations regarding the Relationship and, if the results warranted it, thereafter to disclose this conflict or to withdraw from the Cases—as it was advised to do by its own ethics expert in June of 2022.  Unfortunately, at every important moment in this matter, JW chose not to disclose but instead to conceal what it knew or had good reason to know about the Relationship.

Respectfully submitted,

*Jonathan Lipson*

Jonathan C. Lipson
September 30, 2024
Philadelphia, Pennsylvania

## Appendix A

### Exhibit 6A
### Judge Jones
### Jackson Walker Fee Order Entered
### Open Cases

| Debtor Name | Case Number | Petition Date | Confirmation Status | Position | Date of Retention App | Retention App ECF | Fee App Order ECF | Total Fees Awarded | Total Expenses | Ms. Freeman Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| Westmoreland Coal Company | 18-35672 | 10/9/2018 | Confirmed | Debtor Local Counsel | 11/8/2018 | 376 | 2249 | $676,806.00 | $87,114.29 | $129,629.50 |
| J.C. Penney Company, Inc. | 20-20182 | 5/15/2020 | Confirmed | Debtor Local Counsel | 6/11/2020 | 685 | 2874 | $1,087,263.00 | $14,219.21 | $286,159.00 |
| Whiting Petroleum Corporation | 20-32021 | 4/1/2020 | Confirmed | Debtor Local Counsel | 4/17/2020 | 173 | 840 | $695,091.50 | $3,541.94 | $36,115.00 |
| Neiman Marcus Group LTD, LLC | 20-32519 | 5/7/2020 | Confirmed | Debtor Local Counsel | 6/3/2020 | 750 | 2147 | $380,573.50 | $6,103.70 | $49,910.00 |
| Stage Stores LLC | 20-32564 | 5/10/2020 | Confirmed | Debtor Local Counsel | 6/4/2020 | 385 | 983 | $182,655.50 | $2,090.65 | $29,295.00 |
| Chesapeake Energy Corporation | 20-33233 | 6/28/2020 | Confirmed | Debtor Local Counsel | 7/16/2020 | 370 | 3509 | $912,742.00 | $21,275.94 | $192,258.00 |
| Covia Holdings Corporation | 20-33295 | 6/29/2020 | Confirmed | Debtor Conflicts Counsel | 7/21/2020 | 195 | 1304 | $325,181.00 | $6,200.85 | $51,021.00 |
| Bouchard Transportation Co., Inc. | 20-34682 | 9/28/2020 | Confirmed | Debtor Local Counsel | 10/28/2020 | 173 | 20-34758 at 63 | $436,790.00 | $5,371.86 | $23,380.00 |
| Mule Sky LLC (Gulfport Energy) | 20-35561 | 11/13/2020 | Confirmed | Debtor Conflicts Counsel | 12/11/2020 | 20-35562 at 390 | 212 | $765,173.50 | $7,334.20 | $54,525.50 |
| Seadrill Partners LLC | 20-35740 | 12/1/2020 | Confirmed | Debtor Local Counsel | 12/23/2020 | 110 | 690 | $286,885.00 | $1,617.25 | $28,223.00 |
| Seadrill Limited | 21-30427 | 2/10/2021 | Confirmed | Debtor Local Counsel | 3/8/2021 | 250 | 1340 | $501,242.00 | $2,123.05 | $5,594.50 |
| Brilliant Energy, LLC | 21-30936 | 3/16/2021 | No Plan | Other | 4/13/2021 | 68 | 241 | $186,363.50 | $2,246.63 | $0.00 |
| Katerra Inc. | 21-31861 | 6/6/2021 | Confirmed | Debtor Local Counsel | 6/29/2021 | 289 | 1639 | $858,653.01 | $3,934.72 | $0.00 |

| Debtor Name | Case Number | Petition Date | Confirmation Status | Position | Date of Retention App | Retention App ECF | Fee App Order ECF | Total Fees Awarded | Total Expenses | Ms. Freeman Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| Basic Energy Services, Inc. | 21-90002 | 8/27/2021 | Confirmed | Debtor Lead Counsel | 12/13/2021 | 809 | 1511 | $1,543,432.34 | $3,082.84 | $0.00 |
| Strike LLC | 21-90054 | 12/6/2021 | Confirmed | Debtor Local Counsel | 1/6/2022 | 363 | 1248 | $875,026.00 | $12,331.41 | $0.00 |
| 4E Brands Northamerica LLC | 22-50009 | 2/22/2022 | Confirmed | Debtor Lead Counsel | 3/24/2022 | 72 | 427-1 | $859,425.50 | $7,300.81 | $0.00 |
| Sungard AS New Holdings | 22-90018 | 4/11/2022 | Confirmed | Debtor Conflicts Counsel | 5/10/2022 | 211 | 897 | $414,495.00 | $5,966.56 | $0.00 |

Totals  $10,987,798.35  $191,855.91  $886,110.50

**Exhibit 6B**
**Judge Jones**
**Jackson Walker Fee Order Entered**
**Closed Cases**

| Debtor Name | Case Number | Petition Date | Confirmation Status | Position | Date of Retention App | Retention App ECF | Fee App Order ECF | Total Fees Awarded | Total Expenses Awarded | Ms. Freeman Fees |
|---|---|---|---|---|---|---|---|---|---|---|
| Jones Energy Inc. | 19-32112 | 4/14/2019 | Confirmed | Debtor Local Counsel | 4/23/2019 | 125 | 251 | $92,854.00 | $20,915.86 | $10,582.00 |
| McDermott International Inc. | 20-30336 | 1/21/2020 | Confirmed | Debtor Local Counsel | 2/19/2020 | 424 | 1021 | $391,655.00 | $21,154.16 | $114,002.50 |
| Sheridan Holding Company I, LLC | 20-31884 | 3/23/2020 | Confirmed | Debtor Local Counsel | 4/2/2020 | 130 | 213 | $11,779.50 | $12,025.30 | $3,565.00 |
| Hornbeck Offshore Services, Inc. | 20-32679 | 5/19/2020 | Confirmed | Debtor Conflicts Counsel | 6/1/2020 | 132 | 283 | $61,428.00 | $798.75 | $4,727.50 |
| Denbury Resources Inc. | 20-33801 | 7/30/2020 | Confirmed | Debtor Local Counsel | 8/28/2020 | 238 | 384 & 442 | $124,321.50 | $890.07 | $37,122.50 |
| iQor Holdings Inc. | 20-34500 | 9/10/2020 | Confirmed | Debtor Local Counsel | 9/28/2020 | 154 | 252 | $63,842.00 | $3,857.50 | $1,670.00 |
| Volusion, LLC | 20-50082 | 7/27/2020 | Confirmed | Debtor Lead Counsel | 8/26/2020 | 74 | 172 | $339,428.00 | $3,025.97 | $62,897.00 |
| Seadrill New Finance Limited | 22-90001 | 1/11/2022 | Confirmed | Debtor Local Counsel | 2/8/2022 | 94 | 121 | $27,286.00 | $21,067.75 | $0.00 |
| LaForta - Gestao e Investmentos | 22-90126 | 6/16/2022 | No Plan | Debtor Lead Counsel | 7/15/2022 | 67 | 298 | $505,907.50 | $7,946.11 | $0.00 |
| | | | | | | | **Totals** | **$1,618,501.50** | **$91,681.47** | **$234,566.50** |

**Exhibit 6C**
**Jones Mediation Cases**
**Jackson Walker Fees/Expenses**
**Open Cases**

| Debtor Name | Case Number | Petition Date | Judge | Confirmation Status | Position | Date of Retention App | Retention App ECF | Fee App Status | Fee App Order ECF | Total Fees Awarded | Total Expenses Awarded | Ms. Freeman Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sanchez Energy Coporation | 19-34508 | 8/11/2019 | Isgur | Confirmed | Debtor Local Counsel | 10/1/2019 | 269 | Final Approved | 1502 | $1,905,683.35 | $98,468.48 | $531,384.50 |
| GWG Holdings Inc. | 22-90032 | 4/20/2022 | Isgur | Confirmed | Debtor Local Counsel | 5/19/2022 | 267 | Final Pending | | $801,232.50 | $59,972.91 | $228,572.81 |
| HONX, Inc. | 22-90035 | 4/28/2022 | Isgur | Plan Pending | Debtor Local Counsel | 5/31/2022 | 128 | Interim Filed | | $393,782.00 | $7,681.61 | $71,790.00 |
| Altera Infrastructure LP | 22-90130 | 8/12/2022 | Isgur | Confirmed | Debtor Local Counsel | 9/12/2022 | 228 | Final Approved | 22-90129 at 20 | $357,209.50 | $6,739.23 | $53,445.00 |
| IEH Auto Parts Holding LLC | 23-90054 | 1/31/2023 | Lopez | Confirmed | Debtor Lead Counsel | 3/2/2023 | 181 | Final Pending | | | | |
| IEH Auto Parts Holding LLC | 23-90054 | 1/31/2023 | Lopez | Confirmed | Debtor Conflicts Counsel | 3/2/2023 | 183 | None Filed | | | | |
| MLCJR LLC | 23-90324 | 5/14/2023 | Lopez | No Plan | Debtor Conflicts Counsel | 6/13/2023 | 433 | Interim Filed | | | | |
| | | | | | | | | | Totals | $3,457,907.35 | $172,862.23 | $885,192.31 |

4

**Exhibit 6D**
**Jones Mediation**
**Cases**
**Jackson Walker Fees/Expenses**
**Closed Cases**

| Debtor Name | Case Number | Petition Date | Judge | Confirmation Status | Position | Date of Retention App | Retention App ECF | Fee App Status | Fee App Order ECF | Total Fees Awarded | Total Expenses Awarded | Ms. Freeman Fees |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EXCO Resources, Inc. | 18-30155 | 1/15/2018 | Isgur | Confirmed | UCC Local Counsel | 2/26/2018 | 382 | Final Approved | 122 | $1,820,436.59 | $68,949.97 | $185,702.50 |
| Tailored Brands, Inc. | 20-33900 | 8/2/2020 | Isgur | Confirmed | Debtor Local Counsel | 9/1/2020 | 496 | Final Approved | 1404 | $253,420.00 | $1,482.05 | $57,345.00 |
| | | | | | | | | | **Total** | **$2,073,856.59** | **$70,432.02** | **$243,047.50** |

Appendix B

# JONATHAN C. LIPSON

Harold E. Kohn Chair in Law; Professor of Law
Temple University—Beasley School of Law
1719 North Broad Street
Philadelphia, Pennsylvania 19122
215.204.0608 (office)
jlipson@temple.edu
http://www.law.temple.edu/Pages/Faculty/N_Faculty_Lipson_Main.aspx

| | |
|---|---|
| *Current Appointment* | **Harold E. Kohn Chair in Law, Temple University—Beasley School of Law (2012—present)** |
| | *Courses (current and prior):* **Main** courses: Bankruptcy; Commercial Transactions; Contracts; Corporations; **Additional courses:** Advising the Multinational Company; Introduction to International Business Transactions; Negotiating and Documenting Corporate Transactions; Payment Systems; Secured Transactions; Lawyering for Entrepreneurship (capital-formation corporate simulation); "Debt and Democracy" (seminar on bankruptcy and constitutional law); Comparative Insolvency Systems (US/UK law). |
| | *Other Appointments:* Faculty Advisor, Temple Center for Ethics and Compliance; Adjunct Research Fellow, Renmin University Law School. |
| *Law School and University Service* | *Current:* Member, Faculty Colloquium Committee; Chair, Faculty Chairs and Awards Committee (Chair 2013-2019); Member, Career Services Committee; (Member); Founding Editor, *The Temple 10-Q* (weekly electronic business law news magazine and podcast series)(2014-present). |
| | *Prior (Temple):* Dean Search Committee, Temple Law School (2022); Dean Search Committee, Temple University-Japan (2019-20); Member, ABA Self-Study (2018-19); Law School Budget Representative to University (negotiated and advised transition to "responsibility centered" budget model) (2013-2015); Member and Co-Chair Executive Committee (2012-2014); Member, Faculty Recruitment (2012-2013); Member, Faculty Strategic Planning Committee (2012-2014); Program Chair, Temple Law Review Symposium, *The (Un)Quiet Realist: Reflecting and Building on the Contributions of Bill Whitford* (2014)(co-sponsored with University of Wisconsin Law School); Co-Chair, Upper Level Curriculum Initiative (assessed and restructured upper-level curriculum) (2009-2010); |
| | *Prior (Wisconsin):* Member (2010-11) & Chair (2011-12), Tenure Committee; Director, Wisconsin Business Law Initiative; Program Chair, Wisconsin Law Review Symposium, *Who's in the House: The Changing Role and Nature of In-house and General Counsel* (2011); Member, Externships Committee; Member, University Disciplinary Hearing Panel (2010-2012). |
| | *Prior (University of Baltimore):* Provost Search Committee, Dean's Advisory Committee, Self-Study, Curriculum, and Baltimore Scholars Committees.  Co-Chair, Strategic Planning |

Committee. Fellow, University of Baltimore Center for International and Comparative Law.

