```
 1                UNITED STATES BANKRUPTCY COURT
 2                  SOUTHERN DISTRICT OF TEXAS
 3
 4    - - - - - - - - - - - - - - -
 5    IN RE:                        )
 6    PROFESSIONAL FEE MATTERS      ) CASE NO.
 7    CONCERNING JACKSON WALKER     ) 23-00645 (EVR)
 8    LAW FIRM,                     ) CHAPTER 11
 9         Debtor.                  )
10    - - - - - - - - - - - - - - -
11
12
13
14
15             DEPOSITION OF RENEE KNAKE JEFFERSON
16                  WEDNESDAY, DECEMBER 4, 2024
17
18
19
20
21             BEHMKE REPORTING AND VIDEO SERVICES INC.
22               BY:  MICHEAL A. JOHNSON, RDR, CRR, CSR
23                    550 CALIFORNIA STREET, SUITE 820
24                    SAN FRANCISCO, CALIFORNIA   94104
25                                       (415) 597-5600
```

```
 1
 2
 3
 4
 5
 6
 7
 8              Deposition of RENEE KNAKE JEFFERSON,
 9    taken on behalf of the United States Trustee at Norton
10    Rose Fulbright LLP, 98 San Jacinto Boulevard, Suite 1100
11    Austin, Texas, commencing at 9:23 A.M., WEDNESDAY,
12    DECEMBER 4, 2024, before Michael A. Johnson, Certified
13    Shorthand Reporter, pursuant to Subpoena.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                WEDNESDAY, DECEMBER 4, 2024; 9:23 A.M.
 2                              ---oOo---
 3                         RENEE KNAKE JEFFERSON,
 4        having been administered the oath, was examined and
 5                          testified as follows:
 6                              ---oOo---
 7                             EXAMINATION
 8   BY MR. CHARBONEAU:
 9        Q.   All right.  Would you state your full name for
10   the court reporter, please.
11        A.   Yes.  It's Renee Knake, K-n-a-k-e, Jefferson.
12        Q.   And are you under the influence of any
13   medicines or other substances that affect your ability
14   to hear and understand my questions today?
15        A.   No.
16        Q.   Or to answer them truthfully?
17        A.   No.
18        Q.   Do you have any physical conditions that affect
19   your ability to hear and understand my questions?
20        A.   No.
21        Q.   Or to answer them truthfully?
22        A.   No.
23        Q.   If I start speaking too softly, will you let me
24   know?
25        A.   I will.
```

```
 1        Q.   And what firm employed you?
 2        A.   I was employed by Gibbs & Bruns -- or Gibbs
 3   Bruns.
 4        Q.   Can you say that last name again.
 5        A.   G-i-b-b-s, B-r-u-n-s.
 6        Q.   And have you testified as an expert by
 7   deposition in the last four years?
 8        A.   In that arbitration, I was deposed, but other
 9   than that, no, not in the last four years.
10        Q.   Okay.  Now, in this case you were retained by
11   Mr. Hardin's law firm; is that correct?
12        A.   That's correct.
13        Q.   And just briefly, what is your hourly rate
14   again for this retention?
15        A.   It's $900 an hour.
16             MS. BREVORKA:  Could I ask those on Zoom to
17   please mute themselves.  We hear someone coughing.
18   Thank you.
19   BY MR. CHARBONEAU:
20        Q.   And in that arbitration you told me about, what
21   was your hourly rate?
22        A.   It was the same.
23        Q.   So $900 an hour?
24        A.   Correct.
25        Q.   Now, in preparation of your report, did you
```

1  perform any legal research?
2      A.  I didn't do legal research in preparation for
3  my report.  I reviewed all of the items that are listed
4  in the exhibit to my report.  Some of them I read more
5  carefully than others.  Some of them I just skimmed.
6      Q.  Why didn't you do any legal research in
7  preparing your report?
8      A.  Well, I didn't need to do additional -- I guess
9  I should say additional legal research.  So the items
10 that are cited in my report are items that I'm familiar
11 with based on the work that I do regularly in my
12 research and scholarship on professional conduct,
13 whether it's writing articles or updating treatises or
14 books and the like.
15          So I guess I should say I didn't do additional
16 research.  I certainly cite rules and any of the
17 opinions, for example, in my report.  And so that didn't
18 require doing additional research.  It was just items
19 that I was aware of that were germane to this case.
