UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

EXHIBIT 2

| | |
|---|---|
| *In re:*<br><br>Professional Fee Matters Concerning the Jackson Walker Law Firm | Case No. 23-645 |

## SUPPLEMENTAL EXPERT REPORT OF PROFESSOR JONATHAN C. LIPSON REGARDING CERTAIN DISCLOSURE AND ETHICS MATTERS

I have been retained by the United States Trustee for Region 7 ("UST") in connection with the above-captioned matters (the "Matters"). On September 30, 2024, I submitted my *Report on Certain Disclosure and Ethics Matters* (as subsequently corrected, the "Report").[1] Because the deadline for the Report preceded the close of fact discovery in the Matters, the UST asked me to review the materials set forth on Appendix D ("Supplemental Discovery") to determine whether they alter the opinions expressed in the Report.[2]

They do not.

In particular, the Report concludes that "JW's persistent pattern of ignoring, obfuscating, and concealing the Relationship offended both the letter and the spirit of bankruptcy's disclosure regime." Report, at 31. If anything, the Supplemental Discovery bolsters this conclusion. By way of example, and without limitation, I note the following revealed by the Supplemental Discovery:

### *Ignoring*

In deposition, JW attorney Veronica Polnick, a close friend and mentee of EF, asserted that she neither knew nor asked whether the Relationship was continuing after EF first confessed to it (but had falsely claimed it ended[3]).

---

[1] Capitalized terms used herein without definition have the meanings ascribed to them in the Report. As in the Report, I reserve the right to amend or supplement the opinions expressed herein, and in the Report, based on subsequent discovery or other information as it may become available.

[2] Appendices A-C appear in the Report.

[3] It is not entirely clear when Freeman confessed that she had a prior relationship with DJ, but it appears to have been on March 7th or 8th, 2021 at the latest. Freeman Dep. 205:15-16.

```
1  It never occurred to you to ask her, your friend, Liz
2  Freeman, about the status of her relationship with
3  Judge Jones?
4     A.   I never asked her.
```

Source: Polnick Dep., at 167.

Given the close relationship between Ms. Polnick and EF, if in fact Ms. Polnick neither knew nor asked about the Relationship, then a reasonable inference is that she chose to ignore it.

Nor, for that matter, does it appear that any member of senior management at JW interviewed Ms. Polnick about her knowledge of the Relationship, although she was EF's mentee and close friend. Management, in other words, also ignored a ready way to learn more about the Relationship.

JW apparently also ignored strong advice from its public relations firm that even a past relationship between EF and DJ was "bound to be seen as a clear conflict of interest, <u>at the very least</u>."

> Beyond that, we also feel an obligation – as your advocates in the PR and media space – to say that reporters and others encountering this are bound to see it as a clear conflict of interest, <u>at the very least</u>. Given that, while it is honorable to stand up and defend Liz and her work, we should bear in mind that once we say something on her behalf, we own it, even as the story develops, the questions come in and the facts – potentially – get worse. And Barbara – we agree with your point, i.e. the notion that women too often end up being the focus of such coverage, even though it was a man – in this case a federal judge – who took part as well.

Source: Email from Mark Annick to Barbara Malin & Patrick Cowlishaw, Mar. 9, 2021, 12:35 pm [JW_00030140]

We now know that the facts did "get worse." Had JW not ignored these signals, and undertaken even a modest investigation, the outcome might have been different.

JW also appears to have ignored its own internal procedures for addressing conflicts of interest. It appears, based on "Attorney Source Books" produced as part of the Supplemental Discovery, that JW has a standing Conflicts Committee:

> The Firm has established a Conflicts Committee to review and make recommendations regarding the Firm's conflicts policy and procedures, to provide for internal continuing legal education regarding conflicts of interest, and to serve as a resource to the Firm's attorneys and other employees on conflicts-related questions. The Conflicts Committee includes attorneys in most of the Firm's offices, and you are encouraged to consult with the Conflicts Committee whenever you have a conflicts-related question. The members of the Conflicts Committee are listed on JW One.

