EXHIBIT 5

United States Bankruptcy Court
Southern District of Texas
Houston Division

---

In re:

Professional Fee Matters Concerning
the Jackson Walker Law Firm

Case No. 23-645

---

Expert Report of Richard J. Davis

# 1 Qualifications

Since completing my Clerkship in 1970 for United States Federal Judge for the Eastern District of New York Jack B. Weinstein I have developed an expertise in the conduct of investigations, including internal investigations of private entities. I have served as an Assistant United States Attorney for the Southern District of New York, an Assistant Watergate Special Prosecutor where I oversaw two investigative task forces, an Associate and Partner at Weil, Gotshal &Manges LLP and, since my retirement from that firm a solo practitioner.  A copy of my resume is attached as Exhibit A. In each of these positions I was involved in conducting major investigations. In the private sector these investigations included investigations on behalf of corporations or their Boards of Directors, a not- for- profit entity and a law firm. I also have been a Court appointed Trustee and Examiner in bankruptcies where I organized significant investigations, including as the Examiner in the bankruptcy of the Caesars Entertainment Operating Corporation. For over a decade while a Partner at Weil, Gotshal & Manges LLP (WGM) I also served as its General Counsel and as Chair of the Compliance Committee. In these capacities, among other things, I addressed possible legal or reputational risks to WGM.

## 2. Scope of Review and Methodology

In connection with rendering this opinion I relied on both my experience as well as my review of the materials attached as Exhibit B. This report may be supplemented based on any additional discovery.

## 3. Issues Addressed

A. **Under the circumstances presented by the evidence in this case, what reasonable steps should the firm have taken at any stage to investigate the allegations of a long-term intimate, romantic, financial, or cohabiting relationship between its partner and a bankruptcy judge that the firm regularly appears before or seeks approval of employment or compensation in his court.**

In determining how to approach an internal investigation two important factors are the seriousness of the allegations and the potential consequences for the organization should they

1

be true in terms of legal obligations, potential liability or reputational harm. In developing the appropriate response to the allegations it thus is vital that there be a complete understanding of the actual facts. A misunderstanding of what occurred risks increasing the long- term legal and reputational exposure of the entity.

In this case the allegation that a Judge has had an undisclosed romantic relationship with a partner of a law firm appearing before that Judge is undoubtedly serious. Jackson Walker (JW) had to make sure that it fulfilled any independent disclosure obligations flowing from any relationship. As described in the June,2022 opinion of JW's outside ethics expert, it also had to focus on their potential obligation to disclose the relationship if the Judge declined to do so, or to resign from representations in front of that Judge. They also needed to understand whether because of a relationship between their partner and the Judge they needed to notify clients or make updated disclosures in connection with fee applications, disclosure statements or other matters previously ruled on by the Judge. It also was important that in seeking outside advice from an ethics expert that the expert have an accurate understanding of all the relevant facts.

Moreover, even apart from any romantic relationship it also was important to understand the full relationship between the partner and the Judge so the firm could determine whether those relationships themselves created any legal obligations. In analyzing their obligations JW needed to consider both its ethical obligations as well as the requirements of the Bankruptcy Code and Rules.

From the outset JW understood that the allegations were serious, that they were important to the firm and the Court, and that any questions about the credibility of the person transmitting the allegation of a romantic relationship between Elizabeth Freeman (EF) and Judge Jones didn't detract from the seriousness of the allegation, and the need to look into it. See, W. Ross Forbes 30(b)(6) deposition at 81,86. Upon EF's acknowledgment in March 2021 that there had been a past romantic relationship with Judge Jones JW also believed that this admission "contradicted the disclosures she made to JW when she joined the firm." See, 5/22/24 Jackson Walker LLP Response in Opposition to the US Trustee Amended and Supplemental Motion for Relief in J.C. Penney Direct Marketing Services LLC, et al at paragraph 35. Also, JW understood that the existence of a romantic relationship could mean that the entire firm could not appear before Judge Jones. See Exhibit 75, draft JW letter to Holland & Knight. This potentially had implications for current and past representations.

One reasonable step that JW should have taken was to conduct detailed interviews of EF. While in conducting internal investigations the first step normally would involve the collection of potentially relevant documents in this instance having an initial interview would be reasonable as a way both to get an initial understanding of the facts and to help structure additional investigative steps.[1] Once any relevant documents were identified there could then be one or more follow-up interviews with EF.

