EXHIBIT
11

1          IN THE UNITED STATES BANKRUPTCY COURT

2              SOUTHERN DISTRICT OF TEXAS

3

4    - - - - - - - - - - - - - - - -

5    IN RE:                        )

6    PROFESSIONAL FEE MATTERS      ) CASE NO.

7    CONCERNING THE JACKSON        ) 23-00645 (EVR)

8    WALKER LAW FIRM,              )

9              Debtor             )

10   - - - - - - - - - - - - - - - -

11

12    THIS TRANSCRIPT AND ITS EXHIBITS CONTAIN INFORMATION

13     SUBJECT TO A PROTECTIVE ORDER AND SHALL BE TREATED

14        AND USED ONLY IN ACCORDANCE THEREWITH

15

16

17       REMOTE DEPOSITION OF ANNA G. ROTMAN

18          FRIDAY, SEPTEMBER 20, 2024

19

20

21       BEHMKE REPORTING AND VIDEO SERVICES, INC.

22          BY:  CRYSTAL WALKER CSR NO. 12376

23          500 CALIFORNIA STREET, SUITE 820

24          SAN FRANCISCO, CALIFORNIA  94104

25                       (415) 597-5600

1
2
3
4
5
6
7
8          Remote Deposition of ANNA G. ROTMAN, taken on
9    behalf of The United States Trustee, via
10   videoconference with the witness located in Houston,
11   Texas, commencing at 9:06 A.M., FRIDAY, SEPTEMBER 20,
12   2024, before Crystal Walker, Certified Shorthand
13   Reporter No. 12376, pursuant to Subpoena.
14
15
16
17
18
19
20
21
22
23
24
25

```
 1                THE WITNESS:  I do.
 2                THE COURT REPORTER:  Okay.  And I'll read
 3  on the record.
 4                This deposition is being taken using a video
 5  connection before a court reporter who is not in the
 6  same location as the witness.  I therefore request the
 7  parties stipulate that the deposition may be taken
 8  remotely before this court reporter pursuant to Federal
 9  Rules of Bankruptcy Procedure 7029 and 9014.
10                MR. PENA:  The United States Trustee's
11  Office agrees.
12                MR. HUESTON:  On behalf of Kirkland and
13  Ellis, we agree as well.  John Hueston.
14                THE COURT REPORTER:  You may proceed.
15                     ANNA G. ROTMAN,
16  having been first duly sworn, testified as follows:
17  EXAMINATION BY MR. HUESTON:
18      Q.   Ms. Rotman, please state your name for the
19  record, spelling your last name first -- spelling your
20  last name.
21      A.   Anna Rotman, R-O-T-M-A-N.
22      Q.   And Ms. Rotman, you're an attorney; is that
23  correct?
24      A.   That's right.
25      Q.   How long have you been a lawyer?
```

```
 1            It says, "Documents to be produced.  Number 1,
 2    all documents and communications relating to Kirkland's
 3    receipt of information about the existence of the
 4    relationship."  And the relationship is defined, you
 5    know, within the document.
 6            You had an opportunity to review this subpoena
 7    before coming here today; is that correct?
 8       A.    That's correct.
 9       Q.    Okay.  What was it that you did in order to
10    ensure that you complied with this portion -- the duces
11    tecum portion of the subpoena?
12       A.    So when I received the subpoena, I sent it on
13    to our firm's general counsel.  And they -- we have
14    counsel, and they engaged in a process of collecting my
15    documents and reviewing them and producing them.
16       Q.    All right.  To the extent -- well, let me ask
17    you a little bit about documents.  The process by which
18    the documents reflected that, did that include emails?
19       A.    Yes.
20       Q.    Okay.  Did it include texts?
21       A.    Yes.
22       Q.    Did it include any sort of memorialization of
23    any conversations that you had with regards to this
24    litigation?
25       A.    Only if it would've been in my email or some
```

1  electronic source.  There's nothing besides that.

2      Q.   Okay.  Okay.  All right.  Very good.  So

3  physically, where are you located?

4      A.   Houston, Texas.

5      Q.   Okay.  Does Kirkland and Ellis have a Houston,

6  Texas, office?

7      A.   We do.

8      Q.   Okay.  How big is it?  How many lawyers are

9  there?

10      A.   Well, I think, now, we may be up to 280 or so.

11      Q.   And does Kirkland and Ellis have a bankruptcy

12  practice in Houston, Texas?

13      A.   We don't have any bankruptcy lawyers that are

14  based in Houston, no.

15      Q.   Okay.  Are there bankruptcy lawyers in Texas

16  that assist in Houston cases, bankruptcy cases?

17      A.   Kirkland?  Do -- are you referring to are

18  there -- well, are there Kirkland bankruptcy lawyers.

19      Q.   Yes.  Yes.  Kirkland.

20      A.   No.  No.  Kirkland has no bankruptcy lawyers

21  in Texas.

22      Q.   All right.  How is Kirkland set up?  Is it --

23  I mean, how many lawyers does -- are associated with

24  Kirkland and Ellis?

25      A.   In the entire firm, you mean?

```
 1      Q.   Yeah, the entire firm.
 2      A.   I suspect that there are over 3,000.
 3      Q.   Okay.  And is it an international firm?  Does
 4  it have a presence in China and London and those sorts
 5  of places?
 6      A.   It does.
 7      Q.   All right.  How many lawyers are in Texas, if
 8  you know, approximately?
 9      A.   I suspect there's around 400 across three
10  offices.
11      Q.   Okay.  Where are the primary offices located
12  in Texas?
13      A.   Only three.  Houston, Dallas, and Austin.
14      Q.   All right.  When did you join the firm?
15      A.   In January, 2016.
16           Mr. Pena, may I ask, if we're not gonna --
17  can we take down the document unless we're asking
18  more questions, only 'cause then I can see you as
19  opposed to a tiny box?
20      Q.   Yeah.  Okay.
21      A.   Perfect.
22      Q.   I'm not sure that you want that, but
23  whatever -- whatever makes you comfortable.
24      A.   Thank you.
25      Q.   All right.  So -- all right.
```