*Prior Academic Appointments*

**University of Wisconsin Law School: Foley & Lardner Professor of Law (with tenure)** (2010-2013)(on leave 2012-13).

**Temple University - James E. Beasley School of Law:** Peter J. Liacouras Professor of Law (2009-2010); Professor of Law (2007-2009); Associate Professor of Law (2005-2007); Visiting Associate Professor of Law (2004-2005) (with tenure).

**University of Pennsylvania Law School:** Visiting Professor of Law (Spring 2007).

**University of Baltimore School of Law:** Assistant Professor of Law (1999-2003) & Associate (with tenure)(2003-2005) (on leave 2004-2005).

**Northeastern University School of Law:** Adjunct Professor of Law (Banking) (1995 – 1998).

*Publications*

*The End(s) of Bankruptcy Exceptionalism:* Purdue Pharma *and the Problem of Social Debt*, 46 CARDOZO L. REV. __ (forthcoming 2025) (w/ Pamela Foohey)

*FTX'd: Conflicting Public and Private Interests in Chapter 11,* 77 STAN. L. REV. __ (forthcoming 2025) (w/David Skeel) (featured in Sujeet Indap, *Law firm conflicts 'permeated FTX's bankruptcy', professors allege,* Fin. Times, Mar. 26, 2024)

*"Special": Remedial Schemes in Mass Tort Bankruptcies,* 101 TEX. L. REV. 1773 (2023)(invited symposium contribution)

*The Rule of the Deal: Bankruptcy Bargains and Other Misnomers,* 97 AM. BANKR. L.J. 41 (2023)(peer reviewed)

*Response, First in Time; First Is Right: Comments on Levitin's* Poison Pill, 101 TEX. L. REV. ONLINE 33 (2022) [https://perma.cc/5VVZ-58W5] (invited response).

*The End(s) of Corporate Social Responsibility, in* CONTRACTS FOR RESPONSIBLE AND SUSTAINABLE SUPPLY CHAINS (Am. Bar. Assn. 2023)(David Snyder & Susan Maslow, eds) (invited book chapter)

*Foreword: Contract in Crisis,* 85 L. & CONTEMP. PROB 1 (2022)(w/ R. Rebouché)(symposium editors)

*The Truth Wherever it May be Found: The Wisconsin School of Contracts (an Introduction*), 2021 WIS. L. REV. 337 (invited symposium contribution)

*Contracting COVID: Private Order and Public Good*, 76 BUS. LAW. 437 (2021)(with Norman Powell)

MODEL BUSINESS CORPORATION ACT ANNOTATED (5th edition, 2020) (co-editor with L. Hamermesh; authored by ABA Corporate Laws Committee)

*The Business Lawyer at 75 and Secured Transactions Under Article 9 of the Uniform Commercial Code* 75 BUS. L. 1575 (2019-20) (w/ S. Weise)

*Promising Justice: Contract (as) Social Responsibility,* 2019 WIS. L. REV. 1109.

*Something Else: Specific Relief for Breach of Human Rights Terms in Multinational Supply Chain Agreements,* 68 AM. U. L. REV. 1751 (2019) (solicited symposium contribution).

*Reforming Institutions: The Judicial Function in Bankruptcy and Public Law Litigation,* 94 IND. L. J. 545 (2019) (with K. Noonan and W. Simon).

*Securitization and Social Distance,* 37 REV. BANK. & FIN. L. 827 (2017-2018)(solicited symposium contribution).

*Controlling Creditor Control:* Jevic *and the End(?) of* LifeCare, 27 NORTON BANKR. L & PRAC. 563 (2018) (solicited symposium contribution).

*The Secret Life of Priority:  Corporate Reorganization after* Jevic, 93 WASH. L. REV. 631 (2018).

*Bargaining Bankrupt:  A Relational Theory of Contract in Bankruptcy*, 6.2 HARV. BUS. L. J. 239 (2016) (winner, 2018 Temple Law School Friel-Scanlan Award).

*Examining Success*, 90 AM. BANKR. L.J. 1 (2016) (with C. Marotta) (solicited manuscript; peer reviewed) (winner of the American Bankruptcy Law Journal "Editor's Prize" for best paper of 2016).

*Braucher's Business*, 58 ARIZ. L. REV. 173 (2016) (solicited symposium contribution).

*Foreword: Forward!*, 87 TEMP. L. REV. 693 (2015) (solicited symposium contribution).

*The Pattern in Securitization and Executive Compensation:  Evidence and Regulatory Implications,* 20.2 STAN. J. L. BUS & FIN. 145 (2015) (with M. Matsumura, R. Martin & E. Unlu).

*Against Regulatory Displacement: An Institutional Analysis of Financial Crises*, 17.3 PENN. J. BUS L. 673 (2015).

*Concentration, Complexity, & Capture: An Institutional Analysis of Financial Crises,* Banking and Financial Services Policy Report (Aspen, 2015) (solicited contribution).

*From a Scream to a Whisper:  The Supreme Court Does Little to Fix its Supreme Court Mess (Executive Benefits Insurance Agency v. Arkison (In re Bellingham))*, 2014 WIS. L. REV. ONLINE 1 (solicited contribution).

Stern*, Seriously:  The Article I Judicial Power, Fraudulent Transfers, and Leveraged Buyouts*, 2013 WIS. L. REV. 1161 (with J. Vandermeuse) (cited in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 197 L. Ed. 2d 398 (2017)).

*Why (and How to) Define Securitization?  A Sur-Reply to Professor Schwarcz*, 85 S. CAL. L. REV. 1301 (2012).

*Re: Defining Securitization*, 85 S. CAL. L. REV. 1229 (2012) (selected for reprint in *The Corporate Practice Commentator*).

*Foreword:  Who's in the House:  The Changing Role and Nature of In-house and General Counsel,* 2012 WIS. L. REV. 237 (2012) (with Engel and Crespo).

*What's Amiss?  The Lawyering Interest in "Miscellaneous" Contract Provisions*, 65 CONSUMER FIN. L. Q. 151 (2011)(solicited manuscript).

*Governance in the Breach: Controlling Creditor Opportunism,* 84 S. CAL. L. REV. 1035 (2011) (translated by Renmin University into Chinese as 濒危公司的治理（译文修改) (cited in *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.,* 75 F.Supp.3d 592 (S.D.N.Y. 2014)).

*Controlling the Market for Information in Reorganization,* 18 AM. BANKR. INST. L. J. 647 (2010) (solicited manuscript).

*Understanding Failure: Examiners and the Bankruptcy Reorganization of Large Public Companies*, 84 AM. BANKR. L.J. 1 (2010) (peer reviewed).

*Enron Rerun*, in LESSONS FROM THE FINANCIAL CRISIS:  CAUSES, CONSEQUENCES AND OUR ECONOMIC FUTURE 43 (2010, R. Kolb ed.).

*The Shadow Bankruptcy System*, 89 B.U. L. REV. 1609 (2009) (excerpted in LESSONS FROM THE FINANCIAL CRISIS:  CAUSES, CONSEQUENCES AND OUR ECONOMIC FUTURE 609 (2010, R. Kolb ed.)).

*Cost-Benefit Analysis and Closing Opinion Practice,* 63 BUS. L. 1187 (2008) (peer reviewed).

*Courting the Suicide King: Closing Opinions and Lawyer Liability*, 17 BUS. L. TODAY 59 (Mar/Apr. 2008)(with Donald Glazer).

*Debt and Democracy:  Towards a Constitutional Theory of Bankruptcy*, 83 NOTRE DAME L. REV.

605 (2008) (cited in *In re Apex Long Term Acute Care—Katy, L.P.*, 465 B.R. 452 (2011)).

*Where's the Beef?  A Few Words About Paying for Performance in Bankruptcy*, 156 UNIV.PA. L. REV. PENNUMBRA 64 (2007) (invited contribution to UNIVERSITY OF PENNSYLVANIA LAW REVIEW online, available at http://www.pennumbra.com/).

*The Expressive Function of Directors' Duties to Creditors,* 12 STAN. J. L. FIN. & B. 224 (2007) (cited in *In re Stephens*, 704 F.3d 1279 (10ᵗʰ Cir. 2013)).

*Twilight in the Zone of Insolvency*, 1 J. BUS. & TECH. L. 229 (2007)(invited panel remarks).

*When Churches Fail:  The Diocesan Debtor Dilemmas*, 79 S. CAL. L. REV. 363 (2006) (cited in *Blaudziunas v. Egan*, 74 A.D.3d 697 (2010)).

*Religious Organizations Filing for Bankruptcy*, 13 AM. BANKR. INST. L. REV. 25 (2005)(invited panel remarks).

*Price, Path & Pride: Third-Party Closing Opinion Practice Among U.S. Lawyers (A Preliminary Investigation)*, 3 BERKELEY BUS. L.J. 59 (2005) (selected for presentation at *2005 Yale/Stanford Junior Faculty Forum* & *2005 Harvard/Texas Commercial Realities Workshop*).

*Secrets and Liens:  The End of Notice in Commercial Finance Law*, 21 EMORY BANKR. DEV. J 421 (2005) (cited in *In re Duckworth*, 776 F.3d 453 (7th Cir. 2014) & *Express Working Capital, LLC v. Starving Students, Inc.*, 28 F. Supp. 3d 660 (N.D. Tex. 2014)).

*Doing Deals in School:  A prof talks about teaching transactional law*, 15 BUS. L. TODAY 51 (Sept/Oct 2005).

*Directors' Duties to Creditors:  Power Imbalance and the Financially Distressed Corporation*, 50 UCLA L. REV. 1189 (2003) (cited in *N. Am. Catholic Educ. Programming Found., Inc. v. Rob Gheewalla*, 92 A.2d 930 (Del. May 18, 2007); *In re RSL Com Primecall Inc.*, 2003 Bankr. LEXIS 1635 (Bankr. S.D.N.Y. Dec. 11, 2003)).

*Remote Control:  Revised Article 9 and the Negotiability of Information*, 63 OHIO ST. L.J. 1327 (2002) (cited in In re Gamma Center, Inc., 489 B.R. 688. (Bankr. N.D. Ohio 2013)).

*Enron, Asset Securitization and Bankruptcy Reform:  Dead or Dormant?* 11 J. BANKR. L. & PRAC. 101 (2002) (cited in *Trenwick America Litigation Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del.Ch. 2006).

*Financing Information Technologies:  Fairness and Function,* 2001 WIS. L. REV. 1067.

*Fighting Fiction with Fiction:  The New Federalism in (a Tobacco Company) Bankruptcy* 78 WASH. U.L.Q. 1271 (2000) (cited in *In re Mayes*, 294 B.R. 145 (10ᵗʰ Cir. 2003)).

*On Balance:  Religious Liberty and Third-Party Harms*, 84 UNIV. MINN. L. REV.589 (2000) (cited in *In re Congregation Birchos Yosef*, 535 B.R. 629 (Bankr. S.D.N.Y. 2015)).

*First Principles and Fair Consideration:  The Developing Clash Between the First Amendment and the Constructive Fraudulent Conveyance Laws*, 52 UNIV. MIAMI L. REV. 247 (1997).

Editor, *Forms Under Revised Article 9 of the Uniform Commercial Code,* BUSINESS LAW SECTION, AMERICAN BAR ASSOCIATION (2002).

*Proceeds Under Revised Article 9 of the UCC*, MARYLAND INSTITUTE FOR CONTINUING PROFESSIONAL EDUCATION OF LAWYERS  (April, 2000 & September 2001).

Contributor (with J. Levin, M. Ginsburg and T. Freedman) MERGERS, ACQUISITIONS & BUYOUTS (Aspen) (fraudulent conveyance issues) (1992 to 2006).

Regular Guest Blogger:  Creditslips.org, concurringopinions.org. & regblog.org.

*Casebooks*          CONTRACTS: LAW IN ACTION (Carolina Academic Press), vol. I & II, with Macaulay et al.