20          And then I also am serving as a rebuttal
21 expert.  And so I view any role as primarily looking to
22 the research that the report that I am reviewing looked
23 at.  And so, again, I didn't see a need for additional
24 research.
25      Q.  And did you review the cases that Mr. Lipson

```
 1        Q.  So now does that refresh your recollection
 2   ability the rule I'm talking about?
 3        A.  Yes.
 4        Q.  And is that, in fact, interpreted significantly
 5   different in Texas than under the model rules?
 6        MS. BREVORKA:  Objection, form.
 7        A.  Well, the rule for imputing conflicts under the
 8   ABA model rules is different than the rule for imputing
 9   conflicts under the Texas rule.
10   BY MR. CHARBONEAU:
11        Q.  And the Texas rule is more expansive, correct?
12        A.  Yes, with respect to personal conflicts.
13        Q.  And you'll also agree that screening is not an
14   option in Texas, correct?
15        A.  Correct.  It is not an option to address a
16   personal conflict in the way that you might be able to
17   address it differently under the ABA model rules.
18        Q.  All right.  Now, prior to your involvement in
19   this case, had you ever done an expert rebuttal report
20   before?
21        A.  I believe the expert reports I have done have
22   not been -- I do not recall a rebuttal.  So I've been
23   the primary expert or, like, written a declaration or
24   the like.
25        Q.  Did you understand your role as a rebuttal
```

1    Q.  So your opinion, however, was not that Jackson
2    Walker met its disclosure obligations under the
3    bankruptcy code?
4    A.  I'm not offering any opinion related to the
5    bankruptcy code.
6    Q.  And you're not offering any opinion on Jackson
7    Walker's -- the reasonableness of its actions under the
8    bankruptcy rules?
9    A.  I am not offering any opinion under the
10   bankruptcy rules.
11   Q.  All right.  I want to pick up your report at
12   paragraph 17.  And so that's going to be on
13   Jefferson 339.  And here, paragraph 17, I'll paraphrase
14   a little bit, you say that the reasonableness of Jackson
15   Walker's actions must be viewed, quote:  Based upon the
16   information known at the time, not upon what was later
17   admitted by Ms. Freeman after years of deception, end
18   quote.
19        Is that accurate?
20   A.  Yes.
21   Q.  All right.  Known at the time.  Okay.  I want
22   to focus on that for a second.  Who did the information
23   have to be known by?
24   A.  Well, I view actions taken by Jackson Walker.
25   The firm acts through its management team.

```
 1   Jackson Walker holds itself out as having at least one
 2   practice group with expertise in conducting internal
 3   investigations?
 4           MS. BREVORKA:  Objection, form; objection, goes
 5   beyond the scope of the reports.
 6       A.  I believe that the firm has a practice group
 7   related to investigations, but I'm not familiar with it.
 8   BY MR. CHARBONEAU:
 9       Q.  Okay.  So you don't know whether Jackson Walker
10   asked any members of that investigation group to look
11   into this matter?
12       A.  I don't know.
13       Q.  Do you hold yourself out as having any
14   expertise in internal investigations?
15       A.  No.
16       Q.  So without knowing what the alternative steps
17   might be, how can you opine the steps Jackson Walker
18   took were reasonable?
19           MS. BREVORKA:  Objection, form.
20       A.  Well, I'm opining on the steps that Jackson
21   Walker took to address the allegations related to this
22   relationship under the Texas professional conduct rules.
23   BY MR. CHARBONEAU:
24       Q.  Okay.  And you say under the Texas conduct
25   rules.  Where do they address how a firm should
```

```
 1  partner payout are beyond my area of expertise.
 2  BY MR. CHARBONEAU:
 3       Q.  Okay.
 4       A.  I'm not opining on how her settlement was
 5  calculated or paid out.  I have no opinion about that.
 6       Q.  Okay.  I want to focus your attention on No. 2
 7  in this e-mail.  So we're still looking at
 8  Jefferson 598.  And it says:  Year to date 11/30/2022
 9  cash related to matters before Judge Jones equals
10  ███████████.  Estimated net margin for 2022 is
11  ███████.  Nets to ███████.  Liz's share of that
12  would be ██████ percent or ██████.
13           Do you see that?
14       A.  I see the language that you've read.
15       Q.  And up above in this calculation they're
16  deducting out ██████, are they not?