Source: JW Attorney Source Book, v. 4, at 15 [JW_00030209]

The Source Book indicated that if a conflict arose or came to the attention of JW attorneys during the course of a representation, it should be brought to the attention of the Conflicts Committee:

> As stated earlier, FIRM POLICY REQUIRES THAT, BEFORE ANY LEGAL WORK IS PERFORMED ON A NEW MATTER OR ANY NEW CLIENT MATTER IS OPENED FOR TIME ENTRY, THE ATTORNEY OPENING THE NEW MATTER MUST CONFIRM IN WRITING TO THE CONFLICTS DEPARTMENT THAT A CONFLICTS CHECK HAS BEEN COMPLETED, AND ALL CONFLICTS CLEARED. Conflicts review procedures are further described below. Should a conflict or potential conflict be discovered during the review process, the matter will not be opened until it is satisfactorily resolved. IF CONFLICTS ISSUES REMAIN UNRESOLVED AFTER CAREFUL REVIEW BY THE ATTORNEY SEEKING TO OPEN THE MATTER, HE OR SHE IS EXPECTED TO CONSULT WITH THE CONFLICTS COMMITTEE. If a conflict issue arises during the course of a representation, it must be promptly resolved, and the same requirement to consult with the Conflicts Committee applies.

Source: JW Attorney Source Book, v. 4, at 15 [JW_00030209]

I have seen no evidence this occurred with respect to the Relationship.

The Supplemental Discovery further reveals that JW ignored what it knew about Texas's special interest imputation rule, pursuant to which it appears that the conflict of EF would be deemed to be a conflict of JW:

> (3) Law Firm Prohibition: imputed disqualification. If the conflict of interest rules prohibit a particular lawyer from engaging in a representation, all lawyers in the Firm are similarly prohibited (except as discussed below with respect to government lawyers and adjudicatory officials). Rule 1.06(f). The use of special screening procedures in connection with the imputed disqualification rules is discussed below in connection with the conflicts rules pertaining to former clients.

Source: JW Attorney Source Book, v. 4, at 21 [JW_00030215]

The Source Book indicates that, even if there is a personal interest conflict, it can be waived only with informed client consent:

> However, the prohibitions of Rule 1.06(b) are conditional. Rule 1.06(c) permits a lawyer to represent a person in either of these circumstances IF the lawyer REASONABLY BELIEVES that the representation of EACH CLIENT WILL NOT BE MATERIALLY AFFECTED and obtains the INFORMED CONSENT of all parties.

Source: JW Attorney Source Book, v. 4, at 16 [JW_00030210]

It appears that JW ignored obtaining informed client consent to the conflict presented by the Relationship (and, as explained below, misrepresented to its ethics expert that it had sought such informed consent).

3

In short, the Supplemental Discovery provides additional evidence that JW attorneys—including its then-general counsel, Mr. Cowlishaw—ignored opportunities to investigate the Relationship and to follow JW's own procedures for addressing conflicts of interest.[4]

*Obfuscating*

JW's failure to follow its own internal procedures for addressing the Relationship also constitutes evidence that JW sought to obfuscate, rather than to disclose, the Relationship. Other Supplemental Discovery supports this inference.

The Supplemental Discovery shows, for example, that JW misled its own ethics expert, Peter Jarvis, in two critical ways: (i) by claiming that JW had informed its co-counsel, Kirkland & Ellis, of the existence of the prior relationship revealed in March 2021; and (ii) by claiming that, based on such disclosures, JW's clients' had chosen not to make public disclosure of the Relationship. Neither was true. Jarvis Dep. 2, at 185:4-8 & 21-24 ("As best I can recall, there would have been one conversation about what K&E, or Kirkland & Ellis if that was the firm -- had to say, and it was the client didn't want disclosure and there wasn't a continuing dialogue of which they were informing me. . . . . [I]f the client had said, yes, by all means disclose it, then that would have simplified the process of what the firm would do.").