---

[1] I followed this approach as the Examiner in the Caesars bankruptcy. While documents were being collected I conducted preliminary interviews with the key players. The goal was to help identify structure the investigation.

The goal of these interviews would be to obtain a precise history of the relationship, including when it began, whether it changed over time, who knew about it, whether there was an effort to keep it secret, what discussions she had with the Judge about the impact of their relationship once she joined JW, whether they ever lived together and whether apart from any romantic relationship they had any financial or other relationship.

I understand that there is a desire to simply believe a partner and not go further. Here, however, taking this approach in my opinion was not reasonable. First, on hearing in a relatively brief telephone conversation in March 2021 that she acknowledged a past romantic relationship with Judge Jones the firm believed that she had misled them on an important issue when she was hired. See, Jackson Walker LLP 5/22/24 Response in Opposition to US Trustee Amended and Supplemental Motion for Relief in J.C. Penney Direct Marketing Services LLC, et al, at paragraph 35. This itself made simply accepting her version of the facts without further inquiry unreasonable.

Second, a reality in any investigation is that when someone is confronted with an allegation where they arguably have either done something wrong or be subject to embarrassment about what they had done, a very common response is to either lie or minimize their involvement. This risk is magnified when the issue involves someone's personal life, including something like their sex life or drug or alcohol dependency. People are particularly reluctant to be fully forthcoming about these kinds of personal issues. Indeed, in 2022 when confronted with evidence that she was then living with Judge Jones even then EF's initial response was to deny an intimate relationship. See, 11/13/23 Preliminary Response of Jackson Walker LLP to Recent Filings by the Office of the US Trustee in J.C. Penney Direct Marketing services LLP, et al, at paragraph 16.

For all these reasons given that this was a serious matter where the risks to the firm were significant, simply accepting what EF said in a brief discussion was not reasonable. Its co-counsel, Kirkland & Ellis LLP, also expected JW to conduct an investigation of the allegations in the anonymous letter and assumed that they had done so. Deposition of Joshua Sussberg at 55.

Once EF was initially interviewed there were a number of steps JW reasonably should have taken. First, it should have reviewed EF's emails, including those in her firm account and any personal email account that she maintained. She also should have been required to make her mobile phone available to check for texts. While EF may have been reluctant to provide access to her phone in these circumstances a firm should insist. In responding to the subpoena in this matter Kirkland & Ellis obtained the private cell phones of the relevant partners to check for texts. See Deposition of Anna G. Rotman at 23. The firm also reasonably should have searched the firm's email system for references to Judge Jones.

Second, after documents were reviewed the firm should have conducted interviews with selected people in the firm. Ideally these interviews, as well as interviews of EF, would be conducted by someone with investigative experience. Among those to be interviewed would be EF's closest friends in the firm, her assistant and any support person within the bankruptcy group

3

who might have information or relevant documents. The purpose of these interviews would be to determine what, if anything, they knew about EF's relationship with Judge Jones and whether they had any relevant documents. Based on these interviews and what was identified in the document review discussed above EF also might need to be re-interviewed.

Once the firm completed the above investigative steps the question would be whether to expand the investigation by interviewing people outside the firm. Those who could potentially be interviewed initially included EF's close friends and her ex-husband. Since the anonymous letter had been provided to Judge Jones the Judge and those on his Court staff who had a friendly relationship with EF also could be interviewed, although the Judge might have objected to such interviews. In conducting internal investigations there, however, often is a reluctance to conduct interviews outside the entity where the matter being investigated is not already public. The reason is to preserve confidentiality, at least until the entity can complete its investigation and determine what, if any, public disclosure or reporting to a Government agency is required.

There is one external step which would have been reasonable for the firm to take and which would not have compromised confidentiality. The firm had a record of where EF resided. In order to test the veracity of EF's apparent assertion that she had never lived with the Judge they could have checked public records to see if the Judge had any interest in that residence.

Whether in 2021 the firm should have interviewed individuals outside the firm would, however, be impacted by the issue of whether based upon what EF disclosed in March 2021 that was enough to require disclosure, including under the special requirements of the Bankruptcy Code and Rules. There also is an obvious issue as to whether the firm should have disclosed EF's acknowledgment of a past romantic relationship to the Judge considering the motion to recuse Judge Jones because of his relationship with EF (based on his September 20, 2024 letter it appears Judge Isgur believes that there should have been such a disclosure). I am not opining on these issues, but if there then was a disclosure requirement in 2021 then interviews outside the firm could have been conducted.