1          So let's talk a little bit -- go back before
2  we go into your background.  Let's talk a little bit
3  about what was done to preserve documents.  Was the
4  litigation hold issued with regards to the allegations
5  that have been made in these cases?
6      A.   Yes.
7      Q.   Okay.  Who was involved in the process of
8  putting together a litigation hold?
9      A.   It went through our general counsel's office.
10  I'm not certain of the exact person.
11      Q.   Does Kirkland and Ellis have an IT staff in
12  Houston?
13      A.   We do.
14      Q.   Okay.  Is the server that Kirkland and Ellis,
15  Houston uses, is that centralized in Houston?
16      A.   I don't know.
17      Q.   Okay.  All right.  Does Kirkland and Ellis
18  issue cell phones to its attorneys?
19      A.   You have an option to get a Kirkland-issued
20  cellphone, yes.
21      Q.   Do you have a Kirkland-issued cellphone?
22      A.   I do not.
23      Q.   Okay.  At what point did you decide that you
24  didn't want a Kirkland-issued cellphone?
25      A.   Probably -- one, because I didn't want to have

1   two different devices.

2       Q.   All right.  Did you provide your texts off of

3   your personal cellphone to the folks that were

4   coordinating the litigation hold?

5       A.   I did.

6       Q.   Okay.  How --

7       A.   I provided them my cellphone, and they took it

8   to image.  So that would include my texts.

9       Q.   All right.  Very good.  Okay.

10          And they -- obviously, they'd have access to

11  emails and office emails and things that were

12  associated with files that you worked on; correct?

13      A.   Yes.

14      Q.   Did you participate at all in the Responses to

15  Interrogatories or Request for Production that were

16  drafted in this case?

17      A.   I did not.

18      Q.   Were you asked for information that might have

19  been responsive to those, if you know?

20      A.   I actually don't know.

21      Q.   Okay.

22      A.   If -- all I -- I gave my documents.  They may

23  have been part of what was responsive.  I just don't

24  know.

25      Q.   Does Kirkland and Ellis have a policy, a

1  retention policy regarding its emails and
2  communications?
3      A.   I'm sure we do, but I don't know the specifics
4  around it.
5      Q.   You don't know how long the policy calls for
6  retention?
7      A.   I think it depends on the nature of where the
8  email is in someone's outbox or in someone's Outlook.
9  So just basically, my own personal experience, what
10 seems to be the case is, deleted emails are at least no
11 longer accessible to me after seven days.  But I have
12 all my sent emails since I started at the firm, and
13 anything that I have foldered or that is still in my
14 inbox remains.
15     Q.   Okay.  So you don't know if Kirkland and Ellis
16 stores, you know, the old emails even over seven days
17 on the cloud or on a storage facility or, you know, on
18 a server somewhere?
19     A.   Yeah.  To be clear, it's only deleted emails.
20 So anything that hasn't been deleted by me is retained.
21 Deleted emails at least disappear from me after seven
22 days.  I don't know -- I actually think they are still
23 accessible, just -- but I'm not a hundred percent sure.
24     Q.   All right.  Are you aware of any joint defense
25 agreements that exist with regards to this litigation?

```
 1   file cases in the Southern District of Texas and needed
 2   local counsel because we had no restructuring lawyers
 3   in Houston or in Texas.  And Patty Tomasco was a
 4   well-respected restructuring lawyer at Jackson Walker
 5   that had a well-respected practice.
 6           Jackson Walker is actually, I think, the
 7   biggest firm that's just based in Texas, so very
 8   Texan.  And in that context, I got to know Patty as
 9   local counsel at Jackson Walker.
10       Q.   Okay.  What year did you first meet Patty
11   Tomasco?
12       A.   2016.
13       Q.   Okay.  So about the time that you got there?
14       A.   Sometime during that year.
15       Q.   Yeah.  Sometime during that year.  All right.
16           So did you know a guy by the name of Matthew
17   Cavenaugh?
18       A.   I did also get to meet Matt Cavenaugh about
19   the same time.
20       Q.   Okay.  And again, you know, you indicated that
21   they're a pretty big Texas firm, Jackson Walker.  The
22   context under which you met Ms. Tomasco and
23   Mr. Cavenaugh, was that business-related?
24       A.   It was.
25       Q.   Okay.  And was there a case associated with
```

```
 1   that the first time that you met them, Ms. Tomasco and
 2   Mr. Cavenaugh?
 3        A.   Yes, I believe so.
 4        Q.   Do you remember the name of the case, the
 5   debtor's name?
 6        A.   I think it was Mid-States.
 7        Q.   Okay.  And was that your first professional
 8   interaction with Mr. Cavenaugh and Ms. Tomasco --
 9        A.   Yes.
10        Q.   -- during the course of that case?
11        A.   Yes.
12        Q.   What was the role of Jackson Walker in that
13   case, if you recall?
14        A.   I believe they were local counsel.
15        Q.   Okay.  Now, when you say local counsel and
16   I've seen a few of the -- a few of the declarations and
17   the applications for employment -- when you say local
18   counsel, are you essentially referring to local
19   counsel, that they -- or are you referring to
20   co-counsel?  Do they enter appearances as co-counsel,
21   or do you make a distinction between the two?
22        A.   I don't -- I don't know what the distinction
23   is.  In my mind, they were our local counsel.
24        Q.   All right.  And initially, when you dealt with
25   Ms. Tomasco, was she still in the Jackson Walker Austin
```

1  appreciate your time spent reviewing and commenting on

2  the complex Chapter 11 procedures."

3       Do you see that?  Is that one of the sentences

4  that's represented in this communication?

5       A.   Yes, that sentence is written there.

6       Q.   Okay.  So it looks like he's asking for info

7  with regards to the continuation of the complex

8  procedures in -- for support Chapter 11 cases.  Do --

9  did you ever receive a copy of this, or was this ever

10  forwarded to you for comment internally at Kirkland and

11  Ellis?

12       A.   No.  I didn't receive this email, and I've

13  never seen it or those procedures that I know of.

14       Q.   Okay.  Are you familiar with the complex case

15  panel procedures?  Have you ever read them?