(4th ed. 2016) & 5th edition w/ Rebouche & Epstein (forthcoming 2024).

| | |
|---|---|
| *Works in Process* | *The End(s) of Bankruptcy Exceptionalism:* Purdue Pharma *and the Future of Mass Tort Reorganization* (w/ Pamela Foohey)(previewed on Harvard Bankruptcy Roundtable, July 17, 2024) |

*Debtor-Creditor Corpus Construction* (developing large-language model dataset of chapter 11 bankruptcy documents) (lead co-PI, with D Chen and D Cai)

*Corporate Due Process:* (consideration of baseline procedural protections in corporate governance)

*Corporate Mitosis* (assessment of corporate law issues in so-called "Texas Two-Step" reorganizations)

*Against Corporate Social Responsibility* (critique of CSR as a legal mechanism of social change)

*Why Is Business Law Education So Bad?  Value(s) Creation by Law Professors* (critiquing literature on "transactional skills" education).)

| | |
|---|---|
| *Recent Professional and* <br><br> *Community Activities* | **American Bar Association—Business Law Section**: Committee on Corporate Laws (by invitation, 2018-present) & Assistant Reporter, Model Business Corporation Act (promulgated by same); Section Council (board of directors of Business Law Section) (2010-2011; 2017-present); Section Content Officer (2011-2017) (responsible for strategic and policy guidance on all educational and other content generated by Business Law Section); *Chair,* Section Publications Board ($3.2 million book publications program) (2004-2010); *Co-Chair*, Business Law Education Committee of Business Law Section (2003-2007); *Co-Chair:* Law School Initiative (2003-2006); member, Task Force on Human Rights in Supply Chain Agreements (on going); two-time winner of "Chair's Award" for distinguished service to the Business Law Section. |

**American Law Institute**: *Member,* elected 2005; member, various consultative groups.

**_The American Bankruptcy Law Journal._** Faculty adviso**r** (2023-present); member, advisory board (2015-2018) (peer reviewed journal of the National Conference of Bankruptcy Judges).

**_The Business Lawyer_**.  Member, editorial board (2009-present) (peer reviewed journal of the Business Law Section of the American Bar Association).

**American College of Commercial Finance Lawyers**, *Fellow,* inducted 2008; Member, Board of Regents (2014-present).

**Association of American Law Schools**:   *Chair*, Section on Commercial and Related Consumer Law (2003-2004).

**Congregation Rodeph Shalom**, member, Advisory Board and Strategic Planning Subcommittee

**_The Temple 10-Q_**: Founding editor of weekly business law blog by and for Temple business law community.

Counsel of Record, *Brief for* Amici Curiae *Law Professors in Support of Petitioner*, *Harrington v. Purdue Pharma,* (In re *Purdue Pharma*), No. 23-124 (U.S. Supreme Court, Oct. 2023) (counsel, with Pamela Foohey, for a dozen law professors, in successful challenge to "third-party releases"), opinion reported at *Harrington v. Purdue Pharma, L.P.,*__U.S.__, 144 S. Ct. 2071 (2024).

Counsel of Record, *Brief for* Amici Curiae *Law Professors in Support of Petitioner*, *Vara v. FTX Trading, Ltd,* (In re *FTX Trading, Ltd*), No. 23-2297 (U.S. Court of Appeals for the Third Circuit, Sept. 2023) (counsel to seven law professors in successful effort to have examiner

appointed), opinion reported at *In re* FTX Trading Ltd., 91 F.4th 148, 157 (3d Cir. 2024)

Counsel of Record, *Brief for* Amici Curiae *Law Professors in Support of Petitioner, Casimir Czyzewski v. Jevic Holding Corp.* (In re *Jevic Holding Co.*)*, et al.,* No. 15-649 (U.S. Supreme Court, Dec. 2015)(co-counsel Melissa Jacoby in successful effort to challenge use of "structured dismissals"), opinion reported at *Czyzewski v. Jevic Holding Corp.,* 580 U. S. 451, 465 (2017).

Counsel of Record, *Brief of* Amicus Curiae *Law Professors, in Support of Petitioners,* In re *Cybergenics Corp.,* No. 01-3805, U.S. Court of Appeals for the Third Circuit) (counsel six law professors in successful effort to confer "derivate standing" on official committee of unsecured creditors), opinion reported at *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 580 (3d Cir.2003) (en banc).

National Conference of Bar Examiners:  Observer, Contracts Drafting Group, April 2012.

Illinois Bar Examiners:  Question drafter (Contracts, Secured Transactions, and Negotiable Instruments).

Philadelphia Stock Exchange:  Dispute resolution panelist (2007-2010).

National Conference of Bankruptcy Judges:  *Fellow* (October 2002).

Baltimore Scholars Program:  Mentor pre-law students at historically black Maryland colleges and universities.

Member, Board of Directors and Secretary, Baltimore Ronald McDonald House, Inc (1999-2002).

Member, Greater Baltimore Committee Education Subcommittee (2000-2004).

Baltimore Jewish Council:  Reading tutor for elementary-age school children.

Boston Athenaeum, Associates' Council.  Member of council responsible for activities of young members of one of the nation's oldest private libraries (1997-99).

Member and general counsel to Massachusetts Citizens Against the Death Penalty, Inc.  Pro-bono counsel to 501(c)(4) organization opposed to institution of death penalty in Massachusetts (1998-99).

Boston Law Firm Group.  Mentor to Boston-area minority law students (1997-99).

| | |
|---|---|
| *Significant Expert Engagements* | **In re Enron Corp. (Bankr. S.D.N.Y)**, consulting expert to Official Committee of Unsecured Creditors on matters of transaction characterization and legal opinions (2005-2007); resolved by settlement including $30 million estate recovery. |

**In re Dexter Distributing (Bankr. D. Az)**, consulting expert to debtor in possession on claims of breach of fiduciary duty by corporate directors.

**U.S. Bank National Association v. GreenPoint Mortgage Funding, Inc. (N.Y. Sup. Ct., pending)**, consulting and potentially testifying expert on certain definitions in asset securitization transactions.

**Banco Santander v. Stradley Ronon, LLP, (Pa. Ct. Cm. Pl.)**, expert retained in legal malpractice case involving secured transaction under UCC Article 9; resolved in favor of client at summary judgment.

**National Credit Union Administration Board v. Credit Suisse Securities (USA) LLC, et al. (S.D.N.Y.); National Credit Union Administration Board v. UBS Securities, LLC (S.D.N.Y.); et al.**, submitted expert report and testified at deposition in coordinated actions brought by the NCUA in the Southern District of New York, the Central District of California and the District of Kansas.

| | |
|---|---|
| *Education* | University of Wisconsin-Madison, B.A. (1986) (honors); J.D. (1990) (Dean's list 1988); Note and Comment Editor, Wisconsin Law Review. |

|  | B.A., *cum laude* (1986), University of Wisconsin (history and philosophy); Trewartha Scholar (research grant for outstanding honors thesis); History department prize for best history essay. |
|---|---|
| *Prior Professional Experience* | <u>Hill & Barlow</u>, Boston, MA; Senior Associate, corporate and commercial departments (1995-1999). |
|  | <u>Kirkland & Ellis</u>, New York, NY; Associate, commercial department (1992-1995). |
|  | <u>Milbank, Tweed, Hadley & McCloy</u>, New York, NY; Associate (1990-1992). |
| *Admissions to Practice* | New York (1991); Massachusetts (1995) (inactive); Supreme Court of the United States (2015) |

<u>Selected Presentations, Short Articles and Media Quotes</u>

*Selected Presentations and Short Articles:*

1. The Conversation, *Supreme Court rejects settlement with OxyContin maker Purdue Pharma over legal protections for the Sackler family that owned the company*, June 27, 2024

2. Guest, *Against the Rules (Michael Lewis Podcast), Judging Sam: Judging the FTX Bankruptcy*, May, 2024

3. *FTX'd: Conflicts of Public and Private Interests in Chapter 11*, BYU Bankruptcy Deals Conference, April 3, 2024

4. *Bankruptcy Boilerplate, a Proposal for a Proposal,* Landmines, Black Holes and the Contract Production Paradox, University of Virginia Law School, Mar. 30, 2024

5. *Arguing About Purdue Pharma and Third-Party Releases*, Delaware Bankruptcy Inn of Court, Dec. 23, 2023

6. *Corporate Mitosis*, Tsinghua Commercial Law Conference, Oct. 30, 2023

7. *Corporate Mitosis*, Canadian Law and Economics Association, Oct. 15, 2023

8. *FTX'd: Conflicting Public and Private Interests in Chapter 11,* BYU Deals Conference, Mar. 2023

9. *"Special": Remedial Schemes in Mass Tort Bankruptcies*, University of Texas Law Review Symposium: Judicial Management of MDLs and Other Consolidations, January 28, 2023

10. Problem of Social Debt, HLS; TUSL; Tsinghua

11. Co-Organizer and co-moderator (w/ R. Rebouche), *Contract in Crisis,* Law & Contemporary Problems Symposium, July 2021

12. Panel Presenter, *Failure's Failures,* National Business Law Scholars 2021 Conference (June 2021)

13. Panel organizer and editor, University of Wisconsin Law Review Symposium:  The Wisconsin School of Contracts (October 2020)

14. *The Sacklers' Last Poison Pill*, N.Y. TIMES, Dec. 5, 2020 (with Gerald Posner), available at https://www.nytimes.com/2020/12/05/opinion/sackler-purdue-pharma-doj.html

15. Plenary Presenter, *Contracting COVID: Private Order and Public Good,* National Business Law Scholars 2020 Conference (May 2020)

16. *Don't Just Do Something; Stand There!* ABA *Business Law Today* & presentations of model standstill agreement to various bar associations)(April 2020-present)

17. Presenter, *Why is Business Law Education So Bad? Legal Education and Institutional Choice*, BYU Deals Conference (March 2020)

18. Fintech and Institutional Choice, AALS discussion group (Jan. 2020)

19. Presenter, *Against Corporate Social Responsibility,* Commercial Law Conf. Tsinghua University School of Law (Oct. 2019).

20. Presenter, *Moral Bankruptcy*, Renmin University School of Law & Tsinghua University School of Law (Oct. 2019)

21. Presenter, *Against Corporate Social Responsibility*, Canadian Law and Economics Association (Oct. 2019)

22. Moderator, John Kidwell Lecture, University of Wisconsin-Madison (March 2018 & November 2018)

23. Presenter, *Contract Social Responsibility,* Tsinghua University Law School (Beijing) & Beijing Normal Law School (October 2018)

24. Presenter, *Addressing Economic Crimes,* Mongolian Prosecutors Association (Mar. 2018).

25. Commentator, Corpus Linguistics and Contract Interpretation, Corpus Linguistics Conference, Brigham Young University (March, 2018)

26. Presenter, *Controlling Creditor Control*, Festschrift in Honor of Jay Westbrook, University of Texas-Austin (January, 2018)

27. Presenter, *The Secret Life of Priority,* University of Amsterdam Law School (November 2017)

28. Presenter, *The Secret Life of Priority,* Tsingua University (Beijing) (October 2017)

29. Presenter, *Structured Dismissals in Bankruptcy*, Joe Lee Lecture, Univ. Kentucky Law School (June 7, 2017)

30. Presenter, *Addressing Economic Crimes,* Mongolian Supreme Court and Lower Courts (Mar. 2017).

31. Presenter, *Making America Worse, Trump Casinos 1997-2010,* Tsinghua University Law School (Oct. 29, 2016) & Temple University (Nov. 2)*:*

32. Presenter: *Best Practices in Debt Collection Law:* Mongolian Bailiff's (Sheriff's) Office, Ulan-Bator, Mongolia (Mar. 31 & Apr. 1, 2016).

33. Moderator*: Current Trends in Compliance and Enforcement*, Temple Law School (Apr. 2016).

34. Presenter and Organizer: *Content Convergence for Business Bar Leaders*, ABA Business Bar Leaders' Conference (May 2016).

35. Author, *The Arc of Covenant Banking,* Concurring Opinions (Jan. 29, 2016).

36. Presenter, *A Few Words About Independent Directors*, Tsinghua University (Oct. 2015).

37. Presenter, *Examining Success*, Renmin University, Beijing, China (Oct. 2015).

38. Presenter, *Braucher's Business,* University of Arizona Law Review Symposium (April 2015).

39. *Organizer and Discussant, The (Un)Quiet Realist: Reflecting and Building on the Work of Bill Whitford*: Organized Temple Law Review symposium with leading bankruptcy, commercial and contracts scholars (Oct. 24, 2014).

40. *Organizer and Moderator, Harold E. Kohn Lecture*: Presentation by speaker Leo E. Strine, Chief Justice, Delaware Supreme Court (Oct. 9, 2014).

41. *The Global Financial Crisis: Some Causes and Cures,* presentation for representatives of Consiglio Nazionale Forense (Italian Bar Association), Phila, PA (Aug. 13, 2014).

42. *Regulatory Implications of Bank Securitization and Executive Compensation,* RegBlog, available at http://www.regblog.org/2014/05/27-lipson-unlu-matsumura-martin-bank-securitization-and-executive-compensation.html (May 27, 2014) (invited contribution).