17       A.  That is -- appears to be what's occurring, yes.
18       Q.  And do you have any reason to dispute, then,
19  that in 2022 she had continued to receive income as a
20  result of cases before Judge Jones?
21           MS. BREVORKA:  Objection, form.
22       A.  It's not in my knowledge what she was paid in
23  2022.
24  BY MR. CHARBONEAU:
25       Q.  So do you have any reason to dispute that after
```

```
 1  March 6th of 2021 through and including
 2  December 31, 2021, that she continued to receive income
 3  as a result of cases pending before Judge Jones?
 4          MS. BREVORKA:  Objection, form.
 5      A.  It's not in my knowledge what her income was.
 6  BY MR. CHARBONEAU:
 7      Q.  But if the court makes a finding that, in fact,
 8  she continued to receive income as a result of cases
 9  before Judge Jones, that means Jackson Walker, in fact,
10  didn't take that reasonable step of deducting out her
11  income?
12          MS. BREVORKA:  Objection, form.
13      A.  I guess I'm confused, because it's deducted
14  here.
15  BY MR. CHARBONEAU:
16      Q.  Right.  This is after she had left the firm.
17  They're trueing up because they had paid her all along.
18  Okay.  You'll see here on Jefferson 598 that she had
19  left -- you'll agree with me she left the firm
20  November 30th, 2022, will you not?
21          MS. BREVORKA:  Objection, form.
22      A.  I don't remember the final date that she left.
23  BY MR. CHARBONEAU:
24      Q.  I'll represent to you that she -- her last day
25  was November 30th, 2022.
```

1  from clients and move forward or if she would be
2  required to leave the firm, to withdraw from any
3  representation.  And that's what's reflected here, is
4  that ultimately the outcome was the latter; that the
5  resolution was requiring her to leave the firm.  And
6  that was all happening in -- based on the way I have
7  reviewed the record, sort of in realtime.
8         So it's not surprising to me to see that once
9  the conclusion is reached that she is going to leave the
10 firm, that they have to sort this out.
11 BY MR. CHARBONEAU:
12     Q.  Do you know whether or not Jackson Walker ever
13 stopped paying Ms. Freeman origination credits related
14 to cases that ended up before Judge Jones?
15     A.  I don't know about the origination credits.
16     Q.  Do you know if Jackson Walker ever tried to
17 take back from her final payout origination credit it
18 might have paid her for cases that entered before
19 Judge Jones?
20     A.  I don't have specific knowledge about how they
21 handled, again, any of her ultimate compensation.
22     Q.  If a financial true-up didn't occur until after
23 the fact, would that be reasonable?
24         MS. BREVORKA:  Objection, form.
25     A.  So I think what's in -- again, in the context

1  you're asking have I done my own independent accounting
2  of whether or not those safeguards were imposed, I mean,
3  that's beyond my ability to testify to as an expert.
4      Q.  Well, I mean, if you test -- if you, in fact,
5  write here that they imposed those safeguards, don't you
6  have some obligation to know if they actually imposed
7  them?
8          MS. BREVORKA:  Objection, form.
9      A.  I'm taking to be true the pleadings that I cite
10 in my report.
11 BY MR. CHARBONEAU:
12     Q.  Okay.  So then if I show you information that
13 shows that what you took to be true was inaccurate, does
14 that impact your final opinion?
15         MS. BREVORKA:  Objection, form.
16     A.  So you would need to show me the specific
17 information that -- and show me where I relied on
18 something that was factually inaccurate and then I would
19 be able to tell you whether or not it changes my
20 opinion.
21 BY MR. CHARBONEAU:
22     Q.  All right.  Let's move along to paragraph 26 of
23 your opinion.  And we are at Jefferson 341.  And you
24 write:  Jackson Walker also obtained written
25 confirmation from Ms. Freeman in August 2021 that she

```
 1  that she was on vacation or it was a spring break or
 2  with her kids or there was something like that
 3  intervening.
 4      Q.  And do you know if during that time period
 5  Ms. Freeman was incapable of being reached by telephone?
 6      A.  I don't know.
 7      Q.  Okay.  Would it have been reasonable for
 8  Jackson Walker to try to reach her telephonically?
 9          MS. BREVORKA:  Objection, form.
10      A.  It would be reasonable to try to reach her.  My
11  understanding is that they did and I know that they did
12  by the end of March.