Similarly, Ms. Polnick's testimony that she did not know of a continuing Relationship between EF and DJ is not credible. She frequently testified in deposition that text exchanges between herself and EF regarding the Relationship were merely "jokes" or "anecdotes" and did not, in fact, show that she knew that the Relationship was ongoing:

```
12    Q.   Okay.  How did you know that they were living
13  together or sleeping together to where that would even
14  be a possibility, that she would kick him in the spine
15  the middle of the night?
16    A.   I didn't.
17    Q.   But you knew that she was spending the night
18  there with him, otherwise you wouldn't have made this
19  reference to kicking him in the spine in the middle of
20  the night.  Is that a fair statement?
21    A.   No.
22    Q.   Okay.  What were you basing this statement on?
23    A.   This is -- this me recounting an anecdote
24  that I had told her either earlier in the night
25  and the days prior about other people that I know,
```

**BEHMKE REPORTING AND VIDEO SERVICES, INC.**
**(415) 597-5600**                                    95

Source: Polnick Dep., at 95.

Yet, these contemporaneous text exchanges suggest that she did know of the Relationship and that it was ongoing. In May of 2021, about two months after EF claimed that the

---

[4] As explained below, Mr. Cowlishaw resisted characterizing JW's actions as an "investigation."

Relationship was over and in the past, Ms. Polnick had the following text exchange with EF suggesting that she (Ms. Polnick)—and JW attorney Genevieve Graham—in fact knew the Relationship was continuing because it "quasi came out in McDermott":

> VP  Veronica Polnick <6313750279>                                        5/4/2021 4:17 PM
>     She obviously knows you have a relationship with Jones and she now knows that it quasi came out in McDermott and
>     that there's high level firm shit going on
>
> VP  Veronica Polnick <6313750279>                                        5/4/2021 4:17 PM
>     And that your life is generally not great as a result

Source: UST Ex. 279 (Polnick Dep.) [JW_00025897]

After JW decided that EF could remain at the firm without making disclosure in the Cases if she were "screened" from such work, it appears that the Source Book required JW attorneys to bring the screening proposal to its Conflicts Committee. There is no evidence that they did so, further indicating an effort to obfuscate the Relationship:

> (vi) <u>Screening procedures</u>. The Firm has established special procedures for screening lawyers from participation in matters as provided for under the Rules discussed above and in certain other situations. As a matter of Firm policy, THE ACCEPTANCE OF ANY REPRESENTATION INVOLVING THE USE OF SCREENING PROCEDURES REQUIRES APPROVAL OF THE CONFLICTS COMMITTEE.

Source: JW Attorney Source Book, v. 4, at 24 [JW_00030218]

Indeed, Mr. Cowlishaw—the former GC and a member of the Conflicts Committee[5]—resisted characterizing whatever action firm management was taking as an "investigation."

---

[5] At Mr. Cowlishaw's deposition, he indicated that he was General Counsel until March 31, 2022 and in that capacity a member of the Conflicts Committee.

```
11       A.     Since April 1st, 2001.
12       Q.     And you mentioned earlier that for some
13    period you were general counsel with Jackson Walker.
14              How long -- from what period of time
15    were you general counsel?
16       A.     January 1st, 2008, March 31st, 2022.
```

Source: Cowlishaw Dep., at 36.

- Not sure about "investigation" – maybe "reviewing this matter to make sure our work in this court, as in all courts, is in compliance with all legal and professional ethical requirements." Trying to sound the theme of "we have a long history of doing things right", we know our partner to be someone who cares and does things right, and we're making sure that we will continue to do right in the future."

For your consideration. Maybe take this into account, along with anything Barbara has to add, and provide us a revised draft that we might circulate to Wade and a couple others. Thanks.

Pat

Patrick R. Cowlishaw
2323 Ross Avenue, Suite 600 | Dallas, TX | 75201
V: (214) 953-6049 | pcowlishaw@jw.com

Source: Email from Patrick Cowlishaw to Barbara Malin et al., Mar. 9, 2021, 11:27 AM [JW_00030141]

### *Concealing*

The foregoing also supports an inference that JW sought to conceal what it knew of the Relationship, as and when it knew it. Further, it appears that JW concealed important evidence from its ethics counsel, Peter Jarvis. Mr. Jarvis testified at deposition that he—

> understood at the time that [JW] had a client that had other counsel in a pending bankruptcy matter before Judge Jones. And that the firm either was going to, or had, disclosed what it had learned about the Freeman/Jones situation to that counsel, so that the counsel could discuss it with the client so that the client could decide whether, for example, it wanted to have disclosure made on the record by the firm, which it certainly could have, including Ms. Jones (sic), or wanted to direct the firm to say absolutely nothing and just proceed or something else. I suppose.