Once the firm learned in 2022 that the romantic relationship had resumed, and that EF had affirmatively lied in 2021 when she denied ever living with the Judge, it became even clearer that a full investigation was required involving all the above steps. Given its understanding that the existence of the romantic relationship risked precluding the firm from appearing in front of Judge Jones, conducting such an investigation was also a matter of urgency. In addition, under the opinion JW received from its outside ethics expert in June 2022 it was required to make disclosure of the EF-Judge Jones relationship or resign from all representations before him. After any such disclosure it could then have included in its investigation interviews outside the firm.

Again, one of the reasons for such a complete investigation was to make certain the firm understood the precise nature of the relationship from the time it began. Without such an investigation the firm would not be in a position to determine under applicable bankruptcy rules what it needed to disclose about the relationship in cases before Judge Jones since 2018. It also needed to make a judgment as to whether it needed to refer EF to the Texas Bar disciplinary

4

authorities because of her 2021 lie about a material fact- her assertion that she had never lived with Judge Jones.

B. **When a firm receives an allegation that a partner may be involved in a long-term intimate, romantic, financial, or co-habiting relationship with a judge presiding over or mediating a proceeding involving a firm client, is it reasonable for the firm's investigation to consist solely of an interview of the firm partner alleged to be involved in the undisclosed relationship? What steps should have been taken?**

The answer is no. Given the seriousness of the allegation it was not reasonable to rely solely on interviewing the relevant partner. As discussed above once in March 2021 EF admitted a past romantic relationship JW believed that she had misled them when she was initially hired. Also, as discussed above in these circumstances it is not unusual for the person being interviewed to either lie or minimize the facts in order to avoid possible repercussions. This is particularly true where the allegation involves intimate details about their personal life. The steps that should have been taken are discussed in response to question A.

C. **Could the firm reasonably believe that an investigation consisting solely of interviewing the partner that admittedly engaged in the undisclosed intimate relationship with the judge is: (1) sufficient to obtain relevant and reliable facts; and (2) sufficient to obtain relevant and reliable facts on behalf of an outside firm directed to prepare a fully considered ethics opinion regarding the necessity of disclosure of the partner's relationship with the judge in proceedings involving firm clients?**

For the reasons discussed above simply questioning the partner alleged to have the relationship was not sufficient to obtain the relevant and reliable facts. For an expert to accurately opine on disclosure obligations it is essential that the facts provided to the expert be complete and accurate. In this case, for example, it would have been relevant to obtaining an accurate opinion that the expert understand the entire relationship between the Judge and the partner, and not just if they were then intimate sexually. The fact that they had been living together, that she was the Executor and a beneficiary under his will and that they co-owned the house would be critical facts for the ethics expert to know.

Additional Expert Disclosures

Attached as Exhibit C is a list of all publications authored by me in the last 10 years. I have not provided expert testimony at trial or via deposition in the last four years. I am being compensated at the rate of $950 an hour in connection with this matter.

September 30, 2024

Richard J. Davis

EXHIBIT A

# RICHARD J. DAVIS

Office Address and Telephone

260 Madison Avenue, Floor 3
New York, NY 10010
(646) 553-1365
richard.davis@rjdavislaw.com

## PROFESSIONAL EXPERIENCE

January 2012
to
Present

**RICHARD J. DAVIS, Attorney at Law**
Individual practice focusing on advising in difficult situations, including in the investigative context; arbitration; mediation; crisis counseling; Board of Directors representations; and special assignments. Among other things served as the Court-Appointed Chapter 11 Trustee of Fletcher International Ltd., an investment fund and Plan Administrator under its Plan of Liquidation, the Court-Appointed Examiner in the Caesars Entertainment Operating Company, Inc. bankruptcy and serving in various capacities to oversee litigation on behalf of various entities.

April 1, 1981
to
January, 2012

**WEIL, GOTSHAL & MANGES LLP**
**Partner, Litigation Department**

General practice relating to litigation, investigations, counseling, regulatory issues and international financial problems, including extensive experience in complex negotiations. Principal activities have included representing companies, Boards of Directors and individuals in the conduct of internal investigations, and in grand jury, regulatory and other government investigations of all types; participating in litigation involving a wide range of commercial, bankruptcy- related and other disputes; serving as an arbitrator; serving as counsel to the Government of Argentina during the 1980's in negotiating with the international financial community over the refinancing of its debt and related litigation; and providing advice to various clients on regulatory issues. Also served as Weil's General Counsel with varying management responsibilities until December 31, 2010.