16       A.   I can't think that I've sat down and read

17  them.  I'm familiar with the concept.

18       Q.   Okay.  Do you rely on local counsel to educate

19  you and keep you abreast of all those sorts of nuances

20  with regards to what's required by the complex case

21  panel and its procedures?

22       A.   Yes, we would.

23       Q.   Okay.  All right.  All right.  So then you go

24  back here.  Well, take a look at that first email, that

25  portion.  I don't see anywhere on there a reference to

```
 1  Kirkland and Ellis back when you started?
 2      A.    I'm not sure if he was.  I would think so.  He
 3  was definitely there when I was there.  I don't know if
 4  he was there right when I started.  I suspect he was.
 5      Q.    Okay.  What sort of practice was he involved
 6  in?
 7      A.    He was a restructuring lawyer in the
 8  restructuring practice.
 9      Q.    Did he also -- as a restructuring lawyer, was
10  he familiar with, you know, the bankruptcy code and the
11  requirements of the code?
12      A.    I would believe so, yes.
13      Q.    All right.  During the period of time that
14  you've been with Kirkland and Ellis, who do you
15  consider your primary contact or your closest contact
16  at Jackson Walker in the bankruptcy unit?
17      A.    I would say Matt Cavenaugh.
18      Q.    Have you dealt with him -- well, let me ask
19  you this.
20          Initially, you dealt with Ms. Tomasco and
21  Mr. Cavenaugh.  How would you -- at least in 2016 and
22  2017, how would you split that up, you know, in terms
23  of percentages, you know, between the two?
24      A.    Oh, gosh.  So my recollection is that -- at
25  the point that I'm involved, when were dealing with
```

1  local counsel, we're usually thinking about strategy in

2  connection with some, you know, dispute in how we are

3  gonna handle it.  So I kind of remember, you know,

4  having them both involved when I was involved.

5      Q.  So roughly 50/50?

6      A.  No.  I would say like 100/100.  Like, they

7  were both involved.

8      Q.  All right.  All right.  So -- all right.  Very

9  involved all the time?

10     A.  Well, let me just say, when Jackson Walker was

11  involved, both of them were involved.

12     Q.  All right.  Very good.  And did there come a

13  time when Ms. Tomasco left Jackson Walker?  Do you

14  remember when that happened?

15     A.  You'd need to refresh me on the date.  I know

16  that she left.

17     Q.  That's fine.  Did you continue after she left

18  to work with her on bankruptcy matters in Houston?

19     A.  No, because she -- my understanding is she

20  wanted to pursue a creditor side practice, and our

21  practice was primarily debtor side.

22     Q.  Okay.  Now, the email I showed you a few

23  minutes ago, I think was marked Exhibit 101.  It has a

24  email address of Patty Tomasco at Quinn Emanuel.

25         Now, the email is dated April 30, 2019.  Would

1  it be fair to say that it would've been at or before

2  April 30, 2019, that she left Jackson Walker to go to

3  Quinn Emanuel?

4      A.   Yes, that would be fair.

5      Q.   All right.

6      A.   Based on the email.

7      Q.   All right.  And does that comport generally

8  with what you recall?

9      A.   I really don't have a good recollection of

10  dates, but I have no reason to dispute it.

11      Q.   Okay.  When you were dealing with Ms. Tomasco,

12  Mr. Cavenaugh, and anybody else at Jackson Walker on

13  cases that Kirkland and Ellis was involved in or that

14  you were involved in, what was the nature of the

15  communication?  Was it face-to-face?  Was it remote?

16  Was it telephonic?  Was it text?  How did you

17  communicate with them?

18      A.   Usually face-to-face or on conference calls,

19  like, telephone conference calls.

20      Q.   Okay.  The flow of cases from Kirkland and

21  Ellis to Jackson Walker, who made the decision to use

22  them essentially as a local counsel?  Or was that

23  essentially the relationship they had developed, that's

24  who you used?

25      A.   I mean, we used other folks as local counsel

BEHMKE REPORTING AND VIDEO SERVICES, INC.        65
(415) 597-5600

1  as well, but that was -- the nature of the relationship

2  was using Jackson Walker as local counsel for cases we

3  filed in the Southern District of Texas.

4      Q.   Okay.  What percentage of the cases, Kirkland

5  and Ellis cases, filed in the Southern District of

6  where you used local counsel went to Jackson Walker

7  versus other firms?

8      A.   I don't know.

9      Q.   It'd be fair to say, primarily Jackson Walker,

10 though?

11     A.   I actually just don't know, as the litigator,

12 you know, like, all the cases we filed, but I know they

13 were on a number of cases that I worked on.  There

14 were -- I had other cases that they weren't on.

15     Q.   Who made the decision to use them -- or versus

16 another firm?

17     A.   It would be someone in the restructuring

18 group, but I don't know.  I mean, I guess I would say,

19 ultimately, the client would also be making the

20 decision, yeah.

21     Q.   But the client relies heavily on their

22 counsel, right, in terms of recommending local counsel.

23 That be a fair statement, too?

24     A.   Right.

25     Q.   All right.  Okay.  Here we get to the top

1  part.  When was the first time you found out that there

2  was a -- let's say a romantic relationship between

3  Ms. Freeman and former Judge Jones?

4       A.   October 2023.

5       Q.   All right.  And October 2023 was when that

6  Wall Street Journal article came out; correct?  Like, I

7  think it was October 7, 2023.  Is that a fair

8  statement?

9       A.   I'll trust you on the date, yes.

10      Q.   Okay.  Why was --

11      A.   That was when Judge Jones confirmed that there

12  was a relationship.

13      Q.   Okay.  Confirmed to whom?

14      A.   To the Wall Street Journal, I believe.

15      Q.   All right.  When that article came out, was it

16  circulated there at Kirkland and Ellis?

17      A.   I would -- I'm not sure.  I don't -- I think I

18  received it through, like, one of the Law 360 blasts or

19  something.  So that's how I found out.

20      Q.   Did you share that blast or that communication

21  with other people there at Kirkland and Ellis?

22      A.   Not that I recall.  Not that I recall.  But if

23  there's a document, I could look at it.