43. Program Chair and Presenter, *Producing and Distributing Content*, Business Bar Leaders Conference (sponsored by Business Law Section, ABA) (May 16, 2014).

44. *The Role and Rule of Law: Creditors' Rights and Legitimacy,* presentation for Mongolian judges, Ulan Baator, Mongolian (Mar. 26, 2014).

45. Presenter, *Examining Success*: *The Benefits and Costs of Bankruptcy Examination,* Society for Benefit-Cost Analysis, Washington DC (Mar. 13, 2014).

46. Presenter, *Ethical Issues in Closing Opinion Practice,* Association of Commercial Finance Attorneys, Yale Club, New York (Feb. 18, 2014).

47. *Relational Reorganization,* ContractsProfBlog, available at http://lawprofessors.typepad.com/contractsprof_blog/2013/08/revisiting-the-contracts-scholarship-of-stewart-macaulay-post-vi-jonathan-lipson.html (Aug. 28, 2013) (invited blog post on scholarship of Stewart Macaulay).

48. *Detroit: Kicking the Federalism Question Down the Rhodes,* http://www.concurringopinions.com/

archives/2013/07/guest-post-jonathan-lipson-on-the-mess-in-detroit.html (July 25, 2013) (invited blog post on developments in Detroit chapter 9 bankruptcy).

49. Testimony, American Bankruptcy Institute Field Hearings on Reform of Chapter 11 (video and written statement available at http://commission.abi.org) (June 7, 2013) (testimony on informational aspects of chapter 11 system).

50. Presenter, *Chapter 11 Success Modeling Project*, UCLA Law School (Feb. 2013).

51. Panelist and Presenter, *Executive Compensation and Securitization*, Tsinghua University School of Law, *Commercial Law Conference* (Oct. 2012).

52. Panelist and Presenter, *Executive Compensation and Securitization*, Canadian Law and Economics Ass'n (Oct. 2012).

53. Author, *Failing at Failure: An Institutional Analysis of Dodd-Frank's Orderly Liquidation Authority* RegBlog (Sept. 11, 2012) available at https://www.law.upenn.edu/blogs/regblog/2012/09/11-lipson-orderly-liquidation-authority.html (invited blog post on "institutional analysis" of financial distress systems).

54. Presenter, *Information Discovery and Machine Learning in Bankruptcy Reorganization*, University of Wisconsin Dep't Computer Science (May 2012).

55. Organizer & Program Chair and Commentator, *Who's In the House: The Changing Role and Nature of In-House and General Counsel,* Wisconsin Law Review Symposium (Nov. 2011).

56. Panelist & Presenter: Tsinghua University School of Law, *Commercial Law Conference*, Oct. 2011 (Beijing, China), *Choosing Failure: Comparative Institutional Analysis of the Convergence of Financial Distress Systems*.

57. Commentator and Panelist, *Empirical and Lyrical: The Scholarship of Stewart Macaulay* (Oct. 2011).

58. Panelist and Presenter, *Examine This! Examiners, Examinations and You*, National Conference of Bankruptcy Judges, Tampa, Florida, (Oct. 2011).

59. Panelist & Presenter, *Examiner Examination,* New York City Bar Ass'n (May 2011).

60. Panelist & Presenter, *Examiners in Chapter 11 Bankruptcies*, Business Bankruptcy Committee, Am. Bar Ass'n, Spring Meeting (Apr. 2011).

61. Panelist & Presenter: Tsinghua University School of Law, *Commercial Law Conference* (Oct. 30, 2010) (Beijing, China), *Controlling Creditor Opportunism*.

62. Invited Speaker, Renmin (People's) University (Nov. 1, 2010) (Beijing, China), *Controlling Creditor Opportunism*.

63. Invited Speaker, University of International Business and Economics Beijing, (Nov. 1, 2010) (Beijng, China), *Four Models of Failure Under U.S. Law*.

64. Panelist &Presenter, *The SEC in Bankruptcy: Past, Present and Future*, St. John's School of Law, (Oct. 8, 2010) (presenting *Controlling the Market for Information in Reorganization,* 18 AM. BANKR. INST. L. J. 647 (2011) (solicited manuscript))

65. Panelist & Presenter, *Never Really Thought About It: Understanding "Miscellaneous" Provisions and Other Background Text in Agreements,* Am. Bar Ass'n Annual Meeting (Aug. 8, 2010) (presenting *What's Amiss? The Lawyering Interest in "Miscellaneous" Contract Provisions*, 65 CONS. FIN. L. Q. 151 (2011)(solicited manuscript)).

66. Author, *Of Lebron James and Louis Brandeis: Why Elizabeth Warren Should Run the Consumer Financial Protection Bureau,* National Law Journal (online) (July 29, 1010), *available* at http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202463922960&slreturn=1&hbxlogin=1.

67. Author, *The Great Repression: The Crisis of Richard Posner,* Huffington Post (July 13, 2010), *available* at http://www.huffingtonpost.com/peter-j-liacouras/the-great-repression-the_b_644925.html.

68. Panelist & Presenter, *The Shadow Bankruptcy System,* Commercial Law Conference, Tsinghua, University (Beijing) (Oct. 28, 2009).

69. Panelist (and organizer): *The 'New' New Deal: Transactional Skills for a Changing Environment,* Conference on the Minority Lawyer, Philadelphia, PA (Sept. 24, 2009).

70. Author, *Beware the Toxicity of Shadow Bankruptcy,* Nat'l L.J. 42, (June 15, 2009) (opinion).

71. Author, *Turnaround investors always call the shots,* 80 Adver. Age (May 18, 2009) (available at 2009 WLNR 9767919) (point-counterpoint).

72. Panelist & Presenter, *Cost-Benefit Analysis and Closing Opinion Practice: Some Ethical Issues,* Delaware State Bar Ass'n (Apr. 30, 2009).

73. Panelist & Presenter, American Constitution Society, *Global Financial Climate Change: Bankruptcy, Bailouts, and the Law, presented by the ACS Philadelphia Lawyer Chapter* (Feb. 24, 2009).

74. Panelist & Presenter, *Enron Re-run,* Commercial Law Conference, Tsinghua, University (Beijing) (Oct. 23, 2008).

75. Panelist & Presenter, American Bar Association, Committee on Affordable Housing and Community Development, *Ethical Issues in Third Party Closing Opinions Practice,* Washington, DC (May 23, 2008).

76. Discussant, *Law, Economics and Neuroscience,* University of Southern California, Los Angeles, CA (May 14, 2008) (commenting on Berns, et al, *Adolescent Engagement in Dangerous Behaviors* ).

77. Panelist & Presenter, *Conference on Globalizing Secured Transactions,* Thomas Jefferson University School of Law (Mar. 14, 2008) (presenting *Atrophy and Catastrophe: Designing and Protecting Rights-Creating Information Systems in Global Secured Credit*).

78. Panelist & Presenter, Joint Meeting of American Association of Law Schools Debtor/Creditor Section and National Conference of Bankruptcy Judges (Oct. 2007) (draft of empirical study of use of bankruptcy examiners).

79. Panelist & Presenter, American Bar Association, Committee on Legal Opinions, Annual Meeting ("Crossing the Threshold") (Aug. 12, 2007) San Francisco, CA (repeated as Webcast November 11, 2007).

80. Panelist & Presenter, Harvard/Texas Commercial Realities Workshop (proposal for a study of UCC-1 and corporate chartering systems) (Apr. 2007).

81. Panelist & Presenter, Middle Eastern Partnership Institution (United States State Department/University of Pennsylvania), *U.S. Commercial and Bankruptcy Law* (Apr. 9, 2007).

82. Panelist & Presenter, Association of Commercial Finance Attorneys, Presentation, *Ethical Issues in Negotiating and Drafting Opinion Letters* (Mar. 26, 2007).

83. Panelist & Presenter, Harvard/Texas Commercial Realities Workshop (proposal for an empirical study of examiners in large chapter 11 bankruptcies) (Apr. 2006).

84. Moderator, *Teaching, Training and Growing M&A Lawyers,* Business Law Section, American Bar Ass'n (Apr. 7, 2006).

85. Presenter, Temple Institute for International Law and Public Policy (Nov. 7, 2005) (presented draft of *The Expressive Function of Directors' Duties to Creditors*).

86. Panelist, *Twilight in the Zone of Insolvency*, University of Maryland School of Law (Nov. 3, 2005) (presented draft of *The Expressive Function of Directors' Duties to Creditors*).

87. Panelist, American Association of Law Schools - Joint Meeting of Commercial and Contracts Sections (intellectual property panel) (June 15, 2005) (presented draft of *Not.com: Commercial Law at the Cross-Codes?*).

88. Presenter, 2005 Yale/Stanford Junior Faculty Forum (working draft of *Price and Pride:  Third-Party Closing Opinion Practice Among U.S. Lawyers (A Preliminary Investigation)*) (May 27, 2005)

89. Presenter, 2005 Harvard/Texas Commercial Realities Workshop (working draft of *Price and Price: Third-Party Closing Opinion Practice Among U.S. Lawyers (A Preliminary Investigation)*) (Apr. 8, 2005).

90. Panelist, American Association of Law Schools, Debtor-Creditor Section, *Catholic Church Bankruptcies* (Jan. 7, 2005).

91. Presenter, Midwest Law and Economics Ass'n, University of Iowa.  Present working draft of *Why do Lawyers ask for and Give Third-Party Closing Opinions?* (Oct. 8, 2004).

92. Presenter, Villanova Law School Workshop Series.  Present working draft of *Why do Lawyers ask for and Give Third-Party Closing Opinions?* (Sept. 22, 2004).

93. Presenter, Canadian Law and Economics Ass'n, University of Toronto.  Present working draft of *Why do Lawyers ask for and Give Third-Party Closing Opinions?* (Sept. 17, 2004).

94. Moderator and program chair, American Bar Association, *Train in Vain:  Ethics Training for Business Lawyers and Law Students* (Apr. 2004).

95. Moderator and organizer: *Who's the Consumer?  The Changing Identity of Consumers in Commercial Law*, Association of American Law Schools annual meeting (Jan. 2004).

96. Moderator, Eastern District of Pennsylvania Bankruptcy Bar annual continuing legal education program (Jan. 2004).

97. Moderator and director, American Bar Association, *Questions from the Perplexed -- Common Drafting Issues Under Revised Article 9* (Nov. 2003) (nationwide teleconference of UCC Article 9 program).

98. Presenter, Midwest Law and Economics Association, *Contract, Notice and the Privatization of Property: Verification and Measurement in Commercial Finance Law* (working paper) (Oct. 2003).

99. Presenter, Canadian Law and Economics Association: *Contract, Notice and the Privatization of Property: Verification and Measurement in Commercial Finance Law* (working paper) (Sept. 2003).

100. Moderator and Presenter, American Bar Association, *Training Lawyers and Law Students to do Deals* (Apr. 2003).

101. Moderator and director, American Bar Association, *Questions from the Perplexed -- Common Drafting Issues Under Revised Article 9* (Apr. 2003).

102. Fellow, National Conference of Bankruptcy Judges (Oct. 2002).

103. Presenter, American Bar Association, Presenter, *Special Purposes Entities and Enron* (Aug. 2002).

104. Presenter, Law and Society Conference, *Directors' Duties to Creditors:  Power Imbalance and the Financially Distressed Corporation* (May 2002).

105. Presenter, American Association of Law Schools, *Remote Control:  Revised Article 9 and the Negotiability of Information* (Jan. 2002).

106. Presenter, Arthur Moller Workshop (University of Texas), *Remote Control:  Revised Article 9 and the Negotiability of Information* (Nov. 2001).

*Selected Media Quotes:*

1. Justin Wise, *Purdue Pharma Law Firm Builds 'Ethical Wall' to Shield Ex-Judge*, BLOOMBERG LAW, April 21, 2023.

2. Justin Wise, *FTX GROUP: Sullivan & Cromwell to Reap Millions for Untangling Co.*, TROUBLED CO. REP., Mar. 14, 2023.

3. Libby Lewis, *Why Did FTX Fail? A Judge Is Letting FTX Itself Decide*, NEW REPUBLIC, Feb. 20, 2023.

4. Connor Sephton, *Law Firm Overseeing FTX Bankruptcy Could Make Hundreds of Millions of Dollars*, COINMARKETCAP, Jan. 30, 3023.

5. Samuel Mbaki Wanjiku, *FTX Lawyers to Make Millions from Bankruptcy Case*, CRYPTO.NEWS, Jan. 27, 2023.

6. Helen Partz, *FTX Lawyers To Reap Millions From Bankruptcy Case: Report*, COINTELEGRAPH, Jan. 27, 2023.

7. Justin Wise, *Wall Street Firm Set to Reap Millions for Untangling FTX Empire*, BLOOMBERG LAW, Jan. 27, 2023.

8. Bob Fernandez, *Malvern Opioid Maker Endo to be Monitored by Obama's Former Drug Czar for $25K a Month*, PHILA. INQUIRER, Nov. 22, 2022.