13  BY MR. CHARBONEAU:
14      Q.  And before the break, I believe you testified
15  that the period of time between learning from the
16  credible source and to when they confronted Ms. Freeman
17  was reasonable.
18          Did I understand your testimony correctly?
19          MS. BREVORKA:  Objection, form.
20      A.  So, yes.  This -- this timing is reasonable.
21  BY MR. CHARBONEAU:
22      Q.  Okay.  And have you ever been in management of
23  a law firm?
24      A.  I have never managed a law firm.
25      Q.  So what do you base your opinion that that was
```

```
 1              MS. BREVORKA:  Objection, form; objection, goes
 2    beyond the scope of her expertise and report.
 3         A.   So I guess I need to have more clarification
 4    because I'm not sure what you're asking me.
 5    BY MR. CHARBONEAU:
 6         Q.   Well, let's start off -- your counsel keeps
 7    objecting, going beyond the scope of your expertise.
 8    Maybe that one's on me.
 9              What is your expertise in this matter?
10         A.   I'm here to testify about the Texas rules.
11         Q.   Are you an expert on the Texas disciplinary
12    rules?
13         A.   Yes, but I am not an expert on bankruptcy law
14    or bankruptcy rules or bankruptcy cases.
15         Q.   Or the interplay between the Texas rules and
16    the bankruptcy laws?
17         A.   I am not here to testify about the interplay
18    between the bankruptcy laws and the Texas rules.
19         Q.   And you're not here today purporting to be an
20    expert in the relationship between the bankruptcy laws
21    and the Texas rules?
22         A.   Correct.
23         Q.   But you are here as an expert on the Texas
24    rules, right?
25              The question stands.
```

```
 1   Walker's counsel, Ms. Freeman's retained as co-counsel
 2   and conflicts counsel and there's a mediation and
 3   Judge Jones is selected as the mediator.
 4           Is that consistent with the terms of the
 5   confidential withdrawal agreement?
 6           MS. BREVORKA:  Objection, form; objection, goes
 7   beyond the scope of both experts' reports.
 8       A.  I'd need to look back at the withdrawal
 9   agreement, but I have not been retained to opine on the
10   terms of the withdrawal agreement.
11   BY MR. CHARBONEAU:
12       Q.  Would that situation be improper under the
13   Texas rules?
14           MS. BREVORKA:  Objection, form.
15       A.  I would need to know more about the engagement,
16   the representation.  I mean, I can't opine on that.
17   BY MR. CHARBONEAU:
18       Q.  Would Jackson Walker have an obligation under
19   the Texas rule to disclose to its client the
20   relationship between Ms. Freeman and former Judge Jones?
21           MS. BREVORKA:  Objection, form.
22       A.  Again, I have -- I have offered no opinion on
23   whether the relationship between Ms. Freeman and former
24   Judge Jones rose to the level of a conflict of interest
25   even when she was at the firm.  I have no opinion as to
```

```
 1   which journal this is in?
 2       Q.   The Emory.
 3       A.   The Emory.  Yeah.
 4       Q.   So you reviewed that one?
 5       A.   I did.
 6       Q.   And Ms. Rapoport states that under the Texas
 7   rules, personal conflicts of a lawyer are imputed to a
 8   lawyer's firm.
 9            You agree with that?
10       A.   Well, they're imputed to all of the lawyers
11   within the firm.
12       Q.   And in her article, that Emory one we're
13   talking about, she writes, and I quote:  Rule 1.06(f) is
14   conclusive.  Judge Jones approved both Ms. Freeman's
15   fees and Jackson Walker's fees.  Even if imputation
16   wouldn't have infected the entire firm, the firm would
17   have had to screen off Ms. Freeman, but these cases were
18   all filed in Texas and Texas takes imputation to a whole
19   new level.  Thus, as long as Ms. Freeman was working at
20   Jackson Walker, the firm shouldn't have been appearing
21   before Judge Jones.
22            I'll represent to you that's what she wrote and
23   we can look at it if you're especially suspicious of me.
24   Do you have any reason to dispute that's what she wrote
25   in her article?
```

```
 1        A.  I have no opinion to offer on that.
 2   BY MR. LEMMON:
 3        Q.  So you just wouldn't know.
 4            Have you done anything in the course of this
 5   engagement to consult with any -- anybody who's an
 6   authority on bankruptcy?
 7        A.  I am not offering any opinions with respect to
 8   bankruptcy.