Source: Jarvis Dep. 182:10-21

According to the deposition of Kirkland & Ellis partner Joshua Sussberg, K&E was never informed by JW that EF had confessed to a prior romantic, intimate relationship with DJ or that she subsequently, in 2022, confessed that the Relationship was ongoing.[6]

Further, it appears that Mr. Jarvis advised JW that, even if EF left the firm, JW must address then-pending cases before Judge Jones.

There are other issues that will have to be addressed as a part of an overall approach or solution. For example, an assessment of what, if anything, to do with each of the cases that have been pending before Judge Jones during the present status of his relationship with Ms. Freeman seems appropriate, and the economic terms of Ms. Freeman's separation from your firm will need attention. If your colleagues and you agree, we would propose to address these matters with Tom as well as to assess whether or how his, or his client's, views may have evolved since we last spoke with him.

Best regards,

**Peter Jarvis | Holland & Knight**          **Jacqueline Harvey | Holland & Knight**

Source: Email from Jacqueline Harvey to William Jenkins, Patrick Cowlishaw, June 2, 2022, 7:28 PM, UST Ex. 290 [H&K 0002810]

There is no evidence that JW developed an "overall approach or solution" to the problems presented by the Relationship for then-pending cases, other than entering into the Confidential Withdrawal Agreement with EF, as addressed in my Report. As explained in my

---

[6] Sussberg Dep. 35:16-25; 36:1-6.

6

Report, the Confidential Withdrawal Agreement would appear designed to conceal the nature of the Relationship and JW's internal efforts regarding it.

In short, for the reasons set forth above, the Supplemental Discovery has not altered the opinions expressed in my Report.

Respectfully submitted,

_____
Jonathan C. Lipson
January 27, 2025
Philadelphia, Pennsylvania

## [APPENDIX D—SUPPLEMENTAL DISCOVERY]

7

| Supplemental documents | |
|---|---|
| **Folders*** | **Documents** |
| **Holland & Knight** | |
| | Harvey depo transcript, vol. 1 |
| | Harvey depo transcript, vol. 2 |
| | Jarvis depo transcript, vol. 1 |
| | Jarvis depo transcript, vol. 2 |
| | partial Exh. 290 - H&K docs [H&K_0000283-H&K_0000284, H&K_0000633, H&K_0000636, H&K_0000638, H&K_0000654-H&K_0000659, H&K_0000796-H&K_0000797, H&K_0000817-H&K_0000822, H&K_0000890-H&K_0000892, H&K_0001953-H&K_0001958, H&K_0002073-H&K_0002079, H&K_0002087, H&K_0002246, H&K_0002318-H&K_0002320, H&K_0002701-H&K_0002712, H&K_0002728-H&K_0002731, H&K_0002734-H&K_0002738, H&K_0002746-H&K_0002747, H&K_0002749-H&K_0002756, H&K_0002772-H&K_0002773, H&K_0002808-H&K_0002814, H&K_0002871, H&K_0002916] |
| **Partnership Agreement (addl order)** | |
| | 524.Order re Partnership Agreement |
| | JW_00029645-JW_00029822 (Partnership Agreements) |
| **Polnick deposition** | |
| | Exh. 279 - JW_00025752-JW_00025903 (Polnick texts) |
| | Polnick depo transcript |
| **Additional documents** | |
| | JW_00030188-JW_00030336 (Sourcebook v. 4) |
| | JW_00030816-JW_00030996 (Sourcebook v. 8) |
| | PR firm emails [JW_00029823, JW_00030017, JW_00030020, JW_00030024, JW_00030034-JW_00030037, JW_00030039, JW_00030041, JW_00030043-JW_00030048, JW_00030140-JW_00030143, JW_00030163-JW_00030164, JW_00030166-JW_00030168, JW_00030175-JW_00030176, JW_00030172-JW_00030174] |
| **Jefferson report** | |
| | Jefferson Report (10.30.24) |
| | Jefferson Report (10.31.24) |
| | Jefferson Report (11.5.24) |
| | Jefferson Report (12.3.24) |
| | Jefferson engagement ltr (JW_00030997 to JW_00030999) |

* Folders are in **bold**