September, 1977
**Operations)**
to
January 23, 1981

**ASSISTANT SECRETARY OF THE TREASURY (Enforcement and**

Responsibilities included supervision of the U.S. Customs Service; the Bureau of Alcohol, Tobacco and Firearms; the U.S. Secret Service; the Federal Law Enforcement Training Center; the Office of Foreign Assets Control; and representing the Treasury Department concerning law enforcement, terrorism and related issues. In this capacity, among the matters responsible for were the freeze on Iranian assets and other sanctions imposed as a result of the seizure of American hostages; participation in the development of the U.S.-Iran Hostage Release Agreements of January, 1981; implementation of various U.S.

EXHIBIT A

|  |  |
|---|---|
|  | embargoes and financial freezes involving Cuba, Vietnam, and others; regulation of the alcoholic beverage industry; administration of the Bank Secrecy Act and Currency Reporting Regulations; firearms regulation; criminal justice policy; intelligence and terrorism issues; the protection of public officials; and application of the Customs laws. |
| January 1976 to August 1977 | **WEIL, GOTSHAL & MANGES LLP**<br>**General Litigation Practice**<br><br>Principal matters included representation of the City of New York and its officials in an investigation by the Securities and Exchange Commission; and of companies and individuals in the conduct of internal investigations and in grand jury and other government investigations. |
| July 1973 to August 1975 | **WATERGATE SPECIAL PROSECUTION FORCE**<br><br>Responsibilities as an Assistant Special Prosecutor included serving as Chief Trial Counsel in the trials of Dwight Chapin and Edward Reinecke; as Chief of the Political Espionage and ITT Task Forces; and being responsible for coordinating issues relating to securing documentary evidence and testimony from former President Nixon. |
| September, 1970 (Southern District of New York) to July, 1973 Corruption Unit | **UNITED STATES ATTORNEY'S OFFICE (Southern District of New York)**<br><br>Member of the Criminal Division and for varying periods served in the<br><br>and as Assistant Chief Appellate Attorney |
| September, 1969 to August 1970 | **LAW CLERK TO UNITED STATES DISTRICT JUDGE JACK B. WEINSTEIN, EASTERN DISTRICT OF NEW YORK** |

**EDUCATION**

Columbia University School of Law – J.D., 1969

- Notes and Comments Editor of the Law Review
- Graduated magna cum laude

University of Rochester – B.A., 1966

- Graduated with high honors in history

**HONORS AND AWARDS**

- May 1999 – Recipient of the Curtis J. Berger Award given by The Bridge, Inc. in recognition of public service activities in the tradition of Curtis Berger, deceased Professor of Law, Columbia Law School.

- March 2000 – Recipient of the Whitney North Seymour Award given by the Federal Bar Council in recognition of contributions to public service by a lawyer in private practice.

EXHIBIT A

- September 2000 – Recipient of the Ari Hallberstam Award given by the Jewish Children's Museum in recognition of commitment to justice and the needs of New York and its children.

- November 2000 – Recipient of the J. Edward Lumbard Award given by the United States Attorney's Office for the Southern District of New York in recognition of outstanding public service.

- March 2004 – Recipient of the Law & Society Award given by New York Lawyers for the Public Interest in recognition of public service.

- October 2009 – Recipient of the Robert Wagner, Jr. Award given by Citizens Union for long-term participation in civic affairs of New York City.

- November 2010 – Recipient of the Champion for Children Award given by the Randall's Island Sport Foundation.

- June 2016 – Recipient of New York State Bar Association Root Stimson Award for public and community service.

- September 2016 – Recipient of New York Law Journal Award for public service.

- May 2018 – Recipient of The Legal Aid Society Servant of Justice Award.

## CIVIC AND OTHER ACTIVITIES

**Good Government**

- Chair, Citizen Union (2004-January 2008) and Member of the Board of Directors (1991-1997 and 1998- 2009, a hundred-year-old civic organization in New York City.

- New York City Campaign Finance Board (July 1, 2009 – present). A five person Board which oversees and enforces the New York City Campaign Finance Law.

**Criminal Justice System**

- Chair, The Legal Aid Society (12/10 –10/21) and Member of the Board of Directors (1986 – 1992 and 2000 – 10/21).