24      Q.   We'll go through that in a little while.

25      A.   Okay.

```
 1      Q.   This isn't a gotcha.  I'm just --
 2      A.   Okay.
 3      Q.   -- just asking generally.
 4           So when was the first time that you found out
 5 that they, in fact, lived together, cohabited?
 6      A.   I -- so I don't know if that was confirmed in
 7 the Wall Street Journal article.  I do know, prior to
 8 the Wall Street Journal article, there was the filing
 9 that Mr. Van Deelan made that purported to attach
10 property records that showed that they co-owned
11 property.  And I think that was just a few days before,
12 in October 2023.
13      Q.   Okay.  So that's actually ownership of real
14 estate.  Are you aware of any other relationship, for
15 example, beneficiaries of any sort of wills or estates?
16      A.   Not -- no.
17      Q.   Were you surprised when you read that
18 Ms. Jones and former -- Ms. Freeman and former Judge
19 Jones lived together and owned real estate together?
20      A.   So I was shocked by the confirmation from
21 Judge Jones.  I don't -- just to -- on your question, I
22 don't know, you know, where I read, or if there -- when
23 there was confirmation, if there has been, that they
24 lived together and owned real estate together.  But I
25 was shocked that I read the confirmation of a
```

```
 1  relationship.
 2      Q.   Have you ever been to any CLE where Judge
 3  Jones or Judge Isgur provided continuing legal
 4  education on the bankruptcy -- in bankruptcy?
 5      A.   Yes.
 6      Q.   Okay.  When did that happen?
 7      A.   So I participated in a CLE with Judge Jones
 8  and Judge Lopez that was on litigators appearing in
 9  Bankruptcy Court to our discussion.  It was other
10  litigators as well.  There was a gentleman from Morgan
11  Lewis, I believe, and me, as the litigators.  That was
12  an HBA.  That's our Houston Bar Association CLE.
13      Q.   Okay.  Part of that CLE, did it include an
14  ethics component like many CLEs do?
15      A.   I don't know what the accreditation was.
16      Q.   Okay.  So what was Judge Jones' participation?
17      A.   He was a panelist.
18      Q.   Okay.  Along with yourself and some other
19  folks.
20      A.   Yeah.  Along with me, Judge Lopez, and other
21  litigators who have been in Bankruptcy Court.
22      Q.   Have you ever been in Jones' -- former Judge
23  Jones' chambers?
24      A.   No, not that I recall.
25      Q.   Okay.  Subsequent to October of 2023 when you
```

 1  10:50.
 2  BY MR. PENA:
 3      Q.   All right.  Ms. Rotman, are you ready to
 4  continue?
 5      A.   I'm ready.
 6      Q.   All right.  We were about to, as a group, in
 7  terms of moving through this -- obviously, there's
 8  going to be some questions about the Van Deelan
 9  communications and letters.  I want to go through that
10  with you.
11           Was the Van Deelan event -- I'll call it the
12  Van Deelan event -- that took place around March 6,
13  2021 the first time that you heard any allegations that
14  was a romantic relationship between Judge Jones and
15  Ms. Freeman?  Was that the first time you've heard
16  that?
17      A.   Yes.
18      Q.   Okay.  You've never heard it on the street or
19  in the office or in the halls of the office or
20  watercooler talk that, you know, there was any sort of
21  relationship, other than a professional relationship,
22  between Judge Jones and Ms. Freeman?
23      A.   Never.
24      Q.   All right.  All right.  So let's talk about
25  this.  And I guess it would be easier for me to go to

 1  that I recall.

 2      Q.   Do you know if this email was ever forwarded

 3  to Josh Sussberg?

 4      A.   I don't know.

 5      Q.   Did you ever forward it to Josh Sussberg?

 6      A.   Not that I recall, but I don't know.

 7      Q.   Okay.  Do you recall having a conversation

 8  with Josh Sussberg during that weekend or as you were

 9  preparing for the hearing?

10      A.   You're referring to the hearing on the Motion

11  to Recuse?

12      Q.   Yeah.  And we'll get there to that document in

13  a few minutes.

14      A.   Sure.

15      Q.   Yeah.

16      A.   Yes.  I did discuss the Motion to Recuse

17  hearing with Josh prior to the hearing.

18      Q.   Okay.  As a result of those conversations, did

19  you draw any conclusions with regards to the veracity

20  of the allegations in the -- we'll call it the Van

21  Deelan communication?

22      A.   With -- discussions with Josh?

23      Q.   Yes.

24      A.   No.

25      Q.   Okay.  Did there come a time when

```
 1      Q.   Go to the second page, Item No. 6, down at the
 2  bottom --
 3      A.   Yeah.
 4      Q.   -- and let me read it into the record.
 5           I believe it says, "The Van Deelan
 6  communications contain defamatory statements and should
 7  be sealed pursuant to 11 USC Section 107(b)(2)."
 8           Do you see that.
 9      A.   Yes, you read that correctly.
10      Q.   Okay.  So what communications would have been
11  considered to be defamatory in that communication -- in
12  the Van Deelan communication, specifically?
13      A.   I mean, I see it as a defined term in the
14  sentence before --
15      Q.   Okay.
16      A.   -- where it points to counsel from McDermott
17  receiving several communications from Mr. Van Deelan
18  that had become increasingly antagonistic.  And that's
19  what they're defining as Van Deelan communications.  I
20  certainly understood it to include the anonymous letter
21  that Mr. Van Deelan said he received in the mail.
22      Q.   Okay.  And we'll get there in just a second.
23  All right.
24           This matter was actually pending in front of
25  Judge Jones, and Judge Isgur ended up sitting on the
```

1  hearing -- sitting -- handling the hearing on the
2  recusal; is that correct?
3      A.   That's correct.
4      Q.   And he sat in on the Motion to Seal -- the
5  emergency Motion to Seal; is that correct?
6      A.   Are you saying Judge Isgur sat in on the
7  emergency Motion to Seal?
8      Q.   Yeah.  Actually sat.  Was the one considering
9  the emergency Motion to Seal.  Do you recall it that
10 way?
11     A.   I actually -- I recall that it was sealed.  I
12 actually don't recall who -- which Court ordered that.
13     Q.   Okay.  Now, in this particular case, there was
14 a hearing that took place.  Did you appear virtually or
15 in person, if you recall?
16     A.   Yeah.  So I believe I must have been virtual.
17 I don't have a specific recollection, but I think it
18 was virtual given the time period of COVID.
19     Q.   Okay.  Do you know whether Matt Cavenaugh
20 appeared at that hearing?
21     A.   I believe he also -- I think he was also
22 participating.  I don't know if he made an appearance.
23     Q.   Okay.  Yeah.  And, again, I'm just relying on
24 the record.  I didn't see anywhere where he made an
25 appearance.  Do you recall him being part of that

 1  hearing?