9. Ernie Sadashige, *FTX Bankruptcy Will Offer a Look Behind Crypto's Dark Curtain*, FOX BUS., Nov. 18, 2022.

10. Reuters, *Will FTX's Bankruptcy Spill Into the General Economy Like Lehman Brothers?*, FOX BUS., Nov. 16, 2022.

11. Bob Fernandez, *ENDO INT'L: Paid Key Execs $55.5M in Bonuses Prior to Bankruptcy*, TROUBLED CO. REP., Oct. 5, 2022.

12. Santiago F. Dumlao Jr., *Revisiting Securitization*, BUS. MIRROR, Oct. 5, 2022.

13. Bob Fernandez, *Executive Bonuses at Malvern Opioid Firm Endo Were 'Excessive' and 'Secret' Before Bankruptcy, state AGs Say*, PHILA. INQUIRER, Sept. 23, 2023.

14. Bob Fernandez, *Opioid Maker Endo Paid Top Executives $55.5 Million in Bonuses Before Bankruptcy Filing*, PHILA. INQUIRER, Aug. 24, 2022.

15. Daniel Gill & James Nani, *Endo Follows Opioid Bankruptcy Playbook, With A Few Twists*, BLOOMBERG, Aug. 18, 2022.

16. Rick Paszkiet, *Book Chat — Model Business Corporation Act Annotated, Fifth Edition*, BUS. L. TODAY (06/27/2022).

17. New Generation Research, *Purdue Pharma L.P. – U.S. Trustee Still Not Happy with Sackler Release Provisions in Sixth Amended Plan; Examiner Finds No Evidence of Sackler Influence on Special Committee*, BANKRUPTCYDATA.COM, July 21, 2021.

18. Maria Chutchian, *Sacklers Did Not Influence Purdue in Deal Talks, Examiner Finds*, REUTERS, July 20, 2021.

19. Vince Sullivan, *Examiner Clears Sacklers of Influencing Purdue's Board*, LAW360, July 20, 2021.

20. Andy Brownfield, *Cincinnati Attorney to Play Key Role in Oxycontin-Maker's $5.4B Settlement*, CIN. BUS. COURIER, June 30, 2021.

21. Libby Lewis, *The Swashbuckling Lawyer Who's Taking on the Sackler Family*, THE NEW REPUBLIC, June 28, 2021.

22. Maria Chutchian, *Purdue Pharma Bankruptcy Judge OKs Examiner but Condemns Sackler-Related Attacks*, REUTERS, June 16, 2021.

23. Jeremy Hill, *Purdue Judge Backs Bankruptcy Examiner After Explosive Hearing*, BLOOMBERG NEWS, June 16, 2021.

24. Vince Sullivan, *Examiner with Narrow Scope Approved in Purdue Ch. 11*, LAW360, June 16, 2021.

25. Brian Mann, *Sackler Family Empire Poised to Win Immunity from Opioid Lawsuits*, NPR ALL THINGS CONSIDERED (June 2, 2021).

26. Brian Mann, *24 States Mount Legal Fight to Block Sackler Bid for Opioid Immunity*, NPR MORNING ED. (May 3, 2021).

27. Meryl Kornfield, *Newly Unsealed Court Documents Reveal Sackler Family's Early Concerns over Lawsuits*, WASH. POST, Dec. 22, 2021.

28. Geoff Mulvihill, F*amily Behind Purdue Pharma to Face Congressional Scrutiny*, ASSOC. PRESS, Dec. 17, 2020.

29.  Andrew Scurria & Peg Brickley, *Democratic Senators Object to "Rebranding" of Purdue as a Public Asset*, WALL ST. J.,  Nov. 9, 2020

30. Sunday Sindhu, *Penney's Heads to Sale as Shareholders Dispute Value*, WOMEN'S WEAR DAILY, Nov. 9, 2020.

31. *ABA Publishes 5th Edition of "The Model Business Corporation Act Annotated,"* Oct. 15, 2020.

32. Larry Hamermesh, *Daily Podcasts: Episode 3: The Model Business Corporation Act Celebrates 70 Years – Commemorated by the Fifth Edition of the Model Business Corporation Act Annotated*, ABA Vitual Section Annual Meeting (Sept. 23, 2020)

33. Edward Helmore, *Activists see Purdue bankruptcy case as last chance to call Sacklers to account*, THE GUARDIAN, July 8, 2020.

34. *This year could be one of the worst for bankruptcies*, USA TODAY, June 30, 2020

35. Becky Yerak, Peg Brickley and Aisha Al-Muslim, *Hertz Global : Judge to Rule on Hertz's Controversial Stock Sale in Bankruptcy,* MKT SCREENER, June 12, 2020

36. Peter Hayes, *Empty Dorm Rooms Spawn Dozens of Suits That Will Be Tough to Win*, U.S. L. WEEK, June 4, 2020

37. Leslie A. Pappas, *Surge of Bankruptcies Will Be Next Virus Curve to Flatten*, BLOOMBERG L. NEWS, April 20, 2020

38. Celest Bott, *ABA* Lays *Out COVID-19 Business Standstill Template*, LAW360, April 20, 2020

39. Juliet Macur, *As Gymnasts Who Were Abused Seek Answers, They Are Offered Only Money,* N.Y. TIMES, March 3, 2020.

40. Geoff Mulvihill and The Associated Press, *Bankruptcy Judge Thrust into Spotlight in Purdue Pharma Case*, FORTUNE, Dec. 25, 2019.

41. **Nina Feldman, *Failure to pay doctors' malpractice insurance lands Hahnemann, St. Chris owner in bankruptcy trouble*, PHILA. TRIB., Dec. 18, 2019.**

42. Sara E. Teller, *Refinery Pushes for Executives to Receive Bonuses Despite Bankruptcy,* LEGAL READER, Dec. 5, 2019.

43. Andrew Maykuth, *After fire, Philadelphia refinery paid executives $4,591,500 in bonuses while hundreds were laid off*, PHILA. INQUIRER, (Sept. 10, 2019).

44. Peg Brickley, *Bankruptcy Scholars Seek Probe of Purdue Pharma's Owners*, WALL ST. J. (Nov. 6, 2019)

45. Renae Merle, *Judge in Purdue Pharma bankruptcy case extends lawsuit protection to Sacklers*, WASH. POST (Nov. 6, 2019).

46. Renae Merle, *Purdue's choice of NY bankruptcy court part of common forum shopping strategy, experts say,* WASH. POST. (Oct. 10, 2019).

47. Knowledge@Wharton podcast, *The Purdue Pharma Bankruptcy Case: What's at Stake,* (Sept. 23, 2019).

48. Sarah Karlin-Smith, Dan Goldberg, Briana Ehley, *Partisan split could snarl strategy to fix opioid crisis*, POLITICO (Sept. 18, 2019).

49. David Millward, *Sacklers set for more Purdue pain despite opioid settlement*, THE TELEGRAPH,  (Sept. 18, 2019).

50. Renae Merle & Lenny Bernstein, *Purdue Pharma's bankruptcy plan includes special protection for the Sackler family fortune*, WASH. POST (Sept. 18, 2019).

51. Andrew Maykuth, *After fire, Philadelphia refinery paid executives* $4,591,500 in bonuses while hundreds were laid off, PHILA. INQ., (9/10/19).

52. Peg Brickley, *PG&E : Investors Back PG&E on Bankruptcy Control*, WALL STREET JOURNAL, Market Screener https://www.marketscreener.com/PG-E-CORPORATION-13946/news/PG-E-Investors-Back-PG-E-on-Bankruptcy-Control-28637087/ (05/22/2019)

53. Gretchen Morgenson & Lillian Rizzo, *Who Killed Toys-R-Us?  Hint:  It wasn't only Amazon* WALL STREET JOURNAL (Aug. 23, 2018).

54. MPR News discussing Minneapolis Catholic diocese bankruptcy (06/01/2018).

55. Bloomberg Law *After ten years, a disputed settlement, and a trip through the Supreme Court, Jevic Holding Corp.'s Chapter 11 reorganization case is heading to Chapter 7 liquidation* (05/24/2018).

56. Daniel Gill, *High Court Restricts Ch. 11 'Structured Dismissals'*, U.S.L.W. (Mar. 23, 2017).

57. Peg Brickley, *U.S. Supreme Court Rejects Structured Bankruptcy Dismissals*, WALL STREET J. (Mar. 22, 2017).

58. Tracy Rucinski & Tom Hals, *Coal Revival Means Big Stock Bonuses at Bankrupt Peabody*, REUTERS (Feb. 28, 2017) http://www.reuters.com/article/us-peabody-energy-bankruptcy-bonuses-ana-idUSKBN1670HM.

59. Jean Hopfensperger, Archdiocese Abuse Victims to Vote on Bankruptcy Plans, MINN. STAR-TRIB. (Jan. 12, 2017), http://www.startribune.com/twin-cities-archdiocese-clergy-abuse-victims-face-key-moment-in-bankruptcy-case/410523275/.

60. Martin Moylan, *Endgame May Be Near in Twin Cities Archdiocese Bankruptcy Case*, MPR NEWS (Dec. 15, 2016), https://www.mprnews.org/story/2016/12/15/twin-cities-archdiocese-bankruptcy-sex-abuse-settlement.

61. Daniel Gill, *High Court Hears Argument on* Jevic*, First Bankruptcy Case of Term*, BANKR. L. REP. (Dec. 7, 2016), https://www.bna.com/high-court-hears-n73014448264/.

62. Daniel Gill, *Creditors Cutting in Line: Bankruptcy Settlements at SCOTUS*, U.S.L.W. (Dec. 1, 2017).

63. Bianca Bruno, *From Bankruptcies to Trump U: The Effect of Trump's Legal Woes on Politics*, COURTHOUSE NEWS SERV., (Nov. 7, 2016).

64. Daniel Gill & Deborah Swann, *The Bankruptcies Behind Trump's 'King of Debt' Claim*, DAILY REP. EXECUTIVES (BNA), (Nov. 1, 2016).

65. Tom Hals, *Lehman Brothers returns in deal that led to First Data IPO*, Reuters, Oct. 22, 2016, available at http://www.reuters.com/article/us-firstdata-ipo-lehman-idUSKCN0SG21420151022?feedType=RSS&feedName=innovationNews.

66. Jonathan Lipson, *Can Trump Create Millions of Jobs? Don't Bet on It*, THE CONVERSATION, (Sep. 30, 2016) https://theconversation.com/can-trump-create-millions-of-jobs-dont-bet-on-it-66104. [Reprinted at Salon.com, Newsweek, and elsewhere]

67. Jonathan Lipson, *Trump Still Can Ride 'Bankruptcy Campaign' to Victory*, USA TODAY, (Sep. 30, 2016) http://www.thecalifornian.com/story/opinion/2016/09/30/trump-still-can-ride-bankruptcy-campaign-victory/91283500/.

68. Peg Brickley &  Alexandra Berzon, *Trump Casinos Lost Jobs at Greater Rate than Atlantic City Rivals, Study Finds*, WALL STREET J., (Sep. 29, 2016) https://www.wsj.com/articles/trump-casinos-lost-jobs-at-greater-rate-than-atlantic-city-rivals-study-finds-1475162295

69. *Business Law Section Content Library—New Benefit for Members*, BUS. L. TODAY, (Sep. 22, 2016) https://www.americanbar.org/publications/blt/2016/09/content.html.

70. Jean Hopfensperger, *Lawyer Fees Reach $11 Million for Twin Cities Archdiocese*, MINN. STAR-TRIB., (Sep. 21, 2016) http://www.startribune.com/lawyer-fees-reach-11-million-for-twin-cities-archdiocese/394364831/.

71. Lillian Rizzo, *Caesars Bankruptcy Mediator Abruptly Resigns*, WALL STREET J., (Sep. 9, 2016).

72. Michelle Caffrey, *What ITT Tech Students Need to Know as They Plan for Their Future*, PHILA. BUS. J., (Sep. 8, 2016), https://www.bizjournals.com/philadelphia/news/2016/09/08/itt-tech-students-transfer-credits-student-loans.html?ana=bbg.

73. Tracy Rucinski, *Report due in days could break deadlock on Caesars bankruptcy*, Reuters, Mar. 4, 2016, available at http://www.reuters.com/article/us-caesars-bankruptcy-idUSKCN0W62NQ.