 9        Q.  Thank you.  That wasn't my question.
10            Have you done anything during the course of
11   this engagement to consult with anybody who's an
12   authority on bankruptcy?
13        A.  No, I have not because I'm not offering any
14   opinions with respect to federal bankruptcy law.
15        Q.  Do you agree if there was a duty to disclose to
16   the client, as Judge Isgur held, that the failure to
17   disclose is a breach of fiduciary duty?
18            MS. BREVORKA:  Objection, form; objection, goes
19   beyond the scope of her report.
20        A.  So Judge Isgur's letter speaks for itself and I
21   am not in a position to opine beyond that.  I haven't
22   been asked to opine about breaches of fiduciary duty in
23   this matter.
24   BY MR. LEMMON:
25        Q.  Do you think this is a close call --
```

```
 1          MR. TRAHAN:  Let's go ahead and stop.  I think
 2   we're done with time.  Can we check on time and we'll
 3   see?
 4          MR. LEMMON:  I object first of all to the
 5   double teaming, but I only have a few more questions.
 6          MR. TRAHAN:  Let's go off the record and check
 7   time.  We'll see how much time we've got.
 8          MR. LEMMON:  Okay.
 9          (Recess taken from 6:10 p.m. to 6:10 p.m.)
10          MR. TRAHAN:  Ten minutes?
11          THE REPORTER:  Yes.
12   BY MR. LEMMON:
13       Q.  Was it a close call whether or not to disclose
14   in this case?
15          MS. BREVORKA:  Objection, form; objection, goes
16   beyond the scope of her report.
17       A.  So I'm not sure what you mean by was it a close
18   call whether or not to disclose.  If you're talking
19   about under the requirements of the federal bankruptcy
20   rules, I have no opinion to that.
21   BY MR. LEMMON:
22       Q.  Let's just stick to what you say you're an
23   expert in.  Was it a close call as to whether to
24   disclose to the client?
25       A.  So I have not reached any opinion as to
```

```
 1   whether -- and I was not asked to reach an opinion as to
 2   whether the relationship between Ms. Freeman and
 3   Judge Jones rose to the level of constituting a personal
 4   conflict of interest that would require disclosure.  So
 5   I have no opinion as to whether or not it was a close
 6   call.
 7        Q.   Are you familiar with what Liz Freeman
 8   supposedly told Jackson Walker in March of '21 once she
 9   was confronted with the anonymous letter?
10             MS. BREVORKA:  Objection, form.
11        A.   I might be, but I need you to refresh my
12   recollection of what she said.
13   BY MR. LEMMON:
14        Q.   Are you -- are you aware that the testimony
15   from Mr. Cavenaugh has been that Liz volunteered that
16   she and David Jones had never lived together?
17             MS. BREVORKA:  Objection, form.
18        A.   So, again, I -- I may have read that in his
19   deposition testimony.
20   BY MR. LEMMON:
21        Q.   Did anything strike you as odd about that, just
22   up and saying, Yeah, we had a relationship but we never
23   lived together?
24             MS. BREVORKA:  Objection, form.
25        A.   Nothing struck -- strikes me as odd about that.
```

```
 1  disinterestedness in bankruptcy?
 2          MS. BREVORKA:  Objection, form.
 3      A.  I am not here to opine or offer any opinions
 4  about bankruptcy -- federal bankruptcy law or any
 5  components of it.
 6  BY MR. LEMMON:
 7      Q.  Again, I'm not asking you what your employer
 8  has hired you to do.  I'm asking do you know anything
 9  about the concept of disinterestedness in bankruptcy?
10          MS. BREVORKA:  Objection, form.
11      A.  I'm not an expert in bankruptcy law.
12  BY MR. LEMMON:
13      Q.  Do you know anything about the concept of
14  disinterestedness in bankruptcy?
15      A.  I am not an expert in bankruptcy law.
16      Q.  I didn't ask you if you're an expert.  I'm
17  asking you if you know anything about it.
18      A.  I understand generally the concept.  But again,
19  I'm not an expert in bankruptcy law, I haven't practiced
20  bankruptcy law, I don't teach bankruptcy law.  It's not
21  my field.
22      Q.  If I breached my duties to my client, can I be
23  disinterested?
24          MS. BREVORKA:  Objection, form; objection, goes
25  beyond the scope of her expertise and report.
```