- Chair, Mayor's Commission to Combat Police Corruption (1996-2002), a commission appointed to monitor anti-corruption activities of the New York City Police Department. The Commission published over twenty reports during this period.

- Member, Task Force on Police-Community Relations (1997), appointed by the Mayor following an incident of severe police brutality in Brooklyn.

- Chair, Criminal Justice Council of the City Bar Association (2000-2003).

- Departments of Justice and Treasury: Member of panel of experts to provide advice on future hostage/barricade situations in the aftermath of the Waco siege (1993).

EXHIBIT A

- Member, Citizen Task Force on Use and Security of Central Park (1989 - 1990) and Co-Chair of the Citizens Advisory Process (1990-1993) to monitor implementation of the Task Force recommendations and to deal with ongoing security issues relating to the northern portion of the park and surrounding neighborhoods.

- Member of Commission which reviewed the operations of the Philadelphia Police Department (1987).

**Parks and Recreation**

- Chair, Randall's Island Sports Foundation (1995 - 2010), a non-profit organization working with the City to help renew park and recreational facilities on Randall's Island. Chair Emeritus (2010-date).

- Chair, Pier Park and Playground Association (1999-2005), a non-profit organization created to promote the development of open space and playing fields in Greenwich Village and other parts of lower Manhattan.

- Member, Partnership for Pier 40 (2007-2009), a non-profit organization created to work towards a positive community supported plan for Pier 40 in the Hudson River Park.

- Parks Council, Member of the Board of Directors (1994-2001).

**Other**

- Member, Board of Trustees, Goucher College (2015-date)

- American Red Cross of Greater New York, Member of the Chairman's Council (2006-2010), a group created to work with the Red Cross to assist in enhancing resources and preparedness for catastrophic events.

- Vice Chair of group convened by Mayor's Office regarding controlling construction costs (2007).

- Member, Commission on the Capital Plan (2002), a commission appointed by the Schools' Chancellor to review issues related to school construction costs.

- The Harbor for Boys and Girls, Member of the Board of Directors (1992 - December, 2011), a non-profit organization working with young people in East and Central Harlem.

- Jewish Childrens' Museum, Member of the Board of Directors (January, 2007 – March 2014)

- Pro Bono Special Master for Investment Policy for the Agent Orange Settlement Fund (1984 - 1986).

- Member of study group on the Iranian Hostage Crisis at Council on Foreign Relations (1981 - 1982) and co-author of book chapters, *American Hostages in Iran*, published by Yale University Press.

- Taught Trial Advocacy in special intensive course at Harvard Law School (September 1975; September 1976)

EXHIBIT A

## EXPERT WITNESS

Testified at the request of President Clinton's Counsel as an expert on standards of prosecution before the House Judiciary Committee considering the impeachment of the President (December 9, 1998).

EXHIBIT B

1. Deposition Transcripts of Charles L. Babcock, William Russell Jenkins, C. Wade Cooper, Elizabeth Freeman, W. Ross Forbes as Corporate Representative, W. Ross Forbes, Patrick R. Cowlishaw, Matthew D. Cavenaugh, Anna G. Rotman, Joshua A. Sussberg and Bruce J. Ruzinsky
2. Partial Transcript of Elizabeth Freeman Interview
3. 11/13/23 Preliminary Response of Jackson Walker LLP to Recent Filing by the Office of the US Trustee in In Re J.C. Penney Direct Marketing Services LLC, et al
4. 5/22/24 Jackson Walker LLP Response in Opposition to US Trustee Amended and Supplemental Motion for Relief in J.C. Penney Direct Marketing Services LLC, et al
5. 5/22/24 Jackson Walker LLP Response in Opposition to US Trustee Amended and Supplemental Motion for Relief in Brilliant Energy LLC
6. 2/29/24 US Trustee Amended and Supplemental Motion for Relief in In Re Nieman Marcus Group Ltd, et al
7. 9/20/24 Letter from Judge Marvin Isgur to Chief Judge Randy Crane
8. 6/2/22 Holland & Knight Memorandum from Peter R. Jarvis and Jacqueline n. Harvey to Jackson Walker LLP
9. 9/22/21 Letter from Peter R. Jarvis to Patrick Cowlishaw
10. 8/16/24 Memorandum Opinion and Order of Chief United States District Judge Alia Moses in Van Deelen v. David R. Jones, et al
11. Docket Sheet in Van Deelen v. Dickson, Bankruptcy Case 20-30336, Adversary Proceeding 20-3309
12. 3/8/21 Plaintiffs Addendum to Plaintiffs Motion to Disqualify Judge David Jones, Adversary Proceeding 20-3309
13. 5/19/22 email chain between Matthew Cavenaugh and Ana G. Rotman
14. 3/7/21 email chain between Matthew Cavenaugh and Chip Babcock
15. 3/6/21 email from Van Deelen to Matthew Cavenaugh
16. 4/23/19 Jackson Walker LLP Press Release re Erica Benites Giese
17. Jackson Walker LLP Website re Erica Benites Giese
18. Jackson Walker LLP Website Excerpt re Investigations and White Collar Defense
19. 10/15/18 email form Matthew Cavenaugh to Liz Freeman attaching 10/13/18 email from Elizabeth Miller to Matthew Cavenaugh re Jones expenses: NY
20. 4/20/18 email from Liz Freeman to Alesia Foster re Jackson Walker Arrival
21. Elizabeth Freeman Drivers License
22. 8/27/21 email from Liz Freeman to Pat Cowlishaw re request for an opinon and 8/26/21 email from Pat Cowlishaw to Liz Freeman re request for an opinion
23. Excerpts from Jackson Walker LLP Source Book
24. Chart of Fee Orders Entered by Judge Jones (exhibit 6A)