 2      A.   I don't think he said anything at the hearing,

 3  so in that sense, he wasn't a part of it.  I think

 4  during those days of, you know, all these hearings by

 5  Zoom, he participated in the hearing the same way, you

 6  know, some of the other lawyers are participating

 7  today, but you're the one asking questions.

 8      Q.   Okay.  All right.  So you -- based on what you

 9  recall, you think that he was on some sort of remote

10  access, but didn't --

11      A.   That's my recollection.

12      Q.   Okay.  Now, that particular hearing, when it

13  took place, you took the lead on that.  Why was that?

14      A.   Because it was a Motion to Recuse that had

15  been filed by Mr. Van Deelan.  So this is sort of our

16  quintessential, there's now a dispute within the

17  context of an adversary proceeding that had been -- or

18  with respect to a case that had been removed to the

19  Bankruptcy Court.  And so since it's a dispute, I will

20  take the lead in anticipation of there being, you know,

21  the need to make an evidentiary record as the

22  litigator.

23      Q.   Okay.  And even though you have local counsel,

24  you would take the lead on matters that affected your

25  client in terms of trial work?  I'm trying to

 1  understand that.  I mean, you have local counsel.  Why
 2  didn't you just use local bankruptcy counsel to take
 3  the lead on that?
 4      A.   I think it was -- again, just kind of the way
 5  we think of this is, if there's a dispute that's
 6  happening before the Bankruptcy Court where there's
 7  going to be evidence or potentially evidentiary
 8  objections, Kirkland litigators take the lead on that.
 9      Q.   Now, I don't know how to characterize this
10  other than what it is.  This looks like a bombshell
11  communication.  When was it -- the first time that you
12  saw the actual letter?  Was that at the hearing or
13  after the hearing or before the hearing?
14      A.   I believe it was before the hearing.
15      Q.   Okay.  Who provided it to you?  Was that
16  Cavenaugh -- Mr. Cavenaugh or was it Mr. Van Deelan or
17  how did you come in possession of it?
18      A.   I know for sure that Mr. Van Deelan forwarded
19  to me.
20      Q.   Okay.  Directly?
21      A.   I believe so, yes.
22      Q.   Okay.  In that communication, did he also
23  forward it to Mr. Cavenaugh?
24      A.   I believe so.  I want to say the exact email,
25  but I believe he sent it to both of us.  I know for

 1 | sure he sent it to me.
 2 |     Q.   Is that one of the communications that had,
 3 | not just the letter, but also the envelope that had a
 4 | date stamp on it, I think, of March 3rd?  Is that the
 5 | communication that you're talking about?  Does that
 6 | sound about right?
 7 |     A.   I'm not sure.  It could be because I don't
 8 | know how else -- I remember seeing the envelope, and
 9 | I'm not sure how else I would've gotten the envelope.
10 | Although actually, was it attached to the Motion to
11 | Seal.  Oh, no.  Okay.  So --
12 |     Q.   I'll just save you little bit of time.  It's
13 | attached to a communication to Matt Cavenaugh.  And I
14 | don't see your name on it, so I'm assuming you either
15 | got it from Cavenaugh or Van Deelan sent it to you on a
16 | different email train -- communication.  So I'm asking
17 | if you remember.
18 |     A.   I know for sure that Van Deelan sent it to me
19 | directly.
20 |     Q.   Okay.  Once you got that, the communication
21 | and the envelope, did you contact anybody there at
22 | Kirkland and Ellis, for example, conflicts counsel,
23 | general counsel?  I mean, this seems like a pretty
24 | heavy allegation with regards to potential conflict
25 | between an individual that represents some of your

 1  clients and the judge that you're appearing in.
 2          Did you do anything like that?
 3      A.   I forwarded it on to our general counsel's
 4  office, and I'll explain why.
 5      Q.   Okay.  Go ahead.
 6      A.    It's because it came from Mr. Van Deelan.  And
 7  we had been dealing with Mr. Van Deelan in the context
 8  of the McDermott bankruptcy for, you know, now, at this
 9  point, well over a year.  And he was a very difficult
10  person who had caused a lot of consternation during the
11  McDermott bankruptcy and afterwards.  We knew him to be
12  a serial litigant who -- other courts had found him to
13  fabricate evidence.  And he was, respectfully, an
14  unstable person.
15          And so my primary concern and why I
16  forwarded this to our general counsel is, to me,
17  this was like, a Van Deelan special, that here now,
18  he said, I received this anonymous letter.  I look
19  at the letter, and it seems like -- again,
20  respectfully -- something that Mr. Van Deelan
21  himself would write because we had seen a lot of
22  things that he had written in connection with
23  McDermott and other litigation.  That was my
24  concern.
25      Q.   All right.  So let me talk to you a little bit

1  about that.  And, again, this isn't a -- this is not

2  gotcha.  I'm not gonna do that to you.

3      A.   Thank you.

4      Q.   But I'll -- but there is some information in

5  here that just seems like it would be outside of

6  Mr. Van Deelan's expertise.  So if you could take a

7  look at what's been marked as Exhibit No. 5, I think it

8  in front of the screen.

9          (Exhibit 5 marked for identification.)