74. Tom Corrigan, *Resignations, Criminal Charges Cloud Minneapolis Archdiocese's Bankruptcy*, Wall St. J., June 15, 2015, available at http://www.wsj.com/articles/resignations-criminal-charges-cloud-minneapolis-archdioceses-bankruptcy-1434392515.

75. Marty Moylan, *Archdiocese weighs bankruptcy, but what would it mean?* Minnesota Public Radio Jan. 15, 2015, available at http://www.mprnews.org/story/2015/01/14/archdiocese-bankruptcy.

76. Nate Raymond and Joseph Ax, *Texas investor Sam Wyly files for bankruptcy after losing SEC fraud case*, Reuters, Oct. 20, 2014, available at http://www.reuters.com/article/2014/10/20/us-sec-wyly-idUSKCN0I924820141020.

77. Reuben Kramer, *Straub says he's not planning to appear at Revel hearing Friday,* Press of Atlantic City, Dec. 11, 2014, avilable at http://www.pressofatlanticcity.com/news/breaking/straub-says-he-s-not-planning-to-appear-at-revel/article_64dd9878-80aa-11e4-bbd2-a7a611eeb8c0.html.

78. Martin Moylan, *Bankruptcy could help Winona Archdiocese avoid sex abuse law suits*, Minnesota Public Radio, Oct. 7, 2014, available at http://www.mprnews.org/story/2014/10/07/bankruptcy-winona-diocese.

79. Nick Brown, Analysis – *LightSquared win for Dish's Ergen may hurt him in investor lawsuit*, Reuters, May 21, 2014, available at http://uk.reuters.com/article/2014/05/21/uk-lightsquared-bankruptcy-analysis-idUKKBN0E11E620140521.

80. Nick Brown, *Clock ticks on Ergen, Falcone fight for LightSquared*, Reuters, Feb. 23, 2014, available at http://www.reuters.com/article/2014/02/23/us-lightsquared-bankruptcy-analysis-idUSBREA1M0R320140223.

81. Annysa Johnson, Milwaukee *Archdiocese's bankruptcy plan is in the works*, Milwaukee Joural-Sentinel, Jan. 14, 2014, available at http://www.jsonline.com/news/religion/milwaukee-archdiocese-is-ready-to-file-bankruptcy-plan-b99180350z1-240195521.htm.

82. Tom Scheck, *Bankruptcy an option for church confronting clergy misconduct, financial uncertainty,* Minnesota Public Radio, Oct. 23, 2013, available at http://www.mprnews.org/story/2013/10/22/catholic-church/bankruptcy-an-option-for-archdiocese.

83. WABC6 Minneapolis-St. Paul, *Minnesota clergy abuse reports pose financial concerns*, Oct. 23, 2013, available at http://www.wday.com/event/article/id/88878.

84. Evan Weinberger, $*13B JPMorgan Deal Could Complicate Big Bank Resolution*, *Law360,* Oct. 13, 2013, available at http://www.law360.com/articles/481727.

85. Milwaukee Journal-Sentinel, Annysa Johnson, *Church Cemetery Funds off-limits,* July 31, 2013.

86. Chicago Tribune, Michael O'Neal, *Part four: Bankruptcy, Inc.,* Jan. 16, 2013, available at http://articles.chicagotribune.com/2013-01-16/news/ct-biz-trib-series-4-20130116_1_aurelius-capital-management-bankruptcy-judge-kevin-carey-bankruptcy-process/2.

87. Wisconsin Public Radio, Chuck Quirmbach*, Milwaukee Archdiocese and Creditors Battle over Cemetary Funds,* Jan. 15, 2013, available at http://wpr.org/news/display_headline_story.cfm?storyid=52899.

88. Milwaukee Journal-Sentinel,  Annysa Johnson, *Milwaukee Diocese Says It's Going Broke,* Jan. 24, 2013, available at http://www.jsonline.com/features/religion/milwaukee-archdiocese-says-its-going-broke-628gmme-188309451.html.

89. National Public Radio, Chuck Quirmbach, *Bankrupt Diocese Tries to Protect Assets,* Feb. 16, 2012 available at http://www.npr.org/2012/02/16/146995458/bankrupt-wis-church-tries-to-limit-abuse-claims.

90. Reuters.com, Tom Hals, *Lawsuit against Blackstone could test LBO defense,* June 20, 2011, available at http://www.reuters.com/article/2011/06/20/extendedstay-blackstone-lawsuit-idUSN1623126920110620.

91. ThompsonReuters, *Tribune creditors sue ex-shareholders for billions,* June 3, 2011, available at http://newsandinsight.thomsonreuters.com/Legal/News/2011/06_-_June/Tribune_creditors_sue_ex-shareholders_for_billions/.

92. Milwaukee Journal-Sentinal, Annysa Johnson, *Archdiocese denies Cousins Center ownership*, May 14, 2011, available at http://www.jsonline.mobi/more/news/milwaukee/121843378.htm.

93. THE ECONOMIST, *Chapter 11, Verse 8*, Feb. 10, 2011, available at http://www.economist.com/node/18114701.

94. Chicago Tribune, Ameet Sachdev, *Creditors sue to get money back from Tribune Co. executives, managers*, Dec. 12, 2010, available at http://mobile.chicagotribune.com/wap/news/text.jsp?sid=289&nid=31567993&title=Business&nstart=1&cid=16276&scid=1392&from=&redir=&ith=6&storytitle=Creditors+sue+to+get+money+back+from+Tribune+Co.+executives,+managers&font=s.

95. Reuters, *WaMu's Creditor's Brace for Examiner's Report*, Oct. 30, 2010, available at http://westlawnews.thomson.com/Bankruptcy/News/2010/10_-_October/WaMu_s_creditors_brace_for_examiner_report/.

96. Wall Street Journal, Matt Phillips, *Lehman's Accidental Historian,* Sept. 18, 2010, available at http://online.wsj.com/article/SB10001424052748704858304575498261847641000.html.

97. *Academic Crystal Ball,* Ben Fidler, Aug. 18, 2010 Daily Deal, 2010 WLNR 17786676.

98. Leagle, Inc., In re HSF Holding, Inc., Jan. 13, 2010, available at http://www.leagle.com/unsecure/page.htm?shortname=inbco20100113525.

99. The Orange County Register, Creditors turn up the heat in Freedom bankruptcy, Nov. 30, 2009, available at http://ocbiz.freedomblogging.com/2009/11/30/creditors-turn-up-the-heat-in-freedom-bankruptcy/15959/.

100. Daily Finance, Brian Tierney's time, money, luck slipping away from his Philly news empire, Oct. 22, 2009, available at http://www.dailyfinance.com/story/company-news/brian-tierney-s-time-money-slipping-away-for-his-philly-news-em/19204135/.

101. South Bay Law Firm Law Blog, Taking the Punchbowl Away from the Party, Oct. 12, 2009, available at http://www.southbaylawfirm.com/blog/?p=326.

102. Philadelphia Business Journal, Saxbys: Legal fees forced bankruptcy, Sept. 4, 2009, available at http://philadelphia.bizjournals.com/philadelphia/stories/2009/09/07/story15.html.

103. ABC News.com, *Too Many Madoff Victims, Not Enough Money to Go Around, U.S. Official Says*, Aug. 1, 2009, available at http://i.abcnews.com/Blotter/Madoff/Story?id=8223686&page=3.

104. PrawfsBlawg, Complexity, Judgment, and the Subprime Crisis - The Hedgehog's View, July 2, 2009, available at http://prawfsblawg.blogs.com/prawfsblawg/2009/07/complexity-judgment-and-the-subprime-crisis-the-hedgehogs-view.html.

105. The Posse List, Beware of shadow bankruptcy, June 15, 2009, available at http://www.theposselist.com/2009/06/15/beware-of-shadow-bankruptcy/.

106. Legal Profession Blog, Thinking About the Financial Crisis – It's Scary When We Don't Know What We Don't Know, June 18, 2009, available at http://lawprofessors.typepad.com/legal_profession/2009/06/thinking-about-the-financial-crisis-.html.

107. China Daily (and others), *GM aims for restart as Chrysler gets green light*, June 2, 2009, available at http://www.chinadaily.com.cn/world/2009-06/02/content_7963761.htm.

108. 1853 Chairman, GM Likely To Use Chrysler's Strategy In Its Expected Bankruptcy, May 24, 2009, available at http://www.1853chairman.com/2009/05/24/gm-likely-to-use-chryslers-strategy-in-its-expected-bankruptcy.

109. Agence France-Press, *Chrysler on legal fast-track, faces long road ahead,* May 7, 2009, available at http://www.asiaone.com/Motoring/News/Story/A1Story20090507-139901.html.

110. Tradingmarkets.com, *Update: Bankruptcy Experts Discuss AIG's Legal Options*, Feb. 27, 2009 available at http://www.tradingmarkets.com/.site/news/Stock%20News/2199796.

111. Bloomberg.com, *Madoff Trustee Picard May Take Five Years to Pay Back Investors*, Jan. 21, 2009, available at http://www.bloomberg.com/apps/news?pid=20601087&sid=a6JDlygKnj8k&refer=home.

112. Pat Regnier, *Will there be a subprime 'perp walk'?* 37 Money 138, May 1, 2008, 2008 WLNR 6657003.

113. *How Hollywood gets money wrong*, May 29, 2008, available at http://articles.moneycentral.msn.com/SavingandDebt/LearnToBudget/HowHollywoodGetsMoneyWrong.aspx?page=all.

114. *Waiting for a subprime perp walk*, April 18, 2008, available at http://money.cnn.com/2008/04/18/real_estate/bottom_line.moneymag/index.htm?postversion=2008042105.

115. *Judge backs landmark priest-abuse settlement,* The Oregonian, April 14, 2007.

116. *Complex issues will accompany settlement* (San Diego Diocese bankruptcy), San Diego Union-Tribune, Feb. 28, 2007.

117. *Parishioners Welcome Settlement,* The Oregonian, Dec. 20, 2006.

118. *Bill aims to protect post-bankruptcy tithing*, Albany-Times Union, Oct. 3, 2006.

119.    *No place for church in state* of *bankruptcy*, Albany Times-Union, Sept. 14, 2006.

120. *None of your business?  No – Law schools need to bring their business law teaching up to date*, Business Law Today, Sept. / Oct. 2006.

121. *In Delta Bankruptcy, Judge's Ruminations are Legal Sideshow*, Wall Street Journal, Nov. 18, 2005, p. B1.

122. *'Unpredictable' Judge Running Delta Case*, Fulton County Daily Report, Oct. 10, 2005, available at http://www.law.com/jsp/article.jsp?id=1128675915080&rss=newswire.

123. Newscast: *MCI entering hearings on bankruptcy,* Minnesota Public Radio: Marketplace Morning Report, Sept. 8, 2003, transcript available at 2003 WL 6866224.

124. *MCI (ex-*WorldCom*) sort de la faillite* . . . available at http://archives.webfin.com/dcforum/analyse/12510.html.

125. Bloomberg News, *Enron Bankruptcy Judge Approves $137. Mln in Fees*, May 8, 2003.

126. *Washington Technology*, http://www.washingtontechnology.com/news/1_1/telecom/18616-1.html.

127. *The Seattle Times*, http://seattletimes.nwsource.com/html/businesstechnology/134518985_ebbersranch22.html.

128. *Cox Newspapers, Washington*, http://www.coxnews.com/washingtonbureau/staff/emling/030102ENRON-COURT01.html.

129. *Washingtonpost.com*, http://discuss.washingtonpost.com/wpsrv/zforum/02/technews_lipson072202.htm.

130. *National Law Journal*, http://www.counterpunch.org/pipermail/counterpunch-list/2002-January/017981.html.

131. *New York Times*, *A Law Firm's 2 Roles Risk Suit by Enron*, Jan. 29, 2002.

132. *National Law Journal*, *Enron Woes Spur Calls for Reform*, Jan. 28, 2002.