EXHIBIT C

Davis, Richard J. (December 30, 2015). Hillary Clinton Should Set Ethics Boundaries, *CNN Opinion*, (https://edition.cnn.com/2015/12/30/opinions/davis-hillary-clinton-foundation-speaking-fees/).

Davis, Richard J. and Millstein, Ira (August 31, 2016). We're mad as hell about Trump, Clinton and the Clinton Foundation, *CNN Opinion*, (https://www.cnn.com/2016/08/31/opinions/mad-as-hell-clinton-foundation-opinion-davis-millstein/index.html).

Davis, Richard J. (August 14, 2020). 11 Keys to Make Policing Work, *Gothan Gazette*, (https://www.gothamgazette.com/citizens-union-speakers/9672-11-keys-to-make-policing-work-nypd-reform).

Davis, Richard J. (February 3, 2021). Trump Isn't Nixon and this Isn't 1974: Press Ahead with Prosecutions if There's Evidence, *New York Daily News*, (https://www.nydailynews.com/2021/02/03/trump-isnt-nixon-and-this-isnt-1974-press-ahead-with-prosecutions-if-theres-evidence).

Davis, Richard J. and Halberstam, Devorah (April 22, 2021). How Ghost Guns Kill: A Personal Story, *New York Daily News*, (https://www.nydailynews.com/2021/04/21/how-ghost-guns-kill-a-personal-story/).

Davis, Richard J. (August 8, 2022). Trump v. Nixon: When Prosecution is in the Public Interest, *The Hill* (https://thehill.com/opinion/white-house/3590067-trump-v-nixon-when-prosecution-is-in-the-public-interest/).

Davis, Richard J. (November 26, 2023). Biden Would Be a Hero If He Dropped Out of the 2024 Race Righ Now, *Daily Beast* (https://www.thedailybeast.com/biden-would-be-a-hero-if-he-dropped-out-of-the-2024-race-right-now).

Davis, Richard J. (March 19, 2024). I Once Helped No Labels. The Group Has Lost Its Way, *The Hill* (https://thehill.com/opinion/campaign/4540470-i-once-helped-no-labels-the-group-has-lost-its-way/).

Davis, Richard J. (May 10, 2024). Opinion: Netanyahu and his Extremist Allies are Endangering Israel's Long-Term Security, *CNN Opinion*, (https://www.cnn.com/2024/05/10/opinions/netanyahu-israel-extremist-allies-government-gaza-davis/index.html) HYPERLINK "https://www.cnn.com/2024/05/10/opinions/netanyahu-israel-extremist-allies-government-gaza-davis/index.html)HYPERLINK%20%22https://www.cnn.com/2024/05/10/opinions/netanyahu-israel-extremist-allies-government-gaza-davis/index.html)%22.".

Davis, Richard J. (February 7, 2024). Telling Joe Biden He Is Too Old To Drive, *The Hill*, (https://thehill.com/opinion/white-house/4490359-telling-joe-biden-he-is-too-old-to-drive/).