10  BY MR. PENA:

11     Q.   Is that in front of you?

12     A.   Yep, I have it here.

13     Q.   Yeah.  So let's -- let's go through that.

14  So -- and I understand your concern and your previous

15  experience with him, but how would Mr. Van Deelan had

16  known that Ms. Freeman worked as Judge -- former Judge

17  Jones' clerk for six years?

18     A.   I don't know.  He could've looked at LinkedIn.

19  I would say he's a very resourceful person.  You know,

20  he's not a lawyer, but he was routinely filing things

21  in our case and citing to -- in the McDermott case,

22  and, you know, citing to different provisions of The

23  Bankruptcy Code and the Federal Rules of Evidence.

24          So he was resourceful, but I don't know.  I

25  don't know that this was actually something that he

 1  wrote.  I don't know that.  I just know that he
 2  was -- had been very difficult, and so this was
 3  something that he sent, and that caused me concern.
 4      Q.   Okay.  So just before or at the time of the
 5  hearing, you have this document.  This represents
 6  Exhibit No. 5, I believe.  And you represent the
 7  interest of your client at the Motion to Seal hearing.
 8  And I've looked at a rough transcript of that.
 9          Judge Isgur then issued an opinion.  Does --
10  did he issuing a ruling from the bench at that hearing,
11  or did he subsequently issue an order?
12      A.   Are you talking about a hearing on the Motion
13  to Seal?
14      Q.   Yes, on the Motion to Seal.
15      A.   Gosh.  I'm sorry.  I don't remember a hearing
16  on the Motion to Seal.
17      Q.   Do you remember an order being issued by Judge
18  Jones months later on the Motion to Seal?
19      A.   I -- I know that it was sealed.  I know that
20  Jackson Walker filed a Motion to Seal in which they
21  said that the Van Deelan communications were
22  defamatory, so they were false.  And I know they were
23  sealed.  I do not recall which judge issued that order
24  or when.
25      Q.   Did you ever attempt to talk to Elizabeth

 1 | Freeman about the allegations in this communication?
 2 |     A.    I did not.
 3 |     Q.    By the time that the Van Deelan communication
 4 | took place in March -- around March 6th or 7th of
 5 | 2021, you had already worked cases with Ms. Freeman; is
 6 | that correct -- or worked on cases with Ms. Freeman
 7 | then?
 8 |     A.    Yes, that's -- that's correct.
 9 |     Q.    Okay.  What sort of relationship did you have
10 | up until that point?
11 |     A.    I mean a professional relationship like I
12 | would have with, you know, local counsel that was
13 | working with us on a case.
14 |     Q.    Okay.  Do you -- did you or anybody at
15 | Kirkland and Ellis do anything to inquire about the
16 | veracity of the allegations in the communication prior
17 | to the hearing on the emergency Motion to Seal?
18 |     A.    I had a conversation with Matt Cavenaugh about
19 | the communication over that weekend.  And Matt told me
20 | that this was new to him and that they were looking
21 | into it.
22 |     Q.    Okay.
23 |     A.    (Zoom audio disruption) -- said to be Jackson
24 | Walker, and then, Jackson Walker filed the Motion to
25 | Seal where they characterized the communication as

 1 | defamatory.  So I understood that to be their position
 2 | with respect to the communication was that it was
 3 | defamatory, right, that it was false.
 4 |     Q.   And in that's why you took the position you
 5 | did to seek to seal the communication; correct?
 6 |     A.   Right.  So it was Jackson Walker that filed
 7 | the Motion to Seal, but that was why I believed they
 8 | took that position, which seemed like the -- I
 9 | understood, again, given context with Mr. Van Deelan
10 | being -- you know, kind of saying things throughout our
11 | year-and-a-half of experience with him that were
12 | unreliable -- I understood why.
13 |         And the nature of the allegations, right?
14 | They're pretty salacious allegations, and so I
15 | understood why they would want it to be sealed.
16 |     Q.   Okay.  Did you or anybody at Kirkland and
17 | Ellis subsequent to the hearing follow up with regards
18 | to investigating the veracity of that letter?
19 |     A.   I -- not that I know of because basically at
20 | that point the, you know, state of play was, Jackson
21 | Walker had filed the Motion to Seal saying that it was
22 | defamatory.  We had a hearing before -- Judge Jones
23 | didn't participate in the hearing, but didn't
24 | acknowledge that anything with respect to this -- what
25 | you're calling the Van Deelan communication was true.

1            And then we had a hearing before Judge
2   Isgur.  And at that hearing, you know, he gave
3   Mr. Van Deelan an opportunity to prove up the
4   authenticity of the letter which he was unable to
5   do.  And so the Motion to Recuse was ultimately
6   denied.  And so to me that was the end of it.
7        Q.   In your mind --
8        A.   Although Mr. Van Deelan then continued to
9   appeal and appeal and appeal, but that was sort of the
10  end of the inquiry.
11       Q.   Okay.  In your mind, when this case got
12  referred or this matter got referred from Judge Jones
13  to Judge Isgur, did you assume that Judge Jones or
14  Judge Isgur had had some sort of communication about
15  the veracity of the letter?
16       A.   I -- I honestly don't know if I assumed one
17  way or the other.
18       Q.   Were you ever made aware or are you aware of
19  this communication and how it got into Judge Jones'
20  hands, whether it was delivered by anybody at Jackson
21  Walker or Kirkland and Ellis to Chambers?
22       A.   Gosh.  I don't know -- I don't think we --
23  Kirkland delivered it to Chambers?  I guess I --
24       Q.   No.  I'm not saying that.
25            Are you aware of anybody having delivered it