## Appendix C

| Jonathan Lipson |
|---|
| **Folder/Documents** |
| Letter to Lipson 09 05 24 |
| **Lipson - Potential Documents** |
| **08.30.24 M. Cavenaugh (transcript & exhibits)** |
| **08/20.24 R. Forbes_30b6 (transcript & exhibits)** |
| 1 - Isgur's Disciplinary Letter |
| **09.20.04 J. Sussberg (transcript & exhibits)** |
| **09.20.24 A. Rotman (transcript & exhibits)** |
| **09.09.24 B. Ruzinsky (transcript & exhibits)** |
| **Disclosures** |
| JW_00023522-JW_00023705 Attorney Sourcebook |
| Exhibit A-1 USTP Identified Cases (002) |
| **Local Rules** |
| JW_00000307-JW_00000316 - 10-15-18 Email from Cavenaugh to Freeman & PDF of Expenses |
| IEH - 150 - UST Reply |
| MotiontoEmploy328final_0 |
| |
| |
| *Folders are in bold |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| Potential Documents | Transcripts | 08.05.24 W. Jenkins | 43104 W. Jenkins Exhibits | 43104 W. Jenkins Prev. Marked 038 |
| | | | | 43104 W. Jenkins Prev. Marked 057 |
| | | | | 43104 W. Jenkins Prev. Marked 062 |
| | | | | 43104 W. Jenkins Prev. Marked 063 |
| | | | | 43104 W. Jenkins Prev. Marked 064 |
| | | | | 43104 W. Jenkins Prev. Marked 075 |
| | | | | 43104 W. Jenkins Prev. Marked 077 |
| | | | | 43104 W. Jenkins Prev. Marked 078 |
| | | | | 43104 W. Jenkins Prev. Marked 079 |
| | | | | 43104 W. Jenkins 080 |
| | | | | 43104 W. Jenkins 081 |
| | | | | 43104 W. Jenkins 082 |
| | | | | 43104 W. Jenkins 083 |
| | | | 43104JenkinsUSTP.txt | |
| | | | 43104JenkinsUSTP_F (SECURED) | |
| | | 08.13.24 C. Cooper | Exhibits | 43151 W. Cooper 062 |
| | | | | 43151 W. Cooper 063 |
| | | | | 43151 W. Cooper 064 |
| | | | | 43151 W. Cooper 075 |
| | | | | 43151 W. Cooper 077 |
| | | | | 43151 W. Cooper 080 |
| | | | | 43151 W. Cooper 081 |
| | | | | 43151 W. Cooper 110 |
| | | | | 43151 W. Cooper 111 |
| | | | | 43151 W. Cooper 112 |
| | | | | 43151 W. Cooper 113 |
| | | | | 43151 W. Cooper 116 |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | | | 43151 W. Cooper 117 |
| | | | | 43151 W. Cooper 118 |
| | | | | 43151 W. Cooper 119 |
| | | | 43151CooperUSTP.txt | |
| | | | 43151CooperUSTP_F (SECURED) | |
| | | **Babcock Deposition** | **Exhibits** | 43087 C. Babcock 054 |
| | | | | 43087 C. Babcock 055 |
| | | | | 43087 C. Babcock 056 |
| | | | | 43087 C. Babcock 063 |
| | | | | 43087 C. Babcock 065 |
| | | | | 43087 C. Babcock 066 |
| | | | | 43087 C. Babcock 067 |
| | | | | 43087 C. Babcock 069 |
| | | | | 43087 C. Babcock Prev. Marked 038 |
| | | | | 43087 C. Babcock Prev. Marked 053 |
| | | | 43087BBabock_F (SECURED) | |
| | | **Freeman Deposition** | **Exhibits** | Exhibit 1 |
| | | | | Exhibit 10 |
| | | | | Exhibit 11 |
| | | | | Exhibit 12 |
| | | | | Exhibit 13 |
| | | | | Exhibit 14 |
| | | | | Exhibit 15 |
| | | | | Exhibit 16 |
| | | | | Exhibit 17 |
| | | | | Exhibit 18 |
| | | | | Exhibit 19 |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|--------|------------------|------------------|------------------|-----------|
| | | | | Exhibit 2 |
| | | | | Exhibit 20 |
| | | | | Exhibit 21 |
| | | | | Exhibit 22 |
| | | | | Exhibit 23 |
| | | | | Exhibit 24 |
| | | | | Exhibit 25 |
| | | | | Exhibit 26 |
| | | | | Exhibit 27 |
| | | | | Exhibit 28 |
| | | | | Exhibit 29 |
| | | | | Exhibit 3 |
| | | | | Exhibit 30 |
| | | | | Exhibit 31 |
| | | | | Exhibit 32 |
| | | | | Exhibit 33 |
| | | | | Exhibit 34 |
| | | | | Exhibit 35 |
| | | | | Exhibit 36 |
| | | | | Exhibit 37 |
| | | | | Exhibit 38 |
| | | | | Exhibit 39 |
| | | | | Exhibit 4 |
| | | | | Exhibit 40 |
| | | | | Exhibit 41 |
| | | | | Exhibit 42 |
| | | | | Exhibit 43 |
| | | | | Exhibit 44 |
| | | | | Exhibit 45 |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | | | Exhibit 46 |
| | | | | Exhibit 47 |
| | | | | Exhibit 48 |
| | | | | Exhibit 5 |
| | | | | Exhibit 6 |
| | | | | Exhibit 7 |
| | | | | Exhibit 8 |
| | | | | Exhibit 9 |
| | | | Elizabeth Freeman-Final-Full | |
| | | **Freeman Interview partial tr** | **InformalInterviewofElizabethFreeman_FDFTran** | |
| | | 08.01.24 P. Cowlishaw Job No. 33790SCX - Final Files.zip | 43097 P. Cowlishaw Exhibits | 43097 P. Cowlishaw 070 |
| | | | | 43097 P. Cowlishaw 072 |
| | | | | 43097 P. Cowlishaw 073 |
| | | | | 43097 P. Cowlishaw 074 |
| | | | | 43097 P. Cowlishaw 076 |
| | | | | 43097 P. Cowlishaw 077 |
| | | | | 43097 P. Cowlishaw Prev. Marked 038 |
| | | | | 43097 P. Cowlishaw Prev. Marked 053 |
| | | | | 43097 P. Cowlishaw Prev. Marked 054 |
| | | | | 43097 P. Cowlishaw Prev. Marked 062 |
| | | | | 43097 P. Cowlishaw Prev. Marked 063 |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|--------|------------------|------------------|------------------|-----------|
| | | | | 43097 P. Cowlishaw Prev. Marked 064 |
| | | | 43097CowlishwUSTP_F (SECURED) | |
| | | | 43097CowlishwUishawU SPT.txt | |
| | | | 43178ForbesUSTP_F (SECURED) | |
| | | | JW 30b6 transcript | |
| | JW Retention Apps | 17-32660-Ameriforge Group Inc._153-App to Employ JW_2017.05.26.pdf | | |
| | | 17-35623-Offshore Specialty Fabricators LLC_148-App to Employ JW_2017.11.22.pdf | | |
| | | 17-60079-Seadrill Limited_191-App to Employ JW_2017.09.29.pdf | | |
| | | 17-60179-Expro Holdings US Inc._153-App to Employ JW_2017.12.29.pdf | | |
| | | 18-30155-EXCO Resources, Inc._382-App to Employ JW_2018.02.26.pdf | | |
| | | 18-31274-iHeartMedia, Inc._271-App to Employ JW_2018.03.22.pdf | | |
| | | 18-35672-Westmoreland Coal Company_376-App to Employ JW_2018.11.08.pdf | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|--------|------------------|------------------|------------------|-----------|
| | | 18-36057-Gastar Exploration, Inc._215-App to Employ JW_2018.11.30.pdf | | |
| | | 18-36958-Parker Drilling Company_253-App to Employ JW_2019.01.13.pdf | | |
| | | 19-31087-Weatherly Oil & Gas, LLC_170-App to Employ JW_2019.03.30.pdf | | |
| | | 19-32112-Jones Energy Inc._125-App to Employ JW_2019.04.23.pdf | | |
| | | 19-34508-Sanchez Energy Coporation_269-App to Employ JW_2019.09.06.pdf | | |
| | | 19-35198-Sheridan Holding Company II, LLC_118-App to Employ JW_2019.09.25.pdf | | |
| | | 20-20182-J.C. Penney Company, Inc._685-App to Employ JW_2020.06.11.pdf | | |
| | | 20-30336-McDermott International Inc._424-App to Employ JW_2020.02.19.pdf | | |
| | | 20-31884-Sheridan Holding Company I, LLC_130-App to Employ JW_2020.04.02.pdf | | |
| | | 20-32021-Whiting Petroleum Corporation_173-App to Employ JW_2020.04.17.pdf | | |
| | | 20-32519-Neiman Marcus Group LTD, LLC_750-App to Employ JW_2020.06.03.pdf | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | 20-32564-Stage Stores LLC_385-App to Employ JW_2020.06.04.pdf | | |
| | | 20-32631-Ultra Petroleum Corp._195-App to Employ JW_2020.06.04.pdf | | |
| | | 20-32679-Hornbeck Offshore Services, Inc._132-App to Employ JW_2020.06.01.pdf | | |
| | | 20-33233-Chesapeake Energy Corporation_370-App to Employ JW_2020.07.16.pdf | | |
| | | 20-33302-Covia Holdings Corporation_195-App to Employ JW_2020.07.21.pdf | | |
| | | 20-33605-Bruin E&P Partners, LLC_143-App to Employ JW_2020.08.04.pdf | | |
| | | 20-33752-California Pizza Kitchen, Inc._297-App to Employ JW_2020.08.28.pdf | | |
| | | 20-33768-Mood Media Corporation_122-App to Employ JW_2020.08.14.pdf | | |
| | | 20-33801-Denbury Resources Inc._238-App to Employ JW_2020.08.28.pdf | | |
| | | 20-33900-Tailored Brands, Inc._496-App to Employ JW_2020.09.01.pdf | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | 20-33918-Benevis Corp._176-App to Employ JW_2020.09.01.pdf | | |
| | | 20-34114-Valaris PLC_207-App to Employ JW_2020.09.15.pdf | | |
| | | 20-34215-Valiant Energy, L.L.C. (Arena Energy)_147-App to Employ JW_2020.09.04.pdf | | |
| | | 20-34500-iQor Holdings Inc._154-App to Employ JW_2020.09.28.pdf | | |
| | | 20-34682-Bouchard Transportation Co., Inc._173-App to Employ JW_2020.10.28.pdf | | |
| | | 20-34771-Oasis Petroleum Inc._207-App to Employ JW_2020.10.16.pdf | | |
| | | 20-35561-Mule Sky (Gulfport Energy)_390-App to Employ JW_2020.12.11.pdf | | |
| | | 20-50082-Volusion, LLC_74-App to Employ JW_2020.08.26.pdf | | |
| | | 21-30354-Frontera Holdings, LLC_159-App to Employ JW_2021.02.25.pdf | | |
| | | 21-30427-Seadrill Limited_250-App to Employ JW_2021.03.08.pdf | | |
| | | 21-30630-Belk, Inc._154-App to Employ JW_2021.03.08.pdf | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|--------|------------------|------------------|------------------|-----------|
| | | 21-30936-Brilliant Energy, LLC_68-App to Employ JW_2021.04.13.pdf | | |
| | | 21-31861-Katerra Inc._289-App to Employ JW_2021.06.29.pdf | | |
| | | 21-31948-Washington Prime Group, Inc._208-App to Employ JW_2021.07.01.pdf | | |
| | | 21-90002-BASIC ENERGY SERVICES, INC._809-App to Employ JW_2021.12.13.pdf | | |
| | | 21-90017-Carlson Travel, Inc._221-App to Employ JW_2021.12.07.pdf | | |
| | | 21-90054-Strike LLC_363-App to Employ JW_2022.01.06.pdf | | |
| | | 22-50009-4E Brands Northamerica LLC_72-App to Employ JW_2022.03.24.pdf | | |
| | | 22-60043-Free Speech Systems, LLC_230-App to Employ JW_2022.10.11.pdf | | |
| | | 22-60043-Free Speech Systems, LLC_265-Order Employing JW_2022.11.07.pdf | | |
| | | 22-90001-Seadrill New Finance Limited_94-App to Employ JW_2022.02.08.pdf | | |
| | | 22-90018-Sungard AS New Holdings_108-Order Retaining JW_2022.03.11.pdf | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | 22-90018-Sungard AS New Holdings_211-App to Employ JW_.pdf | | |
| | | 22-90018-Sungard AS New Holdings_291-Order Employing JW_2022.06.06.pdf | | |
| | | 22-90032-GWG Holdings Inc._267-App to Employ JW_2022.05.19.pdf | | |
| | | 22-90035-HONX, Inc._128-App to Employ JW_2022.05.31.pdf | | |