1  either from Kirkland and Ellis or Jackson Walker to
2  Chambers?
3      A.   I'm not aware.
4      Q.   Okay.  Do you know if this letter was sent up
5  to the conflicts committee at Kirkland and Ellis?
6      A.   I don't know.
7      Q.   Do you know what steps general counsel took to
8  ascertain the veracity of the allegations of a conflict
9  of interest in this letter?
10     A.   I don't know specifically, but I do know that
11 the letter was making allegations about Jackson Walker,
12 and Jackson Walker filed a Motion to Seal in which they
13 characterized the communication as defamatory.  So to
14 me, that meant that their position, after looking into
15 it, as Mr. Cavenaugh said he was going to do, was that
16 the allegations were false.
17     Q.   So you're assumption was that they -- since it
18 involved one of their lawyers, that they would do the
19 investigation or look into it as to the truth and
20 veracity of the letter.  Is that what you're saying?
21 You would've expected them to do that?
22     A.   Yes.  And Matt Cavenaugh said that's what they
23 were doing.  So, yes.
24     Q.   Okay.  Now, that whole series of events took
25 place in early March.  Were you ever aware of Jackson

```
 1       Q.   Are you there on 263?  Do you have that in
 2  front of you?
 3       A.   I'm with you, yes.
 4       Q.   Okay.  Do you -- do you know what Katerra
 5  is -- Katerra Inc, that case?
 6       A.   I'm not familiar with Katerra, no.
 7       Q.   Okay.  Do you know if that's a Kirkland and
 8  Ellis case?
 9       A.   I only know because, now, I'm looking at this
10  document, and there's a resolution of the board where
11  Kirkland is retained --
12       Q.   Okay.
13       A.   -- as general bankruptcy counsel.
14       Q.   All right.  And it's similar language to what
15  we already discussed in the other cases.  Is that a
16  fair statement?
17       A.   Similar language in terms of the retention?
18       Q.   Yeah.  In the terms of the retention, the
19  scope of employment.
20       A.   Correct.  The law firm of Kirkland and Ellis
21  as general bankruptcy counsel.
22       Q.   Yeah.  And in this case and June 6th of 2021,
23  Matt Cavenaugh was acting as counsel for the debtor;
24  correct?
25       A.   Correct.
```

1      Q.   All right.  And were you ever made aware of an
2  opinion letter from a firm called Holland and Knight
3  around September of 2021 that addressed the Judge's
4  obligation to disclose and make a disclosure
5  independent of the lawyer's obligation?
6      A.   No.
7      Q.   Was that -- and when you say, no, had you ever
8  heard such an opinion existed -- or an opinion letter
9  existed?
10      A.   No.
11      Q.   Is this the first time you've heard about that
12  opinion letter?
13      A.   I believe so.
14      Q.   Did Matt Cavenaugh ever make any sort of
15  representation to you as to the scope or the results of
16  any investigation that Jackson Walker did into the
17  allegations of a inappropriate intimate financial or
18  cohabitation relationship between Ms. Freeman and Judge
19  Jones?
20      A.   Yes.  In the sense that Jackson Walker filed a
21  Motion to Seal in which they characterized the Van
22  Deelan communication as defamatory.  So that, to me,
23  was their position on those allegations, which, you
24  know, were alleging a relationship between Judge Jones
25  and Liz Freeman.

1     Q.   Okay.  But subsequent to that, were you ever
2  made aware of by Mr. Cavenaugh or anybody at Jackson
3  Walker as to the results of their investigation as to
4  the veracity of those allegations was after the
5  hearing?
6     A.   No.
7     Q.   Okay.  Subsequent -- or in the spring of 2022,
8  did Mr. Cavenaugh or anybody from Jackson Walker tell
9  you or anybody that you know at Kirkland and Ellis
10 about a meeting that took place with Ms. Freeman where
11 she confirmed that, in fact, there was an ongoing
12 relationship with Judge Jones?
13    A.   No.
14    Q.   Were you ever made aware that there might be a
15 relationship having to do with a right of survivorship
16 in some contexts between Ms. Freeman and Judge Jones?
17    A.   No.
18    Q.   Okay.  Did Mr. Cavenaugh or anybody from
19 Jackson Walker ever tell you about an opinion letter
20 that they received from the same firm, Holland and
21 Knight, discussing the attorney's duty to make
22 disclosure of an improper relationship between one of
23 their partners, Ms. Freeman, and a judge in whom --
24 before whom she was appearing?
25    A.   No.

1     Q.   Did Mr. Cavenaugh or anybody at Jackson Walker
2  ever tell you about a meeting or a confrontation,
3  whatever you want to call it, between Mr. Cavenaugh and
4  Judge Jones where Judge Jones provided acceptable
5  language in terms of disclosure to Mr. Cavenaugh in or
6  around October or November of 2022?
7     A.   No.
8     Q.   Were you privy to or did you know about the
9  agreement that Jackson Walker had with Elizabeth
10  Freeman regarding her departure?  I think it was called
11  a Confidential Withdrawal Agreement.  Do you know what
12  the terms were?
13     A.   No.  Never seen it.  Never heard of it.
14     Q.   Has anybody ever advised you or anybody at
15  Jackson -- at Kirkland and Ellis, that you know of,
16  that one of the provisions called for a confidentiality
17  of any communications associated with the relationship
18  that Ms. Freeman had with Judge Jones?  Did you know
19  about that?
20     A.   No.
21     Q.   Did anybody ever -- did anybody ever advise
22  you of that?
23     A.   No.  I don't think I've ever heard of whatever
24  that document is that you're referring to until right
25  now.

1      Q.   And, again, we talked a little bit about this,
2  but I want confirmation.  Subsequent to her leaving in
3  December of 2022, leaving Jackson Walker, were you ever
4  made aware that Jackson Walker was attempting to
5  continue its relationship with Liz Freeman regarding
6  cases associated with Kirkland and Ellis in -- as
7  special counsel or conflicts counsel?
8      A.   No.  I've never heard that.
9           Mr. Pena, would you --
10     Q.   Yes?
11     A.   -- can you take down the document, or do we
12  need to keep it up?
13     Q.   I apologize.  We're --
14     A.   It's fine.  It's just because it's easier if I
15  look directly at you.  I've --
16     Q.   Yeah.  It is -- Ms. Rotman, I agree a thousand
17  percent.  I'm not a big fan of this.  So I'd rather be
18  in a room with you and make it a lot easier.  I
19  understand.  But I think we've just got a few more
20  documents I want to go through.  And it will be easier
21  just to keep it up for -- (Simultaneous speaking.)
22     A.   Okay.
23     Q.   -- with anybody elses.  All right.
24
25

1   Girlfriend Cash In."

2          Do you see that?

3      A.   I see that.

4      Q.   Have you ever seen this article before?  Have

5   you read it before?