| | | 22-90126-LaForta - Gestao e Investmentos_67-App to Employ JW_2022.07.15.pdf | | |
| | | 22-90130-Altera Infrastructure LP_228-App to Employ JW_2022.09.12.pdf | | |
| | | 22-90168-Cineworld Group PLC_486-App to Employ JW_2022.10.05.pdf | | |
| | | 22-90291-Pipeline Health System, LLC_219-App to Employ JW_2022.10.20.pdf | | |
| | | 23-60048-Candy Club LLC_107-App to Employ JW_2023.08.28.pdf | | |
| | | 23-90002-Nautical Solutions LLC_142-App to Employ JW_2023.01.27.pdf | | |
| | | 23-90054-IEH Auto Parts Holding LLC_181-App to Employ JW_2023.03.02.pdf | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | 23-90054-IEH Auto Parts Holding LLC_183-App to Employ LF_2023.03.02.pdf | | |
| | | 23-90068-Invacare Corporation_269-App to Employ JW_2023.03.02.pdf | | |
| | | 23-90071-Nielsen & Bainbridge, LLC_273-App to Employ JW_2023.03.10.pdf | | |
| | | 23-90085-Sorrento Therapeutics Inc._231-App to Employ JW_2023.03.15.pdf | | |
| | | 23-90088-Avaya Inc._293-App to Employ JW_2023.03.10.pdf | | |
| | | 23-90111-Loyalty Ventures Inc._175-App to Employ JW_2023.04.05.pdf | | |
| | | 23-90301-Venator Materials PLC_227-App to Employ JW_2023.06.14.pdf | | |
| | | 23-90324-MLCJR LLC_433-App to Employ JW_2023.06.13.pdf | | |
| | | 23-90342-Envision Healthcare Corporation_330-App to Employ JW_2023.06.14.pdf | | |
| | | 23-90566-Beneytt Technologies Inc._249-App to Employ JW_2023.06.22.pdf | | |
| | | 23-90584-Qualtek Services, Inc._215-App to Employ JW_2023.06.23.pdf | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | 23-90602-Diebold Holding Company, Inc._208-App to Employ JW_2023.07.03.pdf | | |
| | | 23-90614-Genesis Care Pty Limited_237-App to Employ JW_2023.07.03.pdf | | |
| | | 23-90709-Center for Austism and Related Disorders, LLC_197-App to Employ JW_2023.07.11.pdf | | |
| | | 23-90731-Surgalign Holdings, Inc._257-App to Employ JW_2023.07.19.pdf | | |
| | | 23-90745-AppHarvest Products, LLC_247-App to Employ JW_2023.08.21.pdf | | |
| | | 23-90761-Condor Inversiones SpA_141-App to Employ JW_2023.09.11.pdf | | |
| | | 23-90769-Soft Surroundings_188-App to Employ LF_2023.10.11.pdf | | |
| | **Quinn Eman disclosure of SDTX bankr judges** | Altera Infrastructure L.P_22-90130_Quinn Emanuel Employment App | | |
| | | Ultra Petroleum Corp_20-32631_Quinn Emanuel Employment App | | |
| | JW_00000435-JW_00000441 - 08-26-21 Email from Cowlishaw to Freeman | | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | JW_00012070-JW_00012083 | | | |
| | JW_00015883-JW_00015884 | | | |
| | JW_00020335-JW_00020338 | | | |
| | Van Deelen Dismissal | | | |
| **08.20.24 R. Forbes_30b6** | **Exhibits** | 43189 R. Forbes 049 | | |
| | | 43189 R. Forbes 053 | | |
| | | 43189 R. Forbes 062 | | |
| | | 43189 R. Forbes 064 | | |
| | | 43189 R. Forbes 065 | | |
| | | 43189 R. Forbes 066 | | |
| | | 43189 R. Forbes 075 | | |
| | | 43189 R. Forbes 096 | | |
| | | 43189 R. Forbes 103 | | |
| | | 43189 R. Forbes 112 | | |
| | | 43189 R. Forbes 119 | | |
| | | 43189 R. Forbes 121 | | |
| | | 43189 R. Forbes 122 | | |
| | | 43189 R. Forbes 123 | | |
| | | 43189 R. Forbes 124 | | |
| | | 43189 R. Forbes 125 | | |
| | | 43189 R. Forbes 126 | | |
| | | 43189 R. Forbes 127 | | |
| | | 43189 R. Forbes 128 | | |
| | 43189JacksonWalkerLLP.txt | | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | 43189JacksonWalkerLLP 1A - CONFIDENTIAL.txt | | | |
| | 43189JacksonWalkerLLP 1A _F (SECURED) - CONFIDENTIAL | | | |
| | 43189JacksonWalkerLLP _F (SECURED) | | | |
| **08.30.24 M. Cavenaugh** | **2023.08.20** | 43247CavenaguhUSTP.txt | | |
| | **Exhibits** | 43247 M. Cavenaugh 001 | | |
| | | 43247 M. Cavenaugh 005 | | |
| | | 43247 M. Cavenaugh 016 | | |
| | | 43247 M. Cavenaugh 017 | | |
| | | 43247 M. Cavenaugh 032 | | |
| | | 43247 M. Cavenaugh 033 | | |
| | | 43247 M. Cavenaugh 034 | | |
| | | 43247 M. Cavenaugh 035 | | |
| | | 43247 M. Cavenaugh 036 | | |
| | | 43247 M. Cavenaugh 037 | | |
| | | 43247 M. Cavenaugh 043 | | |
| | | 43247 M. Cavenaugh 049 | | |
| | | 43247 M. Cavenaugh 056 | | |
| | | 43247 M. Cavenaugh 057 | | |
| | | 43247 M. Cavenaugh 062 | | |
| | | 43247 M. Cavenaugh 063 | | |
| | | 43247 M. Cavenaugh 064 | | |
| | | 43247 M. Cavenaugh 065 | | |
| | | 43247 M. Cavenaugh 072 | | |
| | | 43247 M. Cavenaugh 074 | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | 43247 M. Cavenaugh 075 | | |
| | | 43247 M. Cavenaugh 077 | | |
| | | 43247 M. Cavenaugh 082 | | |
| | | 43247 M. Cavenaugh 083 | | |
| | | 43247 M. Cavenaugh 084 | | |
| | | 43247 M. Cavenaugh 085 | | |
| | | 43247 M. Cavenaugh 086 | | |
| | | 43247 M. Cavenaugh 087 | | |
| | | 43247 M. Cavenaugh 091 | | |
| | | 43247 M. Cavenaugh 092 | | |
| | | 43247 M. Cavenaugh 093 | | |
| | | 43247 M. Cavenaugh 094 | | |
| | | 43247 M. Cavenaugh 095 | | |
| | | 43247 M. Cavenaugh 096 | | |
| | | 43247 M. Cavenaugh 098 | | |
| | | 43247 M. Cavenaugh 100 | | |
| | | 43247 M. Cavenaugh 101 | | |
| | | 43247 M. Cavenaugh 104 | | |
| | | 43247 M. Cavenaugh 112 | | |
| | | 43247 M. Cavenaugh 117 | | |
| | | 43247 M. Cavenaugh 124 | | |
| | | 43247 M. Cavenaugh 136 | | |
| | | 43247 M. Cavenaugh 137 | | |
| | | 43247 M. Cavenaugh 138 | | |
| | 43247CavenaughUSTP.txt | | | |
| | 43247CavenaughUSTP_F (SECURED) | | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| 09.09.24 B. Ruzinsky | **43288 B. Ruzinsky Exhibits** | 43288 B. Ruzinsky 016 | | |
| | | 43288 B. Ruzinsky 017 | | |
| | | 43288 B. Ruzinsky 032 | | |
| | | 43288 B. Ruzinsky 056 | | |
| | | 43288 B. Ruzinsky 062 | | |
| | | 43288 B. Ruzinsky 063 | | |
| | | 43288 B. Ruzinsky 064 | | |
| | | 43288 B. Ruzinsky 065 | | |
| | | 43288 B. Ruzinsky 072 | | |
| | | 43288 B. Ruzinsky 074 | | |
| | | 43288 B. Ruzinsky 075 | | |
| | | 43288 B. Ruzinsky 077 | | |
| | | 43288 B. Ruzinsky 092 | | |
| | | 43288 B. Ruzinsky 094 | | |
| | | 43288 B. Ruzinsky 098 | | |
| | | 43288 B. Ruzinsky 101 | | |
| | | 43288 B. Ruzinsky 111 | | |
| | | 43288 B. Ruzinsky 112 | | |
| | | 43288 B. Ruzinsky 124 | | |
| | | 43288 B. Ruzinsky 138 | | |
| | | 43288 B. Ruzinsky 180 | | |
| | 4328RuzinskyUSTP.txt | | | |
| | 4328RuzinskyUSTP_F(SECURED) | | | |
| 09.20.04 J. Sussberg | **Exhibits** | 43351 J. Sussberg 264 | | |
| | | 43351 J. Sussberg Prev. Marked 005 | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | 43351 J. Sussberg Prev. Marked 083 | | |
| | | 43351 J. Sussberg Prev. Marked 086 | | |
| | | 43351 J. Sussberg Prev. Marked 136 | | |
| | | 43351 J. Sussberg Prev. Marked 138 | | |
| | | 43351 J. Sussberg Prev. Marked 257 | | |
| | | 43351 J. Sussberg Prev. Marked 258 | | |
| | | 43351 J. Sussberg Prev. Marked 259 | | |
| | | 43351 J. Sussberg Prev. Marked 260 | | |
| | 43321BSussbergUSTP.txt | | | |
| | 43321BSussbergUSTPUSTP_F (SECURED) | | | |
| **09.20.24 A. Rotman** | **Exhibits** | 43351 A. Rotman 256 | | |
| | | 43351 A. Rotman 257 | | |
| | | 43351 A. Rotman 258 | | |
| | | 43351 A. Rotman 259 | | |
| | | 43351 A. Rotman 260 | | |
| | | 43351 A. Rotman 261 | | |
| | | 43351 A. Rotman 262 | | |
| | | 43351 A. Rotman 263 | | |
| | | 43351 A. Rotman 265 | | |
| | | 43351 A. Rotman Prev. Marked 005 | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | | 43351 A. Rotman Prev. Marked 083 | | |
| | | 43351 A. Rotman Prev. Marked 101 | | |
| | | 43351 A. Rotman Prev. Marked 136 | | |
| | | 43351 A. Rotman Prev. Marked 138 | | |
| | 43351ARotmanUSTP.txt | | | |
| | 43351ARotmanUSTP_F (SECURED) | | | |
| Disclosures | 17-32660 Ameriforge Group DOC 148 App to Employ K&E 05.25.2017.pdf | | | |
| | 18-35672 Westmoreland Coal Co. DOC 227 App to Employ K&E 10.22.2018.pdf | | | |
| | 19-31087-Weatherly Oil & Gas, LLC_170-App to Employ JW_2019.03.30.pdf | | | |
| | 19-32112 Jones Energy DOC 121 App to Employ K&E 4.23.2019.pdf | | | |
| | 19-34508-Sanchez Energy Coporation_269-App to Employ JW_2019.09.06.pdf | | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|--------|------------------|------------------|------------------|-----------|
| | 19-35198-Sheridan Holding Company II, LLC_118-App to Employ JW_2019.09.25.pdf | | | |
| | 20-30336 McDermott International DOC 428 App to Employ K&E 02.19.2020.pdf | | | |
| | 20-32631-Ultra Petroleum Corp._195-App to Employ JW_2020.06.04.pdf | | | |
| | 20-33605-Bruin E&P Partners, LLC_143-App to Employ JW_2020.08.04.pdf | | | |
| | 20-33752-California Pizza Kitchen, Inc._297-App to Employ JW_2020.08.28.pdf | | | |
| | 20-33768-Mood Media Corporation_122-App to Employ JW_2020.08.14.pdf | | | |
| | 20-33900-Tailored Brands, Inc._496-App to Employ JW_2020.09.01.pdf | | | |
| | 20-34114-Valaris PLC_207-App to Employ JW_2020.09.15.pdf | | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | 20-34215-Valiant Energy, L.L.C. (Arena Energy)_147-App to Employ JW_2020.09.04.pdf | | | |
| | 20-34771-Oasis Petroleum Inc._207-App to Employ JW_2020.10.16.pdf | | | |
| | 20-35562 Gulfport Energy (Mule Sky 20-35561) DOC 460 App to Employ K&E 12.17.2020.pdf | | | |
| | 21-30354-Frontera Holdings, LLC_159-App to Employ JW_2021.02.25.pdf | | | |
| | 21-30630-Belk, Inc._154-App to Employ JW_2021.03.08.pdf | | | |
| | 21-31948 Washington Prime DOC 206 App to Employ K&E 07.01.2021.pdf | | | |
| | 21-90017-Carlson Travel, Inc._221-App to Employ JW_2021.12.07.pdf | | | |
| | 22-90001 Seadrill New Finance DOC 92 App to Employ K&E 02.08.2022.pdf | | | |

| Folder | Folder/Documents | Folder/Documents | Folder/Documents | Documents |
|---|---|---|---|---|
| | 23-90071 Nielsen & Bainbridge 362 Order K&E Employment App 04.13.2023.pdf | | | |
| **Local Rules** | Local Rules 01.28.20 FINAL | | | |
| | Local Rules 02.13.20 FINAL | | | |
| | Local Rules 120115 FINAL | | | |
| | Local_Rules_05.19.22 FINAL | | | |