6      A.   I have.

7      Q.   When did you read it?  Do you remember?

8      A.   Probably around the time that it was published

9   so, you know, sometime in June of 2024.

10     Q.   Okay.  What was your reaction -- your guttural

11  reaction when you read that?

12     A.   It had a lot of inaccuracies with respect to

13  Kirkland.

14     Q.   Okay.  Well, let's go through some of them.

15  All right.  Let me highlight this section where -- I'm

16  going to read a paragraph in the reported story marked

17  as Exhibit 265.

18          "Certain lawyers at Kirkland had already heard

19  talk that Jones and Freeman were lovers and some spoke

20  about it with other lawyers, according to people

21  familiar with conversations."

22          Do you know of any Kirkland lawyers that knew

23  or had heard about the romantic relationship between

24  Jones and Freeman?

25     A.   No.  Not before the October 2023 confirmation

```
 1  from Judge Jones.
 2      Q.   Okay.  We've gone over this a little bit, but
 3  I need to ask if you have any reason to quarrel with
 4  us.  This paragraph.  I'm going to read into the
 5  record.
 6           "Jackson Walker didn't publicly disclose what
 7  it learned about Jones/Freeman relationship at the
 8  time.  Kirkland also kept quiet about the allegation.
 9  Jones remained Houston's chief bankruptcy Judge, and
10  Freeman continued to work on Kirkland cases involving
11  Jones."
12           Where it says, "Kirkland also kept quiet about
13  the allegation," did Kirkland know anything subsequent
14  to March of 2021 about the nature of the relationship
15  between Judge Jones -- Judge -- yes, Judge Jones and
16  Elizabeth Freeman?
17      A.   What Kirkland knew is that Jackson Walker had
18  filed in Motion to Seal in which they characterized a
19  communication about the alleged relationship as
20  defamatory.  That's all we knew.
21      Q.   Okay.  And you -- and Kirkland and Ellis, as
22  far as you know, was not made -- was not made aware of
23  the results of investigation or interviews with
24  Ms. Freeman subsequent to that.  Is that a fair
25  statement?
```

```
 1   STATE OF TEXAS        )

 2   COUNTY OF DENTON      ) ss.

 3            I hereby certify that the witness in the

 4   foregoing deposition, ANNA G. ROTMAN, was by me duly

 5   sworn to testify to the truth, the whole truth, and

 6   nothing but the truth, in the within-entitled cause;

 7   that said deposition was taken at the time and place

 8   herein named; that the deposition is a true record of

 9   the witness's testimony as reported by me, a duly

10   certified shorthand reporter and a disinterested

11   person, and was thereafter transcribed into typewriting

12   by computer.

13            I further certify that I am not interested in

14   the outcome of the said action, nor connected with, nor

15   related to any of the parties in said action, nor to

16   their respective counsel.

17            IN WITNESS WHEREOF, I have hereunto set my

18   hand this 23rd day of September, 2024.

19   Reading and signing was:

20   _x_ requested ___ waived ___ not requested

21

22

23

24            CRYSTAL WALKER, CSR NO. 12376

25            STATE OF TEXAS
```

In Re: PROFESSIONAL FEE MATTERS CONCERNING THE JACKSON WALKER LAW FIRM, DEBTOR.

Case No: 23-00645 (EVR)

Witness: ANNA G. ROTMAN

Date of Deposition: FRIDAY, SEPTEMBER 20, 2024

```
┌─────────────────────┐
│ R E C E I V E D     │
│   JAN 17 2025       │
│ BEHMKE REPORTING AND│
│ VIDEO SERVICES, INC.│
└─────────────────────┘
```

Control Number: 43351A

Reporter: CRYSTAL WALKER, CSR 12376

I HAVE READ THE DEPOSITION AS REQUESTED.  PLEASE NOTE THE FOLLOWING:

_____  No changes need to be made to the transcript.

___X___  Changes listed below.

_Anna G. Rotman_                          _12/18/24_
WITNESS SIGNATURE                          DATE SIGNED

Note:       Please check the appropriate column for add (+) or delete (-).  If you wish to <u>add</u> anything to the deposition, use the <u>exact</u> words you want to add.  If you wish to <u>delete</u> anything from the deposition, please use the <u>exact</u> words

Page   Line   +  -
- 16:7  Change <EXAMINATION BY MR. HUESTON> to <EXAMINATION BY MR. PENA>
- 31:25-32:1  Change <Kirkland and errors> to <Kirkland and Ellis>
- 34:5  Change <structuring services> to <restructuring services>
- 42:8  Change <Mid-States> to <Midstates>
- 53:14  Change <the Mid-States case> to <the Midstates case>
- 57:1-3  Change <Meet Fest> to <Meat Fest>
- 57:12  Change <Alex Partners> to <AlixPartners>
- 65:15  Change <when were dealing with> to <when we're dealing with>
- 66:25-67:1  Change <Here we get to the top part> to <Here we get to the tough part>
- 68:9, then passim  Change <Van Deelan> to <Van Deelen>

BEHMKE REPORTING AND VIDEO SERVICES, INC.
455 MARKET STREET   SUITE 1800   SAN FRANCISCO, CA   94105
415.597.5600 tel   800.335.3376 toll free   415.597.5606 fax   behmke.com

**Rotman Deposition Errata, Continued**

- 76:7-13  Change to link to the correct Exhibit 138 (motion to seal)
- 97:20  Change <is her outside counsel> to <is our outside counsel>
- 101:2, 105:11, 105:20  Change <Jones' Energy> to <Jones Energy>
- 114:11  Change <Exhibit 60 marked for identification> to <Exhibit 260 marked for identification> and add link
- 115:25  Change <Houston including which many cases in which K and E> to <Houston, including many cases in which K&E>
- 116:4-6  Change <Smile Direct Club, Center for Autism and Related Disorders, Genesiscare, Envision, Benefytt, Venator, and Avaya> to <SmileDirectClub, Center for Autism and Related Disorders, GenesisCare, Envision, Benefytt, Venator and Avaya>



RECEIVED
JAN 17 2025
BEHMKE REPORTING AND
VIDEO SERVICES, INC.